**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

LEROY PERNELL, et al.,

     *Plaintiffs*,

v.

                                    Case No.: 4:22-cv-304

FLORIDA BOARD OF GOVERNORS OF
THE STATE UNIVERSITY SYSTEM, et al.,

     *Defendants*.

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Jerry Edwards
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION OF FLORIDA
Fla. Bar No. 1003437
933 Lee Road, Suite 102
Orlando, FL 32810
Tel.: (786) 363-1107
jedwards@aclufl.org

Daniel B. Tilley
Katherine H. Blankenship
Caroline McNamara
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION OF FLORIDA

*Counsel for Plaintiffs*

Emerson Sykes
Leah Watson
Sarah Hinger
Laura Moraff
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION

Jason Leckerman
Charles Tobin
Jacqueline Mabatah
Isabella Salomão Nascimento
BALLARD SPAHER LLP

Morenike Fajana
Jin Hee Lee
Santino Coleman
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

INTRODUCTION .................................................................................... 1

FACTUAL BACKGROUND ...................................................................... 3

ARGUMENT ......................................................................................... 17

I.     Plaintiffs Are Likely to Succeed on the Merits of Their Claims .................. 17

       A.     Section 2(4)(a) of the Stop W.O.K.E. Act is a viewpoint-based
              restriction on academic freedom that violates the First
              Amendment. ........................................................................ 17

              1.     The Stop W.O.K.E. Act is a viewpoint-based restriction
                     on instructors' speech in higher education. ............................ 20

              2.     The Stop W.O.K.E. Act is a viewpoint-based restriction
                     on students' right to receive information. ............................... 27

              3.     The Stop W.O.K.E. Act fails strict scrutiny. ........................... 28

       B.     The Stop W.O.K.E. Act is void for vagueness .................................. 29

II.    Absent an Injunction, Plaintiffs Will Suffer Irreparable Injury. ................... 33

III.   The Balance of Equities Favors Granting a Preliminary Injunction. ............ 35

IV.    An Injunction Would Serve the Public Interest ........................................ 35

CONCLUSION ...................................................................................... 37

CERTIFICATE OF COMPLIANCE ............................................................. 39

# TABLE OF AUTHORITIES

## <u>CASES</u>

*Hill v. Colorado*,
    530 U.S. 703 (2000)............................................................................30

*Arce v. Douglas*,
    793 F.3d 968 (9th Cir. 2015)............................................................27

*Ashcroft v. ACLU*,
    542 U.S. 656 (2004) ........................................................................29

*Ashton v. Kentucky*,
    384 U.S. 195 (1966) ........................................................................29

*Barrett v. Walker Cnty. Sch. Dist.*,
    872 F.3d 1209 (11th Cir. 2017)........................................................33

*Bazaar v. Fortune*,
    476 F.2d 570 (5th Cir.), *modified on reh'g,* 489 F.2d 225 (5th Cir. 1973).........19

*BERT v. O'Connor*,
    5:21-cv-01022-G (W.D. Okla. 2021) ................................................15

*Bonner v. City of Prichard*,
    661 F.2d 1206 (11th Cir. 1981)........................................................19

*Charles H. Wesley Educ. Found., Inc. v. Cox*,
    408 F.3d 1349 (11th Cir. 2005)........................................................17

*Democratic Exec. Comm. of Fla. v. Lee*,
    915 F.3d 1312 (11th Cir. 2019)........................................................35

*Elrod v. Burns*,
    427 U.S. 347 (1976) ........................................................................34

*Gay Lesbian Bisexual All. v. Pryor*,
    110 F.3d 1543 (11th Cir. 1997)........................................................18

*Holloman ex rel. Holloman v. Harland,*
   370 F.3d 1252 (11th Cir. 2004) ........................................................................17

*Honeyfund.com v. DeSantis,*
   4:22-cv-00227-MW-MAF, 2022 WL 3486962 (N.D. Fla. Aug. 18, 2022)
   .................................................................................................. 30, 31, 32

*In re Dinnan,*
   661 F.2d 426 (5th Cir. 1981) ............................................................................18

*Keyishian v. Bd. of Regents of Univ. of State of N. Y.,*
   385 U.S. 589 (1967) ...................................................... 24, 27, 30, 36

*KH Outdoor, LLC v. City of Trussville,*
   458 F.3d 1261 (11th Cir. 2006) ................................................... 34, 35

*Mejia v. Edelbut,*
   1:21-cv-01077 (D.N.H. 2021) ..........................................................................15

*Minnesota Voters Alliance v. Mansky,*
   138 S.Ct. 1876 (2018) .......................................................................................29

*Regents of Univ. of Cal. v. Bakke,*
   438 U.S. 265 (1978) ..........................................................................................18

*Reno v. ACLU,*
   521 U.S. 844 (1997) ..........................................................................................29

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
   141 S. Ct. 63 (2020) ..........................................................................................34

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
   515 U.S. 819 (1995) .................................................................................. passim

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump,*
   508 F. Supp. 3d 521 (N.D. Cal. 2020)........................................... 15, 30

*Siegel v. LePore,*
   234 F.3d 1163 (11th Cir. 2000) .................................................... 17, 34

*Speech First, Inc. v. Cartwright,*
    32 F.4th 1110 (11th Cir. 2022)..................................................... passim

*Stanley v. Georgia,*
    394 U.S. 557 (1969). ..........................................................................27

*Sweezy v. New Hampshire,*
    354 U.S. 234 (1957) .......................................................... 21, 26, 36

*Texas v. Johnson,*
    491 U.S. 397 (1989) ...........................................................................18

*Transcon. Gas Pipe Line Co. v. 6.04 Acres,*
    910 F.3d 1130 (11th Cir. 2018) .........................................................36

*United States v. Associated Press,*
    52 F. Supp. 362 (S.D.N.Y. 1943) ......................................................27

*Whitney v. California,*
    274 U.S. 357, 377 (1927) ..................................................................18

*Wieman v. Updegraff,*
    344 U.S. 183 (1952) ...........................................................................26

*Wollschlaeger v. Governor, Fla.,*
    848 F.3d 1293 (11th Cir. 2017) .........................................................30

## **STATUTES**

2022 Fla. Sess. Law Serv. Ch. 2022-154 ......................................................8

Fla. Stat. § 1000.05 .................................................................. passim

Fla. Stat. § 1001.92(5)........................................................................8

## **OTHER AUTHORITIES**

*10.005, Prohibition of Discrimination in University Training or Instruction,* Bd. of
    Governors, State Univ. Sys. of Fla. (proposed July 1, 2022)................9

*2/1/22 House State Affairs Committee*, The Florida Channel (Feb. 1, 2022),.........16

*2/8/22 House Education and Employment Committee*, The Florida Channel
  (Feb. 8, 2022)........................................................................16

Anna Wilder, *Professors in Florida are Feeling the Chill from DeSantis'
  Education Legislation*, The Miami Herald (Aug. 10, 2022) ...............................34

Chantal Da Silva, *Democrats Determined to See Roe v. Wade Overturned Face
  Backlash*, Newsweek (Jan. 3, 2020).......................................................5

*Civil Discourse Final Report*, Bd. of Governors, State Univ. Sys. of Fla. (2022)....4

Danielle Haynes, *Study: Black Americans 3 Times More Likely to be Killed by
  Police*, UPI (June 24, 2020) ...............................................................24

David Kaufman, *The Fight for Fertility Equality*, N.Y. Times (July 22, 2020) .......5

Editorial Board, *University Professors are Afraid. Florida's Crackdown on 'Woke'
  Academia is Already Working*, The Miami Herald (Aug. 10, 2022) ...................10

Jeremy C. Young & Jonathan Friedman, *America's Censored Classrooms*,
  PEN America (Aug. 17, 2022) ...............................................................5

John Blake, *It's Time to Talk About 'Black Privilege'*, CNN (Mar. 31, 2016).......31

Letter from Black Faculty, Fla. State Univ., to Black Students at Fla. State Univ.,
  (June 4, 2020) ............................................................................5

Nate Cohn & Kevin Quealy, *How Public Opinion Has Moved on Black Lives
  Matter*, N.Y. Times (June 10, 2020) ....................................................4

Press Release, Gov. Ron DeSantis, Governor DeSantis Announces Legislative
  Proposal to Stop W.O.K.E. Activism and Critical Race Theory in Schools and
  Corporations (Dec. 15, 2021) ...............................................................16

Ryan Need, *I'm a Professor and the 'Stop Woke' Act Creates a Climate of Fear for
  Florida Educators*, Tampa Bay Times, (Aug. 16, 2022) .....................................10

*Statement of Free Expression*, State Univ. Sys. of Fla. (Apr. 15, 2019)...................4

Univ. of Fla. Black Student Union, *Improve Race Relations Here at the University of Florida*, Change.org ...........................................................................5

*Woke*, Meriam-Webster ...........................................................................1

**INTRODUCTION**

House Bill 7 ("H.B. 7")—also known as the Stop Wrongs to Our Kids and Employees Act ("Stop W.O.K.E. Act")—unconstitutionally bans viewpoints disfavored by the legislature, including those recognizing the existence of systemic inequality and the importance of diversity, equity, and inclusion, from university classrooms. It prohibits Plaintiffs and other instructors—from professors to teaching assistants—from promoting so-called "woke"[1] concepts, while permitting instructors to denounce those same concepts. By extension, the Stop W.O.K.E. Act denies students access to viewpoints on important issues such as privilege, colorblindness, racism, and sexism.

This law plainly violates instructors' and students' First Amendment rights to free speech and access to information, and offends the well-established constitutional principle of academic freedom. Under the guise of prohibiting discrimination, the Act identifies eight officially proscribed viewpoints and expressly prohibits teachers from endorsing them. Teachers are free, however, to condemn those views. This is classic viewpoint discrimination.

---

[1] Merriam-Webster defines the term "woke" as "aware of and actively attentive to important facts and issues (especially issues of racial and social justice)." *Woke*, Meriam-Webster, https://www.merriam-webster.com/dictionary/woke (last visited Aug. 21, 2022).

As a viewpoint-based restriction, the Stop W.O.K.E. Act is presumptively unconstitutional and is subject to strict scrutiny. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829–30 (1995). The Act cannot survive such scrutiny because the government's interest is precisely to silence viewpoints it dislikes—an interest that, far from compelling, is impermissible.

The Stop W.O.K.E. Act is also so vague that instructors lack fair notice regarding how to comply with it, while the state retains unbridled discretion regarding how and when to enforce it. This failure to provide notice is a due process violation in a setting that requires especially clear guidelines because of the chilling effect on speech that the statute's open-ended and ill-defined terms have. Instructors may risk individual lawsuits or punishment including termination, and public colleges and universities risk losing state funding if they are found to have violated the law's vague terms. As a result, university instructors face an impossible, and unconstitutional, choice: either censor their speech, violating the principles of academic freedom and professional ethics, or risk official discipline. Meanwhile, college and graduate students will be denied access to full and open discussion on topics related to race and gender. Instead, their education will be limited to the ideological parameters prescribed by the Florida legislature.

2

As argued below, the Stop W.O.K.E. Act violates Plaintiffs' First and Fourteenth Amendment rights.[2] In view of the imminent and irreparable harm the new law imposes on Plaintiffs and public higher education in Florida more broadly, as instructors and students are about to begin a new school year, the Court should move expeditiously to preliminarily enjoin enforcement of the Stop W.O.K.E. Act's higher education provisions, and any implementing regulations, until this action can be fully adjudicated on the merits.

## FACTUAL BACKGROUND

Florida colleges and universities are tasked with fostering new ideas and challenging prevailing wisdom. *See Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1128 (11th Cir. 2022). They must also reckon with the state's history—the good and the bad—and, at least in recent years, they have done so by encouraging open discussion. In 2019, as conversations about racial injustice spread across the country and Florida campuses, the State University System adopted a "Statement of Free Expression," affirming its commitment to "provide a learning environment

---

[2] Plaintiffs also allege that the Stop W.O.K.E. Act violates the Fourteenth Amendment's Equal Protection Clause because the legislature passed the law with the intent to discriminate based on race. However, Plaintiffs are now moving for a preliminary injunction only on their First Amendment claims and Fourteenth Amendment vagueness claim.

3

where divergent ideas, opinions, and philosophies, new and old, can be rigorously debated and critically evaluated." *Statement of Free Expression*, State Univ. Sys. of Fla. (Apr. 15, 2019).[3] According to the Statement, individuals should remain "free to express any ideas and opinions they wish, even if others may disagree with them or find those ideas and opinions to be offensive or otherwise antithetical to their own worldview . . . . [W]e must not let concerns over civility or respect be used as a reason to silence expression." *Id.*

Today, key matters of public concern—and therefore campus discussion— include race, gender, and sexuality. After the killings of George Floyd, Breonna Taylor, and too many other Black people at the hands of police in 2020, there was a national reckoning with systemic racism past and present.[4] At the same time, the bodily autonomy and equal rights of women and LGBTQ+ people were being

---

[3] *Civil Discourse Final Report*, Bd. of Governors, State Univ. Sys. of Fla. 9 (2022), https://www.flbog.edu/wp-content/uploads/2022/01/SPC_09_Civil-Discourse_Final_CE.pdf.

[4] *See* Nate Cohn & Kevin Quealy, *How Public Opinion Has Moved on Black Lives Matter*, N.Y. Times (June 10, 2020), https://www.nytimes.com/interactive/2020/06/10/upshot/black-lives-matter-attitudes.html.

hotly and publicly debated.[5] Florida's students, instructors, colleges and universities regularly participated in these debates and activism.[6]

However, rather than encourage discussion on these critical issues, a wave of backlash ensued in the form of state legislation seeking to limit challenging discussions on race and gender.[7] As part of this movement, and in direct contradiction of the State University System's stated commitment to free expression, on April 22, 2022, Governor Ron DeSantis signed into law the Stop W.O.K.E. Act. While laws that seek to censor instruction related to race and gender generally raise constitutional concerns, the Stop W.O.K.E. Act is unique in

---

[5] *See, e.g.,* Chantal Da Silva, *Democrats Determined to See Roe v. Wade Overturned Face Backlash*, Newsweek (Jan. 3, 2020), https://www.newsweek.com/democrats-republicans-supreme-court-overturn-roe-v-wade-lipinski-peterson-1480231; David Kaufman, *The Fight for Fertility Equality*, N.Y. Times (July 22, 2020), https://www.nytimes.com/2020/07/22/style/lgbtq-fertility-surrogacy-coverage.html?searchResultPosition=7.

[6] *See e.g.,* Letter from Black Faculty, Fla. State Univ., to Black Students at Fla. State Univ., (June 4, 2020), https://myweb.fsu.edu/jelsner/Letter_to_Black_Students_From_Black_Faculty.pdf; Univ. of Fla. Black Student Union, *Improve Race Relations Here at the University of Florida*, Change.org, https://www.change.org/p/president-w-kent-fuchs-improve-race-relations-here-at-the-university-of-florida (last visited Aug. 21, 2022); President Thrasher Letter Establishing the Task Force (July 23, 2020), https://president.fsu.edu/taskforce/.

[7] Jeremy C. Young & Jonathan Friedman, *America's Censored Classrooms*, PEN America (Aug. 17, 2022), https://pen.org/report/americas-censored-classrooms/.

banning from college and university classrooms certain viewpoints disfavored by a

majority of Florida state legislators.[8]

The Stop W.O.K.E. Act amends Florida Statute 1000.05, which regulates

discrimination against students and employees in the K-20 system.[9] Section 2(4)(a)

of the Stop W.O.K.E. Act provides:

> It shall constitute discrimination on the basis of race,
> color, national origin, or sex under this section to subject
> any student or employee to training or instruction that
> espouses, promotes, advances, inculcates, or compels
> such student or employee to believe any of the following
> concepts:
>
> > 1. Members of one race, color, national origin, or
> > sex are morally superior to members of another
> > race, color, national origin, or sex.
> >
> > 2. A person, by virtue of his or her race, color,
> > national origin, or sex is inherently racist, sexist, or
> > oppressive, whether consciously or unconsciously.
> >
> > 3. A person's moral character or status as either
> > privileged or oppressed is necessarily determined
> > by his or her race, color, national origin, or sex.
> >
> > 4. Members of one race, color, national origin, or
> > sex cannot and should not attempt to treat others
> > without respect to race, color, national origin, or
> > sex.

---

[8] The Stop W.O.K.E. Act also applies to K-12 public education and employers, but
the operative Complaint is limited to the higher education context.

[9] *See* Fla. Stat. § 1000.05.

5. A person, by virtue of his or her race, color, national origin, or sex bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, national origin, or sex.

6. A person, by virtue of his or her race, color, national origin, or sex should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion.

7. A person, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin, or sex.

8. Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, national origin, or sex to oppress members of another race, color, national origin, or sex.

Section 2(4)(b) states that:

Paragraph (a) may not be construed to prohibit discussion of the concepts listed therein as part of a larger course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts.

The Act applies to any person providing instruction at a public higher

education institution in Florida, including, but not limited to, professors, non-

tenured lecturers, teaching assistants, and potentially even undergraduate students leading a class or discussion.

Under Florida Statute 1000.05's framework, an "aggrieved" person can pursue a private right of action, as well as reasonable attorney's fees and costs, for any alleged violation. Fla. Stat. § 1000.05(9). This statute also provides the Florida Board of Governors with rulemaking and implementation authority, including the ability to declare universities and colleges ineligible for competitive state grants for noncompliance, and the Florida Board of Education with authority to "direct the Chief Financial Officer to withhold general revenue funds sufficient to obtain compliance." *See id.* § (7)(g)(2). The Florida Board of Governors has separate statutory authority to declare a "substantiated violation" of Fla. Stat. § 1000.05(4), which causes the institution to "be ineligible to receive performance funding during the next fiscal year following the year in which the violation is substantiated." Fla. Stat. § 1001.92(5).[10]

---

[10] The legislature enacted this statutory subsection in 2022 separately from the Stop W.O.K.E. Act and in direct reference to the operative provision of the Stop W.O.K.E. Act. *See* 2022 Fla. Sess. Law Serv. Ch. 2022-154, § 9 ("Contingent upon HB 7 or similar legislation in the 2022 Regular Session or an extension thereof becoming a law, subsections (5) and (6) of section 1001.92, Florida Statutes, are redesignated as subsections (6) and (7), respectively, and a new subsection (5) is added to that section . . . .").

In furtherance of this specific statutory authority to evaluate potential violations of the Stop W.O.K.E. Act and substantiate them for enforcement, the Florida Board of Governors issued a Notice of Proposed New Regulation [hereinafter BOG 10.005] immediately upon the Stop W.O.K.E. Act becoming law on July 1, 2022.[11] The proposed regulation provides that if the Board of Governors determines that an instructor violated the Act, the Board "shall . . . take prompt action to correct the violation by mandating that the employee(s) responsible for the instruction or training modify it . . . , issu[e] disciplinary measures where appropriate, and remove, by termination if appropriate, the employee(s) if there is a failure or refusal to comply with the mandate." BOG 10.005(3)(c). Put simply, instructors could be fired for expressing viewpoints disfavored by the legislature. The proposed regulation also specifies that if there was a knowing and willful violation of the law, "the university will be ineligible for performance funding for the next fiscal year." *Id.* § (4)(d). While this specific regulation is still pending completion of the rulemaking process, it illustrates the scope of statutory authority given to the Board of Governors to implement the Stop W.O.K.E. Act's viewpoint-based restrictions.

---

[11] *See 10.005, Prohibition of Discrimination in University Training or Instruction*, Bd. of Governors, State Univ. Sys. of Fla. (proposed July 1, 2022) , https://www.flbog.edu/wp-content/uploads/2022/07/10.005NoticeofNewProposedRegulationJune2022-1.pdf.

The Board of Trustees of each university within the State University System of Florida is the public body corporate of the institution. The Boards of Trustees have primary responsibility and ownership of their respective institutions and are endowed with the authority to set university policies within the laws of Florida and the regulations of the Florida Board of Governors. As such, the Boards of Trustees at Plaintiffs' institutions are responsible for ensuring compliance with the Stop W.O.K.E. Act on their campuses.

Instructors in a variety of disciplines, including plaintiffs, fear they will be penalized for, among other things, teaching that implicit bias, privilege, or inequity are real—foundational principles widely accepted and supported by research in their fields.[12] People teaching directly about race and sex in Florida universities, like Plaintiffs LeRoy Pernell, Jennifer Sandoval, Sharon Austin, Dana Thompson Dorsey, Shelley Park, and Marvin Dunn, understand that the law targets coursework like theirs. They cannot impart their expertise and knowledge, including any statements students could construe as endorsing or promoting any of

---

[12] *See, e.g.* Editorial Board, *University Professors are Afraid. Florida's Crackdown on 'Woke' Academia is Already Working*, The Miami Herald (Aug. 10, 2022), https://www.miamiherald.com/opinion/editorials/article264373796.html. *See also,* Ryan Need, *I'm a Professor and the 'Stop Woke' Act Creates a Climate of Fear for Florida Educators*, Tampa Bay Times, (Aug. 16, 2022), https://www.tampabay.com/opinion/2022/08/16/im-a-professor-at-uf-and-the-stop-woke-act-creates-a-climate-of-fear-for-educators-column/.

the eight banned viewpoints, on their areas of study, without risking their professional reputations, employment, and livelihoods.

For example, Plaintiff LeRoy Pernell, a law professor and former Dean at Florida A&M University College of Law ("FAMU Law"), is "concerned that the state government will strip FAMU Law of funding" if he teaches from his casebook, "Combatting Racism in Criminal Procedure." Exhibit 1, Pernell Decl. ¶¶ 22, 29. The premise of the book and related coursework is his view that racism is "embedded" in the American criminal legal system and that "all modern criminal procedure is based on 'race-conscious' decision-making." *Id.* at ¶ 22–23. These viewpoints appear to run afoul of subsection 2(4)(a)(2) of the Stop W.O.K.E. Act, which prohibits teaching that "[a] person, by virtue of his or her race, color, national origin, or sex is inherently racist, sexist, or oppressive, whether consciously or unconsciously." According to Professor Pernell, the Act "directly challenges a foundational notion of [his] pedagogy: that the legal system is not race-neutral." Pernell Decl. ¶ 26. Professor Pernell is especially sensitive to the risks his teaching may bring upon his institution. As a former Dean who worked tirelessly to regain the school's accreditation after it was closed for decades, "[t]he

success of FAMU Law and its continued financial sustainability, which relies on state funding, are particularly important to [him]." *Id.* at ¶ 29.[13]

Likewise, the Stop W.O.K.E. Act impacts the ability of Dr. Thompson Dorsey, a professor at the University of South Florida College of Education, "to teach School Law and Critical Race Studies because the courses and [her] research are directly related to topics prohibited by the Act, namely systemic racism and sexism." Exhibit 2, Thompson Dorsey Decl. ¶ 41. For both of those classes, "students need to be able to discuss the context and implications of such cases as *Brown v. Board of Education* and *Plessy v. Ferguson*." *Id.* at ¶ 44. Dr. Thompson Dorsey "cannot facilitate those discussions without addressing white supremacy." *Id.* By speaking openly and honestly about white supremacy, Dr. Thompson Dorsey worries she may receive complaints from white students who feel "guilt, anguish, or other forms of psychological distress because of actions . . . committed in the past by other members of the same race." Fla. Stat. § 1000.05(2)(4)(a)(7).

Plaintiff Marvin Dunn, professor emeritus of psychology at Florida International University and author of many books on the history of Black people

---

[13] The Florida legislature closed FAMU Law in 1965 in response to students and faculty supporting the Civil Rights movement. Pernell Decl. ¶ 12. Now, in 2022, the school's funding is at risk again because faculty hold views disfavored by the Legislature.

in Florida, fears that his instruction, which includes his personal narrative, puts him at risk under that same provision of the Stop W.O.K.E. Act. Dr. Dunn explains that "[t]elling my story has the potential to make a white person feel sad or 'ashamed' of the conduct of other white people." Exhibit 7, Dunn Decl. ¶ 14. The law forces him to "self-censor when discussing [his] own experiences." *Id.* Dr. Dunn "grew up during segregation when Jim Crow laws were in effect in Florida." *Id.* at ¶ 13. Speaking about his personal history also puts Dr. Dunn at risk of violating subsection 2(4)(b) of the Stop W.O.K.E. Act which requires objectivity, because "one cannot be 'objective' when discussing one's own lived experience." *Id.* at ¶ 14.

The Stop W.O.K.E. Act's vague and viewpoint discriminatory restrictions pose particularly grave risks to untenured faculty. As Declarant Daniel A. Smith, a professor and chair of the University of Florida's Department of Political Science, explains, "[e]ven as Department Chair, there are limits to the protections that I can offer other faculty members, particularly those without tenure." Exhibit 9, Smith Decl. ¶ 12. He worries that "some of the [untenured] faculty that we specifically hired to teach about race, ethnicity, gender, and identity will be inhibited from teaching what they were expressly hired to teach as a result of H.B. 7's restrictions on these very topics, making professional achievement and advancement at UF difficult." *Id.*

Even tenured instructors whose courses are not directly about race or sex are chilled by the law. In all statistics classes taught by Plaintiff Russell Almond, a professor of Measurement and Statistics in Florida State University's College of Education, "it is important that [his] students be aware of the research surrounding race and its effect on educational and other economic outcomes. This includes frank discussions of how past patterns of discriminatory laws and practices affect observed differences between racial groups." Exhibit 6, Almond Decl. ¶ 19. Despite his understanding based on decades of research that it is important to impart these ideas to students, Dr. Almond reasonably fears that this type of discussion could violate the Stop W.O.K.E. Act's prohibition on teaching that a person's "status as privileged or oppressed is necessarily determined by his or her race." Fla. Stat. §1000.005(4)(a)(3).

Students, likewise, are concerned they will no longer learn from a diversity of viewpoints on issues related to race or sex. Plaintiff Johana Dauphin, a student at Florida State University, fears the Stop W.O.K.E. Act will limit her "ability to learn about race-related issues in class, and learn to think critically about those issues through honest, uncensored instruction." Exhibit 8, Dauphin Decl. ¶ 22. Ms. Dauphin is particularly concerned about how subsection 2(4)(a)(8), which prohibits teaching that "colorblindness" can be racist, might impact her education, because as she sees it, "H.B. 7 empowers instructors to ignore race-related issues

14

in class, or even promote the 'virtue' of 'colorblindness.'" *Id.* at ¶ 25. But, as Ms. Dauphin "learned in Florida public schools throughout [her] life, pretending that our society is 'color blind' means ignoring Black perspectives." *Id.* at ¶ 25.

Instructors' and students' fears of censorship are justified not only by the law's text, but also by its legislative provenance and context. The Stop W.O.K.E. Act's list of prohibited concepts originated in former President Trump's Executive Order 13950 ("EO 13950"), which a federal judge partially enjoined on constitutional grounds. *See Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521 (N.D. Cal. 2020) (holding that EO 13950 violated advocacy groups' First Amendment rights because it required them to censor training and speech that was unrelated to government funding, and that EO 13950 was unconstitutionally vague because the plaintiffs had no way of knowing if teaching about unconscious bias, for example, would be a violation).[14]

Florida politicians made clear through public statements that their motivation in passing the law was to suppress what they called "woke"

---

[14] There is ongoing litigation challenging the constitutionality of Oklahoma's H.B. 1775 and New Hampshire's H.B. 2, both of which contain nearly identical lists of "divisive concepts" lifted from EO 13950. *See BERT v. O'Connor*, 5:21-cv-01022-G (W.D. Okla. 2021), and *Mejia v. Edelbut*, 1:21-cv-01077 (D.N.H. 2021).

viewpoints[15]—including viewpoints that systemic inequality, unconscious bias, and privilege are real—from ever entering classrooms, unless the professors express the legislature's viewpoint and condemn the proscribed views. In addition to titling the bill the "Stop W.O.K.E. Act," Governor DeSantis said in his announcement of the bill that became the Act that its purpose was to create a "woke-free state of Florida."[16] Lieutenant Governor Jeanette Nuñez also confirmed that the Stop W.O.K.E. Act would "put an end to wokeness that is permeating our schools and workforce."[17]

---

[15] *See* Press Release, Gov. Ron DeSantis, Governor DeSantis Announces Legislative Proposal to Stop W.O.K.E. Activism and Critical Race Theory in Schools and Corporations (Dec. 15, 2021), https://www.flgov.com/2021/12/15/governor-desantis-announces-legislative-proposal-to-stop-w-o-k-e-activism-and-critical-race-theory-in-schools-and-corporations; *2/1/22 House State Affairs Committee* at 01:01:41.418—01:02:47.944, The Florida Channel (Feb. 1, 2022), https://thefloridachannel.org/videos/2-1-22-house-state-affairs-committee (in which Stop W.O.K.E. Act sponsor Representative Bryan Avila argues that there is no place for discussions of "white privilege," or "systemic racism" in Florida's schools or workplaces); *2/8/22 House Education and Employment Committee* at 00:33:48.470—00:35:14.868, The Florida Channel (Feb. 8, 2022), https://thefloridachannel.org/videos/2-8-22-house-education-employment-committee/ (in which Rep. Avila identifies texts examining white privilege and white supremacy as "absolutely un-American").

[16] Dec. 15, 2021 Press Release, Gov. Ron DeSantis, *supra* note 14.

[17] *Id.*

## ARGUMENT

A preliminary injunction is warranted under Fed R. Civ. P. 65 where Plaintiffs show: "(1) a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant[s] outweighs whatever damage the proposed injunction may cause to the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1354 (11th Cir. 2005) (quoting *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc)). As set forth below, Plaintiffs meet all four prongs of this standard.

### I.     Plaintiffs Are Likely to Succeed on the Merits of Their Claims.

### A.     Section 2(4)(a) of the Stop W.O.K.E. Act is a viewpoint-based restriction on academic freedom that violates the First Amendment.

"One of the most egregious types of First Amendment violations is viewpoint-based discrimination." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1279 (11th Cir. 2004). Viewpoint-based discrimination, a subset of content-based discrimination in which the government prohibits the expression of disfavored views on a subject, is presumptively unconstitutional and subject to strict scrutiny. *Rosenberger*, 515 U.S. at 828; *Speech First*, 32 F.4th at 1126. Indeed, the First Amendment's "bedrock principle" provides that the "government

17

may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). Redress for bad ideas comes through "discussion [of] the falsehood and fallacies" and "the processes of education"—"not enforced silence." *Id.* at 419 (quoting *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring)).

This is particularly true in the context of higher education. "[T]he dangers of viewpoint discrimination are heightened in the university setting." *Speech First*, 32 F.4th at 1127 n. 6 (quoting *Gay Lesbian Bisexual All. v. Pryor*, 110 F.3d 1543, 1550 (11th Cir. 1997)). This is because "[c]olleges and universities serve as the founts of—and the testing grounds for—new ideas." *Id.* at 1128. Thus, "[a]cademic freedom, though not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978); *see also In re Dinnan*, 661 F.2d 426, 430 (5th Cir. 1981) ("Time after time the Supreme Court has upheld academic freedom in the face of government pressure.").

Nearly 50 years ago, this circuit recognized that precedent "leave[s] no room for the view that . . . First Amendment protections should apply with less force on college campuses than in the community at large." *Bazaar v. Fortune*, 476 F.2d

570, 572, 580 (5th Cir.), *modified on reh'g,* 489 F.2d 225 (5th Cir. 1973).[18] The

Stop W.O.K.E. Act violates the First Amendment because it prohibits certain

viewpoints while permitting others, thereby undermining the "historical role of the

University in . . . serving in the vanguard in the fight for freedom of expression and

opinion." *Bazaar*, 476 F.2d at 580.

In *Rosenberger v. Rector & Visitors of Univ. of Virginia*, the Supreme Court

held that a university funding policy violated the First Amendment because it "cast

disapproval on particular viewpoints." 515 U.S. at 836.  There, a student group

followed university procedures to request funding for its newspaper, "*Wide Awake:*

*A Christian Perspective at the University of Virginia.*" *Id.* at 826. Its funding

request was denied based on guidelines prohibiting funding for activities that

"primarily promote[] or manifest[] a particular belie[f] in or about a deity or an

ultimate reality." *Id.* at 825. The Supreme Court explained that that the denial of

funding—and the guidelines themselves—violated the First Amendment, because

they "risk[ed] the suppression of free speech and creative inquiry in one of the vital

centers for the Nation's intellectual life, its college and university campuses." *Id.* at

836.

_____

[18] In *Bonner v. City of Prichard*, the Eleventh Circuit adopted as binding all of the
decisions of the former Fifth Circuit handed down prior to the close of business on
September 30, 1981. 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

19

The Stop W.O.K.E. Act stymies speech and inquiry in much the same way. By prohibiting instruction that "promotes" particular views, the Act—like the *Rosenberger* policy—"effects a sweeping restriction" that covers any "advoca[cy] [of] a philosophic position that rests upon" those views. *See id.* The *Rosenberger* Court even foresaw and dismissed as unconstitutional statutes like the Stop W.O.K.E. Act, stating "[i]f the topic of debate is, for example, racism, then exclusion of [targeted] views on that problem is . . . offensive to the First Amendment . . . ." *Id.* at 831.

To be sure, a state can and must prohibit discrimination in higher education. For example, a professor could claim no First Amendment right to direct disparaging racial slurs at a student. But a state may not, in the guise of fighting discrimination, single out disfavored viewpoints and prohibit their expression or endorsement, taking sides on matters of public controversy. That is precisely what the Stop W.O.K.E. Act does.

### 1.   The Stop W.O.K.E. Act is a viewpoint-based restriction on instructors' speech in higher education.

Section 2(4)(a) of the Stop W.O.K.E. Act identifies eight specific views, and prohibits university instructors from providing "instruction" that "promotes" or "advances" them. The Act permits instruction that denounces the legislature's

forbidden views. The plain text of the law thus expressly takes sides, and discriminates on the basis of viewpoint.

The First Amendment harms inflicted by the Stop W.O.K.E. Act are particularly clear "in the social sciences, where few, if any, principles are accepted as absolutes[,] . . . [and t]eachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). Plaintiffs LeRoy Pernell, Jennifer Sandoval, Dana Thompson Dorsey, Sharon Austin, Shelley Park, and Marvin Dunn, as instructors in social science fields, will therefore be uniquely harmed. But the Act goes further. It also prohibits teaching about scientific studies that reach conclusions disagreeable to the Florida legislature. Researchers typically test a hypothesis by developing a methodology, gathering data, analyzing the data, and considering whether the data compel the conclusion that the hypothesis is true or false. If an instructor believes a study conducted each of those steps soundly, they would logically believe the conclusion and promote its truth to students. Under the Stop W.O.K.E. Act, however, whether an instructor may do so depends on which viewpoint the research supports.

Each of the prohibited concepts is a viewpoint protected by the First Amendment. For example, supported by decades of research, many Florida

21

instructors, including Dr. Austin, teach that unconscious bias is pervasive. *See, e.g.*, Exhibit 3, Austin Decl. ¶¶ 35, 40. Doing so, however, would be prohibited under Section 1000.05(4)(a)(2) of the Act if construed to "advance" the view that "[a] person, by virtue of his or her race, color, national origin, or sex is inherently racist, sexist, or oppressive, whether consciously or unconsciously." Fla. Stat. § 1000.05(4)(a)(2).

Other provisions of the law raise similar concerns. Section 1000.05(4)(a)(7) prohibits instruction that "[a] person, by virtue of his or her race, color, sex or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin, or sex," effectively banning instruction that people bear responsibility for the legacy of historical oppression and its continuing effects. *Id.* § (4)(a)(7). For example, instructors could not teach that past racial injustice is linked to personal experiences today and that people bear responsibility to try to rectify that injustice, but could teach that everyone starts with a blank slate, uninhibited by the legacies of historic discrimination. The Act's selective censorship of one view while permitting the other is textbook viewpoint discrimination.

Similarly, Section 1000.05(4)(a)(5) prohibits instructors from exposing students to "instruction that . . . promotes . . . the . . .  concept[] [that] . . . [a] person, by virtue of his or her race, color, national origin, or sex bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, national origin, or sex." *Id.* § (4)(a)(5). This prohibition effectively outlaws instruction that promotes affirmative action policies or any other initiatives that take race into account to counteract the continuing effects of past discrimination. At the same time, instructors are free to condemn efforts to bridge racial gaps in opportunities, because that is the viewpoint favored by the Florida legislature. The validity of affirmative action is currently being litigated in the Supreme Court, but under the Act, Florida's college teachers can take only one side.

Likewise, Section 1000.05(4)(a)(3) risks chilling candid discussion of the relationship between Black people and law enforcement, a matter of immense public concern. The Act prohibits teaching that "[a] person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex." *Id.* § (4)(a)(3). Thus an instructor cannot teach that white people enjoy a "[privileged] status"—i.e., an unearned advantage or benefit—when interacting with police despite overwhelming evidence that they are significantly less likely than Black people to be stopped and searched, and to be

23

killed during a police encounter.[19] But the Act permits instruction that white privilege does not exist, and that there is no correlation between race and privilege.

In yet another example of its clear unconstitutionality, the Act prohibits teaching that "[s]uch virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, national origin, or sex to oppress members of another race, color, national origin, or sex." *Id.* § (4)(a)(8). So an instructor cannot convey the idea that "racial colorblindness [is] racist," but can espouse the view that racial colorblindness is not racist; cannot teach that assessments of merit sometimes incorporate racial bias, but can teach that they never do; cannot teach that colorblindness can perpetuate past and present inequality, but can teach that colorblindness solves racism. Similarly, one could not teach that conceptions of "objectivity" may conceal implicit bias, but one can teach that they never do. Here, again, the law makes an "authoritative selection" as to which ideas are permissible, and which must be censored based on viewpoint. *See Keyishian v. Bd. of Regents of Univ. of State of N. Y.*, 385 U.S. 589, 603 (1967).

---

[19] Danielle Haynes, *Study: Black Americans 3 Times More Likely to be Killed by Police*, UPI (June 24, 2020), https://www.upi.com/Top_News/US/2020/06/24/Study-Black-Americans-3-times-more-likely-to-be-killed-by-police/6121592949925/.

As Dr. Almond explains, Section 1000.005(4)(a)(8) "limits negative statements about merit, excellence, and hard work." Almond Decl. ¶ 12 But he believes that "[a]lthough these may make a strong difference in the achievement of individuals, they are not important factors when looking at the performance of groups, where differences in talent and effort should average out." *Id.* The Act prohibits him from teaching or endorsing that view, however. In Dr. Almond's view, Section 1000.05(4)(a)(8) allows teachers to teach "that differences in 'merit' or 'effort' could account for observed racial differences," but does not allow them to teach that "[t]his echoes long-discredited theories of eugenics." *Id.*

Dr. Park's scholarship directly challenges the concept of "objectivity," because "objectivity frequently reflect[s] dominant white, straight, male values." Exhibit 4, Park Decl. ¶ 30. This view, according to Dr. Park, is grounded in "a longstanding consensus among feminist philosophers, critical race theorists, and others that notions of merit, objectivity, colorblindness and so forth function to solidify systems of oppression—disguising biased standards as ones that are allegedly neutral." *Id.* at ¶ 16. But despite being supported by decades of scholarship in her field, Dr. Park cannot express these views without violating Section 1000.05(4)(a)(8)'s prohibition on teaching that "objectivity . . . [is] sexist."

25

By dictating state-endorsed and state-proscribed views on controversial issues, the Stop W.O.K.E Act precludes Plaintiffs and other instructors from serving as "exemplars of open-mindedness and free inquiry," *Wieman v. Updegraff*, 344 U.S. 183, 196 (1952) (Frankfurter, J., concurring), and instead forces them to speak with one mind—the Florida legislature's mind—in order to avoid private lawsuits, professional discipline, or the withholding of state funding from their institutions. The resulting danger of "chilling [] individual thought and expression . . . is especially real in the University setting, where the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition." *Rosenberger*, 515 U.S. at 835.

All views proscribed by the Act, whether they are widely condemned or broadly supported, are protected speech. The enforced "absence of such voices"— particularly on college and university campuses—"would be a symptom of grave illness in our society," *Sweezy*, 354 U.S. at 251. By compelling all teachers to avoid expressing disfavored views on issues of public controversy, the law plainly violates the First Amendment. *See Rosenberger*, 515 U.S. at 829.

26

### 2.     The Stop W.O.K.E. Act is a viewpoint-based restriction on students' right to receive information.

By prohibiting instructors like Plaintiffs from teaching disfavored concepts, the Stop W.O.K.E. Act also denies college students like Plaintiff Dauphin the right to learn from and openly discuss those viewpoints.

The Supreme Court has long held that the First Amendment protects not only the right to speak but also "the right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). This, too, applies with special force in the higher education context. As the Eleventh Circuit recently held, the "chief mission [of universities] is to equip students to examine arguments critically and, perhaps even more importantly, to prepare young citizens to participate in the civic and political life of our democratic republic." *Speech First*, 32 F.4th at 1128; *see also Arce v. Douglas*, 793 F.3d 968, 988 (9th Cir. 2015) (recognizing that students' "First Amendment right to receive information" was implicated by an Arizona law targeting a Chicano Studies curriculum).

Students can be prepared for participation in democratic society only if they are "trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, (rather) than through any kind of authoritative selection.'" *Keyishian*, 385 U.S. at 603 (quoting *United States v. Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943)). The Stop W.O.K.E. Act

27

denies students that training—indeed, it denies them the opportunity to sharpen their minds by engaging in debate with differing viewpoints—and instead mandates which views students are permitted to learn. For example, Plaintiff Dauphin has taken several classes about race and gender, and she is enrolled in two classes this semester that are likely to implicate the Stop W.O.K.E. Act—Race & Minority Relations and Religion, Race, and Ethnicity. Dauphin Decl. ¶¶ 18, 20. She and other students credibly fear that because of the Act, their "professor[s] will not be able to provide all of the information they have in past versions of the course, and might water down the views they express about race." *Id*. at ¶ 21. And professor Plaintiffs are also worried about the law's potential impact on the rights of their students. Dr. Thompson Dorsey believes the "concepts prohibited by the Stop W.O.K.E. Act prevent higher education students from learning about different perspectives and lived experiences." Thompson Dorsey Decl. ¶ 38. Professor Pernell agrees. He worries that the Stop W.O.K.E. Act "chills student speech in the classroom, as students will be afraid to express their views on race in a way that they now perceive is contrary to Florida law." Pernell Decl. ¶ 27.

### 3.    The Stop W.O.K.E. Act fails strict scrutiny.

Because it facially discriminates on the basis of viewpoint, the Stop W.O.K.E Act is unconstitutional "seemingly as a *per se* matter." *Speech First*, 32 F.4th at 1126. "[R]estrictions based on content must satisfy strict scrutiny, and

those based on viewpoint are prohibited.*" Minnesota Voters Alliance v. Mansky*, 138 S.Ct. 1876, 1885 (2018). So the Court can enjoin the law without even applying strict scrutiny.

Even if the Court were to apply strict scrutiny, however, the Act fails, as it is not "narrowly tailored to achieve a compelling government interest." *Ashcroft v. ACLU*, 542 U.S. 656, 656 (2004). The government's objective is stopping what it calls "wokeness," that is, silencing a set of disfavored viewpoints. That is not a legitimate state interest, much less a compelling one; indeed, it is categorically impermissible. *See Rosenberger*, 515 U.S. at 828–29 ("The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.").

### B.   The Stop W.O.K.E. Act is void for vagueness.

The Act is also unconstitutionally vague, in violation of the Fourteenth Amendment. The Supreme Court has held that vague laws implicating speech are particularly concerning. *Ashton v. Kentucky*, 384 U.S. 195, 200 (1966); *see also Reno v. ACLU*, 521 U.S. 844, 871–72 (1997) (holding that a vague, content-based regulation on speech "raises special First Amendment concerns because of its obvious chilling effect on free speech.").

The Supreme Court has warned that, particularly in the education context, "[t]he danger of [the] chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform teachers what is being proscribed." *Keyishian*, 385 U.S. at 604. Instead, the Stop W.O.K.E. Act's vague language forces ordinary persons to guess at its meaning—with substantial consequences if they guess wrong.

There are two independent reasons a statute may be void for vagueness: "First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado,* 530 U.S. 703, 732 (2000); *accord Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1319 (11th Cir. 2017) (en banc). The Stop W.O.K.E. Act fails on both fronts. Indeed, a federal court examining many of the same banned concepts in EO 13950 held the plaintiffs in that case were likely to succeed on the merits of their vagueness claim, and preliminarily enjoined enforcement of the government's ban of the concepts. *Santa Cruz Lesbian & Gay Cmty. Ctr.*, 508 F. Supp. 3d at 543.

The Stop W.O.K.E. Act includes ambiguous language throughout that could be interpreted in multiple ways. As this Court recently held in *Honeyfund.com v. DeSantis*, concepts 1 and 4 are "certainly" unconstitutionally vague. 4:22-cv-00227-MW-MAF, 2022 WL 3486962, at *12 (N.D. Fla. Aug. 18, 2022). While

that lawsuit challenges the Act's application to employers, rather than instructors and students, the vagueness analysis is the same. Section 1000.05(4)(a)(1) prohibits teaching that "[m]embers of one race, color, national origin, or sex are morally superior to members of another race, color, national, origin, or sex." Fla. Stat. §1000.05(4)(a)(1).  But the meaning of "morally superior" is opaque. *Honeyfund.com*, 2022 WL 3486962, at *12. Other provisions are similarly unclear. For example, Section 1000.05(4)(a)(3) which, as argued *infra* Part I.A.1, limits speech about white privilege, arguably also bans teaching that race-based programs confer a privileged status on marginalized individuals, because such instruction constitutes espousing the concept that an individual's "status as . . . privileged" depends on race or another identity factor. *Id.* § (4)(a)(3).[20]

Perhaps the most puzzling language is found in Section 1000.05(4)(a)(4), which prohibits instructors from advancing the concept that "[m]embers of one race, color, national origin, or sex cannot and should not attempt to treat others without respect to race, color, national origin, or sex." *Id.* § (4)(a)(4). This language is indecipherable. One is forced to guess, at risk of losing one's job, what it means to "not attempt to treat others without respect to race, color, national origin, or sex." Does that permit recognition that someone has a particular racial

---

[20] *See, e.g.*, John Blake, *It's Time to Talk About 'Black Privilege'*, CNN (Mar. 31, 2016), https://www.cnn.com/2016/03/30/us/black-privilege/index.html.

identity, or that certain characteristics are associated with particular sexes? Does it permit advocacy of the inclusion of perspectives from people of different races or sexes, or does that treat them differently and is therefore forbidden? This provision raises more questions than it answers. *See Honeyfund.com*, 2022 WL 3486962, at *13.

Section 1000.05(4)(b) is also impermissibly vague and, since it applies to all eight of the disfavored viewpoints, renders them all vague by extension. That provision states that the list of banned concepts "may not be construed to prohibit discussion of the concepts listed therein as part of a larger course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts." Fla. Stat §1000.05(4)(b). But how is one to assess whether a discussion is "objective?" Can the instructor express the view that one side of an argument on these subjects is stronger than the other, or would that impermissibly deviate from "objectivity?" Philosophers have for centuries debated what "objectivity" means, and sociologists and historians have frequently demonstrated that one person's objectivity is another's bias. The only safe course, given this ambiguity, is to avoid the subjects altogether, or to parrot the legislature's condemnations of the eight proscribed views. Plaintiffs and other instructors cannot know if any deviation from "objectivity," including any

32

expression of personal opinions or beliefs, might violate the law and risk official discipline.[21]

In addition to failing to provide sufficient notice, the Stop W.O.K.E. Act's ambiguity leaves the government with unbridled discretion to determine whether or not an instructor has violated the law—discretion that, as discussed above, will almost certainly be applied in a viewpoint-based way. *See Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1229 (11th Cir. 2017) (holding that vague regulations create the "risk that speech will be chilled or effectively censored on the basis of content or viewpoint").

The impact of not feeling comfortable to bring one's identity into the classroom has been profound, especially on Black professors, many of whom teach courses that directly analyze race and gender. Dr. Austin, a professor of political science at the University of Florida, fears an exodus of Black colleagues and students whose representation is already woefully small. Austin Decl. ¶ 50.

## II.    Absent an Injunction, Plaintiffs Will Suffer Irreparable Injury.

It is well established that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman*

---

[21] As noted above, Drs. Park and Sandoval's research and teaching directly challenge the notion of objectivity. Park Decl. ¶ 16; Sandoval Decl. ¶ 17.

*Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)); *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). And the Eleventh Circuit has found that there is a presumption of irreparable harm where, as here, "pure speech" is chilled. *See Siegel*, 234 F.3d at 1178.

If the Stop W.O.K.E. Act is not enjoined, professor-Plaintiffs will be stifled in their teaching, and students like Plaintiff Dauphin will be denied the right to hear viewpoints with which the legislature disagrees. The irreparable injury caused by the Act has already begun. Some professors, believing they can no longer accurately and thoroughly teach their subjects while complying with the Act, have decided to stop teaching in Florida.[22] Those who remain must choose to either self-censor or risk official discipline or private lawsuits for continuing to present their students with what they consider to be a comprehensive and accurate education in their area of expertise. *See, e.g.*, Austin Decl. ¶ 44; Exhibit 5, Sandoval Decl. ¶¶ 13, 23, 26; Almond Decl. ¶¶ 30–31; Thompson Dorsey Decl. ¶ 51; Pernell Decl. ¶

---

[22] Anna Wilder, *Professors in Florida are Feeling the Chill from DeSantis' Education Legislation*, The Miami Herald (Aug. 10, 2022), https://www.miamiherald.com/news/local/education/article263966316.html.

28; Dunn Decl. ¶ 14. And due to the vagueness of the law's language, it will inevitably chill more speech than may be prohibited by the law.

### III.    The Balance of Equities Favors Granting a Preliminary Injunction.

The threatened injury to Plaintiffs' First Amendment rights outweighs any damage an injunction might cause Defendants, because the government "has no legitimate interest in enforcing an unconstitutional [statute]." *KH Outdoor*, 458 F.3d at 1272. Even if government officials—or a court—disliked an instructor's so-called "woke" viewpoints, tolerating those viewpoints is "a cost that 'We the People' have accepted as necessary to protect free-speech interests more generally." *Speech First*, 32 F.4th at 1128.

Moreover, the Stop W.O.K.E. Act does not remedy any actual harm. *See* Compl. ¶ 161, ECF No.1. While proponents of the Stop W.O.K.E Act repeatedly claimed the law would stop "indoctrination" in schools, they were unable to show any evidence of indoctrination in Florida's college and university classrooms. *Id.* at ¶ 130. No harm will ensue if the Court enjoins government officials from attacking a problem that does not exist.

### IV.    An Injunction Would Serve the Public Interest.

"[T]he public interest is served when constitutional rights are protected." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019).

And "[n]owhere is free speech more important than in our leading institutions of higher learning." *Speech First*, 32 F.4th at 1128. Academic freedom—uninhibited by state-imposed, viewpoint-based censorship—"is of transcendent value to all of us," *Keyishian*, 385 U.S. at 603. For this reason, this Rule 65 factor favors the entry of a preliminary injunction.[23]

The Stop W.O.K.E. Act's viewpoint-based restrictions strip instructors of their academic freedom and "impose a[] strait jacket upon the intellectual leaders in our colleges and universities," which ultimately "imperil[s] the future of our Nation." *Sweezy*, 354 U.S. at 250. A preliminary injunction against the enforcement of the Stop W.O.K.E. Act would allow Florida universities to continue cultivating vital scholarship and tolerant, critical thinkers, preserving the *status quo* until the Court has an opportunity to fully consider the merits of Plaintiffs' claims.

---

[23] While courts in this circuit generally require a bond before issuing injunctive relief under Federal Rule of Civil Procedure 65(c), it is within the district court's discretion to waive the security requirement. *See Transcon. Gas Pipe Line Co. v. 6.04 Acres*, 910 F.3d 1130 (11th Cir. 2018). Because constitutional rights of public interest are at stake and damage to Defendants resulting from a wrongful issuance of a preliminary injunction cannot be shown, Plaintiffs request that this Court waive the bond requirement here.

## CONCLUSION

For the above reasons, Plaintiffs respectfully ask this Court to preliminarily

enjoin Defendants from enforcing the Act.

Respectfully submitted,

/s/ Jerry C. Edwards
Jerry Edwards
Fla. Bar No. 1003437
American Civil Liberties Union
Foundation of Florida
933 Lee Road, Suite 102
Orlando, FL 32810
(786) 363-1107
jedwards@aclufl.org

**AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
FLORIDA, INC.**
/s/ Daniel B. Tilley
Daniel B. Tilley
Fla. Bar No. 102882
Katherine H. Blankenship
Fla. Bar No. 1031234
Caroline McNamara**
4343 West Flagler Street, Suite 400
Miami, Florida 33134
(786) 363-2707
dtilley@aclufl.org
kblankenship@aclufl.org
cmcnamara@aclufl.org

**NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.**

/s/ Morenike Fajana
Morenike Fajana*

Dated: August 24, 2022

**AMERICAN CIVIL LIBERTIES
UNION FOUNDATION**
/s/ Emerson Sykes
Emerson Sykes*
Leah Watson
Sarah Hinger
Laura Moraff
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
esykes@aclu.org
lwatson@aclu.org
shinger@aclu.org
lmoraff@aclu.org

**BALLARD SPAHR LLP**
/s/ Jason Leckerman
Jason Leckerman*
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
(215) 864-8266
leckermanj@ballardspahr.com

Charles Tobin
Fla. Bar No. 816345
1909 K Street NW, 12th Floor
Washington, D.C. 20006
(202) 661-2200
tobinc@ballardspahr.com

40 Rector Street, 5th Floor
New York, NY 10006
(212) 217-1690
mfajana@naacpldf.org

Jin Hee Lee*
Santino Coleman*
700 14th Street, Ste. 600
Washington, D.C. 20005†
(202) 682-1300
jlee@naacpldf.org
scoleman@naacpldf.org

*Counsel for Plaintiffs*

Jacqueline Mabatah*
201 South Main Street, Suite 800
Salt Lake City, UT 84111-2221
(801) 531-3063
mabatahj@ballardspahr.com

Isabella Salomão Nascimento*
2000 IDS Center, 80 South 8th Street
Minneapolis, MN 55402-2119
(612) 371-3281
salomaonascimentoi@ballardspahr.com

†Mailing address *only* (licensed in and
working remotely from South Carolina)
*(motion for admission *pro hac vice*
forthcoming)
**(Florida Bar admission pending)

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Local Rule 7.1(F) because, excluding the parts of the document exempted by the rule, this document contains 7,933 words. This document complies with the type-style requirements of Local Rule 5.1(C) because this document has been prepared in a proportionally spaced typeface using the word-processing system Microsoft Word 2016 in 14-point Times New Roman. Because no attorney has entered an appearance on Defendants' behalf, Counsel is unable to meet and confer at this time. Counsel will file an amended Rule 7.1(B) certificate once Defendants' counsel enters an appearance.

Dated: August 24, 2022                    By:    /s/ Jerry C. Edwards

                                                 Jerry Edwards

39