# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

LEROY PERNELL, et al.,

    *Plaintiffs*,

v.

FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM, et al.,

    *Defendants*.

Case No.: 4:22-cv-304

**DECLARATION OF DANA THOMPSON DORSEY IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

I, Dana Thompson Dorsey, hereby declare and state as follows:

**A. Background**

1. My name is Dana Thompson Dorsey. I am over 18 years of age.

2. I have personal knowledge of the following facts and if called to testify could and would competently do so.

3. I currently serve as an Associate Professor of Educational Leadership and Policy Studies, with tenure, at the University of South Florida (USF).

4. I have nearly 15 years of professional experience in higher education. My work focuses on education law and policy, specifically, examining local, state, and federal laws and their impact on minoritized students and communities from pre-kindergarten to graduate school. Generally, my work is centered in

racial equity, but I also consider the law's impact on people that identify as LGBTQ+ and disabled.

5. Higher education has played a pivotal role in both my professional and personal development. I earned a Bachelor in Science degree in Accounting from Lincoln University of Pennsylvania, *cum laude,* and a *Juris Doctorate* from the University of Pittsburgh School of Law.

6. After graduating law school in 1999, I worked as an attorney for two civil defense litigation law firms in Pittsburgh until 2002, concentrating on employment discrimination and products liability.

7. From 2002 until 2004, I also had a private law practice focused on civil rights litigation in which I represented local members of my church in landlord-tenant disputes and students with disabilities in primary and secondary (K-12) schools.

8. I went back to school in 2003 to pursue a PhD in Education from the University of Pittsburgh School of Education, specializing in Social and Comparative Analysis in Education and Policy Studies.

9. During my doctoral program, from 2004 to 2006, I worked part-time for COSMOS Corporation as an evaluation consultant for the National Gang-Free Schools Project. From 2006 until 2008, I began working full-time for COSMOS Corporation as a Senior Research Analyst, conducting policy

research and evaluation related to pre-kindergarten to undergraduate education reform, and juvenile and criminal justice policy issues.

10. In 2007, I received my PhD in Education with a specialization in social and comparative analysis in education and policy studies.

11. In 2008, I left COSMOS Corporation and became the Director of Research and Consulting at the University of Virginia's National Center for Women and Information Technology. I held this position until 2009.

12. From 2009 to 2010, I served as an Assistant Professor of Education Law and Leadership at the University of Illinois, Springfield.

13. Starting in 2010, I served as an Assistant Professor in the Department of Educational Leadership and Policy at the University of North Carolina at Chapel Hill (UNC Chapel Hill) for seven years.

14. In 2017, I became an Associate Professor at the University of Pittsburgh, with tenure, and served as the Associate Director of Research and Development for the Center for Urban Education until late 2020.

15. From 2020 to 2022, I served as the Endowed Chair and Director of the David C. Anchin Center for the Advancement of Teaching at USF. I was specifically recruited to USF by former Dean Robert Knoeppel to serve as the Director of the Anchin Center and an Associate Professor because of my research focus area and prior experience running a center.

16. Throughout my academic career, I have also designed and conducted K-12 professional development programming for school districts and other organizations on racial equity, cultural bias, and culturally proficient policies and practices. I have worked with school districts and organizations in Durham, North Carolina, Chapel Hill, North Carolina, Pittsburgh, Pennsylvania, and Dallas, Texas.

17. In addition to this programming, I provide consulting services and deliver lectures on equity in K-12 schools.

18. Deemed one of National Public Radio's experts on racial equity and education law in 2015, I have been featured on local and national shows discussing race-based admissions, and school segregation and desegregation.

19. I am the inaugural chair of the Diversity, Equity, and Inclusion (DEI) Committee for the Florida Association of Professors of Educational Leadership (FAPEL). This FAPEL committee was recently established to consider approaches to equity in higher education and educational leadership. As chair, I worked with the other committee members to develop the committee's vision and mission. Prior to serving as chair, I spoke in FAPEL's Courageous Conversation series about recent developments in Florida's education law and policies.

20. I have received grant funding from the Spencer, Wallace, and Gates Foundations for my research.

21. In 2015, I received a Spencer Foundation grant to research the intersection of students' rural and racial identities in school districts in Alabama that were not subject to desegregation.

22. In 2018, the Gates Foundation awarded me and several colleagues at the University of Pittsburgh a five-year grant to work with the Dallas Independent School District (DISD) to develop K-12 equity programming specifically for English Language Arts (ELA) and writing. I still currently work with DISD as part of the Gates Foundation grant as a research consultant for the University of Pittsburgh.

23. Recently, two of my colleagues from other universities and I were awarded a 27-month grant from the Wallace Foundation. We are developing and validating a survey to identify future school building leaders and their beliefs about equity, with a focus on racial equity, in education.

24. I have also served as a member of the Bill and Melinda Gates Foundation's Continuous Improvement for Equity Design Team.

### B. My Current Course Offerings

25. I have taught courses at both the undergraduate and graduate levels. In the fall and spring semesters of the 2022—23 school year, I will be teaching School

5

Law. Additionally, in the spring semester, I will be teaching Critical Race Studies: Research, Policy, and Praxis (Critical Race Studies).

26. School Law is a required graduate level course in USF's College of Education for students pursuing a Master of Education degree specializing in Educational Leadership. In this course, students review court decisions affecting American education with an emphasis on US and state constitutional provisions and Florida state statutes.

27. I also taught School Law in the Summer 2022 term at USF. Prior to teaching at USF, I also taught versions of this course at UNC Chapel Hill and the University of Pittsburgh.

28. Critical Race Studies is an elective course for USF doctoral students at USF that focuses on the development of critical race theory and other race-conscious research frameworks; their treatment of race, racism, and racial justice and injustice; and their contributions to education policy, practice, and leadership praxis. This course will allow students to examine the frameworks as analytical frameworks that provide race-based epistemological, methodological, and pedagogical approaches to the study of everyday inequities in society with a particular emphasis on education policy and practice.

29. I taught Critical Race Studies in the Fall 2021 term. I was asked to create the course while I was teaching at UNC Chapel Hill in 2013. The original course at UNC was titled Critical Race Theory: History, Research and Practice in Education. I also taught it at the University of Pittsburgh.

30. Students in my courses, especially my Critical Race Studies course, frequently bring up questions about race, gender, and sexual orientation. Students are astounded at the way the course encourages them to think about the world around them.

### C. My Research

31. My research examines education laws, policies and practices, and how they shape educational equity, access, and opportunities for minoritized and underserved populations in various educational contexts. I focus primarily on issues related to school segregation, school discipline and the school-to-prison pipeline, race-based admissions policies in higher education, school choice policies, as well as implicit bias and culturally responsive school policies and practices.

32. I have written various journal articles, including: *From Desegregation to Privatization: A Critical Race Policy Analysis of School Choice and Equal Educational Opportunity in North Carolina*; *Stereotypes, Images, and Discriminatory Action:  The White Racial Frame in the Practice of School*

*Leadership*; *Working the Intersections of Interest Convergence and Whiteness as Property in the Affirmative Action Legal Debate*; and *An Examination of the Legal Debate Regarding Race-Based Education Policies from 1849-1964.*

33. My research has been quoted in the *New York Times*, and my articles have been published in research journals such as *Educational Administration Quarterly*; *Educational Policy*; *Race, Ethnicity and Education*; *Education and Urban Society*; and *Teachers College Record*.

**D. The Interaction Between the Stop W.O.K.E. Act[1] and the Content of My Courses**

34. On April 22, 2022, Governor Ron DeSantis signed the Stop W.O.K.E. Act (also known as House Bill 7 or Individual Freedom Act) into law. This law amended § 1000.05(4), Fla. Stat., to add a list of eight prohibited concepts that instructors are permitted to denounce but are not permitted to advance.

35. It is my understanding that the Stop W.O.K.E. Act was enacted to stop DEI teachings and trainings in K-12 and higher education. It prevents instructors from asserting that the United States is inherently racist or that one race or sex is better than another. It bans topics that make people feel discomfort when instructors are teaching or providing trainings. It also requires that all teaching in higher education must be done from only an "objective" perspective.

---

[1] Ch. 2022-72, Laws of Fla.

36. The experiences of women and people of color are often left out of discourse on education. I strongly believe that students should see themselves and their viewpoints reflected in the course materials, assignments, texts, and faculty. Traditionally, Black and Brown perspectives are largely excluded so I intentionally include them in my courses. The Stop W.O.K.E. Act limits my ability to introduce diverse perspectives in both classroom discussion and course curricula, as related to topics of race, gender, gender identity, and sexual orientation.

37. However, there are many educational and societal benefits to learning about issues from different lived experiences and viewpoints. As an instructor, I do not limit or restrict students' viewpoints during class because I know that students come into college from different backgrounds and lived experiences.

38. I believe that higher education should be a place where students can openly share and discuss what they think. The concepts prohibited by the Stop W.O.K.E. Act prevent higher education students from learning about different perspectives and lived experiences.

39. The Stop W.O.K.E. Act takes away the opportunity for students to interact with and discover new and different viewpoints in higher education, including those disfavored by government. Students are prohibited from expressing certain viewpoints that are at odds with the dominant perspective. When

students and instructors are prohibited from sharing different lived experiences and viewpoints, we risk making the same discriminatory mistakes that have been made in the past.

40. The Stop W.O.K.E. Act will prohibit certain topics in higher education, which will lead to more than a generation of undereducated American citizens; it will lead to generations of uneducated American citizens.

### E. How the Stop W.O.K.E. Act Will Impact My Teaching and My Courses

41. The Stop W.O.K.E. Act impacts my ability to teach School Law and Critical Race Studies because the courses and my research are directly related to topics prohibited by the Act. My School Law and Critical Race Studies courses build upon the understanding that racism is deeply embedded in American society, including in institutions like education, a position widely accepted and supported by research in my field. In Critical Race Studies, I am not able to meet the standards my discipline requires without teaching this foundation.

42. I am concerned that I cannot discuss Critical Race Theory at all, which is a foundational and necessary topic that students must understand in Critical Race Studies. Critical Race Theory is foundational for students to understand theories of anti-Blackness, intersectionality, institutional racism, white supremacy, and colorblindness. I believe that it is important for students to receive content related to these topics because we must teach a new generation

about historical shortcomings as related to minoritized communities if we do not want to repeat our past mistakes in this country. It is not my role to tell students what to think, but it is imperative that students have the ability to think and talk through concepts that are disfavored by the state legislature.

43. Moreover, as a scholar of critical race studies, I have written articles that have contributed to the field's growing body of work. I assign two of these articles in my Critical Race Studies course, *Growing C-D-R (Cedar): Working the intersections of interest convergence and whiteness as property in the affirmative action legal debate* and *From Desegregation to Privatization: A Critical Race Policy Analysis of School Choice and Educational Opportunity in North Carolina*. These articles do not comport with the Stop W.O.K.E. Act because they discuss concepts related to white privilege and denounce the concept of colorblindness. It is difficult for a student to conclude that I do not endorse the material in these articles when I authored them.

44. In both of these courses, students read case law and law review articles. Students must understand precedent and *stare decisis*. To fully understand and critically analyze the law, students need to discuss racial equity, theories of school segregation, and the rights of students and teachers. For example, students need to be able to discuss the context and implications of such cases

as *Brown v. Board of Education* and *Plessy v. Ferguson*. I cannot facilitate those discussions without addressing the existence of white supremacy.

45. In School Law, I teach students how to recognize and counter manifestations of racism in schools. I cannot continue to identify systemic racism and sexism in schools, and train students to do the same, if I censor the concepts listed in the Stop W.O.K.E. Act.

46. Students enrolled in School Law will become school district and building leaders. They must recognize and discuss issues within their schools, such as racial and gender inequities in school funding, school and student assignments, school discipline, special education, Title IX, and student searches. They will not be able to identify or address due process issues or the current manifestations of discriminatory policies and practices in schools without instruction.

47. Students enroll in Critical Race Studies to learn more about tenets of critical race theory and other racial frameworks used in research that are prohibited by the Stop W.O.K.E. Act. Students are expected to have a basic understanding of Critical Race Theory and other race-conscious frameworks, as theoretical frameworks, as well as their utility, limitations, and application in research, policy and practice.

48. We explore the historical development of Critical Race Theory through the more recent frameworks, such as Latino and Latina Critical Legal Theory (LatCrit), Asian Critical Theory (AsianCrit), Queer Critical Theory (QueerCrit), Tribal Critical Race Theory (TribalCrit) and Critical Race Feminism. I teach the origins of Critical Race Theory and how it addresses issues such as race, racism, and power in our country.

49. Through instruction, assigned readings, and classroom discussion, I show how Critical Race Theory is a useful lens for analyzing systemic inequality in law, policy, and the world around us.

50. In the Summer 2022 term, I received many questions from School Law students concerned about the parameters of the Stop W.O.K.E. Act and the impact it will have on our course curriculum. Students were also concerned about the impact it will have on teaching in K-12 classrooms, particularly related to history, social studies, and civics lessons.

51. The Stop W.O.K.E. Act will cause me to self-censor when discussing topics that relate to or implicate a prohibited concept or risk violating the law.

52. As a result of the Stop W.O.K.E. Act, professors that teach prohibited topics will be forced to water down their courses or to not teach them at all. I believe that this will negatively impact students because they will lose the opportunity to be exposed to different viewpoints. I believe that students need to be

exposed to our country's troubling history of racism and not recognizing color, in a world where color matters a great deal. Colorblindness ignores the subjugation of people of color and is harmful, often a matter of life and death for minoritized groups.

53. Instructors are afraid and concerned about their academic freedom, which is a fear that I have not encountered in my nearly 15 years in higher education.

54. I have had discussions with school leaders and educators about the stress we are all under because of the Stop W.O.K.E. Act. Even before the law was enacted, I know of educators that lost their jobs or that had been demoted because they used certain materials or held open-discussions related to critical race studies. I fear other instructors in my field will be targeted.

55. Now that the Stop W.O.K.E. Act has been enacted, administrators that do not support racial and gender equity efforts will be emboldened to push out faculty that teach and conduct research on such topics.

56. I fear that the Stop W.O.K.E. Act will negatively impact tenure and promotion decisions, primarily harming instructors that conduct race-based research and teach race-based courses, at higher education institutions across the state.

57. As a tenured Associate Professor, I am concerned that the Stop W.O.K.E. Act will negatively impact my post-tenure review and my ability to be promoted

to full professor if I am perceived not to comply with the state law. I plan to pursue promotion next year.

58. Although research has shown that women and instructors of color tend to receive lower evaluations when teaching divisive concepts, I have received positive course evaluations and formed long-lasting relationships with my students over the years. I now fear students not interested in the course concepts will enroll in my courses merely to surveil my teaching and to file a complaint with the university administration.

59. Since I have been a vocal opponent of the Stop W.O.K.E. Act and other measures designed to limit discussions of racism that have been passed in Florida, I fear that complaints about my instruction will not be independently or fairly reviewed.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and accurate.

Executed on August 21, 2022.

*[signature]*

_____

Dana Thompson Dorsey