# Exhibit 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

LEROY PERNELL, et al.,

     *Plaintiffs*,

v.

FLORIDA BOARD OF GOVERNORS OF
THE STATE UNIVERSITY SYSTEM, et al.,

     *Defendants*.

Case No.: 4:22-cv-304

## DECLARATION OF SHELLEY PARK IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

I, Shelley Park, hereby declare and state as follows:

### A. Background

1. My name is Shelley Park. I am over 18 years of age.

2. I have personal knowledge of the following facts and if called to testify could and would competently do so.

3. I currently serve as a tenured Professor of Philosophy and Cultural Studies at the University of Central Florida (UCF). My research and teaching focuses on Feminist Theory, Critical Race Theory, Queer Theory, Postcolonial Theory, Kinship Studies, Cultural Studies, Motherhood Studies, Philosophies of Love, Care Ethics, and Science & Technology with an emphasis on technologically mediated forms of care and the ways in which

1

these are gendered and racialized.  I currently teach four undergraduate courses: (1) Feminist Theories, (2) Theories of Sex and Gender in the Humanities (Theories of Sex and Gender), (3) Race & Technology, and (4) Introduction to Philosophy.

4.  I obtained my Bachelor of Arts with honors in Philosophy at the University of Calgary in 1982, my Master's degree in Philosophy from the University of Calgary in 1984, and my PhD in Philosophy from Duke University in 1990.

5.  I have been teaching in higher education for 35 years.  I was an Instructor of Philosophy at Duke University from 1987 to 1990 and at the University of Calgary in Summer 1989.  I have held various roles at UCF.  I was an Assistant Professor of Philosophy from 1990-96, the Director of the Women's Studies Program from 1997-2000, Chair of the Department of Philosophy from 2000-03, and an Associate Professor of Philosophy from 1996-2016.  Since 1992, I have served as Affiliated Faculty in the Women's Studies Program (now the Women's and Gender Studies Program).  I have also served as Affiliated Faculty in Texts and Technologies since 2015 and as a Professor of Philosophy and Cultural Studies since 2016.

6.  In 2019, I was inducted in the UCF Scroll and Quill Society, a prestigious club for faculty excellence.  That year, I was also nominated for the UCF

award for transforming student lives.  I won a UCF Research Initiative Award in 2018, as well as UCF Teaching Incentive Program Awards in 1995, 2007, 2012, 2017, and 2022.  I was awarded UCF Research Sabbaticals in 2010 and 2017.  I won the College of Arts and Sciences Award for Interdisciplinarity twice, once as Director of the Women's Studies Program (2000) and once as Chair of the Philosophy Department (2002).  I received a Dean's Initiative Award for Learning Community Projects in 1998, National Endowment of Humanities Summer Seminar Awards in 1991 and 1996, and a Dean's Initiative Award for Interdisciplinary Courses in 1996.

7.   I am, or have been, a member of the American Philosophical Association; the American Studies Association; the Cultural Studies Association; Feminist Ethics and Social Theory; Florida Philosophical Association; and the International Association of Women Philosophers.

8.   My publications include the book, *Mothering Queerly, Queering Motherhood:  Resisting Monomaternalism in Adoptive, Lesbian, Blended and Polygamous Families*; a co-edited special issue of *Hypatia: A Journal of Feminist Philosophy*, "Contested Terrains: Women of Color, Third World Women, Feminisms, and Geopolitics," and numerous articles and book chapters including: "Gendered Divisions of Labor in the 21st Century

3

Academy:  Research, Teaching and Service"; "The Feminist Killjoy in the

Room:  The Costs of Caring about Diversity"; "The Transracial Adoption of

Ethnic Minority Children:  Questions Regarding Legal and Scientific

Interpretations of a Child's Best Interests"; and "Research, Teaching and

Service:  Why Shouldn't Women's Work Count".

9.  Following the killing of George Floyd in 2020, I worked with my colleagues

in the Philosophy Department at UCF to release a unanimous anti-racism

statement.  I was one of the drafters of the statement, which supported the

Black people, Indigenous people, and other People of Color who challenged

systemic racism, protested the militarization of U.S. police forces, and

sought racial justice.  The statement reflected a departmental commitment to

anti-racist principles in our classroom instruction, research, service, and

internal policies and procedures.

10.  In the Fall 2022 semester, I will teach Theories of Sex and Gender, a course

that introduces recent and contemporary theories of sex and gender and their

interplay in larger society.  During the course, students examine post-

structuralist theories of gender; feminist theories of sex and gender;

biological theories of nature and nurture; developmental systems theories of

sex and sexuality; critical race theories related to the intersection of race,

class, gender, and sexuality; and phenomenological theories of the lived

experiences of sexual and other orientations.

11.   The course focuses on LGBTQIA+ issues, including the social construction

of sex, gender, and sexuality.  Students learn the ways that our

understandings and experiences of sex, gender, and sexuality both shape and

are shaped by historical events and power relations.  They also learn how

sex, gender, and sexuality intersect with race and other phenomena such as

class and age to perpetuate interlocking systems of oppression, privilege,

and structural inequities such as sexism, heterosexism, transphobia, racism,

ethnocentrism, classism, ageism, and so forth.  Course readings include

materials about how power shapes our understandings of what is "normal"

and "deviant" with regard to sex, gender, and sexuality and the impact of

those understandings.

12.   I will teach Feminist Theories in the Spring 2023 semester.  This course

focuses on the theoretical bases of recent and contemporary movements for

women's liberation and how both the notion of "women" and the notion of

"liberation" has changed over time.  Theoretical perspectives examined

include:  liberal, radical, Marxist, intersectional, transnational, postcolonial,

decolonial, eco- and cyber- feminisms as well as disability (crip) theory and

queer theory.  For each theory, students learn how that theory understands

sexism, and how that understanding is linked to its theory of change.  For example, I teach liberal feminism as an enlightenment theory that understands sexism as the treatment of women as less rational, less autonomous, and less deserving of the human rights and freedoms accorded to men.  On this theory, women's liberation (from confinement to home and family) requires fighting for women's equal opportunities to education and careers in order to develop their equal capacity for reason and economic and civic independence.  We then question the assumptions inherent in this theory, including how seeking equality with men sets men as the standard, and the ways meritocracy values the work traditionally performed by men (e.g. paid labor and degrees in business and engineering) over the realms traditionally held by women (e.g. domestic labor and training in the 'helping' professions).

13. The course defines a feminist broadly as someone who believes sexism exists, is neither desirable nor inevitable, and is committed to doing something to address the status quo.  This makes room for a wide variety of feminist beliefs and commitments while establishing the basic assumptions from which the rest of our discussions will proceed.

14. In the Spring of 2023, I will also teach Race & Technology, an exploration of the role of race in the production, consumption, and representation of

technology.  The course considers various forms of technology, including facial recognition software, chatbots, search engines, social media, biomedical and reproductive technologies, and technologies for work and leisure.  A basic premise of this course is that technological literacy requires understanding the varied ways in which technologies—from Google's search engine to Amazon's Mechanical Turk and from dating apps to predictive policing—perpetuate inequalities and oppression under the auspices of neutrality.  The course emphasizes the ways systemic racism works in the technological area, not as a "bug" but often as an intrinsic component of design.  In this course, as in others, I teach from an intersectional perspective, urging awareness of the ways in which race is gendered, sexualized, classed, aged, and so forth.  The likelihood of being chosen as a match on a dating app, for example, is radically different for an Asian-American man than for an Asian-American woman.  As a senior level course, all students are challenged to create a final project demonstrating scholarly research and technological literacy relevant to the themes of the class.

15. My courses focus on structural oppression, how it operates, and how we might imagine and create alternative social structures.

16.  They do not question whether heterosexism, sexism, or racism exist because
there is already consensus in my discipline(s).  Likewise, there is a
longstanding consensus among feminist philosophers, critical race theorists,
and others that notions of merit, objectivity, colorblindness and so forth
function to solidify systems of oppression—disguising biased standards as
ones that are allegedly neutral.  Thus, my students learn to critically
interrogate such concepts.  We study oppression at a macro level; looking
for the ways in which it is "baked in" to systems, structures, designs, values,
institutions, processes, and traditions.  We do not ascribe sexist, racist or
other harmful beliefs to individuals.  To understand macro-level phenomena
such as oppression—as I teach my students—one must not focus on
individual intentions (whether good, bad, or otherwise).

17.  In preparation for this intense study, I spend early weeks establishing class
norms of mutual respect, shared progress, intellectual community, and
collaborative learning.

**B. The Interaction Between the Stop W.O.K.E. Act and the Content of My
Courses**

18.   On April 22, 2022, Governor Ron DeSantis signed the Stop Wrongs
Against Our Kids and Employees Act (also known as the Stop W.O.K.E.
Act, House Bill 7, or the Individual Freedom Act) into law.  This law

amended § 1000.05(4), Fla. Stat., to add a list of eight prohibited concepts that instructors are permitted to denounce but are not permitted to advance.

19. I understand the Stop W.O.K.E. Act to mean that I cannot teach students that meritocracy, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by for oppressive purposes. I also understand that the Stop W.O.K.E. Act prohibits instruction that causes students to feel guilty or sad because of their race or sex.

20. In order to teach my courses, I must instruct students on structural racism, sexism, and heterosexism. For example, queer studies and feminist scholars understand and have been trained to view the normative construction of masculinity (e.g. as dominant, as heterosexual, as white) as inherently harmful. My students learn to identify the harmful effects of dominant social constructions of race and gender. We discuss historic and present manifestations of these constructions and consider how values, ideas, and structures from earlier times re-appear in our contemporary culture.

21. Course materials demonstrate how meritocracy is a myth that works to reinforce the existing status quo, how common understandings of fairness ignore an uneven playing field, how work ethic and neutrality favors the dominant powers, how colorblindness renders us unable to see racism. In my courses, students read texts from the following books: Marilyn Frye, *The*

9

*Politics of Reality: Essays in Feminist Theory*; Judith Butler, *Gender Trouble: Feminism and the Subversion of Identity*; Sara Ahmed, *Queer Phenomenology*: Susan Stryker, ed. *The Transgender Studies Reader*; Ruha Benjamin, *Race After Technology: Abolitionist Tools for the New Jim Code*; and *Algorithms of Oppression* by Safiya Noble.

22. I understand "objectivity" in this context to require teaching arguments in favor of and against any concept. This understanding of objectivity is widely critiqued by philosophers. My discipline—just like any other— requires students to build upon widely accepted foundational principles. The existence of sexism, heterosexism, racism and other forms of oppression and privilege has been well-documented with several decades of empirical research and is the starting place for the work I do inside and outside the classroom.

23. None of my instruction or class discussion singles out individuals, much less students, as racist, sexist, or oppressive. My courses focus oppression at the systemic, not individual level. Similarly, I don't teach or suggest that any person or student should feel guilty or sad about systemic inequalities. I would never do that. At the same time, some students *may* feel bad when they recognize systemic forms of injustice. That is a pretty natural human response.

24. My instruction illuminates the ways in which all of us (myself included) may participate in upholding oppressive structures, intentionally or unintentionally.  For example, in Feminist Theories, I teach bell hooks' classic text, *Feminist Theory from Margin to Center*.  In class, students have the option to answer various questions about their privileges (or lack thereof) related to race, sex, class, and ability.  With each answer, they physically move closer or further from the center of the room (where I dispense candy), representing the social "center."  We debrief on the activity, which students describe as a memorable lesson about what it feels means (and feels like) to be "centered" or "marginalized."  They also learn how privileges shape the experiences of others.  Once more, the focus is on the effects of systems of oppression, not individual motivations.

25. Sometimes students feel guilty when they realize their complicit participation in, or benefit from, systems of oppression through actions they thought were neutral.  They may also feel badly if they recognize their potential complicity with systems that harm themselves or those about whom they care.  Again, this is not a matter of pointing fingers at individual people.

26. My class norms and practices are intended to make the classroom a blame free place where such discomfort can be expressed (if one chooses to do so).

11

We talk about how to approach discomfort as a sign of growth or of struggle.

Just as we may struggle with figuring out a math problem, we may struggle

with figuring out how to be in relationship to one another and the world.

Struggle is part of a process of change and not necessarily a bad thing,

especially if we can rely on the support of others while we figure things out.

The classroom is a shared place where students learn how to challenge

systems of oppression together as a collaborative exercise; no one is singled

out.

**27. C. How HB 7 Will Impact My Teaching and My Courses**

28.  The Stop W.O.K.E. Act impacts my ability to teach because I do not know

how I can meet the instructional standards of my discipline without violating

the law.  It is impossible to teach this course to the standards of my

discipline without discussing systemic inequalities; I would not recognize

my courses.  The existence of systemic inequalities is a baseline

presumption of the scholarship I produce, read, and teach.  My career has

been based on understanding how systems of oppression work, not whether

they exist.

29. The Stop W.O.K.E. Act creates an impossible bind.  If I teach the

foundational principles of my discipline as widely accepted, I may run afoul

of the Stop W.O.K.E. Act's prohibitions.  As outlined above, my discipline

takes the existence of structural oppressions such as sexism, heterosexism and racism as foundational truths.  If I self-censor and weaken my instruction to present these concepts as debatable, I have not met the ethical standards required by my discipline.  Moreover, my discipline questions the ideals of "merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness," pointing out the ways in which such ideals uphold interlocking systems of oppression such as racism and sexism.  Yet, the Stop W.O.K.E. Act suggests that these concepts must be taught as unquestionable virtues without racist or sexist impact.  I'm not sure how I can teach my courses within the confines of the law.

30.   For at least 30-40 years, my discipline has recognized colorblindness and gender neutrality as concepts that reinforce the racism and sexism in the status quo.  My discipline largely concurs that the notion of objectivity frequently reflects dominant white, straight, male values.  And  that the notion of objectivity as an outgrowth of Eurocentric, colonial thinking that accorded this capacity (a function of reason) solely to white, European men of the upper classes.  To ignore the origins and functions of concepts such as these in my teaching is to fail to teach the history of ideas accurately.  And to ignore the ways in which these concepts function today to privilege some forms of thought over others is also unethical.  Thus to present

colorblindness, gender neutrality, or objectivity s to my students as undisputed virtues, as the Stop W.O.K.E. Act suggests, is to abandon my own scholarly and ethical integrity.

31. I am not sure how I must change my approach to classroom instruction as a result of the Stop W.O.K.E. Act.  I teach through a collaborative learning process whereby students may build classroom glossaries, provide examples to illustrate concepts, and offer presentations.  I do not know how the Stop W.O.K.E. Act applies to statements by students in class.  Formal lecturing is not my primary mode of instruction currently but is a way to ensure the discussions do not venture into prohibited concepts.

32. My goal as a UCF professor is to prepare my students to live and excel in a world that is globally, racially, and gender diverse.  Students need to learn diversity competencies to communicate with colleagues, employers, and clientele in inclusive, equitable, and non-offensive ways.  This is a valuable skill in any career path.  I fear that the Stop W.O.K.E. Act will inhibit, or altogether censor, this instruction and result in students who are unprepared for professional life.

33. I also fear that the Stop W.O.K.E. Act will shrink, and possibly silence, instruction about structures of oppression, which disadvantages students. Without this knowledge, students from dominant racial, gender, and

sexuality groups will not understand the impact of those systems. Students from vulnerable populations will lack the analytic skills necessary to process their experiences. Students who are passionate about social justice issues will feel less supported in their institutions. The value of student degrees in affected disciplines will decrease, making students in this field less marketable to future schools or jobs.

34. As a senior, tenured Professor at UCF with 35 years of teaching experience, I am not clear what instruction is prohibited by the Stop W.O.K.E. Act. The Act will cause me to self-censor or to risk violating the law. I am concerned about disciplinary action, including termination, or the expenses of litigation if I am perceived to violate the Stop W.O.K.E. Act. And yet, I cannot abandon the values and professional norms of the discipline(s) to which I belong.

35. This chilling effect of the law is amplified for other instructors. A sizable number of faculty at UCF serve in non-tenured positions, meaning UCF can choose not to renew their contracts in any year without reason. No disciplinary process is required. I have spoken with more junior, untenured instructors who are afraid to be perceived as violating the law. Additionally, faculty in the arts, humanities, and social sciences are especially vulnerable because their disciplines are targeted by the Stop W.O.K.E. Act. Finally,

even before the law, faculty who were Black, Indigenous or People of Color were less likely to be viewed as objective when teaching about racism.  I worry that they will be targeted for complaints.  Ultimately, the Stop W.O.K.E. Act may cause faculty to avoid controversial conversations and self-censor because they feel their employment is at risk.

36.  The coupling of the Stop W.O.K.E. Act with House Bill 233, which allows the recording of instructors, effectively deputizes students to enroll in classes they wouldn't otherwise take in hopes of submitting a complaint that silences instruction.  I fear that these students will change the classroom dynamics from a collaborative, joyful culture of shared trust and learning to an atmosphere of fear and antagonism.  I feel pressure to add legalistic disclaimers and modify my lectures so I am not perceived to violate the law when I am not clear exactly what is prohibited.  I have been advised to save recordings of all of my lectures to defend myself against baseless accusations.

37.  I do not feel supported by UCF against spurious complaints under the Stop W.O.K.E. Act.  After the law went into effect, UCF removed my department's anti-racism statement from the website, which signaled that the administration's commitment to anti-racism was short-lived or disingenuous. I fear that this preemptive censorship, even when there is no clear violation

of the law, reflects UCF's approach to compliance with the law and any complaints will not be independently reviewed.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and accurate.

Executed on <u>August</u> <u>16</u>, 2022.

Shelley Park