# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

|  |  |
|---|---|
| LEROY PERNELL, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM, et al., <br><br> *Defendants*. | Case No. 4:22-cv-304-MW-MAF |

## <u>DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS</u>

Charles J. Cooper (Bar No. 248070DC)
John D. Ohlendorf (*Pro Hac Vice*)
Megan M. Wold (*Pro Hac Vice*)
John D. Ramer (*Pro Hac Vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601

*Counsel for Defendants Florida Board of Governors of the State University System, et al.*

September 22, 2022

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ........................................................................1

BACKGROUND ........................................................................3

   I.   Florida's Elected Officials Enact the Individual Freedom Act. ................3

   II.  Plaintiffs Challenge the Act Under the First Amendment and Due Process Clause. ....................................................................6

STANDARD OF REVIEW ........................................................6

ARGUMENT ...............................................................................7

   I.   No Plaintiff Has Standing To Sue Any Defendant Board of Trustees Other Than That of the Plaintiff's Home Institution. ..................................7

   II.  Plaintiff Dunn Lacks Standing on All Claims Because the Act Does Not Apply to His Bus Tour. ....................................................8

   III.  No Plaintiff Has Standing to Assert an Injury to *Other* Professors, Students, or Universities. ................................................9

   IV.  Plaintiff Dauphin Lacks Standing To Challenge the Act as an Instructor. .......................................................................11

   V.   Plaintiffs Lack Standing To Challenge the First, Third, Fifth, Sixth, and Seventh Concepts. ......................................................12

   VI.  Counts One, Two, and Three Should Be Dismissed Because Plaintiffs Have Failed to State a Claim Under the Free Speech or Due Process Clauses. ....................................................................14

   VII.  Count Four Should Be Dismissed Because Plaintiffs Have Failed To State a Claim Under the Equal Protection Clause. ...........................15

        A.   Plaintiffs Have Failed To Plausibly Allege that the Act Has a Disparate Impact on African-Americans. ...........................16

B.    Plaintiffs Have Alleged No Direct Evidence of Intentional Race Discrimination. .................................................................................19

C.    Plaintiffs' Circumstantial Evidence Does Not Plausibly Support Any Inference of Intentional Race Discrimination. .......................20

1.    The "historical background" of the Act does not suggest that it was enacted for a discriminatory purpose. ................................21

2.    Neither the "events leading up to [the Act's] passage" nor the "statements and actions" of its legislative supporters indicate any discriminatory motivation. ...................................................22

3.    Plaintiffs do not identify any meaningful "procedural and substantive departures" in the Act's enactment process. ...........26

4.    The purported "foreseeability" and legislative "knowledge" of the Act's supposed "disparate impact" do not give rise to any inference of racial animus. .......................................................28

5.    The State reasonably concluded that none of Plaintiffs' "less restrictive" alternatives to the Act would adequately accomplish its compelling interests. ............................................................30

CONCLUSION ........................................................................................30

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page**

*Abbott v. Perez*, 138 S. Ct. 2305 (2018) ...............................................22, 24, 28, 30

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).....................................................7

*Davis v. FEC*, 554 U.S. 724 (2018) ......................................................................12

*Greater Birmingham Ministries v. Ala. Sec'y of State*,
    992 F.3d 1299 (11th Cir. 2021) ........................................................16, 24, 25

*Hallmark Devs., Inc. v. Fulton Cnty., Ga.*,
    466 F.3d 1276 (11th Cir. 2006) ...................................................................28

*Laird v. Tatum*, 408 U.S. 1 (1972).........................................................................14

*League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*,
    32 F.4th 1363 (11th Cir. 2022).........................................1, 20, 21, 22, 29

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) .........................................................

*Miller v. Johnson*, 515 U.S. 900 (1995)............................................................3, 20

*Muransky v. Godiva Chocolatier, Inc.*,
    979 F.3d 917 (11th Cir. 2020) ......................................................................7

*Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979) ...........................................29

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*,
    508 F. Supp. 3d 521 (N.D. Cal. 2020)...........................................................26

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) ...................................10

*Stout by Stout v. Jefferson Cnty. Bd. of Educ.*,
    882 F.3d 988 (11th Cir. 2018) ....................................................................19

*Thai Meditation Ass'n of Ala., Inc. v. City of Mobile, Ala.*,
    980 F.3d 821 (11th Cir. 2020) ....................................................................24

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) ...............................................1

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977)...........................................................................19, 26

*Washington v. Davis*, 426 U.S. 229 (1976) ......................................................15, 16

*Williams v. Poarch Band of Creek Indians*, 839 F.3d 1312 (11th Cir. 2016) .......6, 7

*Young Apartments, Inc. v. Town of Jupiter, Fla.*,
    529 F.3d 1027 (11th Cir. 2008) ............................................................10, 11

*Ziyadat v. Diamondrock Hosp. Co.*, 3 F.4th 1291 (11th Cir. 2021) .......................... 7

**Rules and Statutes**

FED. R. CIV. P.
    12(b)(1) .................................................................................. 2, 6
    12(b)(6) .................................................................................. 2, 6

FLA. STAT.
    § 1000.03(2)(a) ......................................................................... 3
    § 1000.05(4)(a)(1)–(8) ...................................................... 5, 8, 11
    § 1000.05(4)(a)(1) .................................................................... 12
    § 1000.05(4)(a)(3) .................................................................... 13
    § 1000.05(4)(a)(5) ............................................................... 12, 13
    § 1000.05(4)(a)(6) .................................................................... 13
    § 1000.05(4)(a)(7) .................................................................... 14
    § 1000.05(4)(b) ......................................................................... 5
    § 1000.05(6)(b) ......................................................................... 5

2022 Fla. Laws 72 ........................................................................... 3
    § 8 ........................................................................................... 3
    § 2 ........................................................................................... 4

**Regulation**

*10.005*, *Prohibition of Discrimination in University Training or Instruction*, BD. OF
    GOVERNORS, STATE UNIV. SYS. OF FLA. (Aug. 26, 2022), *available at*
    https://bit.ly/3xqDCX8 ("Regulation 10.005") ............................... 5

Regulation 10.005(1)(b) ................................................................... 9

Regulation 10.005(1)(c) ........................................................... 9, 11, 12

Regulation 10.005(4)(a) ................................................................... 5

**Other Authorities**

2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787
    (Max Farrand ed., 1911) ............................................................. 1

*House Bill 7*, *Amendments*, THE FLORIDA SENATE (last visited Sept. 21, 2022,
    10:23 AM), https://bit.ly/3ePqzIp .............................................. 30

Florida House of Representatives, Passage, H.B. 7, 2022 Reg. Sess. (Feb. 24, 2022,
    12:34 PM), https://bit.ly/3Uas4kI .............................................. 24

*Courtroom Battles, Access to the Ballot*, NAACP LEGAL DEF. & EDUC. FUND:
    VOTING RIGHTS 2022 (last visited Sept. 20, 2022, 5:47 PM),
    https://bit.ly/3xjP46Q ......................................................................................25

Order, *Falls v. DeSantis*, No.22-cv-166, Doc. 68
    (N.D. Fla. July 8, 2022) ..............................................................................14

*2/22/22 House Session*, THE FLORIDA CHANNEL (Feb. 22, 2022),
    https://bit.ly/3BaLCN0 ..............................................................................26

# INTRODUCTION

Article III grants federal courts the power to "decide only matters 'of a Judiciary Nature,'" not to "issue advisory opinions." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (quoting 2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 430 (Max Farrand ed., 1911)). Accordingly, a plaintiff can call upon the federal courts to adjudicate grievances against a state law only if the plaintiff demonstrates that the law in fact causes some concrete injury, that the injury is actually traceable to the challenged provisions of the law, and that a judgment striking down the law would redress that injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

Plaintiffs' claims fall short of Article III's requirements in multiple respects. First, no Plaintiff has standing to sue the Florida Board of Governors, its members, or the Commissioner of the State Board of Education, because those officials and entities have no role in enforcing the Act against individual professors (or students) like Plaintiffs. Any injury plaintiffs have suffered is thus not traceable to these defendants, and they must be dismissed from the case. Second, Plaintiff Dunn lacks standing to bring any claim, because he has not adequately alleged any injury arguably caused by the Act. Third, even those Plaintiffs who *are* plausibly injured by some provision of the Act have not alleged any injury from *all* of its provisions— and so Plaintiffs' challenge to the first, third, fifth, sixth, and seventh concepts

enumerated by the Act must be dismissed, since no Plaintiff has credibly alleged or averred that they wish to engage in any instruction genuinely contrary to them. Accordingly, Plaintiffs' claims must be dismissed in part under FED. R. CIV. P. 12(b)(1) for lack of jurisdiction.

Plaintiffs' Complaint also must be dismissed in its entirety on the merits under FED. R. CIV. P. 12(b)(6). With respect to the first three Counts in the Complaint, dismissal is required for the reasons articulated in our response to Plaintiffs' Preliminary Injunction Motion, which is filed contemporaneously herewith.

With respect to Count Four—the Equal Protection claim—dismissal is appropriate because the Complaint alleges no concrete facts sufficient to meet the legal elements of an actionable Equal Protection claim. Because the Act draws no race-based lines on its face, Plaintiffs can state an Equal Protection race-discrimination claim only by adequately alleging both that the Act, which is race-neutral on its face, has a disparate impact on African-Americans *and* that it was enacted with a racially-discriminatory motive. Yes, the Complaint includes conclusory and threadbare legal assertions that these elements are met; but it does not articulate concrete factual allegations sufficient to nudge Plaintiffs' claim of race discrimination over the line from the conceivable to the plausible. Plaintiffs' allegations of disparate impact collapse upon scrutiny. They have no direct evidence whatsoever that Florida's lawmakers enacted the Act because of an invidious race-

2

based motive. And while the indirect evidence they present may tell us a great deal about racism in Florida in the 1950s and '60s, and may suggest that the purpose of the Act was (as is obvious from its face) to prevent Florida-employed teachers from *advocating and endorsing certain concepts* related to race relations in America, that circumstantial evidence provides *not even a hint* that the Act was intended to discriminate against African-Americans because of their race. To the contrary, the *whole point* of the Act was to keep Florida's tax dollars from funding the inculcation of ideas *that are contrary* to the Equal Protection Clause's bedrock principle: "the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class." *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (cleaned up).

## BACKGROUND

### I.    Florida's Elected Officials Enact the Individual Freedom Act.

Earlier this year, pursuant to its authority to "establish education policy, enact education laws, and appropriate and allocate education resources," FLA. STAT. § 1000.03(2)(a), the Florida Legislature passed the Individual Freedom Act ("the Act"). *See* 2022 Fla. Laws 72. Governor DeSantis approved the Act on April 22, and it took effect on July 1. *See* 2022 Fla. Laws 72, § 8.

As relevant here, the Act amended the Education Code to enumerate actions that constitute "discrimination on the basis of race, color, national origin, [or] sex"

and are thus prohibited under Section 1000.05(2). *Id.* § 2. Specifically, the Act prohibits "subject[ing] any student or employee to training or instruction that espouses, promotes, advances, inculcates, or compels such student or employee to believe any of the following concepts:"

1.    Members of one race, color, national origin, or sex are morally superior to members of another race, color, national origin, or sex.

2.    A person, by virtue of his or her race, color, national origin, or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously.

3.    A person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex.

4.    Members of one race, color, national origin, or sex cannot and should not attempt to treat others without respect to race, color, national origin, or sex.

5.    A person, by virtue of his or her race, color, national origin, or sex, bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, national origin, or sex.

6.    A person, by virtue of his or her race, color, national origin, or sex, should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion.

7.    A person, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin, or sex.

8.    Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were

4

created by members of a particular race, color, national origin, or sex to oppress members of another race, color, national origin, or sex.

FLA. STAT. § 1000.05(4)(a)(1)–(8) (as amended by the Act).

The Act, however, draws a sharp distinction between *indoctrination* and *discussion*: it prohibits all persons from subjecting a student or employee to believe these concepts, but at the same time makes clear that it does not "prohibit discussion of the concepts . . . as part of a larger course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts." FLA. STAT. § 1000.05(4)(b).

The Florida Board of Governors is vested with the authority to "adopt regulations to implement [§ 1000.05] as it relates to state universities." FLA. STAT. § 1000.05(6)(b). Pursuant to that authority, the Board recently finalized Regulation 10.005 to implement the Act. *See 10.005*, *Prohibition of Discrimination in University Training or Instruction*, BD. OF GOVERNORS, STATE UNIV. SYS. OF FLA. (Aug. 26, 2022), *available at* https://bit.ly/3xqDCX8 ("Regulation 10.005"). Under the Regulation, the Board takes enforcement action only against a university that "willfully and knowingly failed to correct a violation of the university regulation." Regulation 10.005(4)(a).

## II.     Plaintiffs Challenge the Act Under the First Amendment and Due Process Clause.

Plaintiffs are six current professors at Florida universities, one professor emeritus who hosts a university-sponsored bus tour, and one university student. Together, they argue that the Act violates their rights under the First Amendment and under the Fourteenth Amendment's Due Process and Equal Protection Clauses.

The Plaintiffs are affiliated with different Florida universities. Leroy Pernell is a Professor of Law at Florida A&M University College of Law. Dana Thompson Dorsey is an Associate Professor with tenure at the University of South Florida. Sharon Austin is a Professor of Political Science with tenure at the University of Florida. Shelley Park is a Professor and Jennifer Sandoval is an Associate Professor, both at the University of Central Florida. Marvin Dunn is a Professor Emeritus at Florida International University, where he hosts a university-sponsored bus tour. Russell Almond is an Associate Professor at Florida State University, where Johana Dauphin is a student.

Defendants now move to dismiss Plaintiffs' claims in their entirety or, alternatively, in part, under FED. R. CIV. P. 12(b)(1) and FED. R. CIV. P. 12(b)(6).

### STANDARD OF REVIEW

 Regulation 12 provides that a claim may be dismissed for either "lack of subject matter jurisdiction" or "failure to state a claim upon which relief can be granted." *Id.* Under Regulation 12(b)(1), "[t]he burden for establishing federal

subject matter jurisdiction rests with the party bringing the claim." *Williams v. Poarch Band of Creek Indians*, 839 F.3d 1312, 1314 (11th Cir. 2016). The plaintiff "must clearly and specifically set forth facts to satisfy" the injury-in-fact requirement. *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 924–25 (11th Cir. 2020) (cleaned up).

"Under Rule 12(b)(6), a court should dismiss [a claim] … when the plaintiff's factual allegations, if true, don't allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ziyadat v. Diamondrock Hosp. Co.*, 3 F.4th 1291, 1295 (11th Cir. 2021) (cleaned up). The court must "view the complaint in the light most favorable to the plaintiff and accept all of the plaintiff's well-pleaded facts as true," but it cannot credit "mere conclusory statements," *id*. at 1295–96, and a plaintiff's allegations must be supported with enough detail to "nudge[ ] their claims across the line from conceivable to plausible," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## ARGUMENT

### I.   No Plaintiff Has Standing To Sue Any Defendant Board of Trustees Other Than That of the Plaintiff's Home Institution.

Each Plaintiff is affiliated with only one university in the Florida University System. It obviously follows that no Plaintiff can allege an injury-in-fact that is traceable to and redressable by the Board of Trustees for any university with which that Plaintiff is *not* affiliated. For example, Plaintiff Leroy Pernell, who is a Professor

of Law at Florida A&M University College of Law, has not (and cannot) allege an injury-in-fact that would be traceable to and redressable by the Defendant Boards of Trustees of the University of Florida, the University of South Florida, or any of the other university defendants. Accordingly, in the event that the Court finds that any individual Plaintiff lacks standing in this case, the Defendant Board of Trustees for that Plaintiff's university should also be dismissed.

## II.    Plaintiff Dunn Lacks Standing on All Claims Because the Act Does Not Apply to His Bus Tour.

Plaintiff Dunn has also failed to allege standing because the bus tour that he leads is not a "training or instruction" covered by the Act.

Dunn is a Professor Emeritus at Florida International University who leads a "Black history bus tour of Miami," funded by FIU. Pls.' Compl. ("Compl."), Doc. 1, ¶ 28 (Aug. 18, 2022). Dunn alleges that "he fears that the discussions about his past experiences of discrimination with white colleagues" while on his bus tour will violate the Act, and that his bus tour will violate the Act's requirement "that instructors be 'objective' when discussing certain topics related to race." *Id*. at ¶ 30. In fact, Dunn's bus tour is not governed by the Act at all and does not restrict his actions while conducting the tour.

The Act defines discrimination to include "training or instruction" that espouses one of eight prohibited concepts. FLA. STAT. § 1000.05(4)(a)(1)–(8). And Regulation 10.005, which enforces the Act, defines "instruction" as "the process of

8

teaching or engaging students with content about a particular subject by a university employee or a person authorized to provide instruction by the university *within a course*." Regulation 10.005(1)(c) (emphasis added). Dunn's bus tour does not occur within any course offered by Florida International University, so it cannot qualify as "instruction" under the Act. Regulation 10.005 defines "training" as "a planned and organized activity conducted by the university *as a mandatory condition of employment, enrollment, or participation in a university program*," and Dunn's bus tour does not fall within that definition either. Regulation 10.005(1)(b) (emphasis added). Dunn's bus tour is voluntary and is not a condition of any student's participation or enrollment in any university program. Accordingly, Dunn should be dismissed as a plaintiff in this case.[1]

## III.   No Plaintiff Has Standing to Assert an Injury to *Other* Professors, Students, or Universities.

These Plaintiffs cannot rescue their standing by pointing to the alleged injuries suffered by *other* individuals or entities. Several of Plaintiffs, including Plaintiffs Austin, Almond, and Dunn, speak extensively about alleged harms to professors, students, or universities who are not parties in this case. *See, e.g.*, Decl. of Sharon Austin in Supp. of Pls.' Mot. for a Prelim. Inj. ("Austin Decl."), Doc. 13-3, ¶¶ 45–

---

[1] Consequently, the Board of Trustees of FIU must also be dismissed as a defendant because no other Plaintiff has alleged an injury-in-fact that is traceable to and redressable by the FIU Board of Trustees.

57 (Aug. 24, 2022) (describing alleged harms to internal funding, professor recruitment and retention, student access to information, student respect for instructors, minority student recruitment and retention, retaliation against other professors, tenure decisions, outside funding for race studies research, and alleged "chill" of campus discussions); Decl. of Dr. Russel G. Almond in Supp. of Pls.' Mot. for a Prelim. Inj. ("Almond Decl."), Doc. 13-6, ¶¶ 34–35 (Aug. 24, 2022) (asserting potential harm of university funding loss and concern "about how my graduate-level students will perform in their fields after graduation"); Decl. of Dr. Marvin Dunn in Supp. of Pls.' Mot. for a Prelim. Inj. ("Dunn Decl."), Doc. 13-7, ¶ 15 (Aug. 24, 2022) (expressing fear over loss of university funding); *see also* Decl. of Leroy Pernell in Supp. of Pls.' Mot. for a Prelim. Inj. ("Pernell Decl."), Doc. 13-1, ¶¶ 27, 29 (Aug. 24, 2022); Decl. of Dana Thompson Dorsey in Supp. of Pls.' Mot. for a Prelim. Inj. ("Dorsey Decl."), Doc. 13-2, ¶¶ 38–39, 46, 50, 52–57 (Aug. 24, 2022); Decl. of Shelley Park in Supp. of Pls.' Mot. for a Prelim. Inj. ("Park Decl."), Doc. 13-4, ¶¶ 32–33, 35–36 (Aug. 24, 2022); and Decl. of Jennifer Sandoval in Supp. of Pls.' Mot. for a Prelim. Inj. ("Sandoval Decl."), Doc. 13-5, ¶ 28 (Aug. 24, 2022).

These assertions of third-party harms cannot form the basis of an injury-in-fact for any Plaintiff. An injury-in-fact is "a harm *suffered by the plaintiff* that is 'concrete' and 'actual or imminent, not 'conjectural' or 'hypothetical.''" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998) (emphasis added). "In an

ordinary case, a plaintiff is denied standing to assert the rights of third parties." *Young Apartments, Inc. v. Town of Jupiter, Fla.*, 529 F.3d 1027, 1041 (11th Cir. 2008). Plaintiffs do not, and could not, allege that they may assert third-party standing to raise these alleged harms on behalf of other professors, students, and universities.

### IV. Plaintiff Dauphin Lacks Standing To Challenge the Act as an Instructor.

Plaintiff Johana Dauphin is a student at Florida State University, and as such, she lacks standing to challenge the Act as an instructor. In her declaration, Dauphin alleges that the Act restricts her classroom speech because she says she "can no longer express certain views when [she is] acting as an 'instructor,'" by, for example, "express[ing] [her] opinion that it is unhelpful for people to work on demonstrating that they [are a] good person instead of working on unlearning the unconscious prejudices that led them to saying the racist remark." Decl. of Johana Dauphin in Supp. of Pls.' Mot. for a Prelim. Inj. ("Dauphin Decl."), Doc. 13-8, ¶ 23 (Aug. 24, 2022).

Student participation in classroom discussions is not covered by the Act. The Act defines discrimination to include "training or instruction" that espouses one of eight prohibited concepts. FLA. STAT. § 1000.05(4)(a)(1)–(8). As defined by the Board of Governor's Regulation 10.005, "instruction" is "the process of teaching or engaging students with content about a particular subject *by a university employee*

11

*or a person authorized to provide instruction* by the university within a course."
Regulation 10.005(1)(c) (emphasis added). Dauphin is neither a university employee
nor a person authorized to provide instruction to other students. Accordingly,
Dauphin should be dismissed as to claims (1), (3), and (4) of the Complaint.

## V.   Plaintiffs Lack Standing To Challenge the First, Third, Fifth, Sixth, and Seventh Concepts.

Even those Plaintiffs who do have standing to challenge certain provisions of
the Act do not have standing to challenge the Act as an undifferentiated, unified
whole. "Standing is not dispensed in gross. Rather, a plaintiff must demonstrate
standing for each claim he seeks to press and for each form of relief that is sought."
*Davis v. FEC*, 554 U.S. 724, 734 (2008) (cleaned up) (citation omitted).
Accordingly, Plaintiffs cannot leverage an alleged injury under *one* of the Act's eight
concepts into a challenge against—and entitlement to a preliminary injunction
barring the enforcement of—*other* prohibited concepts that they have alleged no
intention of espousing, not to mention the Act as a whole. And for several provisions
of the Act, no Plaintiff alleges any injury.

No Plaintiff states an intention to teach that "[m]embers of one race, color,
national origin, or sex are morally superior to members of another race, color,
national origin, or sex," FLA. STAT. § 1000.05(4)(a)(1), or that "[a] person, by virtue
of his or her race … bears responsibility for, or should be discriminated against or
receive adverse treatment because of, actions committed in the past by other

members of the same race," FLA. STAT. § 1000.05(4)(a)(5). Nor does any Plaintiff clearly state an intention to teach that "[a] person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex." FLA. STAT. § 1000.05(4)(a)(3). Plaintiff Sandoval is the only Plaintiff to discuss this principle, but she merely states her belief that no "professor could teach a course on critical race theory without advancing" that principle. Sandoval Decl. ¶ 21. She does not meaningfully explain why. And in any event, Sandoval herself *does not teach* critical race theory—and as explained above, she cannot claim standing to defend the interests of the unspecified professors who do. *See supra*, Part III.

No Plaintiff challenges the Act's sixth principle either, which states that "[a] person, by virtue of his or her race, color, national origin, or sex, should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion." FLA. STAT. § 1000.05(4)(a)(6). Plaintiff Almond purports to do so, but he claims only that he cannot instruct his statistics students about the need to have a "diverse body of reviewers" review assessments, Almond Decl. ¶ 26, and that has nothing to do with the sixth principle, which advocates *adverse treatment* against an individual based solely on race, color, national origin, or sex.

Similarly, with respect to the Act's seventh concept, Plaintiffs' claims fail for lack of standing because they are premised on fundamental misunderstandings about

what that concept covers. The Act's seventh principle prohibits teaching that "[a] person, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for *and must feel* guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin, or sex." FLA. STAT. § 1000.05(4)(a)(7). Plaintiffs misread this provision to restrict any teaching that merely *has the effect* of making a student feel guilt, anguish, or other forms of psychological distress for historical racism. *See* Dorsey Decl. ¶¶ 35, 47; Park Decl. ¶¶ 19, 25; Sandoval Decl. ¶ 12; Dunn Decl. ¶ 14. But the Act only restricts advocating the proposition that a student *must feel* guilt, anguish, or other forms of psychological distress, and no Plaintiff admits to intending to teach *that*. *See* Order, *Falls v. DeSantis*, No.22-cv-166, Doc. 68, at 9–10 (N.D. Fla. July 8, 2022). Plaintiffs' challenge to this concept is thus based on an alleged "subjective 'chill'" rather than an objectively reasonable "threat of specific future harm" under the Act. *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972).

## VI.   Counts One, Two, and Three Should Be Dismissed Because Plaintiffs Have Failed to State a Claim Under the Free Speech or Due Process Clauses.

Counts One, Two, and Three should also be dismissed in their entirety because they fail to state a claim for the reasons set out in Defendants Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction, filed

contemporaneously with this Motion, which are hereby incorporated by reference. All of Plaintiffs' Free Speech and vagueness claims fail on their merits. The Act's educational provisions regulate only curricular speech, which is pure government speech, so the First Amendment simply does not apply; and even if it did, (1) Florida's decisions concerning the content of curricular speech must prevail in disputes with individual educators and (2) the State's indisputably compelling interest in preventing its educators from espousing the prohibited concepts, which the State condemns as discriminatory and abhorrent, to Florida's students would justify any burden the Act may place on the Free Speech rights of individual professors or students to advocate or hear those ideas on the State's dime. And because the Act gives fair notice, in readily understood language, of the conduct it prohibits, it is not unconstitutionally vague.

## VII.   Count Four Should Be Dismissed Because Plaintiffs Have Failed To State a Claim Under the Equal Protection Clause.

Plaintiffs' claim that the Act violates the Equal Protection Clause by intentionally discriminating against African-Americans also fails as a matter of law. The Act draws no explicit distinctions based on race—on its face, it prevents teachers of *any* race from endorsing the prohibited concepts, which are themselves race neutral. Because it is facially neutral, the Plaintiffs can state an Equal Protection violation only if they plausibly allege both that the Act "has a racially disproportionate impact" and "a racially discriminatory purpose." *Washington v.*

*Davis*, 426 U.S. 229, 239 (1976); *see also Greater Birmingham Ministries v. Ala. Sec'y of State*, 992 F.3d 1299, 1321 (11th Cir. 2021). They have done neither.

### A. Plaintiffs Have Failed To Plausibly Allege that the Act Has a Disparate Impact on African-Americans.

Plaintiffs' claim fails to leave the starting gates because they have not pleaded adequate factual material to lend plausibility to their threadbare allegation that the Act will "have a disparate impact on Black students and instructors." Compl. ¶ 199.

1. Plaintiffs' primary support for their assertion of disparate impact is based on the following chain of inferences: (i) the Act disproportionately restricts the teaching of "instructors who teach Critical Race Theory, race studies, ethnic studies, or otherwise discuss systemic racism, and gender and sex discrimination," *id.* at ¶¶ 183–84; and (ii) "Black instructors within Florida's State University System are more likely to teach courses on race studies, Critical Race Theory, ethnic studies, and other courses that involve" the prohibited concepts, *id.* at ¶ 185; so therefore (iii) "the law's impact will bear particularly heavily on Black instructors, who are more likely to teach on these topics," *id.* at ¶ 240. This conclusion does not follow, however, because Plaintiffs have not plausibly supported either of the premises.

As an initial matter, Plaintiffs' syllogism effectively ignores the Act's application to *sex* discrimination. Under the Act, instructors cannot teach that individuals, solely because of their sex, are inherently *sexist* any more than that they, solely because of their race, are inherently *racist*; they cannot teach that members of

16

one *sex* "are morally superior" to members of the other sex any more than they can teach that one *race* is morally superior. Indeed, all eight of the Act's concepts apply to sex discrimination in equal measure as race discrimination. And when the Act's application to sex discrimination is taken into account, Plaintiffs' conclusory allegation that "Black instructors . . . are more likely to teach courses . . . that involve" the Act's concepts, *id.* at ¶ 185, becomes completely implausible. "Departments of African American Studies" may well be "predominantly staffed by Black instructors," *id.* at ¶ 186, but Plaintiffs do not even allege that departments of sex and gender studies are.

This shortfall is even more obvious at the K-12 level, where there are no dedicated African-American studies departments. Plaintiffs do not allege that African-Americans make up a disproportionate share of teachers in these grades affected by the Act. Nor do they offer any justification for their decision to limit their allegations of disparate racial impact to the "University System," rather than K-20, since the Act applies to teachers at all of these levels in equal measure. *Id.* at ¶ 185.

Moreover, even if the Act's application to sex discrimination could be ignored, Plaintiffs have still failed to show a disparate impact. Yes, courses involving "Critical Race Theory, race studies, [and] ethnic studies", Compl. ¶¶ 183–84, are likely to deal with material implicating the Act's eight concepts, but they

17

hardly have a monopoly on the subject matter. Courses across a wide range of subjects may raise these concepts—indeed, Plaintiff Almond is a statistics professor, and as Plaintiffs' note, one legislator pointed during the drafting process to one teacher's discussion of "white privilege" in mathematics courses. *Id.* ¶ 115. Yet even with respect to the Act's application to race alone, Plaintiffs nowhere allege that the category of K-20 teachers who wish to teach one or more of the Act's concepts is disproportionately comprised of African-Americans.

2.    Plaintiffs also allege that the Act will have a disparate impact on "Black students" by exposing them to an increased likelihood of "racial harassment and discrimination." *Id.* ¶¶ 194, 240. Plaintiffs' theory is that "[i]nstruction about race, and student awareness of racism, reduce the likelihood that students will engage in racial harassment," while "removing this instruction increases the likelihood that students of color will experience increased racial harassment and discrimination." *Id.* ¶¶ 193–94. The problem with this argument is that the Act *does not limit* "instruction" about race or "awareness of racism" in general. Such instruction remains permissible so long as it does not include the endorsement of one of the Act's eight enumerated concepts. Plaintiffs do not allege—and it would be completely implausible to conclude—that instruction endorsing the concepts the Act actually prohibits would reduce racial harassment. Indeed, the Act prohibits the inculcation of the eight enumerated concepts *precisely because* the state of Florida

determined that they *constitute racial discrimination* and are thus the *source* of racial division and harassment.

**B.   Plaintiffs Have Alleged No Direct Evidence of Intentional Race Discrimination.**

Even if Plaintiffs had adequately alleged a disparate impact, "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Plaintiffs must allege sufficient factual matter to give rise to a plausible inference that "racial discrimination was a substantial or motivating factor behind enactment of the law." *Stout by Stout v. Jefferson Cnty. Bd. of Educ.*, 882 F.3d 988, 1006 (11th Cir. 2018). They have not done so.

While Plaintiffs' complaint includes conclusory allegations that the Act "was enacted with the intent to discriminate against Black instructors and students," Compl. ¶ 9, it is entirely devoid of any *direct* evidence of such a discriminatory purpose. Plaintiffs reproduce a number of statements from Governor DeSantis and various supporters of the Act in the state legislature, but these statements, at most, support the allegation that the Act "was enacted to suppress *speech* about systemic racism, white privilege, and 'Critical Race Theory,'" *id.* ¶ 93 (emphasis added)— not that it was enacted to suppress or otherwise discriminate against *a particular race*. Thus, while Plaintiffs quote Governor DeSantis, for example, stating that "[t]here is no room in our classrooms for things like Critical Race Theory," *id.* ¶ 94,

19

that does not even remotely or conceivable imply that there is no room in our classrooms for *a particular race*.

Plaintiffs get no further by reciting various legislators' promotion of "the ideology of colorblindness," or their opposition to those who "ask[] us to consider people not as individuals but as groups." *Id.* ¶¶ 118–19. Plaintiffs may reject "the ideology of colorblindness" and embrace judging people by their race, but they have not plausibly alleged that all those who disagree with them—and who continue to believe that individuals should be judged "based on the content of their character and based on their hard work and what they're trying to accomplish in life," rather than "based on skin color," *id.* ¶ 98—are racist, let alone *necessarily racist*. After all, a society that treat[s] citizens as individuals" rather than members of a racial group has been the aspirational goal of *decades* of Equal Protection jurisprudence. *See Miller*, 515 U.S. at 911.

### C. Plaintiffs' Circumstantial Evidence Does Not Plausibly Support Any Inference of Intentional Race Discrimination.

Because Plaintiffs lack any *direct* evidence that the Act was "the product of intentional race discrimination," *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1372 (11th Cir. 2022), they can state an Equal Protection claim only if they have adequately alleged sufficient *circumstantial* evidence of a racially discriminatory motivation, under the test articulated by the Supreme Court

in *Arlington Heights*. As the Eleventh Circuit has explained, that test considers such factors as:

> (1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; . . . (5) the contemporary statements and actions of key legislators[;]…(6) the foreseeability of the disparate impact; (7) knowledge of that impact; and (8) the availability of less discriminatory alternatives."

*Id.* at 1373 (cleaned up) (citations omitted). Here, the first consideration does not weigh in Plaintiffs' favor because—as explained above—they have failed to plausibly allege that the Act has any disparate impact on African-Americans. And Plaintiffs also do not plausibly allege that any of the other factors give rise to an inference of racial animus.

> **1.  The "historical background" of the Act does not suggest that it was enacted for a discriminatory purpose.**

Plaintiffs begin their discussion of the "historical background" of the Act in 1956, and the bulk of it concerns events that occurred in the 1960s and 1970s. There is no question that African-Americans in Florida faced discriminatory violence and oppression during this period. But binding Supreme Court and Eleventh Circuit precedent makes clear that the racist actions that occurred in Florida during this era cannot show that legislation enacted *five to seven decades later* in 2022 was racially motivated. The *Arlington Heights* inquiry into a law's historical background must "be focused on the specific sequence of events leading up to the challenged decision

21

rather than providing an unlimited lookback to past discrimination." *League of Women Voters*, 32 F.4th at 1373 (cleaned up). Otherwise, *every* modern action taken by the Florida government could be shown to be intentionally racially discriminatory. It does not diminish the grievous injury suffered by African-Americans for much our Nation's history to recognize that "[p]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018) (cleaned up).

Plaintiffs' more recent "historical background" evidence also falls short. Tragedies such as the 1996 police shooting of "an unarmed Black Teenager," the 2012 "killing of Trayvon Martin," or the killing of George Floyd, Compl. ¶¶ 67, 71, 73, do not show that the Florida legislature acted with racial animus when it passed the Act in 2022. Florida's legislators did not perpetrate these tragic acts and in fact had nothing to do with them.

> ### 2. Neither the "events leading up to [the Act's] passage" nor the "statements and actions" of its legislative supporters indicate any discriminatory motivation.

Plaintiffs' discussion of the Act's more immediate historical context, far from revealing some clandestine, racially discriminatory motive, confirms the purpose that is plain from the Act's text. The Act was not designed to oppress African-Americans. It was designed to prevent State-employed teachers from inculcating a set of controversial and highly contested concepts and policy prescriptions relating

to race relations in America—concepts and policies that the People of Florida, in their sovereign judgment, believe to be abhorrent and have determined to be *themselves racially discriminatory*.

That is shown by Plaintiffs' lengthy discussion of the campus activism in the two years leading up to the Act's passage. The handful of student and faculty demands recounted in Plaintiffs' complaint that even potentially touch on issues related to the Act do so only to the extent they advance *concepts* that the Act prohibits—not because some of the students and teachers advocating those concepts were African-American. Moreover, Plaintiffs' narrative repeatedly describes how Universities *welcomed and implemented* these faculty and student recommendations—by, for example, "including activities within courses that will target dismantling racism," and "developing mandatory diversity and inclusivity training for all campus employees and students." *Id.* ¶¶ 86, 88. To the extent that Plaintiffs are right to infer that the Act was a response to these university actions, that does not reveal any racial animus. Rather, it confirms that the purpose of the Act is the one that is evident on its face: Florida's determination that it no longer wants teachers in the Universities and schools it operates to endorse and advocate, at taxpayer expense, a set of controversial concepts that the People of Florida have judged to be racially discriminatory and pernicious.

23

The statements of the Act's supporters reproduced in the Complaint tell the same story. As an initial matter, Plaintiffs cite statements by only five Florida officials—Governor DeSantis, Representatives Avia, Massullo, and Andrade, and Senator Diaz—and precedent makes clear that a court cannot "impute the discriminatory intent of one or a few decisionmakers to the entire group." *Thai Meditation Ass'n of Ala., Inc. v. City of Mobile, Ala.*, 980 F.3d 821, 836 (11th Cir. 2020); *see also Greater Birmingham Ministries*, 992 F.3d at 1324–25. But even if it could, the statements cited by Plaintiffs, rather than revealing some sort of intent to discriminate against African-Americans, again shows the legislature's intent to prevent Florida-employed teachers from endorsing particular, controversial concepts. *See, e.g.*, Compl. ¶¶ 86, 88, 125.

Nor does the fact that the Act passed the legislature largely on racially divided lines demonstrate that it was intended to be an instrument of intentional race discrimination. Plaintiffs' own allegations show that the vote tallies are far more indicative of *partisan* divisions than of *racial* ones: one African-American member in the Florida House—a Republican—voted *in favor* of the Act. *See* Compl. ¶ 121; Florida House of Representatives, Passage, H.B. 7, 2022 Reg. Sess. (Feb. 24, 2022, 12:34 PM), https://bit.ly/3Uas4kI (recording Representative Barnaby's yea vote); *cf. Abbott*, 138 S. Ct. at 2314 (noting in the redistricting context that "because a voter's race sometimes correlates closely with political party preference, it may be very

difficult for a court to determine whether a districting decision was based on race or party preference" (citations omitted)). And binding Eleventh Circuit precedent makes clear that such voting patterns do not support an Equal Protection claim so long as the State "has provided valid neutral justifications . . . for the law's passage," *Greater Birmingham Ministries*, 992 F.3d at 1326–27—here, preventing state-employed teachers from inculcating in their classrooms concepts that Florida deems to be racist and offensive.

Finally, Plaintiffs attempt to indict the Act by highlighting its proximity to a wholly unrelated statute—pointing to the legislature's contemporaneous passage of "Senate Bill 90, a restrictive voting law that was challenged by several nonprofit groups." Compl. ¶ 95. There is nothing to this. The Individual Freedom Act must be assessed only on its own terms and its own legislative background. Indeed, if any state law was subject to invalidation under the Equal Protection clause merely because the State's legislature also passed a (wholly unrelated) voting law that has been challenged as racially discriminatory, the legislative process in over a half-dozen States would be brought to a standstill. *See Courtroom Battles, Access to the Ballot*, NAACP LEGAL DEF. & EDUC. FUND: VOTING RIGHTS 2022 (last visited Sept. 20, 2022, 5:47 PM), https://bit.ly/3xjP46Q.

### 3.   Plaintiffs do not identify any meaningful "procedural and substantive departures" in the Act's enactment process.

Plaintiffs next attempt to identify "[d]epartures from the normal procedural sequence" during the Act's passage. *Arlington Heights*, 429 U.S. at 267. They come up empty. Plaintiffs first claim that the Act's language was "lifted" from "former President Trump's Executive Order 13950," even though that Order was "ruled unconstitutional over a year before H.B. 7 was introduced." Compl. ¶ 129. But Executive Order 13950 was enjoined on vagueness grounds, not Equal Protection grounds; and the district court's reasoning was principally based on language in a Department of Labor FAQ—not the text that is shared by the Executive Order and the Act. *See Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 544–45 (N.D. Cal. 2020).

Plaintiffs' next supposed procedural departure is that the Act's legislative supporters justified it by referring to educational "materials . . . [from] across the nation" rather than from "classroom discussions or university lectures in Florida." Compl. ¶ 130. But elsewhere in the materials cited by Plaintiffs, the Act's supporters *did* point to examples from Florida schools. *See 2/22/22 House Session*, THE FLORIDA CHANNEL, at 01:04:41—01:06:10 (Feb. 22, 2022), https://bit.ly/3BaLCN0. And at any rate, Plaintiffs do not explain why Florida's determination to address a problem occurring in other States before it spreads to Florida is a "[d]eparture[ ] from the normal procedural sequence." *Arlington Heights*, 429 U.S. at 267.

26

Plaintiffs also complain that "the Florida legislature declined to formally consult with any instructors throughout the bill drafting process," and that "[i]nstead, the legislature and Governor DeSantis's office consulted with [Christopher] Rufo, a Senior Fellow of the Manhattan Institute." Compl. ¶¶ 131–32. But all these allegations show is that the Act's proponents focused their efforts on consulting with individuals who *supported* the Act and believed it necessary—rather than groups who *opposed* the Act and, in fact, represented the very teachers who the State feared would likely endorse and inculcate one or more of the Act's eight concepts. The Act's opponents in the legislature no doubt consulted with those who, likewise, opposed its enactment. That does not *depart* from the normal legislative process; it *follows* it.

Plaintiffs' final supposed procedural departure has nothing to do with the substantive provisions of the Act, but rather with an enforcement mechanism allowing the withholding of funding to universities that violate the Act, which Plaintiffs allege was added "to a budget appropriation bill" throughout "the last few weeks of the session." *Id.* ¶ 135. So what? While Plaintiffs characterize the adoption of this language as "a rushed process," they do not allege that it was adopted more rapidly, or with less debate, than other appropriation riders of this nature. And Plaintiffs' argument also ignores the substantial and lengthy debate that had *already occurred* during the enactment of the Act's substantive provisions. Given that earlier

27

debate, the addition of this enforcement mechanism to the 2022 appropriation bill "did not require a prolonged process," and the "brevity of the legislative process" cannot "can give rise to an inference of bad faith—and certainly not an inference that is strong enough to overcome the presumption of legislative good faith" that applies to all duly enacted legislation. *Abbott*, 138 S. Ct. at 2328–29.

Even if one or more of the features of the Act's passage singled out by Plaintiffs *did* constitute a departure from the ordinary legislative process (and they do not), such "procedural abnormalities are only relevant within a larger scope" or "context that renders th[e] deviation suspect." *Hallmark Devs., Inc. v. Fulton Cnty., Ga.*, 466 F.3d 1276, 1285 (11th Cir. 2006). And Plaintiffs allege no reason—none at all—to conclude that any of their supposed procedural departures is actually indicative of racial animus.

> **4.  The purported "foreseeability" and legislative "knowledge" of the Act's supposed "disparate impact" do not give rise to any inference of racial animus.**

Plaintiffs also claim that the Court should infer a racially discriminatory motive because the Act's "opponents put the legislature on notice that it would have a disparate impact on Black students and instructors." Compl. ¶ 199. This argument fails, first, because its premise is false: as shown above, *supra* Part VII. A, Plaintiffs have failed to credibly allege that the Act in fact has any disparate impact on African-Americans. But even granting Plaintiffs' that premise, the argument still fails,

because none of the statements identified in the Complaint actually pointed to the supposed "disparate impact" that Plaintiffs now allege.

Student Plaintiff Dauphin, for instance, did testify that she experienced various instances of racism in school and that, in her opinion, the legislature "do[esn't] seem to care about that." *Id.* ¶ 200. But Plaintiffs do not allege that she testified that the Act would have any disparate impact on African-American students. The statements by other students, and by the ACLU, are cut from the same cloth—none identify any of the purported disparate impacts alleged in Plaintiffs' complaint. *Id.* ¶¶ 201–05.

Finally, even if Plaintiffs *had* adequately demonstrated that the Act will have a disparate racial impact and that the Legislature was actually put on notice of that impact, that would at most "demonstrate[ ] 'an awareness of consequences,' which is insufficient to establish discriminatory purpose." *League of Women Voters*, 32 F.4th at 1373–74. Plaintiffs' complaint includes *no* credible allegations giving rise to the inference that the legislature enacted the Act "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

**5. The State reasonably concluded that none of Plaintiffs' "less restrictive" alternatives to the Act would adequately accomplish its compelling interests.**

Finally, Plaintiffs fault the State for passing the Act rather than other available, less-restrictive alternatives. They allege that the legislature rejected "at least ten (10) proposed amendments that would have been less restrictive." Compl. ¶ 163. But the legislature did adopt numerous other amendments during the enactment process, *see House Bill 7, Amendments*, THE FLORIDA SENATE (last visited Sept. 21, 2022, 10:23 AM), https://bit.ly/3ePqzIp, so it is not as though it "categorically refuse[d] to consider changes." *Abbott*, 138 S. Ct. at 2329. And even if the Act's supporters did "generally hope[ ] to minimize amendments" that "hardly shows that [it] acted with discriminatory intent." *Id.* Nor does the existence of other "provisions in state and federal law" that "protect against . . . race discrimination," Compl. ¶ 162, give rise to any inference of racial animus. The State concluded that these other legal protections *were insufficient* to prevent the form of race discrimination it enacted the Act to curb. The Equal Protection Clause is not a straitjacket confining the States to striking at only those aspects of race discrimination addressed by preexisting law.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be granted.

Dated: September 22, 2022        Respectfully Submitted,

<u>/s/ Charles J. Cooper</u>
Charles J. Cooper (Bar No. 248070DC)
John D. Ohlendorf (*Pro Hac Vice*)
Megan M. Wold (*Pro Hac Vice*)
John D. Ramer (*Pro Hac Vice*)
Cooper & Kirk, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com

*Counsel for Defendants Florida Board of Governors of the State University System, et al.*

## <u>CERTIFICATE OF WORD COUNT</u>

Pursuant to Northern District of Florida Rule 7.1(F), the undersigned counsel hereby certifies that the foregoing Defendant's Memorandum of Law in Support of Motion to Dismiss, including body, headings, quotations, and footnotes, and excluding those portions exempt by Local Rule 7.1(F), contains 7,247 words as measured by Microsoft Office for Word 365.

s/     Charles J. Cooper
Charles J. Cooper
