# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

|  |  |
|---|---|
| LEROY PERNELL, et al., | |
| *Plaintiffs*, | Case No. 4:22-cv-304-MW-MAF |
| v. | |
| FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM, et al., | |
| *Defendants.* | |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Charles J. Cooper (Bar No. 248070DC)
John D. Ohlendorf (*Pro Hac Vice*)
Megan M. Wold (*Pro Hac Vice*)
John D. Ramer (*Pro Hac Vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601

*Counsel for Defendants Florida Board of Governors of the State University System, et al.*

September 22, 2022

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................1

FACTUAL BACKGROUND ................................................................3

I.   The People of Florida Empowered Their Elected Officials To Set
     the Curriculum for Public Universities. ....................................3

II.  Florida's Elected Officials Exercised this Power When Enacting the
     Individual Freedom Act and Adopting Implementing Regulations. ..........5

III. Plaintiffs Challenge the Act Under the First Amendment and
     Due Process Clause. ...............................................................7

STANDARD OF REVIEW ................................................................8

ARGUMENT .................................................................................9

I.   Plaintiffs Have Failed To Establish Standing Sufficient To Support a
     Preliminary Injunction with Respect to Several Provisions of the Act......9

II.  In-Class Instruction in Public Universities Is Government Speech
     and Thus Not Entitled to First Amendment Protection..........................10

     A. University Professors Do Not Have a First Amendment Right To
        Override the State's Curriculum. ........................................10

     B. University Students Do Not Have a First Amendment Right To
        Control the State's Curriculum. .........................................19

     C. The Act's Educational Provisions Satisfy Any Standard of
        Heightened Constitutional Scrutiny. ...................................21

III. The Challenged Provisions Are Not Unconstitutionally Vague. .............24

IV.  Any Unconstitutional Provisions Are Severable......................................31

V.    Plaintiffs Are Not Entitled to a Preliminary Injunction. ..........................32

      A. Plaintiffs Have Not Shown Irreparable Injury. ...................................32

      B. The Balance of the Equities Militates Against Preliminary
         Injunctive Relief. ....................................................................................33

CONCLUSION .........................................................................................................34

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page**

*Arce v. Douglas*,
    793 F.3d 968 (9th Cir. 2015) ..................................................................22, 30

*Arnett v. Kennedy*,
    416 U.S. 134 (1974)..................................................................................25

*Austin v. University of Florida Board of Trustees*,
    580 F. Supp. 3d 1137 (N.D. Fla. 2022) .......................................................19

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
    457 U.S. 853 (1982)..................................................................................20

*Bethel Sch. Dist. No. 403 v. Fraser*,
    478 U.S. 675 (1986)..................................................................................26

*Bishop v. Aronov*,
    926 F.2d 1066 (11th Cir. 1991) ...................................... 14, 15, 16, 18, 22, 24

*Brown v. Board of Educ. of Topeka, Kan.*,
    349 U.S. 294 (1955)...............................................................................1, 23

*Chiras v. Miller*,
    432 F.3d 606 (5th Cir. 2005) .................................................................20, 21

*Coal. to Def. Affirmative Action v. Granholm*,
    473 F.3d 237 (6th Cir. 2006) .......................................................................18

*Demers v. Austin*,
    746 F.3d 402 (9th Cir. 2014) .......................................................................18

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)..................................................................................15

*Edwards v. Calif. Univ. of Penn.*,
    156 F.3d 488 (3d Cir. 1998) ...................................................................13, 17

*Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*,
    624 F.3d 332 (6th Cir. 2010) .......................................................................13

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006)...............................................................................11, 12

*Hazelwood Sch. Dist. v. Kuhlmeier*,
    484 U.S. 260 (1988)...................................................................11, 12, 21, 22

*Honeyfund.com, Inc. v. DeSantis*, 4:22-cv-227,
    2022 WL 3486962 (N.D. Fla. Aug. 18, 2022) ............................23, 27, 28, 29

*Johnson-Kurek v. Abu-Absi*,
    423 F.3d 590 (6th Cir. 2005) ........................................................................17

*Jones v. Gov. of Fla.*,
    975 F.3d 1016 (11th Cir. 2020) ....................................................................30

*Keyishian v. Board of Regents*,
    385 U.S. 589 (1967).......................................................................................16

*Kirkland v. Northside Indep. Sch. Dist.*,
    890 F.2d 794 (5th Cir. 1989) ........................................................................14

*Lane v. Franks*,
    573 U.S. 228 (2014).......................................................................................22

*Lee v. York Cnty. Sch. Div.*,
    484 F.3d 687 (4th Cir. 2007) ........................................................................14

*Loving v. Virginia*,
    388 U.S. 1 (1967)............................................................................................1

*Maryland v. King*,
    567 U.S. 1301 (2012).....................................................................................34

*Mayer v. Monroe Cnty. Cmty. Sch. Corp.*,
    474 F.3d 477 (7th Cir. 2007) ........................................................................12

*Meriwether v. Hartop*,
    992 F.3d 492 (6th Cir. 2021) ........................................................................18

*Miller v. Johnson*,
    515 U.S. 900 (1995).........................................................................................1

*O'Laughlin v. Palm Beach Cnty.*,
    30 F.4th 1045 (11th Cir. 2022) ...............................................................25, 26

*Pickering v. Board of Education of Township High School District 205,
Will County*, 391 U.S. 563 (1968) ...........................................................14, 22

*R.A.V. v. City of St. Paul, Minn.*,
    505 U.S. 377 (1992).......................................................................................24

*Regents of the Univ. of Mich. v. Ewing*,
    474 U.S. 214 (1985).......................................................................................18

*Rosenberger v. Rector and Visitors of University of Virginia*,
    515 U.S. 819 (1995)................................................................................10, 11

*San Filippo v. Bongiovanni*,
    961 F.2d 1125 (3d Cir. 1992) ........................................................25

*Seminole Tribe of Florida v. Florida*,
    517 U.S. 44 (1996) ........................................................................12

*Shurtleff v. City of Boston*,
    142 S. Ct. 1583 (2022) .............................................................10, 24

*Solantic, LLC v. City of Neptune Beach*,
    410 F.3d 1250 (11th Cir. 2005) .....................................................23

*Stanley v. Georgia*,
    394 U.S. 557 (1969) ......................................................................20

*Sweezy v. State of New Hampshire by Wyman*,
    354 U.S. 234 (1957) ......................................................................17

*Tracy v. Fla. Atl. Univ. Bd. of Tr.*,
    980 F.3d 799 (11th Cir. 2020) ...........................................25, 26, 29

*U.S. Civil Serv. Comm'n v. Nat'l Assoc. of Letter Carriers AFL-CIO*,
    413 U.S. 548 (1973) .......................................................27, 29, 30, 31

*United States v. Williams*,
    553 U.S. 285 (2008) ......................................................................26

*Urofsky v. Gilmore*,
    216 F.3d 401 (4th Cir. 2000) .........................................................17

*Virgil v. School Board of Columbia County*,
    862 F.2d 1517 (11th Cir. 1989) .........................................20, 21, 22

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
    576 U.S. 200 (2015) ..........................................................2, 10, 11, 13

*Waskul v. Washtenaw Cnty. Cmty. Mental Health*,
    900 F.3d 250 (6th Cir. 2018) ...........................................................9

*Waters v. Churchill*,
    511 U.S. 661 (1994) ......................................................................26

*Wollschlaeger v. Gov. of Fla.*,
    848 F.3d 1293 (11th Cir. 2017) .........................................24, 25, 32

*Wreal, LLC v. Amazon.com, Inc.*,
    840 F.3d 1244 (11th Cir. 2016) ...........................................8, 9, 33

## Constitution and Statutes

FLA. CONST. art. I, § 2 ..................................................................3

FLA. CONST. art. III, § 8(a) ...........................................................4

FLA. CONST. art. IX, § 1(a) ...........................................................4

FLA. STAT.
    § 1000.01 ...............................................................................4
    § 1000.03(2)(a) ......................................................................4
    § 1000.03(5)(a)-(c) ................................................................4
    § 1000.05(2)(a) ...................................................................4, 5
    § 1000.05(4)(a) ............................................................5, 19, 24
    § 1000.05(4)(a)(1) ...............................................................29
    § 1000.05(4)(a)(1)-(8) ...........................................................5
    § 1000.05(4)(a)(4) ...............................................................28
    § 1000.05(4)(b) ...........................................................5, 23, 24
    § 1000.05(6)(b) .....................................................................6
    § 1000.05(9) ..........................................................................5

2022 Fla. Laws 72 ........................................................................5

6 FLA. ADMIN. CODE ANN. r. 6A-1.094124(3)(c)..........................28

## Regulation

10.005, *Prohibition of Discrimination in University Training or Instruction*,
    BD. OF GOVERNORS, STATE UNIV. SYS. OF FLA. (Aug. 26, 2022),
    *available at* https://bit.ly/3xqDCX8 ("Regulation 10.005") ..........6

Regulation 10.005(1)(b) ...............................................................19

Regulation 10.005(1)(c) ...............................................................19

Regulation 10.005(1)(d) .................................................................7

Regulation 10.005(2)(a) .................................................................6

Regulation 10.005(3)(b) .................................................................6

Regulation 10.005(3)(c) .............................................................6, 31

Regulation 10.005(4)(a) .................................................................7

Regulation 10.005(4)(c) .................................................................7

Regulation 10.005(4)(d) ........................................................7, 30, 31

Regulation 10.005(5) ......................................................................7

**<u>Other Authorities</u>**

FAMU Fall Calendar, https://bit.ly/3DxmkeS...................................................33

FIU Fall Calendar, https://bit.ly/3UnulsH ...................................................33

FSU Fall Calendar, https://bit.ly/3qO4k8n ...................................................33

UCF Fall Calendar, https://bit.ly/3SjNuK7 ...................................................33

UF Fall Calendar, https://bit.ly/3DC1evP...................................................33

USF Fall Calendar, https://bit.ly/3qNKrhV ...................................................33

## INTRODUCTION

"At the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class." *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (cleaned up). "All provisions of federal, state, or local law requiring or permitting such discrimination must yield to this principle." *Brown v. Board of Educ. of Topeka, Kan.*, 349 U.S. 294, 298 (1955).

Impelled by the fundamental moral principle at the root of the Equal Protection Clause—that discriminating against people solely because of their race, sex, or other immutable characteristics is "odious to a free people whose institutions are founded upon the doctrine of equality, " *Loving v. Virginia*, 388 U.S. 1, 11 (1967) (cleaned up)—the State of Florida has enshrined in the statute at issue in this case, the Individual Freedom Act, eight concepts that may not be endorsed by its teachers. For example, the Act prohibits teachers from endorsing the proposition that members of one race are morally superior to members of another, that individuals are inherently racist solely by virtue of their race, or that a person's moral character is necessarily determined by his or her race. Believing these concepts to be reprehensible, the Florida Legislature has directed that they cannot be endorsed in the instruction provided to students in Florida's public universities.

Plaintiffs have brought suit challenging the Act's provisions related to these principles as contrary to the First Amendment, and they have requested a preliminary injunction preventing the Act from taking effect. The request should be denied.

Plaintiffs' First Amendment challenge fails because the Florida Government has simply chosen to regulate *its own speech*—the curriculum used in state universities and the in-class instruction offered by state employees—and the First Amendment simply has no application in this context. "When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015). Indeed, that is the only way government of any kind can go on; for if the First Amendment required content neutrality in this context, the government would be forced "to voice the perspective of those who oppose" it. *Id.* at 208. Here, the Act does not prevent the State's educators from espousing whatever views they may hold, on race or anything else, on their own time, and it does not prevent students from seeking them out and listening to them. All it says is that state-employed teachers may not espouse in the classroom the concepts prohibited by the Act, while they are on the State clock, in exchange for a State paycheck. The First Amendment does not compel Florida to pay educators to advocate ideas, in its name, that it finds repugnant. Nor does it anoint individual professors as universities unto themselves, at liberty to indoctrinate college students in whatever views they please, no matter

how contrary to the university's curriculum or how noxious to the people of Florida. And even if the First Amendment did apply here, Florida's compelling interest in stamping out discrimination based on race and other immutable characteristics amply justifies any burden on speech the Act may impose.

Plaintiffs' vagueness claim likewise fails. The Act is written in plain and common terms that an ordinary person can easily understand. These provisions more than satisfy the vagueness standard that applies to the government's regulation of its own employees.

Plaintiffs are not likely to succeed on the merits of their claims, the balance of the equities favors enforcement of the Act, and the motion for preliminary injunction should be denied.

## FACTUAL BACKGROUND

### I.   The People of Florida Empowered Their Elected Officials To Set the Curriculum for Public Universities.

The People of Florida enshrined in their Constitution fundamental principles that serve as the bedrock of our Nation and the State of Florida. Article I, § 2, of the Florida Constitution enumerates these "Basic Rights":

> All natural persons, female and male alike, are equal before the law and have inalienable rights, among which are the right to enjoy and defend life and liberty, to pursue happiness, to be rewarded for industry, and to acquire, possess and protect property. No person shall be deprived of any right because of race, religion, national origin, or physical disability.

3

And the People of Florida empowered their elected officials to enact laws that both promote these fundamental principles, and prohibit efforts to contravene them. *See* FLA. CONST. art. III, § 8(a).

For example, the Florida Constitution directs the Legislature to enact laws making "[a]dequate provision" for a "high quality system of free public schools that allows students to obtain a high quality education." FLA. CONST. art. IX, § 1(a). To that end, the Florida Legislature exercises the power to "establish education policy, enact education laws, and appropriate and allocate education resources." FLA. STAT. § 1000.03(2)(a). Florida's elected officials therefore help shape the curriculum of Florida's public schools. *See* FLA. STAT. § 1000.01 *et seq.* (The "Florida Early Learning-20 Education System"). And the "priorities of Florida's Early Learning-20 education system" include not only academic performance, but also the hope that students "are prepared to become civically engaged and knowledgeable adults who make positive contributions to their communities." FLA. STAT. § 1000.03(5)(a)-(c).

Apart from the public-school curriculum, Florida's elected officials have recognized that the State must practice the principles it teaches. Therefore, Florida law prohibits discrimination on the basis of race or sex "against a student or an employee in the state system of public K-20 education." FLA. STAT. § 1000.05(2)(a). Thus, no person may "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any public K-20 education program or

activity" on the basis of race or sex. *Id.* "A person aggrieved" by such discrimination "has a right of action for such equitable relief as the court may determine." *Id.* § 1000.05(9).

## II. Florida's Elected Officials Exercised this Power When Enacting the Individual Freedom Act and Adopting Implementing Regulations.

Earlier this year, the Florida Legislature passed the Individual Freedom Act (the Act). *See* 2022 Fla. Laws 72. Governor DeSantis approved the Act on April 22, and it took effect on July 1. *See* 2022 Fla. Laws 72, § 8. Sections 2 through 7 of the Act amended the Education Code.

As relevant here, the Act amended the Education Code to enumerate actions that constitute "discrimination on the basis of race, color, national origin, or sex" and are thus prohibited under § 1000.05(4)(a). The Act prohibits the practice of "subject[ing] any student or employee to training or instruction that espouses, promotes, advances, inculcates, or compels such student or employee to believe any of eight enumerated concepts. *See* FLA. STAT. § 1000.05(4)(a)(1)-(8). The Act, however, draws a sharp distinction between *indoctrination* and *discussion*: It prohibits all persons from subjecting a student or employee to indoctrination in the concepts, but at the same time makes clear that it does not "prohibit discussion of the concepts ... as part of a larger course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts." FLA. STAT. § 1000.05(4)(b).

The Florida Board of Governors possesses the authority to "adopt regulations to implement" § 1000.05 "as it relates to state universities." FLA. STAT. § 1000.05(6)(b). Pursuant to that authority, the Board recently finalized Regulation 10.005 to implement the Act. *See 10.005*, *Prohibition of Discrimination in University Training or Instruction*, BD. OF GOVERNORS, STATE UNIV. SYS. OF FLA. (Aug. 26, 2022), *available at* https://bit.ly/3xqDCX8 ("Regulation 10.005").

Regulation 10.005 creates a detailed enforcement process that consists of numerous steps. The Regulation first requires universities to develop their own regulations that track the Act; those regulations must "contain a method for submitting complaints of alleged violations" to the university. *See* Regulation 10.005(2)(a). When the university receives a complaint, it must investigate only "credible" complaints. Regulation 10.005(3)(b). If the university ultimately determines that "instruction or training is inconsistent with the university regulation," it must notify the Board and "take prompt action to correct the violation by mandating that the employee(s) responsible for the instruction or training modify it to be consistent with the university regulation." Regulation 10.005(3)(c). As part of correcting the violation, the university may "issu[e] disciplinary measures where appropriate," but it may "remove, by termination if appropriate, the employee(s)" violating the regulation only "if there is a failure or refusal to comply with the mandate." *Id.*

6

Under the Regulation, the Board takes enforcement action only against a university that "willfully and knowingly failed to correct a violation of the university regulation." Regulation 10.005(4)(a). The Board's Inspector General will investigate a "credible allegation" of a willful and knowing failure to correct, taking into account "whether the university made a good faith determination that the complaint did not allege a violation of the university regulation." *Id.* The Board will ultimately determinate whether the allegation is "substantiated," Regulation 10.005(4)(c), meaning "the existence or truth of" the violation has been "established" "through the use of competent evidence," Regulation 10.005(1)(d). If the Board determines "that a university willfully and knowingly engaged in conduct at the institutional level that constituted a substantiated violation of [§ 1000.05(4)(a)] and failed to take appropriate corrective action, the university will be ineligible for performance funding for the next fiscal year." *Id.* at (4)(d). The university may seek judicial review of the Board's decision. Regulation 10.005(5).

### III.   Plaintiffs Challenge the Act Under the First Amendment and Due Process Clause.

Plaintiffs are six active higher-education professors, one retired professor, and a college student. The active professors serve at six major colleges and universities throughout Florida and teach various subjects, including law, government, and history. *See* Doc. 1, ¶¶ 10, 13, 16, 19, 23, 25. The retired professor, Dr. Dunn, leads "a Black history bus tour of Miami" that is allegedly funded by Florida International

7

University. *Id.* ¶ 28. Together, the educator-plaintiffs contend that the Act "imposes unconstitutional viewpoint-based restrictions on instructors' speech and is contrary to the principle of academic freedom." *Id.* ¶ 217. The student plaintiff is a rising senior at Florida State University. *Id.* ¶ 31. This fall, she is enrolled in two courses "that she fears will be negatively affected by" the Act. *Id.* ¶ 32.

Plaintiffs also argue that the Act is unconstitutionally vague. *Id.* ¶ 228. In particular, they assert that the Act "fails to provide fair notice of what college professors, student teaching assistants, and other instructors can and cannot say in their courses." *Id.* They also assert that the Act "invites arbitrary and discriminatory enforcement." *Id.*

In addition, Plaintiffs allege that the Act violates the Equal Protection Clause, contending that the Act "was enacted for a racially discriminatory purpose." *Id.* ¶ 236. Alongside their complaint, Plaintiffs seek a preliminary injunction, Doc. 12, on the basis of their First Amendment and vagueness claims, but not on their Equal Protection Claim, *see* Doc. 13 at 3 n.2 (Pls.' Br.).

**STANDARD OF REVIEW**

Under Rule 65 of the Federal Rules of Civil Procedure, a district court may grant a preliminary injunction if the movant shows "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the

proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016) (cleaned up). The movant "bears the burden of persuasion to clearly establish all four of these prerequisites." *Id.* (cleaned up). Here, Plaintiffs have failed to carry their burden on all four scores.

## ARGUMENT

I.    **Plaintiffs Have Failed To Establish Standing Sufficient To Support a Preliminary Injunction with Respect to Several Provisions of the Act.**

Plaintiffs fail at the threshold to show a likelihood of success with respect to several provisions of the Act because they lack standing. As shown in Defendants' motion to dismiss ("MTD"), filed contemporaneously with this brief, no Plaintiff has adequately alleged they will deliberately and persistently violate the Act, which is a prerequisite to punishment under the Board's regulation, MTD 9-10; no Plaintiff has adequately alleged an injury related to the first, third, fifth, sixth, and seventh concepts, *id.* at 12-14; neither Plaintiff Dunn nor Plaintiff Dauphin provide "instruction" as defined by the Act, *id.* at 9-12. Even if Plaintiffs alleged standing sufficient to survive a motion to dismiss with respect to these provisions, they have failed to meet "the heightened standard for evaluating a motion for summary judgment" that applies at the preliminary-injunction stage. *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255 n.3 (6th Cir. 2018).

## II. In-Class Instruction in Public Universities Is Government Speech and Thus Not Entitled to First Amendment Protection.

As relevant here, the Act governs the substance of the instruction and curriculum offered at public universities, which is heartland government speech. Neither the educator-plaintiffs nor the student plaintiff have a First Amendment right to control that government speech. Their First Amendment claims thus fail.

### A. University Professors Do Not Have a First Amendment Right To Override the State's Curriculum.

"When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker*, 576 U.S. at 207. "Were the Free Speech Clause interpreted otherwise, government would not work," because it could not "effectively" implement its policies if it "had to voice the perspective of those who oppose" it. *Id.* at 207-08. Therefore, government speech—"and government actions and programs that take the form of speech"—generally do not "trigger the First Amendment rules designed to protect the marketplace of ideas." *Id.* at 207 (cleaned up). The Constitution instead "relies first and foremost on the ballot box, not on rules against viewpoint discrimination, to check the government when it speaks." *Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1589 (2022).

A public university's curriculum is set by the university in accordance with the strictures and guidance of the State's elected officials. It is government speech. As the Supreme Court held in *Rosenberger v. Rector and Visitors of University of*

*Virginia*, a case involving a public university: "When the University determines the content of the education it provides, it is the University speaking, and we have permitted the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message." 515 U.S. 819, 833 (1995). The same principle—that public universities do not violate the First Amendment when setting their curriculum—explains why universities may even control *student* speech in a school-sponsored student newpaper that could "fairly be characterized as part of the school curriculum," and thus "bear the imprimatur of the school." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988). When the government "determines the content of the education it provides" in public universities, it is thus the government speaking, *Rosenberger*, 515 U.S. at 833, and its determination does not implicate the Free Speech Clause, *Walker*, 576 U.S. at 207-08.

The in-class instruction offered by state-employed educators is also pure government speech, not the speech of the educators themselves. When "public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." *Garcetti v. Ceballos*, 547 U.S. 410, 421-22 (2006). And "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Id.* at 421-22. Therefore, "the employee

11

has no First Amendment cause of action." *Id.* at 418. Accordingly, under the square reasoning of *Garcetti*, educators in public universities do not have a First Amendment right to control the curriculum.

To be sure, *Garcetti* reserved the question whether its holding applies to classroom instruction. *Id.* at 425. But this Court is bound by *Garcetti*'s reasoning in equal measure with its holding, *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 67 (1996), and public-university professors providing instruction to students clearly fall within the rationale of *Garcetti* because they are making "statements pursuant to their official duties," 547 U.S. at 421-22. Moreover, if *Garcetti* did not apply to curricular speech, it would invite "judicial intervention" that is "inconsistent with sound principles of federalism," *id.* at 423, because the Supreme Court has articulated the "oft-expressed view that the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges," *Kuhlmeier*, 484 U.S. at 273.

Multiple courts have recognized that *Garcetti*'s reasoning applies to public-school teachers providing instruction. The Seventh Circuit explained that, because "teachers hire out their own speech," applying *Garcetti* to a public-school teacher's in-class speech was "an easier case for the employer than *Garcetti*" itself, "where speech was not what the employee was being paid to create." *Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 479 (7th Cir. 2007). For similar reasons, the Sixth

Circuit has likewise applied *Garcetti* to in-class instruction in a public high school. *See Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332 (6th Cir. 2010).

Both the Sixth and Seventh Circuits recognized the difficulty the Supreme Court envisioned if the First Amendment were to apply to government speech— "government would not work." *Walker*, 576 U.S. at 207-08. The Sixth Circuit identified numerous challenging questions that would follow if *Garcetti* did not apply to teachers' in-class curricular speech. As most relevant here: "Could a teacher continue to assign materials that members of the community perceive as racially insensitive even after the principal tells her not to?"; or "Could a teacher raise a controversial topic (say, the virtues of one theory of government over another or the virtues of intelligent design) after a principal has told her not to?" *Evans-Marshall*, 624 F.3d at 341-42.

The application of *Garcetti* aligns with other Circuits' determination that curricular speech is not subject to First Amendment scrutiny. For example, in an opinion by then-Judge Alito, the Third Circuit held that "a public university professor does not have a First Amendment right to decide what will be taught in the classroom." *Edwards v. Calif. Univ. of Penn.*, 156 F.3d 488, 491 (3d Cir. 1998). Similarly, the Fourth Circuit has held that "speech" that "is curricular in nature" is unprotected because it is not on "a matter of public concern" within the meaning of

the balancing test established by *Pickering v. Board of Education of Township High School District 205, Will County*, 391 U.S. 563 (1968). *See Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 697 (4th Cir. 2007). So too the Fifth Circuit has held "that public school teachers are not free, under the first amendment, to arrogate control of curricula" because they do "not speak out as a citizen" when teaching in class. *Kirkland v. Northside Indep. Sch. Dist.*, 890 F.2d 794, 800-02 (5th Cir. 1989).

The Eleventh Circuit's pre-*Garcetti* decision in *Bishop v. Aronov* also supports the application of *Garcetti* to speech related to the "content in the courses" taught. 926 F.2d 1066, 1076 (11th Cir. 1991). In *Bishop*, the Court held that a public university's decision to prohibit a professor from speaking about his religious beliefs "during instructional time" did not violate that professor's free speech rights. *Id.* at 1076-77. The Court spoke in no uncertain terms: The government's "conclusions about course content must be allowed to hold sway over an individual professor's judgments." *Id.* at 1077. When the government (there, the university) and an individual educator "disagree about a matter of content in the courses he teaches," the Court explained, the government "must have the final say in such a dispute." *Id.* at 1076-77. The government, "as an employer and educator can direct" an individual professor "to refrain from expression" of particular views "in the classroom," and federal judges cannot second-guess the government's determination by acting as "ersatz deans or educators." *Id.* at 1075, 1077.

Drawing from the Supreme Court's decision in *Kuhlmeier*—then the leading case on the subject—the Eleventh Circuit concluded that the appropriate analysis was limited to determining whether the State's restrictions "are reasonably related to legitimate pedagogical concerns," *id.* at 1074—a standard largely indistinguishable from "rational basis" review, the form of scrutiny that would apply *in the absence* of any First Amendment (or other fundamental) right, under "the separate constitutional prohibitions on irrational laws," *District of Columbia v. Heller*, 554 U.S. 570, 628 n.27 (2008). And although this Court has previously concluded that "*Bishop* crafted a balancing test to judge whether a public university's restriction on a professor's speech violates the professor's rights under the First Amendment," Order, *Falls v. DeSantis*, No. 4:22-cv-166-MW-MJF, Doc. 68 at 5 (July 8, 2022), Defendants respectfully believe *Bishop* is best read to hold that the government's "interests in the classroom conduct of its professors" are *per se* a legitimate pedagogical concern. 926 F.2d at 1076.

Both *Bishop*'s reasoning and its holding thus accurately anticipated the Supreme Court's later cases in *Rosenberger* and *Garcetti*: Where, as here, a State prescribes or restricts the curricular instruction taught in its schools and the in-class conduct of its educators, nothing but government speech is in play, and the First Amendment has no application. Although *Bishop* did not hold that the First Amendment categorically does not apply in this context under the government

15

speech doctrine, the Supreme Court had *not yet announced* that doctrine. The *Bishop* Court candidly admitted that it was doing its best to "frame" its "own analysis to determine the sufficiency of the University's interests in restricting" the professor's "expression in the classroom," in the absence of any "controlling" "cases satisfactorily on point." *Id.* at 1074. But thirty years later, in the more penetrating light shed by the Supreme Court's intervening decisions in *Rosenberger* and *Garcetti*, the best reading of *Bishop* is plainly the one that accords with the teachings of those cases: The First Amendment simply has no purchase here.

Plaintiffs' argument to the contrary rests on a purported individual right to academic freedom. Pls.' Br. 17-18. But *Bishop* rejected this argument in no uncertain terms: "Though we are mindful of the invaluable role academic freedom plays in our public schools, particularly at the post-secondary level, we do not find support to conclude that academic freedom is an independent First Amendment right." 926 F.2d at 1075. *Bishop* acknowledged "abundant cases" that "acclaim academic freedom," including *Keyishian v. Board of Regents*, 385 U.S. 589 (1967). *Bishop*, 926 F.2d at 1075. But it held that the "pronouncements about academic freedom" in the "context" of those cases "cannot be extrapolated to deny schools command of their own courses." *Id.* Under *Bishop*, Plaintiffs have no individual right of academic freedom to control the curriculum.

16

Even if *Bishop* had not settled this issue, the conclusion that university professors do not have an individual right to academic freedom is obviously correct. As the en banc Fourth Circuit explained in its exhaustive analysis of the right to academic freedom, that right, to the extent it exists, belongs to academic *institutions*—specifically universities—and does *not* belong to individual educators. *See Urofsky v. Gilmore*, 216 F.3d 401, 410-14 (4th Cir. 2000) (en banc). Indeed, Justice Frankfurter's classic statement on academic freedom makes clear that it is comprised of "'the four essential freedoms' *of a university*—to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study.'" *Sweezy v. State of New Hampshire by Wyman*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring) (citation omitted).

Other courts agree that any purported right to academic freedom is held by universities as an institution. As then-Judge Alito explained, "academic freedom ha[s] been described" only "as a *university's* freedom." *Edwards*, 156 F.3d at 492 (emphasis added); *see also Johnson-Kurek v. Abu-Absi*, 423 F.3d 590, 593-94 (6th Cir. 2005) (same). And how could it be otherwise? The notion that individual professors have a constitutional right to make their own decisions, free from interference by anyone, whether university administrators or the State itself, concerning what may be taught and how it shall be taught would be a recipe for educational chaos, not excellence. Again, when the university and an individual

17

educator "disagree about a matter of content in the courses he teaches," the university "must have the final say in such a dispute." *Bishop*, 926 F.2d at 1076-77.

Moreover, to whatever extent public universities possess an institutional right of academic freedom, that right is best understood as a right of institutional autonomy *from the judiciary*, not the State that chartered it, governs it, and provides its funding. *See, e.g.*, *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 (1985) (citing *Keyishian* as representing *the Court's* "reluctance to trench on the prerogatives of state and local educational institutions"). Indeed, it is unclear "how the Universities, as subordinate organs of the State," could "have First Amendment rights against the State or its voters." *Coal. to Def. Affirmative Action v. Granholm*, 473 F.3d 237, 247 (6th Cir. 2006). Plaintiffs have not cited a single case holding that a public university possesses a right to academic freedom that permits the institution to reject and override the State's education curriculum.

True, decisions in the Ninth Circuit and Sixth Circuit have distinguished between curricular speech at the college and K-12 levels, holding that *Pickering*, and not *Garcetti*, governs the regulation of such speech in university classrooms. *See, e.g.*, *Demers v. Austin*, 746 F.3d 402, 418 (9th Cir. 2014); *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021). But those decisions are inconsistent with the holding of *Bishop*, the reasoning of *Garcetti* and *Rosenberger*, and the historical foundation of academic freedom outlined in *Urofsky*.

Finally, the Act applies solely to "training or instruction." FLA. STAT. § 1000.05(4)(a). Per the Board's Regulation 10.005, "training" is "a planned and organized activity conducted by the university as a mandatory condition of employment, enrollment, or participation in a university program for the purpose of imparting knowledge, developing skills or competencies, or becoming proficient in a particular job or role." Regulation 10.005(1)(b). And "instruction" is "the process of teaching or engaging students with content about a particular subject by a university employee or a person authorized to provide instruction by the university *within a course*." Regulation 10.005(1)(c) (emphasis added). The Act therefore does not implicate educators' published scholarship. Nor does it broadly regulate anything that "relates to" educators' "expertise," *Austin v. University of Florida Board of Trustees*, 580 F. Supp. 3d 1137, 1161 (N.D. Fla. 2022), or their membership in private organizations.

In sum, the speech that the Individual Freedom Act's education provisions regulate—the content of the curriculum used in public universities and the in-class instruction that occurs there—constitutes pure government speech that does not implicate Plaintiffs' Free Speech rights.

### B. University Students Do Not Have a First Amendment Right To Control the State's Curriculum.

The claim by the student plaintiff, Ms. Dauphin, that the Act violates her First Amendment right to "receive information" also fails. Again, the Act regulates the

public-university curriculum, which is pure government speech that does not implicate the First Amendment. *See supra*, at 10-20.

Students have no independent right to "receive information" that dictates the university's curriculum. Although the Supreme Court has said that the "freedom (of speech and press) necessarily protects the right to receive" speech and published writings, *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (cleaned up), it has never held that students possess a right to receive information that trumps the university's selected curriculum. Indeed, even when four Justices stated that a local school board's decision to remove books from the school library was subject to some form of First Amendment scrutiny, they "carefully circumscribed th[e] potential right, acknowledging that the case 'does not involve textbooks' and that the Court's conclusion 'does not intrude into the classroom, or into the compulsory courses taught there.'" *Chiras v. Miller*, 432 F.3d 606, 619 (5th Cir. 2005) (quoting *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 862 (1982) (plurality opinion)).

To the extent the Eleventh Circuit's decision in *Virgil v. School Board of Columbia County* is to the contrary, that case's tentative conclusion about the power of school boards has been abrogated by the Supreme Court's government speech cases. *Virgil* involved a school board's decision to "remov[e] a previously approved textbook." 862 F.2d 1517, 1518 (11th Cir. 1989). Like *Bishop*, *Virgil* was decided

before the Court issued its key government speech precedents in *Rosenberger* and *Garcetti*. The *Virgil* opinion noted that courts had thus far "failed to achieve a consensus on the degree of discretion to be accorded school boards to restrict access to curricular materials." *Id.* at 1520-21. And like *Bishop*, "the most direct guidance from the Supreme Court" at that time regarding the application of the First Amendment to the content of a public school's curriculum was *Kuhlmeier*. *Id.* at 1521. Therefore, the Court applied the *Kuhlmeier* standard and held that the board could remove the textbook from the curriculum without violating the First Amendment if its actions were "reasonably related to legitimate pedagogical concerns." *Id.* at 1518, 1520-22 (cleaned up).

But *Virgil*, like *Bishop*, must now be read in light of the Supreme Court's subsequent decisions in cases like *Rosenberger* and *Walker*. *See Chiras*, 432 F.3d at 617 (noting *Virgil* "did not have the benefit of" the Supreme Court's recent government-speech cases). In the light shed by those cases, *Virgil* cannot be read as requiring any sort of heightened First Amendment scrutiny in the context of a public university setting its own curriculum.

## C. The Act's Educational Provisions Satisfy Any Standard of Heightened Constitutional Scrutiny.

Even if the Court reads the Eleventh Circuit's pre-*Garcetti* decisions in *Bishop* and *Virgil* as adopting a level of scrutiny marginally more stringent than rational basis review, that standard still requires, only and at most, that the Act's provisions

be "reasonably related to legitimate pedagogical concerns." *Kuhlmeier*, 484 U.S. at 272-73; *see Bishop*, 926 F.2d at 1074; *Virgil*, 862 F.2d at 1521-23. The educational provisions here easily pass muster under this "deferential standard." *Virgil*, 862 F.2d at 1520. As the Ninth Circuit held, educational statutes that, among other things, prohibit teaching classes that "[p]romote resentment toward a race or class of people" or "[a]dvocate ethnic solidarity instead of the treatment of pupils as individuals" are "reasonably related to the state's legitimate pedagogical interest in reducing racism." *Arce v. Douglas*, 793 F.3d 968, 973, 985-86 (9th Cir. 2015) (cleaned up).

If the Court concludes that *Bishop* and *Virgil*'s "reasonably related" standard does not apply, then it should apply the *Pickering* balancing test because the speech at issue involves government employees. Under that test, the court must balance the employee's interest against the State's interest, as employer, in promoting the efficiency of its programs. *Lane v. Franks*, 573 U.S. 228, 236 (2014).

Here, recognizing a right of individual educators to espouse whatever views they wished in the classroom, no matter how contrary to the State's established curriculum policies would clearly "imped[e] the teacher's proper performance of his daily duties in the classroom." *Pickering*, 391 U.S. at 572-73. The First Amendment does not require Florida's education administrators to stand idly by as a teacher, for example, espouses racist or sexist views at the head of a government-funded

university classroom. The State's interest in providing its legislatively defined educational curriculum to students vastly outweighs that individual interest under *Pickering*.

In all events, the provisions here pass muster even under strict scrutiny. The compelling nature of the government's interest in stamping out racial discrimination is so fundamental that it is embodied in our highest law. *See Brown*, 349 U.S. at 298 (noting the "fundamental principle that racial discrimination in public education is unconstitutional"). Thus, public universities are *constitutionally prohibited* from teaching, for example, that members of one race are "morally superior" to members of another race, or that a person "should be discriminated against" on the basis of race. The same is true of discrimination on the basis of sex, religion, and national origin.

The Act's educational provisions are "narrowly drawn to accomplish those ends." *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1267 (11th Cir. 2005). Although the Court has previously stated otherwise, *see Honeyfund.com, Inc. v. DeSantis*, 4:22-cv-227, 2022 WL 3486962, at *10-11 (N.D. Fla. Aug. 18, 2022) ("*Honeyfund*"), Defendants respectfully disagree with that conclusion. As an initial matter, by its own terms, the Act does *not* "prohibit discussion of the concepts" listed in Section 1000.05(4)(b). It merely requires that those concepts be taught "as part of a larger course of training or instruction" and "in an objective manner without

endorsement." *Id.* The Act only prohibits teaching that "espouses, promotes, advances, inculcates, or compels" students or employees to believe the concepts. *Id.* at 4(a). And even within the concepts themselves, the provisions are narrowly drawn—for example, prohibiting instruction that a person is "inherently" racist "solely" by virtue of his or her race or sex, meaning that a person's race is the *only and entire* explanation for his or her racism.

Plaintiffs are also wrong to suggest that they prevail if the Act regulates based on viewpoint. As *Bishop* makes clear, the State "*must* be allowed" to determine the "*viewpoints*" that are taught "in the classroom." 926 F.2d at 1077 (emphasis added); *see also Shurtleff*, 142 S. Ct. at 1589 (For "government speech," the government may regulate "based on viewpoint."). Much curricular speech mandated by state education authorities is, after all, inherently viewpoint based. And in all events, even viewpoint-based regulation is at most subject to strict scrutiny, *see R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 395-96 (1992)—which the Act survives.

## III. The Challenged Provisions Are Not Unconstitutionally Vague.

Under the Due Process Clause, a statute is void for vagueness "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Wollschlaeger v. Gov. of Fla.*, 848 F.3d 1293, 1319 (11th Cir. 2017) (cleaned up). Typically, in the speech context, the government must

regulate "with narrow specificity," but "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Id.* at 1320. And "[i]n the public employment context, the Supreme Court has reiterated that the vagueness doctrine is based on fair notice that certain conduct puts persons at risk of discharge." *O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045, 1055 (11th Cir. 2022) (cleaned up). A provision governing public employment is "not void for vagueness as long as ordinary persons using ordinary common sense would be notified that certain conduct will put them at risk of discharge." *Id.* (cleaned up). Applying that standard, courts have upheld the termination of public university professors based on, for example, a provision requiring professors "to maintain, 'standards of sound scholarship and competent teaching.'" *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1137 (3d Cir. 1992); *see also Arnett v. Kennedy*, 416 U.S. 134, 158-62 (1974) (plurality) (upholding a regulation that allowed termination for speech that hindered the "efficiency of the service").

Here, "ordinary persons using ordinary common sense would be notified that certain conduct will put them at risk" of violating the Act. *O'Laughlin*, 30 F.4th at 1055. Each of the challenged provisions uses plain, everyday language that has an "ordinary or natural meaning" that is either commonly known or can be easily discerned. *Tracy v. Fla. Atl. Univ. Bd. of Tr.*, 980 F.3d 799, 807 (11th Cir. 2020) (consulting dictionary definitions to hold that a term was not unconstitutionally

vague). The "mere fact that close cases can be envisioned" in applying statutory requirements does not render a statute vague. *United States v. Williams*, 553 U.S. 285, 305 (2008).

Plaintiffs are mistaken when they contend that the Court's decision in *Honeyfund* is dispositive here. *See* Pls.' Br. 30-31. Contrary to their assertion, the vagueness standard is *not* "the same" for public employees and private individuals. *Id.* at 31. For example, although "speech restrictions must generally define the speech they target," "surely a public employer may, consistently with the First Amendment, prohibit its employees from being 'rude to customers,' a standard almost certainly too vague when applied to the public at large." *Waters v. Churchill*, 511 U.S. 661, 673 (1994) (plurality); *see also Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 686 (1986) ("[T]he school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions."). Therefore, "[g]overnment employee speech must be treated differently" in the vagueness analysis. *See Waters*, 511 U.S. at 673. And the standard for public employees is merely whether "ordinary persons using ordinary common sense would be notified that certain conduct will put them *at risk*" of violating the Act. *O'Laughlin*, 30 F.4th at 1055 (emphasis added).

Plaintiffs' misunderstanding of the relevant standard undermines all their vagueness arguments. For example, Plaintiffs contend that § 1000.05(4)(b) is

unconstitutionally vague because it expressly permits the discussion of the prohibited concepts "in an objective manner." *See* Pls.' Br. 32. Plaintiffs assert that "[p]hilosophers have for centuries debated what 'objectivity' means" and note that two plaintiffs' "research and teaching directly challenge the notion of objectivity." *Id.* at 32-33 & n.21. This Court concluded similarly in *Honeyfund* at *13 & n.12. But the vagueness inquiry for public employment, we respectfully submit, does not require a statutory definition that definitively settles all possible philosophical debates; it requires statutory language that gives fair notice that certain conduct raises a risk of violating the Act. After all, "there are limitations in the English language with respect to being both specific and manageably brief," and even if the Act's "prohibitions may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with." *U.S. Civil Serv. Comm'n v. Nat'l Assoc. of Letter Carriers AFL-CIO*, 413 U.S. 548, 578 (1973). And if plaintiffs' scholarship "challenge[s] the notion of objectivity," they obviously must have some understanding of what "the notion of objectivity" is in the first place. Section 1000.05(4)(b) provides sufficient notice of what conduct puts a professor at risk of violating the Act.

Indeed, this provision meets the typical vagueness standard for private individuals. The statute's dichotomy between discussing a concept "in an objective

manner" as distinct from "endors[ing]" or "espous[ing]" the concept provides more than fair notice of what is prohibited. The plain meaning of these terms permits discussion of the concepts (*i.e.*, as concepts that others have articulated) without voicing approval to the concepts (*i.e.*, saying the concept *is correct or true*). For example, although it does not apply to universities, the Florida Board of Education has provided a useful, albeit obvious, description of the distinction between discussion and endorsement: "Efficient and faithful teaching further means that ... teachers serve as facilitators for student discussion and do not share their personal views or attempt to indoctrinate or persuade students to a particular point of view[.]" 6 FLA. ADMIN. CODE ANN. R. 6A-1.094124(3)(c). Thus, although contrary to this Court's prior conclusion, Defendants respectfully maintain that it is possible to discuss a concept objectively, without "lend[ing] credence" to it. *Honeyfund* at *14

Plaintiffs argue that other specific provisions are also vague. For example, Plaintiffs contend that Section 1000.05(4)(a)(4) is "indecipherable." Pls.' Br. 31. This Court has previously expressed a similar view. *See Honeyfund* at *13. That provision prohibits endorsing the proposition that "[m]embers of one race ... cannot and should not attempt to treat others without respect to race[.]" FLA. STAT. § 1000.05(4)(a)(4). As a matter of plain meaning, to treat someone "without respect to race" is to treat them the same no matter what their race is—that is, in a manner that is indifferent to and takes no account of their race. Therefore, to say that an

28

individual "cannot and should not" try to treat people the same no matter their race is to say that the individual is either *unable* or should be *unwilling* to treat people the same regardless of their race. This straightforward provision is far from "indecipherable" and instead provides sufficient notice of what conduct places one at risk of violating the Act.

Next, Plaintiffs take issue with two other provisions. First, echoing this Court's *Honeyfund* opinion, they contend that the phrase "morally superior" in § 1000.05(4)(a)(1) is "opaque." Pls.' Br. 31; *see Honeyfund* at *12. That provision prohibits endorsing the concept that, for example, "[m]embers of one race ... are morally superior to members of another race[.]" FLA. STAT. § 1000.05(4)(a)(1). As a matter of "ordinary or natural meaning," *Tracy*, 980 F.3d at 807, however, we submit that this provision simply prohibits endorsing the idea that members of one race are better than members of another race at adhering to ethical behavior.

Second, Plaintiffs point to § 1000.05(4)(a)(3)'s prohibition on endorsing the concept that an individual's "status" as "privileged or oppressed" is "necessarily determined by his or her race." Pls.' Br. 23. This provision, Plaintiffs say, "limits speech about white privilege" and "arguably also bans teaching that race-based programs confer a privileged status on marginalized individuals." *Id*. at 31. But to say that a provision "limits" and "bans" particular speech is not a vagueness argument. *See U.S. Civil Serv. Comm'n*, 413 U.S. at 579 (explaining that public

employees did not have a vagueness claim in part because "there seemed to be little question in the minds of the plaintiffs who brought this lawsuit as to the meaning of the law, or as to whether or not the conduct in which they desire to engage was or was not prohibited by the Act"). And the provision is sufficiently clear that it prohibits endorsing the idea that an individual's race *unavoidably—i.e.*, without exception—determines whether the individual occupies the status of holding a peculiar benefit or advantage over individuals of a different race. Plaintiffs fail to explain what "race-based programs" they believe confer a privilege on every single member of a particular race solely because of their race.

Finally, Plaintiffs contend that the Act "leaves the government with unbridled discretion to determine whether or not an instructor has violated the law." Pls.' Br. 33. But the scienter requirement in the Act and the Board's Regulation 10.005 eliminates any genuine vagueness concerns because "even laws that are in some respects uncertain may be upheld against a vagueness challenge if they contain a scienter requirement." *Jones v. Gov. of Fla.*, 975 F.3d 1016, 1047 (11th Cir. 2020) (internal quotation marks omitted). That Act itself uses terms that imply a scienter requirement. *See Arce*, 793 F.3d at 988-89 (noting that verbs like "advocate" and "promote" "impl[y] an affirmative act and intent"). In addition, Regulation 10.005 makes clear that a university risks losing funding only if the Board determines that the university "willfully and knowingly engaged in conduct at the institutional level

30

that constituted a substantiated violation of section 1000.05(4)(a)," and "failed to take appropriate corrective action." Regulation 10.005(4)(d).

Moreover, Regulation 10.005 explains that universities should enforce the Act against individual instructors who violate it by first mandating the instructor to "modify" the relevant training or instruction, and second by using "disciplinary measures where appropriate and remov[ing], by termination if appropriate, the employee(s)" only "if there is a failure or refusal to comply with the mandate." Regulation 10.005(3)(c). This structure—punishing only failure to take corrective action—likewise reduces vagueness concerns. *See U.S. Civil Serv. Comm'n*, 413 U.S. at 580 (noting it was "important" that government had "established a procedure by which an employee in doubt about the validity of a proposed course of conduct may seek and obtain advice from the [government] and thereby remove any doubt there may be as to the meaning of the law"). The combination of the scienter requirement and the reservation of punishment to only examples where an employee *refuses to correct* prohibited teaching eliminates any perceived vagueness and thus eliminates any risk of arbitrary enforcement.

## IV.   Any Unconstitutional Provisions Are Severable.

To the extent the Court finds Plaintiffs' claims likely to succeed with respect to any of the Act's provisions, it should sever them from the remainder of the Act. Severability is "a matter of state law," and in Florida, unconstitutional provisions are

severable even in the absence of a severability clause if "(1) they can be separated from the remaining valid provisions; (2) the legislative purpose expressed in the valid provisions can be accomplished independently of those which are void; (3) the good and the bad features are not so inseparable in substance that it can be said that the Legislature would have passed the one without the other; and (4) an act complete in itself remains after the invalid provisions are stricken." *Wollschlaeger*, 848 F.3d at 1318 (cleaned up). Here, each of the eight prohibited concepts of the Act clearly stands on its own and independently furthers Florida's interests in enacting it. If any portion of the Act is held unconstitutional, it should be severed from the remaining, valid provisions.

## V.    Plaintiffs Are Not Entitled to a Preliminary Injunction.

### A. Plaintiffs Have Not Shown Irreparable Injury.

Plaintiffs' cursory argument that the Act will cause them irreparable harm is based entirely on the rule that a violation of the First Amendment constitutes a per se "irreparable injury." Pls.' Br. 33-34. Similarly, Plaintiffs invoke "a presumption of irreparable harm" that applies when "pure speech is chilled." *Id.* at 34 (internal quotation marks omitted). But because they have not shown any likelihood that the Act *actually violates* any First Amendment freedoms, this presumption does not apply.

Plaintiffs' failure to show irreparable harm is especially pronounced given the timing of their challenge. The Act was signed into law back in April, it went into effect on July 1, and this Court has already entertained (and ruled on) multiple preliminary-injunction motions related to the Act. On top of Plaintiffs' months-long delay, they did not file their motion for preliminary injunction until *after* classes began at almost all the named university-defendants and on the same day that classes began at the only remaining university-defendant.[1] Given Plaintiffs' unexplained delay, a preliminary injunction would inject chaos into a fall semester that has been underway for weeks even though the law was signed last spring. Plaintiffs' delay should foreclose their demand for emergency relief. *See Wreal*, 840 F.3d at 1248 (plaintiff's "unexplained five-month delay in seeking a preliminary injunction, by itself, fatally undermined any showing of irreparable injury").

### B. The Balance of the Equities Militates Against Preliminary Injunctive Relief.

The balance of the equities and the public interest weigh decisively against enjoining the Act. As shown above, the State has a compelling—constitutionally imperative—interest in ending discrimination based on race and other immutable

---

[1] *See* USF FALL CALENDAR (Aug. 2022), https://bit.ly/3qNKrhV; FIU FALL CALENDAR (same), https://bit.ly/3UnulsH; FAMU FALL CALENDAR (same), https://bit.ly/3DxmkeS; FSU FALL CALENDAR (same), https://bit.ly/3qO4k8n; UCF FALL CALENDAR (same), https://bit.ly/3SjNuK7; UF FALL CALENDAR (Aug. 24), https://bit.ly/3DC1evP.

characteristics, and enjoining the Act will sanction conduct and curricular speech that Florida has determined, in the exercise of its sovereign judgment, is pernicious and contrary to the State's most cherished ideals. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury," *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (cleaned up), and that is true all the more when the statute at issue furthers interests as fundamental as those at the heart of Florida's Individual Freedom Act.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be denied.

Dated: September 22, 2022        Respectfully Submitted,

/s/ Charles J. Cooper
Charles J. Cooper (Bar No. 248070DC)
John D. Ohlendorf (*Pro Hac Vice*)
Megan M. Wold (*Pro Hac Vice*)
John D. Ramer (*Pro Hac Vice*)
Cooper & Kirk, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com

*Counsel for Defendants Florida Board of Governors of the State University System, et al.*

## CERTIFICATE OF WORD COUNT

Pursuant to Northern District of Florida Rule 7.1(F), the undersigned counsel hereby certifies that the foregoing Defendant's Response in Opposition to Plaintiffs' Motion for a Preliminary Injunction, including body, headings, quotations, and footnotes, and excluding those portions exempt by Local Rule 7.1(F), contains 7,984 words as measured by Microsoft Office for Word 365.

/s/Charles J. Cooper
Charles J. Cooper
