IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

| | |
|---|---|
| LEROY PERNELL *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM *et al.*,<br><br>*Defendants*. | Case No.: 4:22-cv-00304-MW-MAF |

### PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

### INTRODUCTION

The Stop Wrongs Against Our Kids and Employees ("Stop W.O.K.E.") Act facially prohibits teaching university students viewpoints disfavored by the legislature—a type of viewpoint discrimination that the First Amendment cannot abide. As presented in Plaintiffs' Complaint (Dkt. 1), Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction (Dkt. 13), and Memorandum of Law in Opposition to Defendants' Motion to Dismiss, Plaintiffs have clearly established standing to challenge the Act, because each Plaintiff fully intends to teach concepts the Act prohibits or enroll in classes where the concepts

1

will be taught.[1] Plaintiffs are irreparably harmed and chilled by the Act, even as they struggle to discern its vague language. A preliminary injunction is necessary to stop the State from casting a "pall of orthodoxy" on Florida colleges and universities. *Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589, 603 (1967).

In their Response in Opposition to Plaintiffs' Motion for Preliminary Injunction, Defendants do not dispute that the Stop W.O.K.E. Act is a viewpoint-based regulation. Instead, they argue that no First Amendment rights are at stake because all instruction at public colleges and universities is "government speech," Dkt. 52 at 10—a startling assertion for Plaintiffs and all who value colleges and universities "as the founts of—and the testing grounds for—new ideas." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1128 (11th Cir. 2022). Defendants' capacious interpretation of the government speech doctrine swallows the concept of academic freedom whole. In their brief, Defendants ignore the Eleventh Circuit's recent opinion reaffirming the importance of First Amendment rights in higher education in *Speech First*, misapply caselaw governing K-12 to higher education, and halfheartedly defend the Stop W.O.K.E. Act's obvious vagueness.

---

[1] *See* Dkt. 13 at 10–16; Pernell Decl. ¶¶ 22–23; Thompson Dorsey Decl. ¶¶ 41–45; Austin Decl. ¶¶ 41–43; Park Decl. ¶¶ 20–21, 30; Sandoval Decl. ¶¶ 13–17; Almond Decl. ¶¶ 12, 20, 22; Dunn Decl. ¶¶ 13–14; Dauphin Decl. ¶ 19–22.

For these reasons, Defendants' arguments are unavailing and the preliminary injunction should be granted.

## ARGUMENT

### I. Viewpoint-Based Discrimination Is Unconstitutional in Higher Education.

#### A. The First Amendment applies with special force in public colleges and universities.

Defendants argue that the First Amendment offers no protection for professors' in-class speech, citing out-of-circuit cases holding that K-12 teachers' speech rights are limited under *Garcetti v. Ceballos*, 547 U.S. 410 (2006), like other public employee speech. Dkt. 52 at 18–27. But these cases, by their own terms, are cabined to the K-12 context. *See, e.g.*, *Evans-Marshall v. Bd. of Educ. of Tipp City*, 624 F.3d 332 (6th Cir. 2010) ("[T]he constitutional rules applicable in higher education do not necessarily apply in primary and secondary schools, where students generally do not choose whether or where they will attend school."); *Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 480 (7th Cir. 2007) ("[T]he [F]irst [A]mendment does not entitle *primary and secondary teachers*, when conducting the education of captive audience, to cover topics, or advocate viewpoints, that depart from the curriculum adopted by the school system.") (emphasis added).

In Defendants' lead case, *Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991), the Eleventh Circuit recognized the distinction between K-12 standards and higher

education, noting that *Hazelwood* "dealt with students at the secondary level" and that no controlling caselaw applied in higher education, while nonetheless adopting *Hazelwood*'s "reasoning" as instructive. *Id.* at 1074 (citing *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 272–73 (1988)). This court should likewise recognize the special protections for speech in higher education.

Whereas high school students "range[] in age from fifteen to just over eighteen, and a substantial number ha[ve] not yet reached the age of majority," college students are adults. *Virgil v. Sch. Bd. of Columbia Cnty.*, 862 F.2d 1517, 1525 (11th Cir. 1989). And Supreme Court precedent "leave[s] no room for the view that . . . First Amendment protections should apply with less force on college campuses than in the community at large." *Healy v. James*, 408 U.S. 169, 180 (1972). Indeed, "given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition." *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003); *see also Speech First, Inc.*, 32 F.4th at 1127 n.6 (quoting *Gay Lesbian Bisexual All. v. Pryor*, 110 F.3d 1543, 1550 (11th Cir. 1997)) ("[T]he dangers of viewpoint discrimination are *heightened* in the university setting.").

4

### B. Academic freedom protects higher education instructors and students from viewpoint-based discrimination.

Defendants argue that "Plaintiffs have no individual right of academic freedom to control the curriculum," Dkt. 52 at 16, but they misunderstand the concept and Plaintiffs' claims in at least three ways. *First*, academic freedom does not belong only—as Defendants suggest—to academic institutions; courts have also recognized that academic freedom interests belongs to individual instructors. *See Hillis v. Stephen F. Austin State Univ.*, 665 F.2d 547, 553 (5th Cir. 1982) ("[Academic freedom's] roots have been found in the [F]irst [A]mendment insofar as it protects against infringements on a teacher's freedom concerning classroom content and method."). Public college faculty and staff "cannot carry out their noble task if the conditions for the practice of a responsible and critical mind are denied them." *Wieman v. Updegraff*, 344 U.S. 183, 196 (1952) (Frankfurter, J., concurring).

While the need for "independent and uninhibited exchange of ideas among teachers and students" and for "autonomous decisionmaking by the academy itself" might appear "somewhat inconsistent[]," *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 n.12 (1985), in this case they are uniquely aligned, as both individual professors and universities have academic freedom from the legislature. In order for institutions and their professors to enjoy academic freedom, the State must not create "an atmosphere of suspicion and distrust" wherein "scholarship cannot flourish." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). With the Stop W.O.K.E. Act,

the legislature is punishing disfavored academic speech on race and sex, violating Plaintiffs' academic freedom.

*Second*, Defendants assert that "academic freedom is [not] an independent First Amendment right." Dkt. 52 at 16 (quoting *Bishop*, 926 F.2d at 1075). Plaintiffs do not dispute that academic freedom has not been recognized as independent grounds for suit, nor did Plaintiffs aver any such independent right in their complaint. Instead, Plaintiffs alleged violations of their First Amendment speech and access-to-information rights. *See* Dkt. 1 ¶¶ 211–25. Plaintiffs simply argue that in the context of higher education, academic freedom is "a special concern of the First Amendment." *Keyishian*, 385 U.S. at 603. As such, courts have weighed academic freedom heavily where, as here, "there [i]s an attempt to suppress ideas by the government." *In re Dinnan*, 661 F.2d 426, 430 (5th Cir. 1981).[2]

*Third*, Defendants argue that Plaintiffs are trying "to control the state's curriculum," relying again on *Bishop*. Dkt. 52 at 16. But *Bishop* actually contemplated a content-based regulation on all religious views, saying that "the University as an employer and educator can direct Dr. Bishop to refrain from *expression of religious viewpoints* in the classroom and like settings." Bishop, 926 F.22d at 1077 (emphasis added). While it made sense for the university to limit

---

[2] "Decisions issued by Unit B of the former Fifth Circuit are binding precedent in the Eleventh Circuit." *United States v. Henco Holding Corp.*, 985 F.3d 1290, 1297 n.4 (11th Cir. 2021)

religious content in Professor Bishop's Health, Physical Education, and Recreation class, the situation would have been quite different if the university had, more analogous to the Stop W.O.K.E. Act, proscribed certain religious views while allowing others.[3]

Requiring that professors teach the content of their assigned subjects and adhere to professional standards is fully consistent with the First Amendment's bar on viewpoint-based restrictions on instructors' in-class speech. Indeed, Plaintiffs want to be held to high academic standards; they are challenging the Act in part because it prevents them from complying with those standards. *See, e.g.*, Almond Decl. ¶ 27. There is a material distinction between requiring professors to keep personal religious views out of gym class, and requiring them to adhere to particular viewpoints within their subject matter expertise. That difference is dispositive.

## II.   Plaintiffs' Instruction and Coursework Are Not "Government Speech."

Defendants argue that professors' in-class speech is "pure government speech, not the speech of the educators themselves." Dkt. 52 at 19. But this is wrong as a

---

[3] The analysis in *Bishop* may also have been different if it were the legislature and not the university regulating the Professor Bishop's speech. The Eleventh Circuit was particularly concerned about "supplant[ing] its discretion for that of the University," as "Federal judges should not be ersatz deans or educators." 926 F.2d at 1075. But this deference to university officials on matters of academic affairs, should not be afforded to state legislators. Like the judiciary, legislators should "trust that the University will serve its own interests as well as those of its professors in pursuit of academic freedom." *Id.* at 1075.

matter of law and of principle. Defendants rely on *Garcetti v. Ceballos*, which limited First Amendment protections for many public employees when it held that they could constitutionally be disciplined for statements made pursuant to their official duties. 547 U.S. at 421. But in so holding, the Supreme Court, recognizing that "[t]here is some argument that expression related to academic scholarship . . . implicates additional constitutional interests that are not fully accounted for by [the Supreme] Court's customary employee-speech jurisprudence," did not "decide whether the analysis [it] conduct[ed] [in *Garcetti*] would apply in the same manner to a case involving speech related to scholarship or teaching." *Garcetti*, 547 U.S. at 425; *see also Austin v. Univ. of Fla. Bd. of Trustees*, 580 F. Supp. 3d 1137, 1172 (N.D. Fla. 2022) (professors' "speech, by its very nature, may merit additional judicial solicitude"), *appeal docketed* No. 22-104488 (11th Cir. Feb. 9, 2022). Plaintiffs are, of course, public employees, but requiring them to teach only viewpoints the legislature has pre-approved would "impose a[] strait jacket upon the intellectual leaders in our colleges and universities [which] would imperil the future of our Nation." *Sweezy*, 354 U.S. at 250.

Furthermore, "[a] crucial rationale for *Garcetti*'s holding that statements made by public employees pursuant to their official duties are not protected by the First Amendment is the governmental employer's right to control official communications," *Hubbard v. Clayton Cnty. Sch. Dist.*, 756 F.3d 1264, 1268 (11th

Cir. 2014), which are distinct from classroom discussions. Defendants cite *Walker* for the proposition that government speech is not protected by the First Amendment because the government "could not 'effectively' implement its policies if it 'had to voice the perspective of those who oppose' it." Dkt. 52 at 10 (quoting *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207–208(2015)). A professor's in-class instruction is clearly not an official communication by the university. The purpose of higher education is to teach students "through wide exposure to [ ] robust exchange of ideas"—not through a single viewpoint, or a class of permissible viewpoints—that the university has made an "authoritative selection" to sponsor as its own. *See Keyishian*, 385 U.S. at 603 (quoting *United States v. Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943)).

Defendants' reliance on *Rosenberger* is similarly misplaced. There, the Court noted in dicta that "[w]hen the University determines the content of the education it provides, it is the University speaking, and we have permitted the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 836 (1995). Defendants argue that a professor's in-class speech is therefore completely without protection. But *Rosenberger* authorized content-based, not viewpoint-based, regulations. This interpretation is supported in the *Rosenberger* Court's reasoning that viewpoint-

based restrictions were improper "when the University does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers." *Id.* at 834. In other words, a university "speaks" when it requires that all students take two semesters of a foreign language, or tells a particular professor to teach physics. But nothing in *Rosenberger* suggests that the viewpoints an instructor advances in class should be directly attributed to the state.

## III. The Stop W.O.K.E. Act Is Unconstitutionally Vague by Any Standard.

This Court has already held that the Stop W.O.K.E. Act is unconstitutionally vague. *Honeyfund.com v. DeSantis*, 4:22-cv-00227-MW-MAF, 2022 WL 3486962, at *14 n.13 (N.D. Fla. Aug. 18, 2022). Defendants argue that there is a lower bar for vagueness where state employees are concerned. Dkt 52 at 26. But "[s]tandards of permissible statutory vagueness are strict in the area of free expression." *Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1320 (2017) (quoting *NAACP v. Button*, 371 U.S. 415, 432 (1963)). This is especially true in "the community of American universities," because in "an area so closely touching our most precious freedoms . . . [t]he danger of [a] chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform teachers what is being proscribed." *Keyishian*, 385 U.S. at 604 (cleaned up); *see also Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) ("Uncertain meanings

inevitably lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked.") (cleaned up).

Under any standard, the Stop W.O.K.E. Act impermissibly chills a wide range of speech and violates Plaintiffs' due process rights because its lack of clarity makes it impossible for Plaintiffs to know what is prohibited and what is permitted. Florida universities are similarly confused about the sweep of the Stop W.O.K.E. Act, as evidenced by their own vague guidance on how to comply with the Act. *See, e.g.*, Sandoval Decl. ¶ 24 (quoting University of Central Florida guidance, stating "[t]his language is not defined by Florida law, and the Florida Legislature did not provide guidance on what this language means in the context of implementing or complying with the requirements.").

Defendants' argument that the enforcement regulations' *scienter* requirement and enforcement procedure cure the Stop W.O.K.E. Act's vagueness is wrong. Dkt. 52 at 30. The law itself includes no *scienter* requirement and Regulation 10.0005 says only that a university can be punished if it "willfully and knowingly engaged in conduct" that violates the Stop W.O.K.E. Act.[4] But willfully and knowingly engaging in conduct is distinct from knowing whether the speech is proscribed or

---

[4] *See* Fla. Bd. of Gov'rs, State Univ. Sys. of Fla., *10.005 Prohibition of Discrimination in University Training or Instruction* (proposed July 1, 2022), available at https://www.flbog.edu/wp-content/uploads/2022/07/10.005Noticeof NewProposedRegulationJune2022.pdf.

permitted. Similarly, Defendants' argument that the fact that Regulation 10.0005's penalties only accrue after universities mandate that instructors modify their speech "eliminates any risk of arbitrary enforcement," Dkt. 52 at 31, misconstrues that risk. It is little comfort to instructors that the university will issue a mandate since the universities themselves cannot know what the law requires of them.

### IV. The Stop W.O.K.E. Act Is Not Severable in Any Way That Would Make It Constitutional.

As this Court held in *Honeyfund*, the "Court need not confront severability because the unconstitutionally vague 'objectivity' requirement, which governs the entire challenged provision, renders the statute as a whole unconstitutionally vague." *Honeyfund*, 2022 WL 3486962, at *14 n.13. Moreover, because each concept in Section 2(4)(a) enacts a viewpoint-based restriction on university instructors' speech, severing any one concept would not leave "remaining valid provisions," and "the good and the bad features" of the Act are "so inseparable in substance that it can [not] be said that the Legislature would have passed the one without the other." *See Wollschlaeger*, 848 F.3d 1293, 1317–18 (11th Cir. 2017) (quoting *State v. Catalano*, 104 So.3d 1069, 1080 (Fla. 2012)) (listing severability requirements).

### V. All Preliminary Injunction Factors Weigh Heavily in Plaintiffs' Favor.

Defendants intimate that Plaintiffs did not file for a preliminary injunction with sufficient urgency. Dkt. 52 at 33. But this lawsuit was filed just six weeks after the law took effect—a far cry from the "unexplained five-month delay" Defendants

cite in *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244 (11th Cir. 2016). *See also Dream Defs. v. DeSantis*, 559 F. Supp. 3d 1238, 1285–56 (N.D. Fla. 2021) (granting preliminary injunction and finding that plaintiffs did not "unduly" delay in filing three months after law came into effect).

Defendants also briefly assert that the balance of the equities weighs in their favor because the State has a compelling interest in ending discrimination. Dkt. 52 at 33. But attempting to cast the Act as an anti-discrimination measure does not exempt it from First Amendment requirements, and prohibiting viewpoints that the legislature disagrees with is not in the public's interest. *See Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."). While preserving academic freedom in universities can lead to uncomfortable conversations, contentious debate, and "hurtful expression," courts have recognized time and time again that "that's a cost that 'We the People' have accepted as necessary to protect free-speech interests more generally." *Speech First*, 32 F.4th at 1128.

## CONCLUSION

The Court should grant Plaintiffs' request for a preliminary injunction.

Respectfully submitted,

*/s/ Emerson Sykes*
Emerson Sykes
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION
125 Broad St. Fl. 18
New York, NY 10004
(212) 549-2500
esykes@aclu.org

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF FLORIDA, INC.**

*/s/ Daniel B. Tilley*
Daniel B. Tilley, Fla. Bar No. 102882
Katherin Blankenship
   Fla. Bar No. 1031234
Caroline McNamara*
4343 West Flagler St., Ste. 400

Jerry Edwards, Fla. Bar No. 1003437
933 Lee Rd., Ste. 102
Orlando, FL 32810
(786) 363-1107
jedwards@aclufl.org

**NAACP LEGAL DEFENSE AND EDUCATION FUND, INC.**

*/s/ Morenike Fajana*
Morenike Fajana*
40 Rector St., Fl. 5
New York, NY 10006
(212) 217-1690
mfajana@naacpldf.org

*Additional counsel are listed on the next page.*

Dated October 4, 2022

**AMERICAN CIVIL LIBETIES UNION FOUNDATION**

*/s/ Emerson Sykes*
Emerson Sykes*
Leah Watson*
Sarah Hinger*
Laura Moraff*
125 Broad St. Fl. 18
New York, NY 10004
(212) 549-2500
esykes@aclu.org
lwatson@aclu.org
shinger@aclu.org
lmoraff@aclu.org

**BALLARD SPAHR LLP**

*/s/ Jason Leckerman*
Jason Leckerman*
1735 Market St., Fl. 51
Philadelphia, PA 19103-7599
(212) 864-8266
leckermanj@ballardspahr.com

Charles Tobin, Fla. Bar No. 816345
1909 K St. NW, Fl. 12
Washington, D.C. 20006
(202) 661-2200
tobinc@ballardspahr.com

Jacqueline Mabatah*
201 S. Main St., Ste. 800
Salt Lake City, UT 84111-2221
(801) 531-3063
mbatahj@ballardspahr.com

| | |
|---|---|
| Jin Hee Lee* | Isabella Solomão Nascimento* |
| Santino Coleman* | 200 IDS Ctr., 80 S. 8th St. |
| 700 14th St., Ste. 600 | Minneapolis, MN 55402-2119 |
| Washington, D.C. 2005† | (612) 371-3281 |
| (202) 682-1300 | solomaonascimentoi@ballardspahr.com |
| jlee@naacpldf.org | |
| scoleman@naacpldf.org | * Admitted *pro hac vice* |
| | |
| *Counsel for Plaintiffs* | † Mailing address only |

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)

This foregoing Reply in Support of Plaintiffs' Motion for a Preliminary Injunction contains 2,927 words in compliance with Local Rule 7.1(I).

Dated: October 4, 2022.   By:   */s/ Emerson Sykes* .
  Emerson Sykes*

  * Admitted *pro hac vice*