## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

LEROY PERNELL, et al.,

      *Plaintiffs*,

v.

FLORIDA BOARD OF GOVERNORS OF
THE STATE UNIVERSITY SYSTEM, et al.,

      *Defendants*.

Case No.: 4:22-cv-304

## **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Daniel B. Tilley
Jerry Edwards
Katherine H. Blankenship
Caroline McNamara
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF FLORIDA

Leah Watson
Emerson Sykes
Sarah Hinger
Laura Moraff
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Morenike Fajana
Alexsis M. Johnson
Jin Hee Lee
Santino Coleman
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.

Jason Leckerman
Charles Tobin
Jacqueline Mabatah
Isabella Salomão Nascimento
BALLARD SPAHR LLP

*Counsel for Plaintiffs*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................ ii

INTRODUCTION ............................................................................1

FACTUAL BACKGROUND .............................................................2

LEGAL STANDARD ......................................................................6

ARGUMENT...................................................................................7

I.   NONE OF DEFENDANTS' RULE 12(B)(1) ARGUMENTS
     HAVE MERIT...........................................................................8

     A.   Dr. Marvin Dunn Has Standing To Challenge The Stop
          W.O.K.E. Act ...................................................................9

     B.   Plaintiffs Brought A Facial Challenge To The Stop
          W.O.K.E. Act In Its Entirety And The Court Has
          Jurisdiction To Consider The Full Scope Of Their Claims ...............10

     C.   Defendants' Remaining Standing Arguments Fail Because
          They Attack Claims Plaintiffs Do Not Assert In The Complaint .......13

II.  THE COMPLAINT ADEQUATELY ALLEGES VIOLATIONS
     OF THE FIRST AMENDMENT AND DUE PROCESS ............................14

III. THE COMPLAINT STATES A CLAIM UNDER THE EQUAL
     PROTECTION CLAUSE ...........................................................15

     A.   Disparate Impact..............................................................18

     B.   Historical Background ......................................................22

     C.   Sequence Of Events .........................................................23

     D.   Contemporaneous Statements ...........................................25

     E.   Substantive And Procedural Departures.............................26

     F.   Foreseeability And Knowledge Of The Disparate Impact ................27

     G.   Availability Of Less Discriminatory Alternatives .............................28

CONCLUSION ..................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU v. Florida Bar*,
  999 F.2d 1486 (11th Cir. 1993) .........................................................................11

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................18

*Babbitt v. United Farm Workers National Union*,
  442 U.S. 289 (1979) ..................................................................................... 12, 20

*Batalla Vidal v. Nielsen*,
  291 F. Supp. 3d 260 (E.D.N.Y. 2018) ...............................................................20

*City of South Miami v. DeSantis*,
  424 F. Supp. 3d 1309 (S.D. Fla. 2019) ....................................................... 19, 25

*City of South Miami v. DeSantis*,
  561 F. Supp. 1211 (S.D. Fla. 2021) ............................................................26, 27

*Coral Springs Street Systems, Inc. v. City of Sunrise*,
  371 F.3d 1320 (11th Cir. 2004) .........................................................................13

*Dream Defenders v. DeSantis*,
  553 F. Supp. 3d 1052 (N.D. Fla. 2021) ....................................................*passim*

*Falls v. DeSantis*,
  No. 4:22-cv-166-MW-MJF (N.D. Fla. July 8, 2022), ECF No. 68 ....................8

*G.H. v. Marstiller*,
  424 F. Supp. 3d 1109 (N.D. Fla. 2019) ...............................................................7

*Greater Birmingham Ministries v. Secretary of Alabama*,
  992 F.3d 1299 (11th Cir. 2021) ........................................................... 15, 16, 17

*Hallandale Professional Fire Fighters Local 2238 v. City of
  Hallandale*,
  922 F.2d 756 (11th Cir. 1991) ...........................................................................11

*Honeyfund.com Inc. v. DeSantis*,
  No. 4:22-cv-227-MW-MAF (N.D. Fla. Aug. 18, 2022), ECF No.
  55................................................................................................................12

*Hunt v. Amico Properties, L.P.*,
  814 F.3d 1213 (11th Cir. 2016) ...................................................7, 18

*Hunt v. Cromartie*,
  526 U.S. 541 (1999)....................................................................16

*I.L. v. Alabama*,
  739 F.3d 1273 (11th Cir. 2014) .......................................................22

*Jean v. Nelson*,
  711 F.2d 1455 (11th Cir. 1983) .......................................................17

*Kennedy v. Floridian Hotel, Inc.*,
  998 F.3d 1221 (11th Cir. 2021) ........................................................6

*League of Women Voters of Florida, Inc., v. Detzner*,
  314 F. Supp. 3d 1205 (N.D. Fla. 2018) ...........................................24

*Lewis v. City of St. Petersburg*,
  260 F.3d 1260 (11th Cir. 2001) ...................................................7, 26

*Mann v. Taser International, Inc.*,
  588 F.3d 1291 (11th Cir. 2009) ........................................................8

*Maxcess, Inc. v. Lucent Technologies, Inc.*,
  433 F.3d 1337 (11th Cir. 2005) ........................................................6

*North Carolina State Conference of the NAACP v. McCrory*,
  831 F.3d 204 (4th Cir. 2016)....................................................16, 26

*NLRB v. McClain of Georgia, Inc.*,
  138 F.3d 1418 (11th Cir. 1998) ........................................................8

*Rogers v. Lodge*,
  458 U.S. 613 (1982).....................................................................25

*Shaw v. Hunt*,
  517 U.S. 899 (1996).....................................................................25

*Stout v. Jefferson County Board of Education*,
   882 F.3d 988 (11th Cir. 2018)...........................................................25

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014)...........................................................................11

*Tracy P. v. Sarasota County*,
   No. 8:05-CV-927-T-27EAJ, 2007 WL 9723801 (M.D. Fla. Sep. 5,
   2007) ...................................................................................................25

*United States v. Zannino*,
   895 F.2d 1 (1st Cir. 1990) ................................................................11

*Veasey v. Abbott*,
   830 F.3d 216, 238–39 (5th Cir. 2016) .............................................26

*Village of Arlington Heights v. Metropolitan Housing Development
   Corp.*,
   429 U.S. 252 (1977)...................................................................15, 17

*Washington v. Davis*,
   426 U.S. 229 (1976)...........................................................................16

*Watson v. Bally Manufacturing Corp.*,
   844 F. Supp. 1533 (S.D. Fla. 1993)...................................................6

**Statutes**

Stop W.O.K.E. Act .......................................................................*passim*

**Other Authorities**

Governor's Reg. 10.005 (Aug. 22, 2022) ......................................8, 9, 10

## **INTRODUCTION**

Plaintiffs LeRoy Pernell, Dana Thompson Dorsey, Sharon Austin, Shelley Park, Jennifer Sandoval, Russell Almond, Marvin Dunn, and Johana Dauphin (collectively, "Plaintiffs"), commenced this action on August 18, 2022, challenging the validity of the Stop Wrongs Against Our Kids and Employees Act (the "Stop W.O.K.E. Act," "H.B. 7," or the "Act") under the First and Fourteenth Amendments of the United States Constitution. The Stop W.O.K.E. Act unconstitutionally prohibits free expression of certain viewpoints related to race, sex, and privilege on college campuses. It was adopted with an intent to discriminate against Black-led activism, and its vague terms broadly chill speech and enable arbitrary and discriminatory enforcement. Plaintiffs, instructors and students at Florida colleges, have described how their discussions in the classroom and on campus are impacted by the threat of the Stop W.O.K.E. Act, and particular the threat to open discussion generated by the Act's private enforcement provision, and the irreparable injury to their First Amendment rights caused by the law.

Defendants, each responsible for the enforcement of the Act, move to dismiss Plaintiffs' Complaint on two grounds. Defendants first argue the Complaint should be dismissed in part on standing grounds, pursuant to Federal Rule of Civil Procedure 12(b)(1). Defendants also contend the Complaint should be dismissed in

its entirety for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6).

All of Defendants' arguments fail. Each Plaintiff has standing because they have sufficiently established that they are subject to the Act as instructors, or are a student deprived of instruction pursuant to the Act. Further, under well-settled law, Plaintiffs have standing to challenge the Stop W.O.K.E. Act in its entirety. Finally, the Complaint alleges in sufficient detail facts supporting each element of Plaintiffs' claims that the Act unconstitutionally abridges First Amendment freedoms by imposing viewpoint-based restrictions on the speech of instructors and the receipt of information by students in college classrooms; violates the Due Process Clause's prohibition against vagueness because it fails to provide fair notice of what is, and is not, prohibited by its terms; and violates the Equal Protection Clause because it was enacted with the intent to discriminate against Black instructors and students. Accordingly, the Court should deny Defendants' motion to dismiss in its entirety.

## **FACTUAL BACKGROUND**

The Stop W.O.K.E. Act constrains Florida's educational system by preventing instructors and students alike from engaging with viewpoints deemed too controversial by the legislature and Governor Ron DeSantis. Under the Act, instructors can no longer advance perspectives on race, sex, and privilege that are included in eight prohibited concepts. As the Stop W.O.K.E. Act's proponents made

remarkably clear, the Act is a direct response to Black-led advocacy for more racially inclusive speech and coursework on Florida's campuses, as part of unprecedented worldwide activism against anti-Black racism, and is designed to stop these efforts dead in their tracks. As a consequence, Plaintiffs and other instructors can no longer freely promote viewpoints on race and racism, all students are less prepared to participate in our multi-racial society, and Black students are disparately impacted by the law's restrictions on coursework and perspectives on racial oppression.

Amidst widespread protests and advocacy calling for racial justice in 2020 and 2021, Black students and instructors were at the forefront of pushing Florida's schools to address the State's longstanding history of racial inequity and to make campuses more affirming for people of diverse backgrounds. Compl. ¶¶ 74–75, 79–83, ECF No. 1. Indeed, this push was primarily for the benefit of Black students and instructors and addressed their own experiences with racial inequalities, which inform and influence their academic scholarship. Many schools responded to these demands by issuing public statements prioritizing anti-racism, equity, and inclusion, adding new courses on race and ethnic studies, and removing monuments and buildings named after Confederate leaders. *Id.* ¶¶ 82, 85–91.

In explicit opposition to these efforts to advance racism, equity and inclusion, Governor DeSantis and members of the legislature, along with their allies, repeatedly criticized Critical Race Theory, racial justice work and other concepts

related to race and racism—calling them "toxic" and "un-American," and saying that there was no place for such discussions in the state of Florida. *Id.* ¶¶ 103–104, 114–116. Florida's policymakers enshrined this criticism into official state policy twice: first in 2021, with a State Board of Education rule banning Critical Race Theory and *The 1619 Project* in K-12 schools, and, again in 2022, with the Stop W.O.K.E. Act.

When Governor DeSantis announced the policy proposal that ultimately became the Stop W.O.K.E. Act, he called on the legislature to pass "the strongest legislation of its kind," and explained that Florida's schools did not need terms like "equity" or "pernicious ideologies" like "Critical Race Theory." *Id.* ¶¶ 101–103. The legislature answered the Governor's call by imposing harsh penalties on Florida's instructors who dare to share viewpoints disfavored by the state's policymakers.

Thus, the aims of the Act could not be clearer. As its name explains, the Stop W.O.K.E. Act was designed to muzzle speech on "wokeness," which, according to the legislature, includes racial justice, diversity, equity, inclusion, and similar topics with which the Act's proponents disagree—topics in which Black students and instructors disproportionately engage and from which they disproportionately benefit. *Id.* ¶¶ 108, 186, 193–194. And the Act is having its intended effect. Florida's universities have begun rescinding their statements on anti-racism, diversity, and inclusion, *id.* ¶¶ 165–169; instructors are afraid to teach their race-related coursework as they normally would for fear of running afoul of the Act and facing

dire consequences, *id*. ¶¶ 170–180, 182; and students are being deprived of certain perspectives in the classroom. *Id.* ¶ 181. These impacts fall more harshly on Black instructors and students given the Act's restrictions on speech about "race, color, sex, or national origin," an individual's "status as either privileged or oppressed," and "diversity, equity [and] inclusion." *Id.* ¶ 51. This speech is most likely to arise in Critical Race Theory and race studies—in fact, there is no question that Critical Race Theory was specifically targeted by the new law. *Id.* ¶¶ 93–103. And Critical Race Theory and race studies are predominantly taught by Black instructors like Plaintiffs, whose own experiences with race, privilege, oppression, diversity, equity, and/or inclusion have informed their academic work and inspired their academic interests, and also helped provide an important perspective when teaching their students about these issues. *Id.* ¶¶ 29–30, 142, 149,183–91.

All of Defendants' arguments to the contrary fall flat. Rather than meaningfully engage with much of Plaintiffs' allegations, Defendants either ignore or mischaracterize it. The problem is not with Plaintiffs' well-pleaded Complaint, however, but the myriad constitutional infirmities of a law deliberately enacted to silence dissent, chill more speech than it facially restricts, and discriminate on the basis of race, as Plaintiffs have set forth in detail in their Complaint.

## LEGAL STANDARD

"Attacks on subject matter jurisdiction, which are governed by Rule 12(b)(1), come in two forms: facial or factual attack." *Kennedy v. Floridian Hotel, Inc.*, 998 F.3d 1221, 1230 (11th Cir. 2021). A factual attack "challenges the existence of subject matter jurisdiction irrespective of the pleadings, and extrinsic evidence may be considered." *Id*. Here, Defendants raise a factual attack on the Court's jurisdiction and Plaintiffs' standing, as seen in their heavy reliance on record materials beyond the four corners of the Complaint, namely Plaintiffs' declarations in support of their Motion for Preliminary Injunction. *See* Defs.' Mem. in Supp. of Mot. to Dismiss ("MTD") at 10–14, ECF No. 51-1. In considering Plaintiffs' standing, it is appropriate to rely on these materials. *See Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1340 n.3 (11th Cir. 2005) ("[A] document outside the four corners of the complaint may still be considered if it is central to the plaintiff's claims and is undisputed in terms of authenticity."); *Watson v. Bally Mfg. Corp.*, 844 F. Supp. 1533, 1535 n.1 (S.D. Fla. 1993) ("In determining whether to grant [a motion to dismiss], the [C]ourt primarily considers the allegations in the complaint, although . . . items appearing in the record of the case . . . may be taken into account"), *aff'd*, 84 F.3d 438 (11th Cir. 1996).

When considering a motion to dismiss under Rule 12(b)(6), generally the Court "is limited to the allegations in the complaint." *Lewis v. City of St. Petersburg*,

260 F.3d 1260, 1264 (11th Cir. 2001). In evaluating Plaintiffs' claims, the Court accepts all well-pleaded facts as true, and construes them in the light most favorable to Plaintiffs. *See Hunt v. Amico Props., L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016). "To withstand a motion to dismiss under Rule 12(b)(6)," courts hold that a complaint only "must include 'enough facts to state a claim to relief that is plausible on its face.'" *G.H. v. Marstiller*, 424 F. Supp. 3d 1109, 1113 (N.D. Fla. 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility means that "the plaintiff [has pleaded] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

The Complaint easily satisfies both Rule 12(b)(1) and Rule 12(b)(6).

## ARGUMENT

Defendants' motion should be denied in its entirety. *First*, the Court has subject matter jurisdiction because all Plaintiffs have standing and properly challenge the validity of the entire Stop W.O.K.E. Act. The rest of Defendants' standing arguments are premised on theories of liability no Plaintiff has pursued and should therefore be disregarded.

*Second*, Plaintiffs more than plausibly pleaded that the Stop W.O.K.E. Act is an unconstitutional viewpoint-based restriction on speech such that it impermissibly infringes on instructors' and students' rights under the First Amendment; is void for

vagueness; and was enacted for a racially discriminatory purpose in violation of the Fourteenth Amendment.

## I.   NONE OF DEFENDANTS' RULE 12(B)(1) ARGUMENTS HAVE MERIT.[1]

Defendants' jurisdictional challenge falls into three general categories. *First*, Defendants argue Plaintiff Marvin Dunn, who teaches at Florida International University ("FIU"), lacks standing because he does not offer instruction as defined by the Act. MTD at 8–9. *Second*, Defendants suggest that Plaintiffs lack standing to challenge the Stop W.O.K.E. Act as a whole because they have only stated they intend to teach some and not all of the concepts prohibited by the law. *Id*. at 12–14. *Third*, Defendants raise a number of standing challenges to propositions no Plaintiff has advanced, including the propositions that Plaintiffs can sue the Defendant Board of Trustees of a university with which they are not affiliated, that they have third-

---

[1] Defendants perfunctorily argue that Plaintiffs do not have standing to sue the Board of Governors or its individual members, including the Commissioner of the Board of Education. MTD at 1. *First*, Defendants' passing reference to the fact that Plaintiffs have sued the wrong Defendants is not sufficiently preserved. *NLRB v. McClain of Ga., Inc.*, 138 F.3d 1418, 1422 (11th Cir. 1998) ("Issues raised in a perfunctory manner, without supporting arguments and citation to authorities, are generally deemed to be waived"). *Second*, Defendants are simply wrong. This Court has already rejected the argument that a university professor's First Amendment injuries resulting from the Act are not sufficiently traceable to the Board of Governors. *See* Order Granting in Part & Denying in Part Mot. Dismiss at 11–12, *Falls v. DeSantis*, No. 4:22-cv-166-MW-MJF (N.D. Fla. July 8, 2022), ECF No. 68. Moreover, under Bd. of Governor's Reg. 10.005(4)(d) (Aug. 22, 2022), which Defendants cite repeatedly, the Board of Governors has clear enforcement authority under the Act. *See id*. And Plaintiffs have only pleaded claims against the Board's members in their official capacities, *see* Compl. ¶¶ 34–41; *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1309 (11th Cir. 2009) ("A claim asserted against an individual in his or her official capacity is, in reality, a suit against the entity that employs the individual.").

party standing for injuries from the Act not personal to them, and that student-Plaintiff Johana Dauphin is claiming she qualifies as an instructor under the Act. *Id.* at 7–8, 9–12.

As shown below, none of these arguments have merit.

### A.   Dr. Marvin Dunn Has Standing To Challenge The Stop W.O.K.E. Act.

Plaintiff Dr. Marvin Dunn is a "Professor Emeritus" who is paid by FIU to "act[s] as an employee of FIU in instructing the students and staff in and outside of the classroom about th[e] [Black Miami History Bus] tour." Compl. ¶ 28; Decl. of Dr. M. Dunn in Supp. of Mot. for Prelim. Inj. ("Dunn Decl.") ¶ 10, ECF No. 13-7. As alleged in the Complaint, Dr. Dunn fears that in conducting the history tours, his speech and expression will be construed as "instruction" that violates the terms of the Stop W.O.K.E. Act. Compl. ¶ 30.

Defendants claim Dr. Marvin Dunn is not subject to the Stop W.O.K.E. Act because he is not an instructor. Relying on the definition of instruction in the Defendant Board of Governors' implementing regulation, Defendants argue that Dr. Dunn's Black history tour of Miami is not offered "within" a university course. *See* MTD at 8–9 (citing to Reg. § 10.005(1)(c) and arguing that it defines "instruction" as "the process of teaching or engaging students with content about a particular subject by a university employee or person authorized to provide instruction by the university within a course"). However, the language of the implementing regulation

is not limited on its face as Defendants suggest.[2] The term "within a course" is part of the characterization of who provides instruction, not where or how it is provided. Pursuant to the regulation, instruction is provided either by "a university employee" or a "person authorized to provide instruction by the university within a course." Reg. § 10.005(1)(c). As alleged, Dr. Dunn is an employee of the university. His Black history tours can be construed as "teaching or engaging students with content about a particular subject." Thus, it is possible to interpret the vague terms of the Stop W.O.K.E. Act, and its implementing regulations, to apply to Dr. Dunn. That possibility in itself chills his free speech, satisfying the requirements of standing. *See infra* Section I.B.[3]

**B.     Plaintiffs Brought A Facial Challenge To The Stop W.O.K.E. Act In Its Entirety And The Court Has Jurisdiction To Consider The Full Scope Of Their Claims.**

Plaintiffs allege that the Stop W.O.K.E. Act violates the First and Fourteenth Amendments on its face. As alleged in the Complaint, the Act is unclear in its entirety and each of its terms work collectively to cast a broad chill on Plaintiffs' speech. Defendants argue the Court's jurisdiction over Plaintiffs' challenge should be limited to only those banned concepts Plaintiffs have stated they are likely to

---

[2] Furthermore, in relying solely on the implementing regulation for this argument, Defendants concede that the Act itself contains no definition of "instruction."

[3] For the same reason, the FIU Board of Trustees should not be dismissed, as discussed in Section I.C, *infra*.

teach, and further that Plaintiffs misapprehend (and mis-plead) what is prohibited by certain concepts. MTD at 12–14.

These arguments go to the scope of the appropriate remedy and are not relevant to the Court's jurisdiction over the claims. It is further unclear what relief Defendants seek based on this argument.[4]

Moreover, by singling out only those concepts which they believe Plaintiffs do not intend to teach, Defendants effectively concede that Plaintiffs *do* have standing to challenge the remaining concepts—namely the second, fourth, and eighth concepts.[5] *See* MTD at 12. Given this concession, and Plaintiffs' repeated assertions that they intend to teach these concepts but are afraid to do so because of the Act, Defendants' motion should be denied. *See* Compl. ¶¶ 10–56, 147–149; *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014); *ACLU v. Fla. Bar*, 999 F.2d 1486, 1492 (11th Cir. 1993) (refraining from expressive activity to avoid potential enforcement of challenged act constitutes injury in fact); *Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale*, 922 F.2d 756, 760 (11th Cir. 1991).

---

[4] Notably, Defendants do not make *any* request of the Court in this section of their brief. Nor do they explain what remedy would even apply, as this argument would not result in the dismissal of any Plaintiff or any of the claims for relief. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." (internal quotations omitted)).

[5] Plaintiffs also clearly state an intention to teach the third and fifth concepts. *See* Compl. ¶¶ 141–142, 156, 172, 175, 181. Puzzlingly, Defendants fail to contend with or acknowledge these allegations.

Even if Defendants' arguments were relevant at this stage, which they are not, they fail because they mischaracterize Plaintiffs claims. Plaintiffs make specific reference to the most problematic concepts prohibited by the Act, but Plaintiffs have not alleged that *only* these concepts are responsible for Plaintiffs' injuries. *See* Compl. ¶¶ 12, 15, 18, 22, 24, 27, 30, 32–33. Because of the vagueness of each concept and the Act as a whole, Plaintiffs cannot say with certainty which specific provisions they may be accused of violating. Plaintiffs' self-censorship harm arises, in part, due to this very ambiguity. *See id.* ¶¶ 24, 156; *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979). This is particularly true here because, as Plaintiffs allege, the Act's provision that the prohibited concepts may be discussed "in an objective manner without endorsement" renders the entire Act vague. Compl. ¶¶ 30, 52–53, 153, 155, 180, 229; *see also* Prelim. Inj at 37 n.13, *Honeyfund.com Inc. v. DeSantis*, No. 4:22-cv-227-MW-MAF (N.D. Fla. Aug. 18, 2022), ECF No. 55 ("This Court need not confront severability because the unconstitutionally vague 'objectivity' requirement, which governs the entire challenged provision, renders the statute as a whole unconstitutionally vague.").

Defendants' argument ignores that Plaintiffs allege the Act as a whole was enacted for unconstitutional purposes: namely, to further viewpoint discrimination and discriminate against Black instructors and students. *See* Compl. ¶¶ 5, 157, 215–218, 221–225, 235–236. As such, Plaintiffs are entitled to request that the Act in its

entirety be invalidated, as a law enacted pursuant to an unconstitutional purpose has no validity. *See Coral Springs St. Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1347 (11th Cir. 2004) ("[W]hen 'the taint of an illegal provision has infected the entire enactment. . .the whole unit [must] fail'") (citation omitted).

Finally, Plaintiffs have standing to challenge the seventh prohibited concept regardless of whether Plaintiffs want their students to feel guilt or whether the students' guilt is a mere consequence of the Plaintiffs' instruction. Plaintiffs plainly and sufficiently allege that their speech is chilled based on this concept, for fear that their students may understand their instruction as an endorsement that they "bear[] personal responsibility for and must feel guilt" for the actions "committed in the past by other members of the same race." *See* Compl. ¶¶ 24, 30, 149, 179. Indeed, the ambiguity of whether an instructor is endorsing that a student "bear[] responsibility for and must feel guilt" for past actions underscores the vagueness of that provision.

## C.    Defendants' Remaining Standing Arguments Fail Because They Attack Claims Plaintiffs Do Not Assert In The Complaint.

Defendants object to a number of theories of liability that Plaintiffs are not pursuing. These arguments are nothing more than a red herring. Plaintiffs' claims do not depend upon their traceability to a Board of Trustees for any university with which Plaintiff is not affiliated nor have Plaintiffs ever so alleged. Nor do Plaintiffs pursue any theory of third-party standing—Plaintiffs have been impacted personally by the Act, as the Complaint makes clear, *see supra*. Finally, Defendants misread

Plaintiff Dauphin's declaration in arguing that she claims to be an instructor, MTD at 11 (citing Decl. of J. Dauphin in Supp. of Mot. for Prelim. Inj. ("Dauphin Decl.") ¶ 23, ECF No. 13-8).[6] Plaintiffs' Complaint makes clear that Ms. Dauphin is only seeking relief on behalf of her rights as a student. *See* Compl. ¶¶ 31–33.

Because Plaintiffs have not and will not be pursuing these theories to support their standing in this action, they are irrelevant to this motion to dismiss.

## II.   THE COMPLAINT ADEQUATELY ALLEGES VIOLATIONS OF THE FIRST AMENDMENT AND DUE PROCESS CLAUSE.

Plaintiffs incorporate by reference all of the arguments raised in Plaintiffs' memorandum of law in support of their motion for a preliminary injunction and their reply memorandum.[7] *See generally* Mem. in Supp. of Pls.' Mot. for Prelim. Inj. ("PI Mot."), ECF No. 13; Reply in Supp. of PI Mot. ("PI Reply"), ECF No. 54. The Stop W.O.K.E. Act, on its face, is a viewpoint-based restriction on instructors' speech and students right to access information in Florida's public colleges and universities. Compounding this First Amendment violation, the Act is also unconstitutionally vague because its unclear and ungrammatical language does not give Plaintiffs fair

---

[6]   Defendants' strained reading of Dauphin's declaration perhaps unintentionally buttresses Plaintiffs' vagueness challenge. Certainly, if a student is confused about what is prohibited under the law and whether they are subject to it, the instructors may be too—and, in fact, the individual actually subject to the law is at great risk of overcorrecting, thereby chilling more speech than is intended to be proscribed, in order to avoid liability. *See* PI Mot. at 30–32; PI Reply at 10–12.

[7] The Court may properly consider these incorporated arguments and the evidence on which they rely when deciding Defendants' motion to dismiss. *See* note 1, *supra*.

notice of what the law prohibits and permits. *See id.* Because Plaintiffs have demonstrated an entitlement to relief under the more exacting preliminary injunction standard, Plaintiffs easily meet the burden to establish standing to survive a motion to dismiss under Rule 12(b)(6).

## III.   THE COMPLAINT STATES A CLAIM UNDER THE EQUAL PROTECTION CLAUSE.

Plaintiffs adequately allege sufficient facts which—when taken as true, as they must be at this stage—support the inference that the Stop W.O.K.E. Act was enacted with a discriminatory purpose and has a discriminatory effect on Black instructors and students.

Rather than acknowledge Plaintiffs' well-pleaded allegations, Defendants ignore and misconstrue these allegations and the applicable law.

A law is unconstitutional under the Equal Protection Clause if "the State's decision or act had a discriminatory purpose and effect." *See Greater Birmingham Ministries v. Sec'y of Ala.* ("*GBM*"), 992 F.3d 1299, 1321 (11th Cir. 2021) (internal marks omitted). "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

Courts use the five-factor *Arlington Heights* framework to examine whether a facially neutral law was passed with discriminatory intent, which includes: "(1) the

impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; . . . (5) the contemporary statements and actions of key legislators." *GBM*, 992 F. 3d at 1321–22. The Eleventh Circuit has supplemented these factors with: "(6) the foreseeability of the disparate impact; (7) knowledge of that impact[;] and (8) the availability of less discriminatory alternatives." *Id.*

While these factors inform the discriminatory purpose inquiry, courts should not "miss[] the forest in carefully surveying the many trees" by focusing on each factor in isolation, or to the exclusion of other relevant evidence. *N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 214 (4th Cir. 2016). These factors are non-exhaustive, and a Plaintiff is not required to prove the existence of each and every factor. *See GBM*, 992 F.3d at 1327. Rather, discriminatory purpose under *Arlington Heights* is determined "from the totality of the relevant facts," and courts must weigh Plaintiffs' evidence as a whole. *Washington v. Davis*, 426 U.S. 229, 242 (1976).

Accordingly, "[t]he *Arlington Heights* factors require a fact intensive examination of the record." *GBM*, 992 F.3d at 1322 n.33. As such, these claims are rarely dismissed at the pleading stage, where the record is not fully developed. *See, e.g.*, *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *Dream Defenders v. DeSantis*, 553 F. Supp. 3d 1052, 1094 (N.D. Fla. 2021).

Defendants fail to genuinely attack the facial plausibility of Plaintiffs claim, likely because such an attack would surely fail. After weighing all Plaintiffs' evidence, it is clear that Plaintiffs sufficiently allege discriminatory purpose and effect. This is especially true because Plaintiffs have alleged facts that support each of the considerations which guide the discriminatory purpose inquiry in the Eleventh Circuit and by the Supreme Court. *See GBM*, 992 F. 3d at 1321–22.

Contrary to Defendants' assertions, Plaintiffs are not required to plead that a decisionmaker is "*necessarily racist*" to establish an Equal Protection claim. *See* MTD at 20 (emphasis in original). The discriminatory purpose need not be the "dominant or [even a] 'primary' one." *Arlington Heights*, 429 U.S. at 265–66. Rather, it need only be a motivating factor because "[r]arely can it be said that a legislature . . . operating under a broad mandate made a decision motivated solely by a single concern." *Id*. at 265. Additionally, Defendants' arguments regarding alternative explanations behind the enactment of the Stop W.O.K.E. Act are also improper because they are rebuttal arguments that may not be considered on a motion to dismiss. *See Jean v. Nelson*, 711 F.2d 1455, 1487 (11th Cir. 1983), *on reh'g*, 727 F.2d 957 (11th Cir. 1984), *aff'd*, 472 U.S. 846 (1985).

Defendants ask the Court to ignore many of the allegations in the Complaint and draw different, less reasonable inferences based on Defendants' selective recitation of the facts. *See* MTD at 22–25. However, this is not the proper inquiry on

a motion to dismiss. This Court must first accept the allegations in the Complaint as true, construe them in the light most favorable to Plaintiffs, and then draw all reasonable inferences to determine whether Plaintiffs have stated a claim that is plausible on its face. *Hunt*, 814 F.3d at 1221; *Iqbal*, 556 U.S. at 678–79. Accordingly, Defendants' motion to dismiss Plaintiffs' Equal Protection Clause claim should be denied for the reasons set forth below.

Plaintiffs address each *Arlington Heights* factor in turn.

**A.   Disparate Impact.**

Plaintiffs allege sufficient evidence regarding the disparate impact factor. *First*, the Complaint clearly alleges that the very speech Plaintiffs already engage in concerning Critical Race Theory, racism and privilege, which Black professors are more likely to engage in, is being chilled. *See* Compl. ¶¶ 165–169, 183–190. The Complaint further alleges that Governor DeSantis's public response championing the University of Florida's removal of its anti-racist statement and encouraging other schools to remove similar statements and initiatives will almost certainly lead to other schools following suit. *See id.* ¶¶ 165–169.

The Complaint also sufficiently alleges that the Act's suppression of classroom instruction drawing on topics like Critical Race Theory will disproportionately harm instructors of color, especially Black instructors. Plaintiffs allege that the Act singles out concepts related to race, color, "an individual's status

as either privileged or oppressed" and that courses using the Critical Race Theory framework or a critical race lens, which are most likely to be taught by Black professors, will be most impacted. *Id.* ¶¶ 182–185. Indeed, as Defendants concede, the African-American Studies departments at FSU, FIU and UF are predominantly staffed by Black instructors. *Id.* ¶ 186; MTD at 17. Moreover, as Dr. Dunn has alleged, his instruction and promotion of the prohibited concepts is specifically informed by his experiences as a Black man and past encounters with racism. *Id.* ¶¶ 29–30; 142, 149. Plaintiffs also allege that student-Plaintiff Dauphin will be harmed because of her race based on decreased access to racially inclusive speech. *Id.* ¶ 194– 195. These allegations regarding particularized facts of chilled speech and why Black instructors and students are most likely to be impacted by the Act's suppression of race-related instruction constitutes sufficient pleading of a disparate impact to survive a motion to dismiss. *See Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 275 (E.D.N.Y. 2018), *rev'd in part sub nom. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, --- U.S. --- (2020); *Dream Defenders*, 553 F. Supp. 3d at 1094–95 (denying motion to dismiss, relying, in part, on allegations of how law enforcement selectively enforced laws designed to quell protests in a manner that disparately impacted Black protestors; and past data on disparities in criminal justice system); *City of S. Miami v. DeSantis*, 424 F. Supp. 3d 1309, 1344 (S.D. Fla. 2019) (denying motion to dismiss Equal Protection claim where the

complaint "set[] forth statistics and data indicating that racial minorities are more likely to be targeted, questioned, and detained by local law enforcement following the implementation of" the challenged law).

*Second*, Defendants' dismissal of the allegations regarding disparate impact as "threadbare" and reliant on a "chain of inferences" utterly fails to account for the harm Plaintiffs, themselves largely Black instructors and students, allege with specificity and particularity in the Complaint. MTD at 16. Indeed, Plaintiffs allege that many University of Central Florida Professors who "are Back or Latinx" are seriously concerned about negative professional consequences if they continue to incorporate elements of Critical Race Theory in their coursework. Compl. ¶ 182. These allegations are further probative of disparate impact and more than sufficient for a pre-enforcement challenge. *Babbitt*, 442 U.S. at 298 (holding that a plaintiff need not wait until a law is enforced against them before pursuing a constitutional challenge).

Defendants' counterarguments are unavailing and rest on a fundamental misunderstanding of equal protection law. Defendants argue that because Plaintiffs do not assert every conceivable claim of discrimination to challenge the Act, they have not alleged sufficient facts regarding the Act's disparate impact. *See* MTD at 16–17. But the fact that Plaintiffs do not challenge the K-12 provision of the Act or assert a claim of sex-based discrimination is irrelevant to the question of the

sufficiency of their disparate impact allegations in higher education, much less fatal to their intentional discrimination claim. Plaintiffs need not assert a claim on behalf of every potential burdened population in order to sufficiently plead race discrimination in their specific circumstances. *See, e.g.*, *Dream Defenders*, 553 F. Supp. 3d at 1094–95 (allowing the plaintiffs' Equal Protection Clause claim to proceed on behalf of Black protestors and Black-led organizations only).

Finally, with regard to Plaintiffs' allegations that student-Plaintiff Dauphin will be discriminated against based on her race, Defendants again misstate Plaintiffs' allegations. At no point does the Complaint allege that promotion of the prohibited concepts banned under the Act would *per se* reduce harassment. MTD at 18. Nor do Plaintiffs allege that the only harm to Ms. Dauphin resulting from the Act is the banning of the concepts enumerated in the Act. Rather, Plaintiffs allege that Ms. Dauphin benefits from and is entitled to the promotion of a wide range of anti-racist speech now prohibited by the Act, and the prohibition of that broad range of anti-racist speech necessarily harms students. *See* Compl. ¶¶ 144–148.

Indeed, the Complaint contains specific allegations as to education and professional disadvantages students will face on account of being denied comprehensive and robust classroom engagement with concepts banned by the Act. *See id.* ¶¶ 145, 171.

**B. Historical Background.**

Defendants misrepresent the allegations in the Complaint regarding the historical background of the Act as limited to events occurring decades ago and wholly unconnected to the Act in an attempt to minimize the clear throughline alleged from the climax of racial justice demonstrations and organizing in the summer of 2020 to Governor DeSantis and the legislature's racially-motivated attempt to suppress those efforts. As a threshold matter, the particular context of Florida's history of systemic racism, anti-Black violence, and the suppression of Black participation in civil and social arenas constitutes relevant circumstantial evidence that the Court can and should consider under *Arlington Heights*. *See I.L. v. Ala.*, 739 F.3d 1273, 1286–87 (11th Cir. 2014) (noting that the district court properly considered plaintiff's historical context allegations, including those related to "Alabama's long-lived hostility to . . . funding public education of black children" and acknowledgement that "Alabama's 'racist past . . . cast long shadows'").

Even putting that necessary context aside, Defendants fail to acknowledge, much less engage with the most current and relevant historical background alleged in the Complaint, all of which occurred within the last two years and directly precipitated the political backlash that culminated in the Stop W.O.K.E. Act. *See* Compl. ¶¶ 73–101. Defendants also incorrectly contend that the "more recent historical background" in the Complaint is limited to the three killings of unarmed

Black people, *see* MTD at 22 (internal quotations omitted), while ignoring the many specific and detailed allegations of the racial justice reforms and protests instituted by Black students and instructors beginning in 2020, and the responses of Florida's educational institutions, continuing through the legislature's passage of H.B. 7, *see* Compl. ¶¶ 73–101.

The allegations regarding the full historical context of the Act, which the Court must accept as true supports sufficient pleading of discriminatory intent.

### C.   Sequence Of Events.

The events leading up to the enactment of the Stop W.O.K.E. Act shed further light on the Act's racially discriminatory purpose. As Plaintiffs allege, following Black-led advocacy by Florida's students, instructors, and activists, *see supra* Section III. A., the Act's proponents repeatedly disparaged this work and the idea of "wokeness." Compl. ¶¶ 103–104, 114–116. In April 2021, the legislature enacted another law at the urging of Governor DeSantis—House Bill 1—designed to suppress speech about racial justice and chill racial justice protests. *Id.* ¶ 95. The legislature also enacted Senate Bill 90, a restrictive voting law that was challenged by several non-profit groups who alleged the law sought to curtail the very voting methods used most by Black Floridians. *See id.* In June 2021, Governor DeSantis then urged the Board of Education to adopt a rule banning Critical Race Theory and The 1619 Project in K-12 schools. *Id.* ¶¶ 97–98. In December 2021, Governor

DeSantis announced the predecessor proposal to the Stop W.O.K.E. Act, explaining that its aim was to codify the Board of Education regulation in higher education and workplaces. *Id.* ¶¶ 101–103. Known anti-CRT activist Christopher Rufo took credit for this proposal and described himself as "aiding" Governor DeSantis in this work. *Id.* ¶ 104. A few weeks later, the legislature introduced the Stop W.O.K.E. Act in the House and a companion bill in the Senate, using language lifted from former President Trump's Executive Order 13950, which was struck down on constitutional grounds a year earlier. *Id.* ¶¶ 109–112.

Defendants ask this court to ignore the weight of these allegations and infer that the legislature was instead interested in combatting discrimination. MTD at 22–24. Such a reading strains the obvious import of the aforementioned events, and at best, creates a question of fact to be resolved at a later stage in this litigation. None of Defendants' post hoc narratives undermine the facial plausibility of Plaintiffs' allegations, which must be accepted as true. *See, e.g.*, *League of Women Voters of Fla., Inc. v. Detzner*, 314 F. Supp. 3d 1205, 1221 (N.D. Fla. 2018).

This Court's recent consideration of H.B. 1—a law enacted under similar circumstances for a similar purpose—further supports the plausibility that race unlawfully motivated the enactment of the Stop W.O.K.E. Act. *See Dream Defenders*, 553 F.Supp.3d at 1094 (finding *inter alia* allegations that Governor DeSantis and H.B. 1's bill sponsors opposed racial justice protests and enacted H.B.

1 to thwart such protests "support an inference that the Act has an unlawful racially discriminatory purpose"); *see also Rogers v. Lodge*, 458 U.S. 613, 625 (1982) ("Evidence of historical discrimination is relevant to drawing an inference of purposeful discrimination, particularly in cases such as this one where the evidence shows that discriminatory practices were commonly utilized. . . .").

### D.   Contemporaneous Statements.

Tellingly, Defendants fail to acknowledge many of the key contemporaneous statements made by the Act's proponents cited in the complaint. *See* MTD at 24. These statements show an intent to curtail speech about white privilege, Critical Race Theory, and systemic racism, that reveals the Act's "actual purpose." *Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996); *Dream Defenders*, 553 F.Supp.3d at 1094–95; *City of S. Miami*, 424 F. Supp. 3d at 1344; *see* Compl. ¶¶ 94–97, 103–104, 114–115.

The motivations of the Stop W.O.K.E. Act's proponents were then ratified by the legislature, which understood the Act to do exactly as its name suggests—to stop discussions of "wokeness." *See Stout v. Jefferson Cty. Bd. of Educ.*, 882 F.3d 988, 1007 (11th Cir. 2018); *Tracy P. v. Sarasota Cty.*, No. 8:05-CV-927-T-27EAJ, 2007 WL 9723801, at *6 (M.D. Fla. Sep. 5, 2007) ("Government officials are generally held to act with discriminatory intent, regardless of their personal views, when they implement the discriminatory desires of others."). Here, too, Defendants' requests for this Court to ignore the plain meaning of repeated, hostile critiques of Critical

Race Theory and related speech, MTD at 22–24, demonstrate a fundamental misunderstanding of the Court's role on a motion to dismiss. *See Lewis*, 260 F.3d at 1264. Plaintiffs undoubtedly allege sufficient facts for this factor.

### E.    Substantive And Procedural Departures.

Plaintiffs allege a number of substantive and procedural departures, including that (1) the Florida legislature adopted its definitions of prohibited concepts from Trump's Executive Order 13950, even though a federal court had enjoined the Order as unconstitutional at least a year before the Act's introduction; (2) could not identify any instances in which the prohibited concepts were being used to indoctrinate students; (3) failed to consult with any instructors throughout the bill drafting process and instead consulted with Rufo, a vocal opponent of Critical Race Theory who is not an educator or education specialist; and (4) rushed to add language to a budget appropriation bill that withholds funding to universities if they are found to violate the Act. Compl. ¶¶ 129–135. When a legislature enacts a law that violates federal law, addresses an imaginary concern, or has no connection to its stated purpose, those substantive departures support an inference of discrimination. *See McCrory*, 831 F.3d at 235–37; *Veasey v. Abbott*, 830 F.3d 216, 238–39 (5th Cir. 2016); *City of S. Miami v. DeSantis* ("*City of S. Miami II*"), 561 F. Supp. 1211, 1280 (S.D. Fla. 2021).

Defendants contend that it is of no significance that the legislature adopted wholesale definitions determined to be unconstitutional by another court because they were enjoined on vagueness, rather than Equal Protection grounds. MTD at 26. However, the inclusion of these enjoined definitions is not only a substantive departure, but also, probative of a discriminatory intent as it shows the Act's proponents were aware the Stop W.O.K.E. Act could chill Plaintiffs' protected speech activities, and indeed, intended to chill their speech. Plaintiffs' allegation that Defendants rushed the process to add language to a budget appropriation bill tying university compliance with H.B. 7 to funding is another clear substantive departure. *See, e.g.*, *City of S. Miami II*, 561 F. Supp. 3d at 1280.

## F.     Foreseeability And Knowledge Of The Disparate Impact.

Defendants again misstate the relevant standard in arguing that Plaintiffs have not sufficiently alleged the disparate impact to Black instructors and students was known and foreseeable to the legislature. Defendants make much of the fact that members of the public who testified against the Act did not use the words "disparate impact" in their oral testimony. MTD at 28–29. However, the *Arlington Heights* inquiry does not require individuals to use legal terms of art to establish that the legislature was aware that a law would specifically harm Black people. *See, e.g.*, *Dream Defenders*, 553 F. Supp. 3d at 1094. Moreover, as described above, the Act's proponents did not mince words §regarding the Stop W.O.K.E. Act's likely

consequences. As such, Plaintiffs' allegations easily support the inference that the legislature was put on notice of the disparate impact of the law on Black students and instructors. Compl. ¶¶ 196–204.

### G.    Availability Of Less Discriminatory Alternatives.

Finally, Defendants fundamentally misunderstand Plaintiffs' allegations regarding less discriminatory alternatives, as well as the import of this *Arlington Heights* factor. Plaintiffs do not allege that the legislature failed to adopt *any* amendments to the Stop W.O.K.E. Act, as Defendants suggest, MTD at 30; rather, Plaintiffs allege that the legislature specifically failed to adopt amendments that could have lessened the impact of the Act on Black instructors and students. Compl. ¶ 163. Defendants offer no genuine arguments in response to these allegations.

*          *          *

Accordingly, Plaintiffs' allegations are more than sufficient and Defendants' Motion to Dismiss should be denied.

<strong><u>CONCLUSION</u></strong>

For all the reasons set forth above, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss in its entirety.

Dated: October 4, 2022                    Respectfully submitted,

*/s/Morenike Fajana*
Morenike Fajana

28

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF FLORIDA, INC.**

*/s/ Daniel B. Tilley*
Daniel B. Tilley
Florida Bar No. 102882
Katherine H. Blankenship
Florida Bar No. 1031234
Caroline McNamara
Florida Bar No. 1038312
Jerry Edwards
Florida Bar No. 1003437
4343 West Flagler Street, Suite 400
Miami, Florida 33134
(786) 363-2707
dtilley@aclufl.org
kblankenship@aclufl.org
cmcnamara@aclufl.org
jedwards@aclufl.org


**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**

*/s/ Leah Watson*
Leah Watson*
Emerson Sykes*
Sarah Hinger*
Laura Moraff*
125 Broad Street, 18thFloor
New York, NY 10004
(212) 549-2500
lwatson@aclu.org
esykes@aclu.org
shinger@aclu.org
lmoraff@aclu.org


**NAACP LEGAL DEFENSE AND EDUCATION FUND, INC.**

*/s/ Morenike Fajana*
Morenike Fajana*
Alexsis M. Johnson*
40 Rector Street, 5th Floor
New York, NY 10006
(212) 217-1690
mfajana@naacpldf.org
amjohnson@naacpldf.org

Jin Hee Lee*
Santino Coleman*
700 14th Street, Ste. 600
Washington, D.C. 20005†
(202) 682-1300
jlee@naacpldf.org
scoleman@naacpldf.org


**BALLARD SPAHR LLP**

*/s/ Jason Leckerman*
Jason Leckerman*
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
(215) 864-8266
leckermanj@ballardspahr.com

Charles Tobin (Fla. Bar No. 816345)
1909 K Street NW, 12th Floor
Washington, D.C. 20006
(202) 661-2200
tobinc@ballardspahr.com

29

Jacqueline Mabatah*
201 South Main Street, Suite 800
Salt Lake City, UT 84111-2221
(801) 531-3063
mabatahj@ballardspahr.com

Isabella Salomão Nascimento*
2000 IDS Center, 80 South 8th Street
Minneapolis, MN 55402-2119
(612) 371-3281
salomaonascimentoi@ballardspahr.com

**Counsel for Plaintiffs**
*Admitted pro hac vice

## **LOCAL RULE 7.1 (F) CERTIFICATION**

In accordance with Local Rule 7.1(F), I certify that the foregoing Opposition contains 6,871 words, excluding the case caption, table of authorities, table of contents, signature block, this certification and certificate of service.

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing was served to all counsel of record through the Court's CM/ECF system on October 4, 2022.

*/s/Morenike Fajana*
Morenike Fajana