UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

| | |
|---|---|
| LEROY PERNELL, et al.,<br><br>       *Plaintiffs*,<br><br>v.<br><br>FLORIDA BOARD OF GOVERNORS OF THE STATE UNIVERSITY SYSTEM, et al.,<br><br>       *Defendants*. | Case No. 4:22-cv-304-MW-MAF |

**<u>DEFENDANTS' REPLY IN SUPPORT
OF THEIR MOTION TO DISMISS</u>**

**ARGUMENT**

**I.    Plaintiff Dunn Lacks Standing on All Claims.**

The Act applies to "training or instruction" to which a university student is subjected, and Plaintiff Dr. Marvin Dunn's historic bus tour of Miami does not qualify as either "training or instruction." FLA. STAT. § 1000.05(4)(a). Plaintiffs do not argue that Dunn's bus tour qualifies as "training," Pls.' Opp'n to Defs.' Mot. to Dismiss, Doc. 55, at 9–10 (Oct. 4, 2022) ("MTD Opp'n"), but do claim that Dunn's tour satisfies the definition of "instruction." It does not.

Board of Governors Regulation 10.005(1)(c) defines "instruction" as "the process of teaching or engaging students with content about a particular subject by

1

a university employee or a person authorized to provide instruction by the university within a course." The phrase "within a course" modifies *both* "a university employee" *and* a "person authorized to provide instruction." Any other reading results in a definition so expansive that it would exceed the plain meaning of the word "instruction," as used in the Act.

If the phrase "within a course" did not modify the phrase "university employee," then *any* university employee who "engag[es] students with content about a particular subject" at any time or in any setting would be engaged in "instruction" within the meaning of the Act. Plaintiffs' reading of Regulation 10.005 would thus yield absurd results. For example, a janitor's hallway conversation with a student or a secretary's small talk with students would qualify as "instruction" under the Act.

Plaintiffs' reading would expand Regulation 10.005's definition of "instruction" far beyond that term's plain and ordinary meaning. "Instruction" is commonly understood to mean *teaching*. *See Instruction*, MERRIAM-WEBSTER ONLINE, *available at* https://bit.ly/3CM9f0e (last visited Oct. 10, 2022) ("the action, practice, or profession of teaching"); *Instruction*, RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY (2d ed. 1997) ("the act or practice of instructing or teaching; education"). The only sensible reading of Regulation 10.005's definition of "instruction" is that instruction always occurs "within a course."

2

## II. Plaintiffs Lack Standing To Challenge the First, Third, Fifth, Sixth, and Seventh Concepts.

Plaintiffs claim to have brought a facial challenge, but that assertion cannot answer whether Plaintiffs have *standing* to challenge the Act as a whole. They do not.

In a pre-enforcement First Amendment challenge, Plaintiffs are required to show that they intend to engage in conduct that each of the challenged provisions arguably proscribes. *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1119 (11th Cir. 2022). Plaintiffs do not even *allege*, however, that they intend to provide instruction that arguably violates *all* of the concepts set out in the Act. Plaintiffs do not claim that they intend to espouse or endorse the Act's First or Sixth concepts, MTD Opp'n at 10–13, and while they do claim to challenge the Seventh concept, no Plaintiff alleges an intention to espouse or endorse that concept, either, *see id.* at 13. Plaintiffs merely claim to have standing because they fear students will *misunderstand* the Seventh concept, but that assertion fails to meet Plaintiffs' standing burden. *See Speech First, Inc.*, 32 F.4th at 1119. Plaintiffs further claim that they "clearly state an intention to teach the [T]hird and [F]ifth concepts," *see* MTD Opp'n at 11, n.5 (citing Compl., Doc. 1 ¶¶ 141–142, 156, 172, 175, 181 (Aug. 18, 2022)), but none of the cited paragraphs "clearly state an intention to teach" lessons that would actually implicate either one. Merely invoking the word "privilege" is not enough.

3

Because "[s]tanding is not dispensed in gross," *Davis v. Federal Election Commission*, 554 U.S. 724, 734 (2008), courts evaluate standing based on *each* challenged provision of a law. In *CAMP Legal Defense Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1273 (11th Cir. 2006), the Eleventh Circuit concluded that the plaintiff "may challenge only provisions … that affect its activities." It relied on Supreme Court precedent that "forecloses the argument … that injury under one provision is sufficient to confer standing on a plaintiff to challenge all provisions of an allegedly unconstitutional ordinance." *Id*. (citing *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 233 (1990)). Just so here. Plaintiffs cannot leverage an alleged injury under one of the Act's eight concepts into a challenge against—and entitlement to a preliminary injunction barring the enforcement of—*other* prohibited concepts that they have not alleged any intention of espousing, nor against the Act as a whole.[1]

## III. Plaintiffs Concede the Remainder of Defendants' Standing Arguments.

Plaintiffs have now made clear that: (1) no Plaintiff seeks relief from the Board of Trustees for any university with which the Plaintiff is not affiliated; (2) no

---

[1] Plaintiffs claim they have standing to challenge the Act as a whole because it is vague, MTD Opp'n at 12, but Plaintiffs' vagueness challenge fails for the reasons already given in Defs.' Opp'n to Pls.' Mot. for a Prelim. Inj., Doc. 52 at 24–31 (Sept. 22, 2022) ("Defs.' PI Opp'n"). Similarly, Plaintiffs cannot show that the Act was enacted for an unconstitutional purpose, *see* MTD Opp'n at 12–13, whether based on viewpoint discrimination, *see* Defs.' PI Opp'n at 10, or racial discrimination, *see* Defs.' Mem. of Law in Supp. of Mot. to Dismiss, Doc. 51-1 at 15–30 (Sept. 22, 2022) ("MTD Br.").

4

Plaintiff is alleging any theory of third-party standing; and (3) Plaintiff Dauphin is not alleging that she qualifies as an instructor under the Act. MTD Opp'n at 13–14. These concessions, which were far from apparent in Plaintiffs' complaint and motion papers, eliminate these issues from the case, and our motion to dismiss should be granted as to these claims and theories.

### IV. Plaintiffs' Free Speech and Vagueness Challenges Fail To State a Claim.

Counts One through Three of the Complaint should also be dismissed for failure to state a valid claim. Nothing in Plaintiffs' latest round of briefing overcomes the fatal defects in those claims set forth in our opposition to preliminary injunctive relief.

### V. Plaintiffs Have Failed To State a Claim Under the Equal Protection Clause.

Plaintiffs' Equal Protection claim should also be dismissed. Plaintiffs argue that such "claims are rarely dismissed at the pleading stage" because they "require a fact intensive examination of the record." MTD Opp'n 16. But the mere incantation of "Equal Protection" or "*Arlington Heights*" does not relieve a plaintiff of the burden of alleging sufficient, specific facts to "nudge[ ] their claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Nothing in Plaintiffs' response brief drags their allegations across that line.

5

### A. Plaintiffs Have Failed To Plausibly Allege Disparate Impact.

Plaintiffs completely fail to show that their conclusory assertion that the Act will disproportionately affect African Americans is plausible. The lynchpin of Plaintiffs' disparate impact claim is the notion that the "courses using the Critical Race Theory framework or a critical race lens, which are most likely to be taught by Black professors, will be most impacted" by the Act. MTD Opp'n 18–19. Nothing Plaintiffs say in their Complaint or briefing makes this premise "plausible on its face." *Twombly*, 550 U.S. at 570.

To the contrary, as explained in our motion papers, the suggestion that "Black professors are more likely to engage in" speech advocating the Act's eight enumerated concepts, MTD Br. 18, is facially implausible, even at the university level. Plaintiffs themselves allege that these ideas are widely supported throughout Florida's universities. *See* Compl. ¶¶ 79–92. And their allegations further show what should be obvious: professors who espouse the Act's prohibited concepts are not confined to—or even predominantly located in—"African-American Studies departments." MTD Opp'n 19;[2] *see also* Compl. ¶ 86 (University of North Florida's psychology faculty announcing plans to "be intentional about including activities

---

[2] To be clear, Defendants do not "concede" that "the African-American Studies departments at FSU, FIU and UF are predominantly staffed by Black instructors." MTD Opp'n 19. We merely accept this facially plausible allegation as true for purposes of our motion to dismiss, as Rule 12(b)(6) requires.

6

within courses that will target dismantling racism"). Indeed, one of the named plaintiffs is a *professor of statistics*, *id.* ¶ 25, who testifies that the Act "prevents me from teaching content that is critical to my students' success in their statistical fields," Almond Decl., Doc. 13-6, ¶ 31 (Aug. 24, 2022).

Plaintiffs' principal response is to point out that *Plaintiffs themselves* are "largely Black instructors," and "the very speech Plaintiffs already engage in . . . is being chilled," MTD Opp'n 18, 20. This response completely misses the point. While these claims about the harm allegedly faced by Plaintiffs themselves may give them *standing* to challenge (some provisions of) the Act, it cannot as a matter of law show that the Act disparately impacts African Americans *overall*. Else, a challenger could *always* show disparate impact through artfully crafting a complaint on behalf of only (or predominantly) African-American plaintiffs.

As our opening brief noted, Plaintiffs' disparate impact allegations completely ignore the Act's application to speech that discriminates based on sex. MTD Br. 16–17. Once one accounts for the Act's application to sex discrimination, any plausibility to the suggestion that the Act will disproportionately impact African-American instructors goes out the window. Plaintiffs offer no response, for they have none, to this point in their response brief.

Plaintiffs' arguments also fail to account for the Act's application to Florida's K-12 instructors. In K-12 classrooms, there can obviously be no suggestion that the

7

Act will disproportionately affect "Critical Race Theory and race studies" professors. MTD Opp'n 5. Plaintiffs' response to this point again completely fails to connect with it. They note that they "need not assert a claim on behalf of every potential burdened population," MTD Opp'n 21, and there is no denying that. But what they *do* need to do is plausibly allege that the population that is burdened *by the Act* is disproportionately comprised of *African Americans*. And they cannot satisfy this obligation by pointing out that some arbitrary *subset* of the people burdened by the Act are disproportionately Black. Again, the Act's constitutionality cannot turn on the fact that Plaintiffs chose not to include any K-12 teachers in their complaint.

Finally, Plaintiffs' backup disparate impact argument—that the Act disproportionately harms African-American students by restricting their "access to racially inclusive speech," MTD Opp'n 19—also fails. As explained in our earlier briefing, the allegations supporting this theory hinge on the idea that restricting "[i]nstruction about race, and student awareness of racism" will "increase[ ] the likelihood that students of color will experience increased racial harassment and discrimination," MTD Br. 18, yet the Act *does nothing to restrict* this type of instruction. Instead, the Act restricts the advocacy (by state employees) of very specific ideas—ideas that, the People of Florida believe, *constitute, and encourage, racial discrimination*.

Plaintiffs now disclaim any allegation "that promotion of the prohibited concepts banned under the Act would per se reduce harassment," MTD Opp'n 21. That is flatly contrary to the Complaint, *see* Compl. ¶¶ 192–95, but Plaintiffs' concession eliminates this issue from the case. Instead, Plaintiffs now pivot to the Complaint's general allegations—originally pleaded in support of Plaintiffs' access-to-information claim—that the Act's purported "prohibition of [a] broad range of antiracist speech necessarily harms students." MTD Opp'n 21 (citing Compl. ¶¶ 144–48). The difficulty with this attempt at course-correction is that nothing in *those* allegations *even suggests* that the students allegedly harmed by the supposed denial of "the right to learn from … or engage in free, open, and robust discussion or even debate on the Act's disfavored viewpoints," Compl. ¶ 145, *are disproportionately African-American*. Indeed, the Complaint specifically alleges that this lack of information access harms "students from dominant racial, gender and sexuality groups" alongside those "from vulnerable populations." *Id.* ¶ 147.

### B. Plaintiffs Have Failed To Plausibly Allege Racially Discriminatory Intent.

Plaintiffs' Equal Protection claim also independently fails because their allegations do not give any plausibility to the assertion that the Act was enacted with discriminatory intent. Plaintiffs effectively concede that the Act is race-neutral on its face and that they have no *direct* evidence of a racially discriminatory motive. And their discussion of the *Arlington Heights* factors fails to fill the gap.

9

1. Plaintiffs' extended discussion of the "systemic racism, anti-Black violence, and the suppression of Black participation in civil and social arenas" that occurred in Florida in the 1950s, '60s, and '70s, MTD Opp'n 22, cannot show that the Legislature acted with racial hostility at least fifty years later when it enacted the Act—not without some evidence that plausibly *links* those racist events from half a century or more ago to the challenged law. Plaintiffs claim that there is a "clear throughline" from the "racial justice demonstrations and organizing in the summer of 2020 to Governor DeSantis and the legislature's racially-motivated attempt to suppress those efforts." MTD Opp'n 22. But a purported "throughline" from the Act to the events of *two years ago* plainly does not show the relevance of racist events that occurred *seventy years ago*.

2. Moreover, Plaintiffs' reliance on these more recent "events leading up to the enactment of the … Act," MTD Opp'n 23, is also unpersuasive. Their principal argument is that the Act was part of a "political backlash" against "the racial justice reforms and protests instituted by Black students and instructors beginning in 2020." MTD Opp'n 22–23. But as Plaintiffs themselves explain (and as is obvious from the text of the law), the Act responded to this "backlash" by seeking to prevent state-employed teachers from espousing certain "concepts related to race and racism" in the classroom. *Id*. 3–4. The fact that Florida's lawmakers find these "concepts related to race and racism" to be repugnant, MTD Br. 23—and do not want the

10

teachers they pay to give instruction in Florida's public schools to advocate them in the classroom—does not mean that those lawmakers are *hostile to any particular race*. Not everyone who disagrees with Ibram X. Kendi's writings harbors racial animus to African Americans.

Plaintiffs never adequately address this critical distinction. They argue that this obvious account of the Act's purpose—*repeatedly articulated in Plaintiffs' own Complaint*, *see* Compl. ¶¶ 5, 78, 93, 114, 119, 125—is a "post h[a]c narrative[ ]" that is an "improper . . . rebuttal argument[ ] that may not be considered on a motion to dismiss." MTD Opp'n 17, 24. But it is *Plaintiffs'* burden—*before* it falls to Defendants to come forward with any rebuttal—to allege sufficient factual material to make plausible the inference that "racial discrimination was a substantial or motivating factor behind enactment of the law." *Stout by Stout v. Jefferson Cnty. Bd. of Educ.*, 882 F.3d 988, 1006 (11th Cir. 2018). And Plaintiffs cannot meet that burden by simply pointing to evidence that the Act was designed to restrict the advocacy of certain *concepts and policies* related to race.

3. Plaintiffs' reliance on "the key contemporaneous statements made by the Act's proponents" fails for the same reason. On Plaintiffs' own telling, those "statements show an intent to curtail speech about white privilege, Critical Race Theory, and systemic racism," MTD Opp'n 25—*not* any intent to *harm or discriminate against the members of any particular race*. Again, not everyone who

11

disagrees with the concepts and policies advocated by Ibram X. Kendi, the 1619 Project, or the Black Lives Matter movement is a racist. In discussing their Free Speech claim, Plaintiffs extol the virtues of "open-mindedness and free inquiry," Mem. of Law in Supp. of Pls.' Mot. for Prelim. Inj., Doc. 13 at 26 (Aug. 24, 2022)—yet their solicitude for these values suddenly disappears when they turn to their Equal Protection claim, which apparently proceeds on the premise that anyone who "criticize[s] Critical Race Theory, racial justice work and other concepts related to race and racism," MTD Opp'n 3–4, is acting out of racial animus against African Americans.

4. The alleged "substantive and procedural departures" in the Act's passage do nothing to advance the ball. *Id.* 26. Plaintiffs argue that where a law "addresses an imaginary concern, or has no connection to its stated purpose," that "support[s] an inference of discrimination," *id.*, but Plaintiffs' own allegations refute that the Act suffers from these defects. The Act's purpose is plain on its face and described repeatedly by Plaintiffs themselves: to prevent Florida's teachers from advocating the eight enumerated "concepts related to race and racism" in the classroom. *Id.* at 3–4. And the Complaint shows that Florida's concern that its teachers might advocate these ideas in the State's classroom was far from "imaginary," *id.* at 26—by Plaintiffs' own account, the Act was passed in reaction to a vigorous campaign by activists and the faculty and staff of Florida's universities

12

*to encourage teachers to advocate* the Act's prohibited concepts. *See* Compl. ¶¶ 71–92. And Plaintiff professors allege that they intend to do just that.

Plaintiffs' discussion of the Act's incorporation of some of the language used in Executive Order 13,950 is equally unavailing. As explained in our opening brief, (1) that Executive Order was enjoined on vagueness grounds, not Equal Protection grounds; and (2) the district court's vagueness reasoning was principally based on language in a Department of Labor FAQ—not the text that the Executive Order and the Act share. *See Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 544–45 (N.D. Cal. 2020). In any event, Florida's legislature is surely entitled to disagree with the vagueness holding of a non-binding decision by the Northern District of California without giving rise to an inference of intentional race discrimination.

5.   Because Plaintiffs have failed to adequately allege that the Act will *have* any disparate impact on African-American teachers or students, they have also failed to adequately allege that Florida's lawmakers were, or should have been, *aware* of any such disparate impact. And in any event, none of the cited legislative statements by lawmakers or activists opposed to the Act actually claimed that the Act would disproportionately harm African Americans. The point is not that these statements did not use the magic words "disparate impact." MTD Opp'n 27. The point is that as a matter of substance, while these statements did describe the *impact*

13

the Act would purportedly have on African-American students and teachers, *none of them claimed that this impact would be disproportionate*.

6. Finally, Plaintiffs cannot support an inference of intentional race discrimination by pointing out that the Legislature did not adopt *their preferred version* of the Act—by adopting various amendments offered by the Act's legislative opponents in the hopes of weakening it. The amendments highlighted in the Complaint—such as eliminating the Act's private cause of action, or its requirement that teaching be objective, Compl. ¶ 163—may have made the Act less effective in preventing teachers from inculcating the enumerated concepts. But nothing in the Complaint supports the notion that these amendments would have reduced any *disparate impact* "on Black instructors and students." MTD Opp'n 28. For as explained above, the Act *has* no disparate impact on Black instructors and students.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be granted.

Date: October 11, 2022							Respectfully submitted,

/s/ Charles J. Cooper
Charles J. Cooper (Bar No. 248070DC)
John D. Ohlendorf (*Pro Hac Vice*)
Megan M. Wold (*Pro Hac Vice*)
John D. Ramer (*Pro Hac Vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601
ccooper@cooperkirk.com
johlendorf@cooperkirk.com
mwold@cooperkirk.com
jramer@cooperkirk.com

*Counsel for Defendants Board of Governors, et al.*

## CERTIFICATE OF WORD COUNT

Pursuant to Northern District of Florida Rule 7.1(I), the undersigned counsel hereby certifies that the foregoing Defendants' Reply in Support of Their Motion to Dismiss, including body, headings, quotations, and footnotes, and excluding those portions exempt by Local Rule 7.1(F), contains 3,194 words as measured by Microsoft Office for Word 365.

/s/Charles J. Cooper
Charles J. Cooper
