**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

```
LEROY PERNELL, et al.,          )
                                )
          Plaintiffs,           ) Case No: 4:22cv304
                                )
        v.                      ) Tallahassee, Florida
                                ) October 13, 2022
FLORIDA BOARD OF GOVERNORS OF   )
THE STATE UNIVERSITY SYSTEM,    )
et al.,                         )
                                ) 9:01 AM
          Defendants.           )
_____ )
                                )
ADRIANA NOVOA, et al.,          )
                                )
          Plaintiffs,           ) Case No: 4:22cv324
                                )
        v.                      )
                                )
MANNY DIAZ, JR., in his         )
official capacity as the        )
commissioner of the Florida     )
State Board of Education,       )
et al.,                         )
                                )
          Defendants.           )
_____ )
```

**TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS**
**BEFORE THE HONORABLE MARK E. WALKER**
**UNITED STATES CHIEF DISTRICT JUDGE**
**(Pages 1 through 98)**

```
Court Reporter:          MEGAN A. HAGUE, RPR, FCRR, CSR
                         111 North Adams Street
                         Tallahassee, Florida 32301
                         megan.a.hague@gmail.com
```

*Proceedings reported by stenotype reporter.*
*Transcript produced by Computer-Aided Transcription.*

```
1   APPEARANCES:

2   For the Pernell Plaintiffs:

3                           ACLU Foundation
                            By:  EMERSON J. SYKES
4                                LAURA B. MORAFF
                                 Attorneys at Law
5                                esykes@aclu.org
                                 lmoraff@aclu.org
6                           25 Broad Street
                            18th Floor
7                           New York, New York 10004

8                           ACLU Foundation of Florida
                            By:  KATHERINE BLANKENSHIP
9                                Attorney at Law
                                 kblankenship@aclufl.org
10                          4343 West Flagler Street
                            Suite 400
11                          Miami, Florida 33134

12                          NAACP LEGAL DEFENSE & EDUCATION FUND
                            By:  MORENIKE FAJANA
13                               Attorney at Law
                                 mfajana@naacpldf.org
14                          40 Rector Street
                            5th Floor
15                          New York, New York 10006

16  For the Novoa Plaintiffs:

17                          Foundation For Individual Rights and
                            Expression
18                          By:  GREG H. GREUBEL
                                 ADAM B. STEINBAUGH
19                               Attorneys at Law
                                 greg.gruebel@thefire.org
20                               adam@thefire.org
                            510 Walnut Street
21                          Suite 1250
                            Philadelphia, Pennsylvania 19106
22
                            GARY S. EDINGER & ASSOCIATES PA
23                          By:  GARY S. EDINGER
                                 Attorney at Law
24                               gsedinger12@gmail.com
                            305 Northeast First Street
25                          Gainesville, Florida 32601
```

3

```
1    For the Defendants:        Cooper & Kirk, PLLC
                                By:   CHARLES J. COOPER
2                                     JOHN D. OHLENDORF
                                      MEGAN M. WOLD
3                                     Attorneys at Law
                                      ccooper@cooperkirk.com
4                                     johlendorf@cooperkirk.com
                                      mwold@cooperkirk.com
5                               1523 New Hampshire Ave Northwest
                                Washington, DC 20036
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              **P R O C E E D I N G S**

2         (Call to Order of the Court at 9:01 AM on Thursday,

3    October 13, 2022.)

4              THE COURT:  Please take your seats.

5              I'm going to open these proceedings with a personal

6    note.  This evening we'll have a memorial service for

7    Judge Smoak, one of my colleagues.  Judge Smoak attended and

8    graduated from the United States Military Academy, more commonly

9    referred to as West Point.  He served multiple tours in Vietnam,

10   fought in some of the most storied actions, including Hamburger

11   Hill where he distinguished himself and was awarded -- or

12   recognized for his valor.

13             He returned from the war, attended law school, was a

14   brilliant lawyer that practiced in this district for years.  He

15   was nominated and confirmed and served as a U.S. District Judge

16   here for many years.

17             This evening we'll say good-bye to Judge Smoak, and I

18   think it's only right and proper, since today is the day of his

19   memorial, to recognize him and his service to this country and

20   to this court.

21             We are here on two cases that overlap that are -- in

22   terms of some legal issues, but are separate and apart,

23   distinct:  Case No. 4:22cv304 and 4:22cv324.

24             I have counsel present.  I'm not going to have

25   everybody announce their appearance.  When you speak, if you'll

1    state your name for the record so the court reporter can keep

2    track of who's speaking.

3                For the case ending in number 304, we set a schedule.

4    It was filed first, as should be obvious based on the case

5    numbers.

6                Once we had set that schedule, Case No. 324 was then

7    filed.  I had a second scheduling hearing, and a schedule was

8    set, and the parties agreed to hear both cases today.

9                I'm going to start with counsel in Case No. 304, the

10   Pernell case.  I'm going to ask a lawyer for -- on behalf of the

11   plaintiffs in each case and the defense, which represents the

12   defendants in both cases, if the following statement is correct.

13               I asked the lawyers through two different status

14   conferences to propose a schedule.  I asked them whether or not

15   they needed to secure any additional evidence and what type of

16   evidence, if any, they wish to present, whether they wish to

17   present any evidence at this hearing.  And it was based on those

18   conferences and agreement of counsel that the parties set a

19   schedule, filed everything, and determined today would not be an

20   evidentiary hearing but simply a legal argument.

21          Let me start with counsel on the Pernell case for the

22   plaintiffs.  Is that correct?

23               MR. SYKES:  Yes, Your Honor.

24               THE COURT:  And that was Mr. Sykes.

25               MR. SYKES:  Yes, Your Honor.

```
 1                 THE COURT:  All right.

 2                 And turning to counsel in the Novoa -- is that how to

 3     pronounce it?

 4                 MR. GREUBEL:  Yes, Your Honor.

 5                 THE COURT:  And this is Mr. Greubel?

 6                 MR. GREUBEL:  Yes, Your Honor, Greg Greubel for the

 7     plaintiffs.

 8                 THE COURT:  Is that correct?

 9                 MR. GREUBEL:  Yes.

10                 THE COURT:  Turning to Mr. Cooper for the defendants

11     in both cases; is that correct?

12                 MR. COOPER:  It is, Your Honor.  Good morning.

13                 THE COURT:  Good morning.

14                 All right.  And I say that because it seems to -- no,

15     it doesn't seem to me.  I'm stating the obvious.  Y'all have

16     filed your papers.  Everybody had a full and fair opportunity to

17     file whatever argument they wanted to file, and the record is

18     closed.  Whatever it is, it is and I have before me now.

19                 What I'm going to do in just a moment is I'm going to

20     ask some questions.  I'm going to do things a little bit

21     differently than I have in the past.  Sometimes my questions are

22     going to be directed to a lawyer for the plaintiffs in each case

23     and the defense.  Sometimes I've just got a direct question for

24     one of the parties, and if somebody else wants to respond to it

25     on their time, they can, but I want to move things along.
```

1          Also -- and I say this in the nicest sort of way --
2     these hearings are longer than they need to be because when I
3     have the question-and-answer session, I ask somebody what their
4     favorite ice cream is, and they don't say, Judge, I don't like
5     ice cream, or respond, This is my favorite flavor.  Instead
6     they'll say, Judge, what I really want to do is talk about
7     Almond Joy versus Mounds, nuts or no nuts.
8          I'm going to give y'all time to make your arguments,
9     but if you don't want to answer the question, I'm not going to
10    hold you in contempt.  Just say, Pass.  I mean, I just -- to
11    spend 15 minutes on a monologue that's nonresponsive to my
12    questions and then repeat that same monologue on your time is
13    just an absolute waste of everyone's time.
14         So if I ask a question and, look, it's not that
15    simple, you can say, Judge, I think the answer to your question
16    in some context, yes, but I don't think that case applies, and
17    if you want me to further explain why it doesn't apply, I'll do
18    that.  I mean, so I'm not suggesting it's, you know, always a
19    yes-or-no question.  But please just don't pivot to talk about
20    some other issue.  I'm going to give y'all ample time.
21         I'll also note, as I normally do, I'm going to ask
22    some questions.  We'll take a break.  We'll come back.  I'll
23    then hear from the plaintiffs.
24         Let me find out -- and the seating may not dictate
25    this.  Mr. Sykes and Mr. Greubel, have y'all talked about who

1   wants to go first?

2           MR. GREUBEL:  Yeah, Mr. Sykes will be going first.

3           THE COURT:  All right.  I just didn't want to assume

4   since he's seated in what I characterize as the jump seat as far

5   as your side.  And I'm slightly disoriented.  I understand

6   there's more of y'all that are seated normally where the defense

7   or the criminal defendant's team would be seated.

8           Mr. Cooper is in the jump seat on his side.  He's

9   going to take the lead.  But for questions -- and, Mr. Cooper,

10  you know this because you've been in front of me before.

11          But Mr. Sykes and Mr. Greubel, if you want to turn to

12  one of your colleagues to respond to a particular question, you

13  can certainly turn to your colleague.  I'm not going to say no.

14  I'm happy to hear from Mr. Ohlendorf or -- is it Ms. Wold?

15          MS. WOLD:  That's correct.  Thank you.

16          THE COURT:  -- Ms. Wold.

17          And so, Mr. Cooper, you're, you know, free to do that.

18          Likewise, when you're making your presentations,

19  Mr. Sykes and Mr. Greubel, if you're going to pivot to some

20  point you want to make and you want to turn to one of your

21  colleagues, I'm certainly not going to cut you off.  You can

22  say, Judge, on this one issue that we want to talk about, I'm

23  going to turn to my colleague, so-and-so; okay?

24          I really am not asking the questions to be unpleasant

25  or difficult.  I do it for a reason.  If I'm asking you

1   questions, it gives y'all an opportunity to know, Here's what

2   the judge's concerns are, so you can address them directly, not

3   just for me but to have an opportunity to be heard and respond

4   so that if one side or the other wants to talk to the

5   Eleventh Circuit, it's -- you've had a chance at this stage to

6   develop whatever your response is, and it just isn't left

7   unanswered.

8        I used to be incredibly frustrated as a lawyer when

9   we'd get to the end of a hearing and the judge would announce

10  his ruling and I was like, Well, Judge, had I known that you

11  were focused on that, I would have addressed that.  And so there

12  is a method to why I'm -- a reason why I'm doing it this way.

13       All right.  With those preliminary matters out of the

14  way, I do have a series of questions and in no particular order.

15       Y'all noted in your Rule 26 report that one of the

16  regulations at issue took effect after the complaint was filed

17  in the Pernell case.  That is a factually accurate statement.

18       I didn't understand -- and this is really for

19  Mr. Cooper or anybody on your team.  I didn't understand anybody

20  on your team -- there's certainly some standing issues you

21  raised, so I want to make that plain.  But setting that aside, I

22  didn't understand anybody on your team to be arguing that the

23  case was not ripe because the regulation took effect after the

24  Pernell complaint was filed.

25       There's a number of cases, not the least of which is

1    *Blanchette -- for the court reporter, B-l-a-n-c-h-e-t-t-e -- out*

2    of the U.S. Supreme Court that says:  *Since ripeness is*

3    *peculiarly a question of timing, it is the situation now, rather*

4    *than the situation at the time of the district court's decision,*

5    *that must govern.*

6            The Eleventh Circuit, of course, is recognizing cases

7    like *Henley,* citing *Blanchette:  The district court need not*

8    *dismiss a case that was not ripe at filing if the case becomes*

9    *ripe before judgment is entered.*  Again, the *Henley* case relying

10   on *Blanchette.*

11           And for obvious reasons, I noted those cases in that

12   order.  I'm not suggesting that's the only authority on point,

13   but that was a clean way to present it.

14           Mr. Cooper, again, I don't see that in the argument,

15   but I just wanted to find out, since the parties noted that the

16   regulation took effect after the complaint was filed, is there

17   any suggestion that that means that the Pernell case was not

18   ripe?

19           MR. COOPER:  No, Your Honor, we're not offering that

20   argument.

21           THE COURT:  All right.  Thank you.

22           This is for plaintiffs' counsel in the Pernell case.

23   For plaintiff Dr. Marvin Dunn, in terms of standing, I'm not

24   sure how his voluntary bus tour qualifies as instruction under

25   the implementing legislation.

1          Regulation 10.005(1)(c) defines instruction as

2    teaching students about a prohibited subject within a course,

3    and you could have a voluntary bus tour that is part of the

4    course.  It's just not -- it's not a mandatory requirement, but

5    it's part of the course.

6          But I've looked through the record -- and I could be

7    missing something, which is why I'm asking the question.  I

8    didn't see anything to suggest that the voluntary bus tour at

9    issue was part of the course.  Whether it was mandatory or

10   discretionary is a different question, but I didn't see any --

11   it seemed to me that it was a -- something he did separate and

12   apart from the courses he was teaching.

13         If I've got that wrong, then let me know, because I

14   want to make sure I'm not overlooking something in the record.

15         MR. SYKES:  Thank you, Your Honor.  Emerson Sykes for

16   the Pernell plaintiffs.

17         We allege that Dr. Dunbar's tour is appropriately

18   understood as falling within the definition of instruction.

19         THE COURT:  How is it within a course if there's no

20   evidence it was in a course?

21         MR. SYKES:  It's not within a traditional course that

22   he is taking -- or that he is teaching.  We'd be happy to

23   provide supplemental information about it.  It's somewhat of a

24   unique tour --

25         THE COURT:  That's why I said the record is closed.

1    I'm stuck with the record I've got.  So what I want to find out

2    is do I just ignore the definition of "within a course?"  How do

3    I -- it seems to me that's an insurmountable problem at this

4    juncture with -- and let me make plain.  There is a difference

5    between -- and I don't think anybody disagrees with this.  There

6    is a difference between standing for purposes of preliminary

7    injunction versus standing for the motion to dismiss.

8              You don't disagree with that, do you, Ms. Sykes?

9              MR. SYKES:  No, Your Honor.

10             THE COURT:  Mr. Cooper?

11             MR. COOPER:  No, Your Honor.  We agree with that.

12             THE COURT:  So we have a heightened burden -- you have

13   a heightened burden at this point that's been described as akin

14   to what the burden would be at the summary judgment stage.  The

15   record is closed.  And I said that not because of this issue,

16   but for, quite frankly, some other issues that -- you know, I

17   let the parties put on what they did, and I didn't restrict you.

18   And we're not -- if I kept reopening the evidence for one side

19   or the other, then there would be no end to a preliminary

20   injunction hearing.  So without any artificial limitations by

21   the Court, y'all have the record you have.

22             But what's your best argument that what he's doing is

23   within a course -- the definition of instruction for the

24   provision I'm applying, or does it not matter what the

25   definition is?

1          MR. SYKES:  Your Honor, it's admittedly not a

2     traditional course, but we understand the intent behind the

3     regulation to include the kind of instruction that's offered to

4     students and professors as a part of the departmental

5     curriculum.  So in that way we believe that it should be

6     considered just as any other course, though it is admittedly not

7     a traditional in-class course like what we normally think about.

8          THE COURT:  The idea being, Judge, the sweep of the

9     statute is not just what is or is not taught in class.  It can

10    be a lecture series.  It can even -- although nobody has raised

11    it that I'm aware of in this case, it also extends to training

12    for faculty, for example; right?

13         MR. SYKES:  Yes, Your Honor.

14         THE COURT:  Okay.  Mr. Cooper, anybody on your team

15    want to be heard on that limited point?

16         MS. WOLD:  Yes, Your Honor.  This is Megan Wold.

17         I think it's a new argument today to suggest that

18    Professor Dunn's historic bus tour is somehow within a course,

19    even though I don't think there is any evidence, as Your Honor

20    noted, in the record that it is.  The argument that plaintiffs

21    have made in their brief is that within a course isn't

22    applicable to university professors within the definition of

23    regulation 10.005.

24         And as we explained in our brief, we don't think

25    that's true under that reading, and I think under the reading

1    that opposing counsel has offered this morning, a janitor's

2    conversation with a student in the hallway would qualify as an

3    instruction; a secretary who makes small talk with students who

4    are waiting for office hours with a professor would fall under

5    the definition of instruction.

6            And if that were so, then the definition of

7    instruction would be far more capacious than the plain meaning

8    of that word in the act.  And so we think that simply can't be.

9            I think the Board of Governors' regulation is clear

10   that instruction has to happen within a course.  We are bound by

11   that, and I think the historic bus tour, which doesn't occur

12   within a course, doesn't qualify.

13           And Your Honor mentioned training, but training is

14   also a word used in the act and then it's separately defined in

15   the Board of Governors' regulation.  And I don't think there's

16   been any suggestion that this bus tour qualifies as training.

17           THE COURT:  And so I think the record would be clear,

18   I wasn't conflating training with a course.  I think what I was

19   repeating back to the plaintiff is argument that the

20   definition -- that the statute coverage was broader, and so it

21   was on that limited point that I asked that question.

22           MS. WOLD:  Absolutely.

23           THE COURT:  Fair enough.  Thank you.

24           MS. WOLD:  I think that's clear.  I wanted to make

25   sure.

1          Thank you.

2          THE COURT:  All right.  Let's talk about *Virgil*.  And,

3  again, I'm making the following comment.  I'm not trying to be

4  unpleasant.  I'm not scowling.  I'm not pounding on the bench.

5  And both sides are guilty of this sin in this case.  Everybody

6  seems to like to cut and lift statements out of opinions

7  completely divorced from the context and the rest of the

8  language of the opinions.

9          You know, I didn't clerk for the U.S. Supreme Court.

10 I didn't go to an Ivy League school, but, at the very least, my

11 public education taught me in law school that, you know, the

12 holding and the context in which it's held matters and not just

13 some language lifted out of a case out of context.

14         So my basic question, in terms of trying to ascertain

15 what the appropriate analytical framework for the claims is,

16 boils down to this.  Let me start with Sykes, then I'll go to

17 Greubel, then I'll go to Cooper, and then the next question I'll

18 do it another order.

19         For purpose of evaluating the students' claims, has

20 *Virgil* been set aside by the Eleventh Circuit en banc?  Or has

21 the U.S. Supreme Court set aside *Virgil*?  And if not, why

22 doesn't *Virgil* from the Eleventh Circuit dictate the contours of

23 the claims of the students' right of access to information?

24         MR. SYKES:  Thank you, Your Honor.

25         The reason that we don't think *Virgil* provides very

strong indications of what the Court should do here is because
it's in the K-12 context, and it was about removal of a book
from the curriculum.

        And we think that fundamentally different rules apply
in higher education where all the students involved are adults.
For example, the book that was removed in *Virgil* was for
explicit material that, of course, would not have been evaluated
in the same way if it were being taught in a college course.  So
I think the facts of *Virgil* itself show that it's a very
different set of circumstances where you are worried about
exposure of young folks to explicit material versus a higher
education context.

        THE COURT:  Since every case practically talks about
how the facts matter, and whether it's *Bishop* in a balancing
test or *Virgil* talking about things being reasonably related to
a pedagogical interest, why isn't -- whether it's under *Virgil*
or under *Bishop*, why is that just not part of the context and
the facts that goes into evaluating the claim, as opposed to
suggesting the standard isn't the right standard?  That's where
both sides have lost me.

        We've got the Eleventh Circuit that passes on the
question generally in *Virgil*.  We then have the Eleventh Circuit
in *Bishop* talk about it creates a balancing test that y'all
don't seem thrilled with and try to distinguish.  I didn't write
*Bishop*.  I wouldn't have written it the way it was written, but

1  it doesn't matter.  It's the Eleventh Circuit.

2        The defense says it establishes a bright-line rule

3  that we can do whatever we want, which is sort of the exact

4  opposite of a balancing test, so I'll ask Mr. Cooper that in a

5  few minutes.  I just -- you know, Judge Cox, who I clerked for,

6  was part of that panel, and he was many things, but stupid

7  wasn't one of them.  And he knew the difference between a

8  bright-line rule and a balancing test.

9        So I'm not sure how I read *Bishop* to establish a

10  bright-line rule when they say this a balancing test.  But

11  that's where both sides lose me.  Because y'all don't like some

12  language, one side or the other in some of these cases, you just

13  try to distance yourself from them.  But if I'm not going to

14  analyze the students' claims under *Virgil* and ask the question

15  about whether, A, the speech is clearly characterized as part of

16  the school curriculum, and, B, is it reasonably related to a

17  legitimate pedagogical, interest -- reasonably being the

18  operative -- well, not the operative -- but a critical word --

19  what's the test that I'm supposed to apply?

20        MR. SYKES:  Thanks, Your Honor.

21        A few quick points.  One is I don't think that we take

22  any issue with *Bishop*.  We are not asking you to --

23        THE COURT:  Well, let's focus on *Virgil* now, and we're

24  going to pivot to *Bishop*.

25        MR. SYKES:  Understood, Your Honor.

1            I want to make clear that even under the standard

2    adopted by *Virgil*, from *Hazelwood* --

3            THE COURT:  And I'm going to ask y'all to apply these

4    standards later.

5            For example, I read the defendant's brief, and they

6    go*, Bishop* ain't it; but if you are going to apply *Bishop*,

7    here's how it should be applied.  They say that, Anything that's

8    said in a classroom is government speech -- end of inquiry, full

9    stop -- we can control absolutely down to the -- you know, the

10   intro statement of a professor, what's said in the class.

11   That's their starting position.  They then said that, If you

12   apply *Bishop*, here's how it should be applied.

13           I'm going to ask y'all both to apply *Virgil* to this

14   record -- and I did emphasize the word "record," and I'm going

15   to have y'all apply *Bishop* to this record.  But I want to find

16   out what -- assuming *Virgil* is not the test, what is the test or

17   the analytical framework, however you want to phrase it?  I

18   just -- Judge, this is what you're supposed to look at, the

19   factors, the -- what are you supposed to balance?  What am I

20   supposed to look at in analyzing the students' claims other

21   than, Judge, it's in the university setting and academic

22   freedom, which is not a right, but an interest that's been

23   recognized and balanced by the Eleventh Circuit explicitly in

24   *Bishop* has a special niche, which the U.S. Supreme Court has

25   repeatedly said?  So, Judge, it's -- I get it.  Y'all have

1   repeated like some talisman over and over and over again it's a

2   special niche and it has this heightened scrutiny.  I get that.

3           But aside from that general statement that's cut and

4   pasted over and over and over and over again, what is the

5   analytical framework for the students' claim if it's not *Virgil*?

6           MR. SYKES:  Your Honor, we think that it's a -- what

7   the basic test for whenever a legislature tries to discriminate

8   based on viewpoint, it's presumptively unconstitutional and, if

9   not, subject to scrutiny.

10          I would just point out that both in *Virgil* and in

11  *Bishop*, the Court was looking at a school disciplining a student

12  or the authority of the university to discipline a professor or

13  the authority of the school district to remove the book.

14          Here we're not looking at a university disciplining

15  students or disciplining professors.  We're talking about a

16  legislature injecting itself into the college classroom.  And we

17  think that this is a very important distinction.

18          THE COURT:  Let me ask you a question there.

19          MR. SYKES:  Sure.

20          THE COURT:  Can the legislature -- are you suggesting

21  only a university in the university setting or only the school

22  board in a secondary school setting has the right to control the

23  curriculum?  Or if it's truly curriculum -- and we're going to

24  talk about the difference between curriculum and everything

25  that's said in a classroom in a little bit.

1           But are you suggesting the Florida Legislature does

2    not have a right to set the curriculum?

3           MR. SYKES:  It is not the role of the legislature --

4           THE COURT:  Not should they.  What's the best legal

5    case for the State cannot set the curriculum for a university,

6    only individual universities can set the curriculum?

7           MR. SYKES:  To be honest, Your Honor, we don't have a

8    case on all fours here because what the legislature has done is

9    so unique.  There have been a lot of proposals, similar cutting

10   and pasting, similar language in many districts in many states.

11   But we have looked hard to find a place where a state

12   legislature has tried to enforce a particular viewpoint on

13   college professors and other instructors.  You have to go all

14   the way back to the -- sort of the loyalty oath cases of the

15   late '50s and '60s.  We don't have a lot of cases in this area

16   because state legislatures generally stay out of this kind of

17   viewpoint-based requirement and --

18          THE COURT:  Again, I want to -- surely, Mr. Sykes,

19   you're not trying to collapse the concept of viewpoint and

20   content.  Is that really the plaintiffs' suggestion, that

21   viewpoint and -- there's no daylight between those two concepts?

22          MR. SYKES:  Not at all, Your Honor.

23          THE COURT:  Because I thought what the law for well

24   over a century has taught us is that there is a huge difference

25   between content and viewpoint.

```
1              So my question to you -- and I'm going to ask this to
2    Mr. Cooper.  It seems to me one of the questions, whether I'm
3    applying, for example, Bishop or Virgil, or any of these cases,
4    is -- and I know some Courts in a perfunctory way roll over
5    concepts and conflate concepts.  I'm not being critical, but
6    Courts do that.  And when you write a three page -- pages on a
7    complex legal issue, then you tend to get that sort of
8    conflating concept -- conflating of concepts.
9              So when I'm talking -- does curriculum suggest both
10   content and viewpoint, or does it envision -- curriculum as it's
11   been applied by Courts to mean content?
12             MR. SYKES:  It's difficult to say, Your Honor.  As you
13   said, Courts use these terms differently.  We do not mean to
14   suggest that there's no difference between --
15             THE COURT:  Do I get to ignore the U.S. Supreme Court?
16             For the life of me -- and I'm going to ask Mr. Cooper
17   about this.  In Rosenberger --
18             MR. SYKES:  Yes, Your Honor.
19             THE COURT:  -- which gets quoted like it's, quite
20   frankly, out of context, but gets -- the language over and over
21   talks about what a university can do, but it explicitly talks
22   about it made content-based choices.  But when Rosenberger says
23   that, they spent the first five pages before that distinguishing
24   between content and viewpoint.
25             So I just -- when I'm analyzing what the university --
```

1   what you can or can't do, whether it's the State or the

2   university, you say I should analyze the State differently from

3   the public university.  And I get it's one step removed.  But

4   for the life of me -- and I'm going to have Mr. Cooper -- I

5   don't understand, if I read *Rosenberger* -- and, again, maybe

6   they taught me something different at UF than they teach you

7   folks at Harvard.  But I thought when I read that statement by

8   the Court, the holding, talking about *Widmar*, that the State, as

9   a speaker, may make content-based choices.

10          How in the world do I read that statement and cut and

11  paste it and ignore the first five pages of the order that

12  distinguish between content and viewpoint?

13          I just, for the life of me, don't understand why I

14  would do that.

15          MR. SYKES:  We're not asking you to do that.  I did

16  not go to Harvard, but I agree that there is a big difference

17  between viewpoint and content.  And we think that this language

18  in *Rosenberger* is dicta, and it's talking about regulating --

19  and it was about student activity fees.  So we think that its

20  application to in-class curriculum is not one to one, but we

21  agree with you wholeheartedly --

22          THE COURT:  Why does it hurt you?  This is what -- for

23  both sides, y'all -- one side relies on a case, and y'all

24  desperately try to say it doesn't -- isn't applicable.  But it

25  does talk about general First Amendment principles, and I don't

understand why -- and maybe -- and you and Mr. Greubel may be

able to explain this to me -- why y'all don't like *Rosenberger*

when, to me, it makes one of the fundamental points which

underlies your argument if I'm going to apply *Bishop*, which is

there's a huge difference between viewpoint regulation and

content regulation.  And you'd have a hard road to hoe to

convince me that the State of Florida or the university can't

dictate what's in the curriculum.

         But it seems to me that is vastly different than

establishing what viewpoints are permissible, which runs afoul

of the most basic principles of First Amendment jurisprudence

from the first time the U.S. Supreme Court addressed or applied

free speech issues.

         MR. SYKES:  Your Honor, I agree completely, and to the

extent we have given a different impression, I apologize.  I

think we think that *Rosenberger* exactly stands for the idea that

the University may have some right to control the content but

not the viewpoint.  So we agree, I think, entirely.

         THE COURT:  And then let me -- and I've got a

follow-up question.  We'll hear from Mr. Greubel on that.

         MR. GREUBEL:  Yes, Your Honor.  It is possible, and

the Eleventh Circuit did recognize this in the *Speech First v.*

*Cartwright*.  For the reporter, it's 32 F.4th 1110.

         And the discriminatory harassment policy in that case

was both content-based and viewpoint discriminatory.  So there

1   is the possibility that a law, like this one, can be

2   content-based and viewpoint discriminatory in a way that offends

3   the First Amendment.

4            THE COURT:  What I'm really asking is the reverse:  Is

5   there any case that says you can have a purely viewpoint policy?

6            MR. GREUBEL:  That the government may have a purely

7   viewpoint policy?

8            THE COURT:  Yes.

9            MR. GREUBEL:  Not in the higher education context.

10           THE COURT:  And, Mr. Greubel, anything else you want

11  to add about evaluating the students' claims in *Virgil*?

12           MR. GREUBEL:  Not on the *Virgil* point, Your Honor, no.

13           THE COURT:  Mr. Cooper?

14           MR. COOPER:  Yes, thank you, Your Honor.

15           Your Honor, I don't think that one can analyze the

16  *Virgil* decision and the rights of students to receive

17  information in a way that's divorced from the antecedent right,

18  if you will, of professors, if they have one, to say what they

19  wish to say in classrooms.

20           THE COURT:  I'm not saying that issues don't overlap.

21  But help me to understand, if in *Virgil*, in evaluating access to

22  information, they applied, I believe, the *Hazelwood* test --

23  correct?

24           MR. COOPER:  Yes, Your Honor, pedagogical concerns.

25           THE COURT:  And whether it's *Virgil* or -- I mean,

1    it's -- why is the *Hazelwood* test applied in *Virgil* not the test

2    I apply to the students' claims.

3            MR. COOPER:  Your Honor, because what we are dealing

4    with here is a claimed right of a student to receive instruction

5    and speech from a professor of a particular kind, and that

6    cannot possibly be a right that's independent of the right of

7    the professor, if the professor has one, under the First

8    Amendment to provide the speech that the student says the

9    student wants to hear.

10           If the professor, as we maintain, Your Honor, has no

11   First Amendment right to espouse the concepts in the Individual

12   Freedom Act, then it cannot be that the student has some

13   independent right to insist that the professor provide the

14   professor's espousal or the professor's opinions about that

15   concept.  The student can't have a right that the professor

16   clearly does not have.  The student can't insist on a bespoke

17   curriculum or bespoke viewpoints to be offered.

18           THE COURT:  So let me ask you this.  So, Judge, when

19   the case law that says that actually the student, because their

20   speech is not government speech, would be -- at the university

21   level for case law would be afforded a more expansive right to

22   speak, Judge, that's different because that's talking about the

23   student's right to speak, not receive information?

24           MR. COOPER:  Yes.

25           THE COURT:  So to the extent there's language that

1   would suggest that the students' rights are more expansive than

2   a professor's right to speak who is speaking for, in this case,

3   the State, based on your arguments, that's the distinction

4   between those type of -- here, Judge, we are not talking about

5   the right of the student to bring up a viewpoint or say

6   something in class; we're talking about the right to receive

7   this information.  And that's the important distinction that

8   separates this case out from those cases that suggest that the

9   student would have a greater right than the teacher to speak in

10  the classroom setting.

11          MR. COOPER:  Your Honor, that's a concise and, I

12  think, accurate statement of our view of things.

13          THE COURT:  So when I do that, I'm not -- I understand

14  that I'm not inventing fire.  I repeat it back because I want to

15  make sure that -- and I thought that was your argument.  So

16  sometimes just to cut to the chase, I'll repeat back the

17  argument.  But I've got that argument correct; right?

18          MR. COOPER:  You do.  You do, Your Honor, but -- and,

19  again, yes, the students have a right to -- First Amendment

20  right to speak that is different from, and we would say

21  certainly broader than the right of a government employee of any

22  kind, including professors.

23          THE COURT:  So the right to receive information is

24  concurrent and conterminous with -- or the exact same as the

25  rights of the -- what rights, if any, the professor has?

1          MR. COOPER:  Exactly, Your Honor.  The student can't

2    possibly have a right to insist on the professor's opinion, even

3    if a professor doesn't want to give the opinion --

4          THE COURT:  I understand.

5          MR. COOPER:  -- or if the State has a right to prevent

6    the professor from giving that opinion.

7          THE COURT:  I understand.  If you'll hold tight on

8    that.

9          MR. COOPER:  Yes.

10         THE COURT:  Mr. Sykes and/or Mr. Greubel, why is that

11    not so, that the *Virgil* case is the case that -- you know,

12    they're really inapposite because here we're talking about

13    something narrower, which is the right to receive information;

14    and if you have no right to give it, why would the right to

15    receive it be broader than the right to give it?

16         MR. SYKES:  Your Honor, in the circumstances of this

17    case where the Stop WOKE Act targets instruction, we agree that

18    the students rights are sort of the flip side of the

19    instructor's rights.  I would just note that that's not going to

20    be true always.  And in many cases, including in *Virgil*, a K-12

21    teacher might not have a First Amendment right to put certain

22    books in the library, but the student still has a First

23    Amendment right to be able to access those rights -- those

24    books.  So it's not that in all situations they are exactly --

25    they have to go hand in hand, but we agree that in the current

1    situation under the Stop WOKE Act, they are sort of on the flip

2    side of that.

3              THE COURT:  All right.  Mr. Greubel, you agree?

4              MR. GREUBEL:  That's right, Your Honor.  And it's our

5    position as well that the State is not permitted to impose

6    itself artificially between the right of a student -- or the

7    right of students to receive information and the right of

8    professors to teach the curriculum.

9              THE COURT:  Thank you.

10             So that's helpful.  This is why we have oral argument.

11   Y'all at least agree on that point.

12             Mr. Cooper, I'm going to let you respond to some of

13   the other issues that were raised during my discussion with

14   Mr. Sykes and Mr. Greubel, but why don't you -- one thing I am

15   curious that I need your help with me understanding is your

16   position as it relates to setting curriculum or content versus

17   viewpoint.  And is there a distinction between the two, and, if

18   not, why not, and what's your best authority for that?

19             MR. COOPER:  Your Honor, I think there is a

20   distinction generally in the law between consent-based

21   restrictions and, beyond that, viewpoint-based restrictions

22   within context.

23             THE COURT:  Fair enough.  Fair enough.  Poorly phrased

24   question.  I didn't mean in general First Amendment

25   jurisprudence.  I mean specifically as it relates to --

```
1              MR. COOPER:  Yes, sir.

2              THE COURT:  -- regulating what can and cannot be said

3    in a university classroom, is there -- does the law recognize a

4    distinction between viewpoint and content, and, if not, why not?

5    And if not, why do the cases talk about content and curriculum?

6    And what's your best case that there's no daylight between those

7    concepts for purposes of a lecture in a university setting?

8              MR. COOPER:  Yes, Your Honor.  I do not think there is

9    a difference in terms of the State's authority to set curriculum

10   to --

11             THE COURT:  What's your best case for curriculum

12   equals content and viewpoint for purposes of a First Amendment

13   analysis as it relates to regulating what's taught by the State?

14             MR. COOPER:  I like Rosenberger very much, Your Honor.

15             THE COURT:  Let me pause you.  Help me to understand

16   that, because I want to read Rosenberger, and I really want

17   you -- and this is good -- I mean, this is like a CLE for me.

18             Help me to understand how I read Rosenberger that says

19   the government can regulate content when they just spent five

20   pages distinguishing between content and viewpoint?  Why would I

21   then collapse those concepts in the very same decision, just a

22   few pages away, when they only use the word "content"?

23             MR. COOPER:  Your Honor, they don't only use the word

24   "content."  Rosenberger itself did collapse those -- those

25   different concepts.  And to my mind anyway, my reading made
```

1  clear that when the university is setting its curriculum, it is

2  entitled to have a viewpoint.  It is entitled to -- and its

3  professors are speaking with its voice, and it's entitled to

4  determine what they say.

5          THE COURT:  But this circles back, though, Mr. Cooper,

6  to your proposition that the State of Florida, without

7  qualification of any kind, can dictate not just that you're

8  going to teach biology, but everything that can be said in the

9  biology class without restriction.

10          How does that then square with *Bishop* that says it's a

11  balancing test?  I don't understand how we can have an absolute

12  right to do something, and then we've got a balancing test.

13  Those seem like two distinct concepts to me that would -- can't

14  possibly be reconciled.

15          MR. COOPER:  Let me try to reconcile them, Your Honor,

16  because I understand the point you make, and I've given a lot of

17  thought to this as well.

18          And, yes, the Court of Appeals in *Bishop* did, indeed,

19  employ a balancing test.  They were clear about that.  They used

20  *Hazelwood* as their polestar, and they went from there, and they

21  analyzed the various elements of -- and considerations that

22  should go into the balance, academic freedom, ultimately

23  concluding that that is not an independent First Amendment

24  right.

25          THE COURT:  We keep saying that, but why do I care?

```
1   If you've got a balancing test that says it's an interest you're
2   going to balance -- I understand it's a good -- you know, if CNN
3   or Fox News is going to interview you, I understand why it's a
4   good sound byte there's no right to academic freedom.  I'm not
5   aware of anybody suggesting there's a right to academic freedom,
6   but what -- the Eleventh Circuit, which I'm bound to follow, has
7   said it's an interest that's weighed.  So while you may not call
8   it a right, who cares?  I understand it would be a higher -- it
9   would be subject to higher review if it was a right.
10          MR. COOPER:  I care because if they're right and their
11  professors have a right to academic freedom to say whatever they
12  want, I lose.  I lose.  That's why I care.  But -- so --
13          THE COURT:  But they haven't argued -- have y'all
14  argued that there's an absolute right?
15          MR. GREUBEL:  No, Your Honor, that's not at all what
16  we've argued.  Does the *Bishop* case recognize --
17          THE COURT:  Hold on.  I've got -- you answered that
18  question, and we'll talk about more -- I'll get both sides to
19  talk about *Bishop* and how it should be applied.
20          I guess my thing is I don't understand -- I absolutely
21  agree, and I will say right now -- because I can read the King's
22  English -- it says in *Bishop* there is not a right to academic
23  freedom.  There is no right to academic freedom.  Boom.  We're
24  done.  On that issue you win, but that's not the end of the
25  inquiry.
```

1          MR. COOPER:  No, it's not.

2          THE COURT:  The inquiry still is -- that is an

3    interest that has to be balanced against other interests, and

4    you keep saying to me, basically, like -- not basically like.

5    You keep saying to me explicitly and in your papers the State of

6    Florida or university can tell a professor not only the subject

7    areas, not only the topics they've got to cover, not only the

8    information that has to be covered, but precisely how they say

9    it and the opinions that they express when they're saying it,

10   and they can control -- because it's the government speaking,

11   literally can control every word.

12         They could hand every professor -- and maybe that's

13   where we're heading; I don't know -- a transcript that says,

14   You're going to read from this transcript semester after

15   semester verbatim because we have absolute control over what you

16   say and how you say it.

17         If that's true, then why does *Bishop* have a balancing

18   test?  I just don't understand that.

19         MR. COOPER:  Your Honor, once again you're right.  It

20   does -- academic freedom is among the interests to be placed in

21   that balance.  So also is the fact that professors and other

22   teachers are employees of the State.  The Court placed

23   significant weight on that point, and I would say dominantly on

24   ultimately that point in the balance, because, Your Honor, what

25   I believe that *Bishop* did was after undertaking that balancing

1    process, it concluded that the autonomy of the professors in

2    that balancing process can never, never overcome the

3    university's decision about what shall be and shall not be

4    taught.  In other words -- and that's essentially what they

5    said.

6              I mean, how else are we to understand after the long

7    windup?

8              THE COURT:  Well, apparently Justice Alito is a

9    simpleton just like I am, because didn't he --

10             MR. COOPER:  Who are you talking about?

11             THE COURT:  Justice Alito.  Didn't Justice Alito --

12   let me find the case that you --

13             MR. COOPER:  *Edwards*, one of my favorites.

14             THE COURT:  -- cited.  Doesn't he -- hold on.  Let me

15   find it.  I've got it somewhere in my stack.  It must be in

16   another stack.  Give me one second.

17        (Pause in proceedings.)

18             THE COURT:  I'm sorry.  It was in a different stack.

19             In *Edwards* -- I was just trying to get the language --

20   in talking about the right to control, he puts, "But see

21   Bishop."  Now, maybe Justice Alito learned something when he

22   went on the Supreme Court he didn't know when he was a circuit

23   judge.

24             But what does "but see" mean other than the

25   Eleventh Circuit has held something to the contrary?

1          MR. COOPER:  Your Honor, I -- I believe -- I'm not

2    sure the passage that he's saying "but see" is connected to, but

3    I have to say that *Edwards* is strong support, I believe, for our

4    position.  Justice Alito at length, analyzing Rosenberger and

5    concludes, Your Honor, a public university professor does not

6    have a First Amendment right to decide what will be taught in

7    the classroom.

8          THE COURT:  And then --

9          MR. COOPER:  Pure and simple.

10         THE COURT:  And then -- and then says, "But see" --

11   *but see Bishop,*" with a parenthetical that says, "recognizing

12   the First Amendment is implicated when you're talking about a

13   university's speech."

14         I just -- I get it.  I get there is this push, because

15   this happens in my courtroom with some frequency, Judge, we

16   think the U.S. Supreme Court is going to change the law.  Fair

17   enough.  They might.

18         Judge, we -- we want you to look to what Justice Alito

19   said as a circuit judge because he's likely to lead the call for

20   a change on the U.S. Supreme Court.

21         But I don't get to predict what the U.S. Supreme Court

22   is going to do, and I wouldn't even try.  I've got to apply the

23   Eleventh Circuit case, and so I just -- when Justice Alito says

24   "but see," it's just hard for me to understand how you then

25   stand and waive that decision and say, Judge, *Bishop* means

1    something other than what Justice Alito said it meant.  I

2    just -- for the life of me, I don't understand why I should

3    adopt a construction different than Alito and apply *Bishop* in a

4    different way.

5            You have a -- the Eleventh Circuit may well en banc --

6    although their predilection to ignore the prior panel rule, they

7    may not go en banc.  They may decide they don't like *Bishop*

8    anymore.  The proper mechanism would be to go en banc, but maybe

9    they don't.  Maybe they just ignore the prior panel rule.

10           But I don't understand how I read *Bishop* to say

11   there's no real balancing; the professors always win on

12   balancing, when even Justice Alito didn't read it that way.

13           MR. COOPER:  Your Honor --

14           THE COURT:  But maybe he was, you know -- I don't

15   know -- not thinking that day or something.

16           MR. COOPER:  If we get to the Eleventh Circuit -- it

17   could happen -- then I'm going to ask the Eleventh Circuit to

18   read *Bishop* exactly the same way I'm asking you to, which is to

19   understand the following sentences.

20           *In short -- in short --* Your Honor, this is its --

21   this is its conclusion from all of the balancing that it did --

22   *Dr. Bishop and the University disagree about a matter of content*

23   *in the courses he teaches.  The University must have the final*

24   *say in such a dispute.*  They go on*:  The University's*

25   *conclusions about course content must be allowed to hold sway*

1    *over an individual professor's judgments.* Finally: *The*
2    *University necessarily has dominion over what is taught by its*
3    *professors...*
4            THE COURT:  Sure.  Curriculum, I agree, they can set
5    you can teach this kind of class; you can't teach this kind of
6    class.
7            But you're reading that -- didn't it also in balancing
8    that -- they also had some other interesting language.  *The*
9    *university has not suggested that Dr. Bishop cannot hold his*
10   *particular views; express them, on his own time,* et cetera.  *The*
11   *University has simply said that he may not discuss his religious*
12   *beliefs...under the guise of University courses.*
13           If the course doesn't include religion or talking
14   about religion -- but you can't simply -- I mean, I think that's
15   got a quote mark around it.  So people can raise their eyebrows,
16   but I'm reading directly from a quote.  *...the University's*
17   *interests in the classroom conduct of the professors are*
18   *sufficient...to warrant the reasonable restrictions...*
19           Because they talk about how you didn't -- this is not
20   part of your core curriculum that you're teaching.  It's a
21   separate class that you're teaching.  You're calling a separate
22   after-hours class to talk about your own personal views, as
23   opposed to teaching the subject matter of the class.  It's
24   coercive because it's done during exams, and while you may say
25   you're not forcing them to listen to your personal views outside

1    of class, you've effectively made it mandatory because it's

2    coercive because it's during exam time.

3              So, I mean -- *Bishop* also says we're going to look at

4    all the particular facts, and in making the statements you're

5    talking, they don't -- I mean, this is the wonderful thing about

6    case law.  Those statements are not divorced from the facts of

7    the case, and they start by saying that, This is a

8    fact-intensive inquiry.  We're applying *Hazelwood*, and under

9    these specific facts, this is why we can control this specific

10   professor from espousing these particular views.  And they go

11   through and say this is why it weighs on that side.

12             But they didn't say he couldn't say in the

13   classroom -- the State could control if he was not doing it

14   after hours, was doing it in his regular class as part of the

15   curriculum, said, And I disagree with this particular, you know,

16   viewpoint by this particular group of academics or something.

17   It doesn't say he can't express his opinions.  It's completely

18   divorced from that.  It says, Here are all the ways it's

19   detached from the curriculum.

20             And I just don't understand why I ignore all those

21   facts.  It seems to me that's why *Bishop* is -- in terms of the

22   application of the facts is a very odd and narrow set of facts

23   and isn't really about does the State have the right to control

24   you offering an opinion about the subject matter about what

25   you're teaching.

1          MR. COOPER:  Who gets to decide whether it's part of

2    the subject matter of what you're teaching?  Isn't that also the

3    professor's First Amendment right, according to the plaintiffs?

4          And, Your Honor, yes, we're not arguing that the

5    plaintiffs here or Dr. Bishop, in his case, can't say whatever

6    he wants to -- whatever opinions he has on his own time not in

7    the context of the classroom.  But even apart from his optional

8    class, he would offer his views -- his viewpoints, as the *Bishop*

9    Court called them, exactly the same as the *Rosenberger* did and

10   Justice Alito in *Edwards* called them, viewpoints.  He would

11   offer those viewpoints in his formal classes, and here's what --

12   you know, yes, here's the language of the Court.

13         THE COURT:  What -- point me to the headnote so I can

14   find out what you're reading from.

15         MR. COOPER:  I don't know about the headnote.

16         THE COURT:  Or just a general area, page number,

17   anything so I can find where you're reading from.

18         MR. COOPER:  Page 1077.

19         THE COURT:  Hold on one second.

20         I've got 1071.  This is 10 -- hold on.

21         MR. COOPER:  It begins with the "In short" -- the

22   paragraph --

23         THE COURT:  I've got it, the last paragraph, "In

24   short..."

25         MR. COOPER:  "In short," that's where the paragraph

1    begins, and I've already shared that passage with the Court.

2    But if you go on down after the "hold sway" sentence, the Court

3    says:  *By its memo to Dr. Bishop, the university seeks to*

4    *prevent him from presenting his religious viewpoint during*

5    *instructional time* -- and here's the point I want to focus on --

6    *even to the extent that it represents his professional opinion*

7    *about his subject matter.*

8              So he -- he believes in his human physiology class

9    that his religious views were important and directly relevant to

10   human physiology, no less so, I would submit to you --

11             THE COURT:  So that, then, would result in the

12   absolute rule that no matter how directly related it was, even

13   if it's part of the -- you're commenting on a reading -- let's

14   say the university -- the State of Florida next passes a list

15   of:  These are the only 100 books you can read -- and maybe

16   that's coming in the next legislative session -- and you're

17   reading directly from the book, that then this is what -- not

18   only is this the course you're going to teach, not only is this

19   the content, these are the books you're going to have your class

20   read and discuss in class.

21             You would read that paragraph in Bishop to say -- and

22   they can pass a law that says -- And the professor can't comment

23   or can't express an opinion about anything, even in the

24   prescribed curriculum?  That's how broad?  That's what that

25   paragraph means?

1          MR. COOPER:  Your Honor --

2          THE COURT:  And why -- if that's the case, why is the

3    rule not -- and maybe we're headed there.  Maybe the rule is

4    that the State of Florida can issue transcripts to every

5    university professor.  But isn't that the logical conclusion of

6    your position, that they can regulate everything that's said in

7    the courtroom -- I'm sorry -- in the classroom down to the last

8    word of the professor?

9          MR. COOPER:  Your Honor, it is not our position that

10   the First Amendment has no scope of operation when the State --

11         THE COURT:  And I thought you just said to me there is

12   no scope of operation in the classroom.

13         MR. COOPER:  No, no.

14         THE COURT:  So either you're pregnant or you're not.

15   There's no such thing as being a little bit pregnant.

16         MR. COOPER:  Your Honor, I've never said that.

17         THE COURT:  In the classroom -- I want to find out.

18   In the classroom, what is the defense position?  Is the State of

19   Florida -- or I'm sorry.  Is the defense's position that in the

20   classroom there's no limitation in terms of the First Amendment

21   on the State controlling what a university professor says?

22         MR. COOPER:  That is not my position.  I do believe

23   that there is a very, very narrow scope to the First Amendment.

24         THE COURT:  And what would that narrow scope be?

25         MR. COOPER:  I think it flows from *Barnett*, and I

1   don't believe the State can require a professor to express a

2   belief to pledge allegiance to the flag --

3           THE COURT:  They can't compel speech, but they can

4   prohibit all speech?

5           MR. COOPER:  They can't compel a professor or any

6   employee to express a belief --

7           THE COURT:  I understand.

8           MR. COOPER:  -- that the person does not --

9           THE COURT:  But they can prohibit any speech, full

10  stop, without qualification; correct?

11          MR. COOPER:  They can prohibit a professor from

12  espousing an opinion that the --

13          THE COURT:  They can't force an opinion, but they can

14  prohibit a professor from expressing any particular opinion

15  without qualification?

16          MR. COOPER:  Your Honor, government speech under

17  *Garcetti*, we believe, under *Rosenberger*, it's clear that the

18  professors are speaking -- or that what they utter is government

19  speech, and the government is entitled to determine the content

20  of that speech and to prohibit the expression of certain

21  viewpoints.

22          THE COURT:  Is all the case law about we're not going

23  to apply the First Amendment in such a way to have some, you

24  know, orthodoxy that we're all going to read from the same

25  page of music?  Is that just fanciful, silly nonsense that has

1    no application?

2          MR. COOPER:  Your Honor, it's not at all fanciful and

3    it's not at all silly.  And the State of Florida embraces that

4    with the most narrow, narrow exception, which is to say that

5    these particular eight concepts, which we believe are racially

6    discriminatory and repugnant, we are not going to permit

7    professors speaking in our State-prescribed curriculum, in our

8    classrooms, on our time, accepting our paychecks to express

9    these particular viewpoints.  And yes, viewpoints, paycheck --

10          THE COURT:  Riddle me this, Batman.  If the

11    administration changes and the government changes in 15 years in

12    Florida, under your theory, the State of Florida could prohibit

13    the instruction on American exceptionalism because it alienates

14    people of color and minorities because it suggests -- and other

15    disadvantaged groups because it suggests that America doesn't

16    have a darker side that needs to be qualified.  So that's --

17          MR. COOPER:  Yes.

18          THE COURT:  -- sort of the 30,000-foot-up view problem

19    I have with your suggestion, Mr. Cooper, about the scope of the

20    law.  Because it suggests that from state to state you can pick

21    and choose which types of what viewpoint you like and, under the

22    guise of stopping indoctrination, you promote indoctrination.

23    Why isn't that so?

24          MR. COOPER:  Your Honor, the government, again, is the

25    one who decides.  It is the State who decides what the

1    curriculum will be and what will be taught and what will not be

2    taught.  And that's true today in Florida and will be true 15

3    years from now in Florida.  If the political profile of this

4    state changes completely and the --

5              THE COURT:  So the scope of the First Amendment and

6    what it does -- I get it.  Fair enough.

7              Go ahead.  I interrupted you.

8              MR. COOPER:  Well, and the concepts that now the State

9    prohibits espousing in its classrooms become the doctrine that

10   this state and its people, through its legislature, decide to

11   embrace and to prescribe as part of the curriculum.  But

12   they're -- and, yes, Your Honor, I have to emphasize that the

13   State, like I believe all states, embraces the policy of

14   academic freedom.  This is -- and in the main in general --

15             THE COURT:  So long as you say what we like, we

16   believe in academic freedom; right?

17             MR. COOPER:  Well, in this narrow area --

18             THE COURT:  How does that even work, Mr. Cooper?  We

19   have the absolute right to control what you say in opinions you

20   offer, but we believe in academic freedom:  What does that mean?

21   That seems like the most -- I mean, I would have to read the

22   worst dystopian novel to come up with the, we believe in

23   academic freedom so long as you say what we say.  I mean, that

24   sounds like you just quoted directly from something George

25   Orwell wrote.  I mean, I just -- I don't get it.

1          You don't see the inconsistency in saying, we

2    wholeheartedly, as a talking point, believe in academic freedom

3    so long as you say what we want you to say?

4          MR. COOPER:  Your Honor, we don't believe that is a

5    right inherent in a professor, a First Amendment right.  We do

6    believe that it is a very important interest in any balancing

7    process that might be --

8          THE COURT:  It's an important interest, but you always

9    lose.  I mean, that's what you said.

10         MR. COOPER:  You always lose in a dispute between a

11   professor and the university, and therefore the State, about the

12   content of the curriculum and the content of the class.

13         THE COURT:  Next question.  Does it not -- and, again,

14   we'll just have to agree to disagree whether content and

15   viewpoint are the same concepts.  Apparently those are the only

16   contexts in the First Amendment where that's true.

17         But let me -- I'll let you finish up.  We've been

18   going over an hour, so we're going to take a break for the

19   benefit of the court reporter.

20         MR. COOPER:  Thank you, Your Honor.

21         I just, I guess, want to make one point in follow-up

22   to this colloquy we've just had.

23         Yes, 15 years from now the State may change its mind

24   and prescribe or prohibit concepts that are precisely the

25   opposite of what the State does now.

1          The plaintiffs are arguing that here and now their

2   professors -- professors generally have the First Amendment

3   right to say that members of the White race are morally superior

4   to members of the Black race.  They have a First Amendment right

5   to say that.

6          THE COURT:  Well --

7          MR. COOPER:  I disagree with that, Your Honor.

8          THE COURT:  -- what's clear is you have a right to

9   talk about eugenics and say that Whites are physically superior

10  to Blacks because that's not prohibited by this; correct?

11         MR. COOPER:  I beg your pardon?

12         THE COURT:  You can talk about eugenics all day long

13  under this; right?  You just can't talk about moral superiority;

14  right?

15         MR. COOPER:  I'm not sure that the example you are

16  raising isn't within one of the eight concepts.  I haven't

17  honestly --

18         THE COURT:  Physical versus moral superiority --

19  anyway, fair enough.  We'll just have to agree to disagree on

20  that.

21         MR. COOPER:  Thank you, Your Honor.

22         THE COURT:  Mr. Cooper, why -- I just -- for the life

23  of me, I don't understand why -- what you're saying is academic

24  freedom is an interest; not a right, but it's an interest.  It's

25  an interest that has to be weighed under *Bishop*.  But what

academic freedom means is it's whatever the political party in

power says it is, is what I just understood you to say.  Sure,

Judge, if power changes hands tomorrow in Florida or in a few

weeks in Georgia, whatever political party takes control gets to

dictate the scope; not what subject matter is taught, not the

curriculum, not what topics have to be covered, but down to what

viewpoints are expressed in the classroom.  Academic freedom

equates to whoever has the political power; right?

MR. COOPER:  Your Honor, even from Bishop we know that

the professor can't express -- and he was disciplined for

expressing his religious viewpoints in a class that he thought

they were directly relevant to his subject matter -- his

religious viewpoints.  The State had the authority, and the

professor did not have the First Amendment right to express

those viewpoints.

THE COURT:  I understand.

MR. COOPER:  This -- the Individual Freedom Act is no

different.  These are familiar concepts and viewpoints that the

State, just as if it were dealing with religious viewpoints -- I

mean, is there any doubt that the State could pass --

THE COURT:  Well, what I've come to learn is the only

people that have First Amendment rights are based on religion;

but fair enough.  We'll have to agree to disagree on that.

MR. COOPER:  Well, let me ask this.  Are religious

viewpoints the only ones that the State has the authority,

1  notwithstanding a claim of First Amendment academic freedom, or

2  otherwise, to place off limits?

3       THE COURT:  No.  I think in a religion class a

4  professor could certainly express their viewpoints about

5  particular religious doctrine, absolutely.

6       But I think there's a world of difference between

7  outside of class coercing your students to feel like during the

8  middle of exams that they are going to ruin their chances to get

9  a good grade in the class.  You're forcing them to go to an

10  extra class, not as part of the regular curriculum, but to

11  discuss your personal views on religion as it could relate to

12  anything up to and including the subject matter of the class.  I

13  think that's fundamentally different than saying a professor in

14  a religion class could not offer their personal views on a

15  particular religious doctrine that was integral to the very

16  subject matter they're being required to teach because it's a

17  part of the prescribed curriculum of the university.  I think

18  those things are very different, and I think it's disingenuous

19  to suggest otherwise.

20       But we are going to go ahead and take a break.  It's

21  10:10, and we'll come back in ten minutes.

22       (Recess taken at 10:12 AM.)

23       (Resumed at 10:23 AM.)

24       THE COURT:  Please take your seats.

25       I need one of y'all for each side to have somebody

1    that's going to act as secretary.  What I'm going to do is I'm

2    going to identify -- because it's taken longer than I

3    anticipated with my questioning.  I told my law clerks I wasn't

4    going to question y'all today, and I guess I'm buying pizza

5    because I lost that bet.

6         There are some other topics, but I want to -- these

7    topics I'm going to want to cover more quickly.  So these are

8    some things I'm going to want y'all to address, and then we are

9    going to take a break.  You are going to tell me how long you

10   need, and we are going to come back, and I'm going to let the

11   plaintiffs go and then the defense go, and then we'll be done

12   for the day.

13        With respect to vagueness -- and this is more directed

14   to the plaintiffs -- I understand the argument that's been made

15   that if there is -- a word appears in a dictionary, it, by

16   definition, can't be vague, which is an interesting concept.

17   But then we would no longer have the vagueness doctrine because

18   I've never seen a nonword be the subject matter of a vagueness

19   challenge.

20        I also understand that there's a ton of cases that

21   talk about syntax that can make something vague or not vague.

22        I also understand there's case law that says context

23   matters.  So, for example, in deliberate indifference, saying

24   that there is both an -- objective and subjective components,

25   you have to look at it both from the standpoint of the person

who's allegedly violated somebody's right, as well as is it
reasonable.  Just because in one context a word may be not vague
doesn't mean in every context and what it's modifying means it's
never vague.  So I understand those arguments and issues.  I
don't need y'all to further elaborate.  Although, certainly, if
the defense wants to reassert those positions, it can.

What I do want you to address is a new issue that
appeared -- I think it was in the reply -- and forgive me.  This
is about the third preliminary injunction hearing I've had in a
couple of weeks.  The issue was raised that because the
collective bargaining agreement uses the word "objective,"
somehow that means it couldn't possibly be vague in this context
as a statute is written.  So if the plaintiff will address that
point.  Anything else you want to say, the other side wants to
say about objective -- I mean vagueness, you can say it.

The next issue -- and I don't think anybody has really
raised this, and the answer may be like the question, Judge,
we're holding hands on the issue of you're going to analyze the
student's right in this case -- I understand Mr. Sykes' point,
which was well-taken, it's not in every case, but in this case
we agree and Mr. Cooper's thoughtful analysis that the right of
the student to receive is -- can't be separated out from the
right of the teacher to speak.  It's not an additional analysis
for the reasons explained.  But historically there's -- not
historically.  But in other context where there's been a

1   discipline post-speech, that's been analyzed differently from a

2   pre-speech prohibition.  So my question is, does that matter in

3   the claims before me?  Or, Judge -- you know, it does or

4   doesn't.  So I want y'all to address that.  For the -- and both

5   sides.  Y'all may agree on that, and if you don't, you can tell

6   me why not.

7         For the defense, I need you to clearly identify me --

8   identify for me the legislature's pedagogical concerns behind

9   the law at issue and explain to me how the viewpoint

10  restrictions at issue are reasonably related to that pedagogical

11  concern.

12        And then I need you to point to, other than legal

13  argument, which last time I checked isn't evidence, what

14  evidence is there in this record that reveals the legislature's

15  pedagogical concerns and what evidence, as opposed to legal

16  argument, if any, supports the conclusion -- or would support a

17  conclusion that those pedagogical concerns are reasonably

18  related to a -- I'm sorry -- that the restrictions are

19  reasonably related to a legitimate pedagogical concern.

20        Then, for both sides, I need y'all to answer the

21  question that I just asked, which is, is there any evidence in

22  the record to demonstrate that this statute and regulation

23  reasonably are related to furthering a legitimate pedagogical

24  interest.  I understand the plaintiffs say it's not reasonably

25  related, but that's a different question.  The question is

1    whether there's evidence to support that.

2            And then finally, I'm interested, in light of

3    *Hazelwood* and the other cases that have gone through this

4    process and Rule 65 and the -- under Rule 65, the burden of

5    persuasion rests with the plaintiff, but it's my understanding

6    that once the plaintiff establishes that we want to speak, we

7    are going to speak, we are not allowed to speak, that it would

8    be up to the defense to have -- point directly to evidence that

9    would support the -- whatever the pedagogical concern is and

10   that it's reasonably related.

11           So I want y'all to talk about who bears what burden in

12   the context of a preliminary injunction hearing under Rule 65.

13           Those are the additional questions I have at this

14   juncture, and I also am going to let y'all confer with each

15   other so that y'all can address different points and streamline

16   your presentation.

17           Let me find out from -- actually, why don't we do

18   this.  I'm going to -- if y'all will keep your seats.

19           And, Mr. Cooper, if you, Ms. Wold, and Mr. Ohlendorf

20   will figure out how long you'd like for a break and how long

21   you'd like for your presentation, because I want -- I find if we

22   give you a chance to confer and think about the questions I just

23   asked and take notes, it will go faster, not slower.

24           And I'm going to ask the same thing -- Mr. Sykes, you

25   and Mr. Greubel can talk in terms of how you want to divide

1    things up and how much time you think you need to make whatever

2    additional presentation you want to make, and just raise your

3    hand when you're ready to tell me how much time you need.

4              MR. COOPER:  Five minutes, Your Honor.

5              THE COURT:  Five minutes for a break.

6              How long do you want for your presentation?

7              MR. COOPER:  Oh, I'm sorry.

8              If it's without interruption, Your Honor, about 15

9    minutes, but I suspect we'll talk about this a little longer

10   than that.

11             THE COURT:  I may not interrupt you.  It's -- well,

12   it's also possible that Santa Claus is going to deliver gifts to

13   my house this year.

14             MR. SYKES:  Your Honor, just to qualify, we're talking

15   about after the break, not the current round of questions?

16             THE COURT:  Two things.  I'm not -- I'm not asking you

17   these questions.  I'm saying when we take a break, how long do

18   you want for the break, and then how long do you want when you

19   come back to both make your presentation and address -- and,

20   again, you can say, Pass.  You don't have to address them.  I

21   just -- how long do you want for a break?  Let's start there.

22             MR. SYKES:  I think 15 minutes, Your Honor.

23             MR. GREUBEL:  15 minutes.

24             THE COURT:  I'll go with the highest bidder because

25   it's reasonable, 15 minutes.

1            And how long, Mr. Sykes, do you want and how long does

2   Mr. Greubel want for whatever presentation y'all are going to

3   make?

4            MR. SYKES:  Your Honor, we would appreciate ten

5   minutes for the presentation and five minutes for rebuttal.

6            THE COURT:  Mr. Greubel?

7            MR. GREUBEL:  Same, Your Honor.

8            THE COURT:  All right.  Mr. Cooper, I'm going to give

9   you longer if you need it, even if I'm not interrupting you.

10  I'm not going to sandwich -- just because we have consolidated

11  cases -- if we had two sets of lawyers here, I'd give y'all the

12  same amount of time as the other time.  We may not use all that

13  time, but I just want to let you know I'm not going to

14  artificially cut you off at 15 minutes if the other side spent

15  20 followed by another 10.  So you'll be able to take the time

16  you need.

17            MR. COOPER:  Thank you, Your Honor.

18            THE COURT:  All right.  So we're going to take a

19  15-minute break.  We're going to come back at 10:50.  We'll

20  start -- Mr. Sykes, are you going first?

21            MR. SYKES:  Yes, sir.

22            THE COURT:  Mr. Sykes is number one; Mr. Greubel is

23  number two, and Mr. Cooper will go third.  Okay.  Thank you.

24            Court is in recess.

25       (Recess taken at 10:33 AM.)

1          (Resumed at 10:56 AM.)

2               THE COURT:  Please take your seats.

3          We've got everybody present.

4          Mr. Sykes, you have the floor.

5               MR. SYKES:  Thank you, Your Honor.

6          I'd like to make a very brief statement, and then I'll

7     take your questions in turn.  And my colleague, Morenike Fajana,

8     will help with the evidence of the legislative intent, if that's

9     okay with you, Your Honor.

10              May it please the Court, the Stop WOKE Act is a

11    viewpoint-based limitation on instructors' speech and students'

12    rights to receive information in Florida public colleges and

13    universities.  Through the Act, the legislature has identified

14    eight politically incorrect views about race and sex that it

15    doesn't like and has banned them from university instruction.

16    This a clear violation of the First Amendment and the principle

17    of academic freedom.

18              Our plaintiffs intend to teach and learn about issues

19    like White privilege, unconscious bias, and color blindness in

20    their courses, but they are prohibited from doing so by the Stop

21    WOKE Act.  For example, instructors are not allowed to teach

22    that White privilege exists, but they are allowed to teach that

23    it does not exist; same with unconscious bias.  And they are not

24    allowed to criticize the idea of color blindless, but they are

25    allowed to support it.

1    This is exactly the kind of viewpoint-based censorship

2    Courts have repeatedly struck down.  Six decades ago in

3    *Keyishian*, the Supreme Court held that the First Amendment does

4    not tolerate laws that cast a pall of orthodoxy over the

5    classroom.  And just this year in *Speech First*, as we heard, the

6    Eleventh Circuit said that the dangers of viewpoint

7    discrimination are heightened in the university setting, and

8    viewpoint discrimination is unconstitutional seemingly as a

9    per se matter.

10    The Stop WOKE Act violates the fundamental principle

11    that the government cannot ban viewpoints it doesn't like from

12    college instruction and, therefore, must be struck down.

13    Plaintiffs also argue that the Stop WOKE Act is

14    unconstitutionally vague for the additional and independent

15    reason -- it's unconstitutional for the additional and

16    independent reason that is a void for vagueness.

17    Your Honor, look closely at the language in *Honeyfund*.

18    So suffice it to say, plaintiffs agree that the Act is obviously

19    impermissible.  And I'll come back to your specific question.

20    Finally, I want to underscore that every day that the

21    Stop WOKE Act is in effect plaintiffs, and other similarly

22    situated instructors and students, are suffering ongoing and

23    irreparable injury as they self-sensor and live in fear that

24    they will lose their jobs or their universities will lose state

25    funding if they violate this vague and discriminatory law.  We

1  ask, therefore, that this Court immediately enjoins enforcement

2  of the Stop WOKE Act.

3         Turning to Your Honor's specific questions, first on

4  the vagueness point, we agree completely that context does

5  indeed matter; and while it may be true that the word

6  "objective" appears elsewhere than just in the Stop WOKE Act,

7  when we look at the facts of this case, it becomes clear that --

8  what does it mean to teach something objectively and without

9  endorsement?

10         For example, our plaintiff, Leroy Pernell,

11  Professor Pernell, teaches a variety of courses at FAMU law

12  school, including the role of racism in criminal procedure.

13  He's teaching in that course from his own textbook about -- it's

14  called *Combating Racism in Criminal Procedure*.

15         What would it mean for him to teach the concepts in

16  this class based on his own scholarship, based on his own

17  rigorous research and analysis, objectively and without

18  endorsement?  Is he required to say at the end of the day, It's

19  up to you; I don't know?  Students enroll in his class,

20  especially, you know, these higher level elective classes,

21  because they want to hear from him about his research.  They

22  respect his scholarship.  They want to hear his expertise and

23  his analysis.  And, crucially, they want to know what his

24  conclusions are based on his years of study.

25         And so for the law -- for the State to require him to

1    withhold any endorsement of any view that's listed there, in

2    practice it's impossible to understand how Professor Pernell

3    could uphold his professional standards, could act as a

4    responsible teacher and scholar, while also sort of teaching,

5    supposedly, in an objective way and without endorsement.

6          Moving to your second question, I think, quite simply,

7    Your Honor asked whether students -- whether it matters whether

8    the discipline is post-speech or a prophylactic broad rule.  And

9    I think the short answer is yes, it does matter.

10         In cases such as *NTEU*, the Supreme Court said that

11   there is more -- in the balancing that the -- where there is a

12   prophylactic rule that bans broad swaths of speech, rather than

13   targeting individual professionals, the First Amendment

14   interests are especially strong.

15         So, in short, we -- we think it does matter, and yes,

16   it works in our favor.

17         I'll now turn to my colleague, Morenike Fajana, from

18   the Legal Defense Fund to talk about the evidence of the

19   pedagogical interest, and then I'll close.

20         MS. FAJANA:  Thank you.

21         So based on the record evidence that we have in this

22   case, we do not believe that there was a legitimate pedagogical

23   interest behind the Stop WOKE Act, and we believe this for --

24         THE COURT:  Counsel, let me ask you a question.

25         MS. FAJANA:  Yes.

1          THE COURT:  In your case, other than the declarations

2    of the plaintiffs, is there any record evidence in your case?

3          I know in the other case they filed the legislative

4    history and so forth.  Is there any record evidence of anything

5    other than the declarations of your clients?

6          MS. FAJANA:  Yes, Your Honor.  We're also relying on

7    the allegations in our compliant for that point and where we

8    extensively cited the legislative record as well.  So we believe

9    Your Honor can take judicial notice of those statements.

10          THE COURT:  Okay.  So, Judge, we've got our

11    declarations.  We've also cited to the legislative record for

12    which we now ask you to take judicial notice.

13          Let me find out from Mr. Cooper.  He may not -- find

14    out what their position is.  I start off by saying the record is

15    closed.  I don't recall seeing any requests for judicial notice,

16    but -- and I know that we've got the whole legislative -- not

17    the whole.  We've got the legislative history and stuff in the

18    other case.

19          But what says you, Mr. Cooper, about you or the other

20    side relying on the legislative history as taking judicial

21    notice of it as cited in the papers in the Pernell case?

22          MR. COOPER:  Yes, Your Honor.  Well, just in terms of

23    the question of what reveals the pedagogical concerns behind the

24    Individual Freedom Act, we believe it's clear on its face, but

25    we also believe that the legislative materials that the

1    plaintiffs have put in support those pedagogical concerns.

2              THE COURT:  And I assumed you were going to say,

3    Judge, that we're going to rely on it, and there would have been

4    no reason for you to file it in the other case because they

5    filed it, if you want to also rely on it.

6              I'm just asking more a technical question.  We don't

7    have those materials that were not filed.  Those materials were

8    not filed in the Pernell case.  They were cited in the

9    complaint, but I didn't have a request to take judicial notice

10   of them until now.  If you have no objection, because, Judge, we

11   are going to refer to them as well, then that's fine.  I just

12   wanted to find out if you objected to me relying on the

13   legislative history for purposes of both cases.

14             MR. COOPER:  I do not, Your Honor.

15             THE COURT:  Okay.

16             MR. COOPER:  And I'm sorry.  I thought there were

17   legislative materials filed with -- in connection with the

18   declarations that were put in.

19             THE COURT:  Are they with the declarations in Pernell?

20   I thought they were just cited in the complaint.

21             And, again --

22             MR. COOPER:  My bad.

23             THE COURT:  -- I didn't want to evaluate -- if nobody

24   disagrees, we don't need to talk about it.  I stood by what I

25   said before, because there was some question -- I forgot.  Maybe

```
1    it was Mr. Sykes said I could -- somebody said we could
2    supplement the record.  I go, No, you can't, because the record
3    is closed.
4            MR. COOPER:  Right.
5            THE COURT:  But for this purpose, I assumed everybody
6    was going to rely on it and refer to it, and it was in the other
7    case.  If nobody has any objections, then I will consider it for
8    both cases.
9            One thing, Mr. Cooper, before I turn back -- and I
10   really didn't plan on asking any questions, but I wanted to make
11   sure I knew what the state of the record was moving forward.
12           I understand -- and, quite frankly, my response to my
13   question would have been, Judge, the pedagogical concerns are
14   expressed in the legislation.  And I should have -- I just
15   didn't want to make that argument for you without asking you --
16   having you say it, because I agree with you.
17           But it seems to me the question arguably is different
18   from what evidence is that it's reasonably related, and I do
19   want you, when you stand up to talk, to address that.  What's
20   the state of the record and what would support my conclusion
21   that it's reasonably related and what would I be relying on in
22   the record to support that conclusion as it being reasonably
23   related as opposed to the concern which is expressed on the face
24   of the legislation and the context of where it is?
25           When I say "the face of the legislation," part of -- I
```

1   assume the analysis should be, Judge, it also matters where you

2   stick it.  If you stick it in a statute that's otherwise

3   structured for a particular purpose and has a purpose and this

4   then expands it, then that also informs what the concerns are;

5   correct?

6            MR. COOPER:  That's right.

7            THE COURT:  I understand that, and I understood that

8   from your papers.

9            Let me turn back.  Counsel, I've now burned up a

10  little bit of your time, but I did want to make sure that there

11  was no disagreement about what was properly in front of me.

12           Go ahead.

13           MS. FAJANA:  Thank you, Your Honor.

14           Just on that point about evidence, I also wanted to

15  point out that the complaint references public statements made

16  by Governor DeSantis as well which we believe that Your Honor

17  can take judicial notice of.

18           THE COURT:  And Mr. Cooper has expressed why in their

19  papers I shouldn't.  It doesn't matter what the Governor says,

20  and I shouldn't consider it I believe is the defense's position;

21  correct?

22           MR. COOPER:  That's right, Your Honor.

23           THE COURT:  Not that he didn't make the statements,

24  but, Judge, we've explained, and we think appropriately, why it

25  doesn't -- is not part of the mix of your analysis of this

```
1    statute; correct?

2              MR. COOPER:  That's correct, Your Honor.

3              THE COURT:  Which are two different things.  Why does

4    it matter?  You say it matters, they say it doesn't matter is a

5    different issue as to whether he said it or not.  And they don't

6    disagree.

7              But go ahead.

8              MS. FAJANA:  Okay.  Thank you, Your Honor.

9              So we believe that this evidence shows that the

10   primary motivation behind the Stop WOKE Act is the suppression

11   of speech which is not a legitimate pedagogical interest.  We

12   believe that this can be found from the name of the Act itself,

13   stopping wokeness.  We believe it can be found from the

14   Governor's statement that he wants to ensure a woke-free state

15   of Florida.

16             We believe that the statements from bill proponents

17   and the bill sponsors in the House and Senate that concepts such

18   as critical race theory and White privilege have no place in the

19   state of Florida are un-American and don't belong in the

20   Floridian education system.  All of those things taken together

21   demonstrate that this Act was designed to chill pure speech.

22             Unlike in other situations, there was no evidence

23   before the legislature that these specific concepts or these

24   specific viewpoints were being used in a manner, whether in K

25   through 12 or higher education, that was harmful to students,
```

1   that was harmful to educators, that was harmful to the larger

2   educational environment, or that they otherwise weren't being

3   used for a legitimate pedagogical interest.

4           And, finally, I just wanted to --

5           THE COURT:  Well, what says you about the survey where

6   they got 4 percent, which somehow is statistically significant,

7   of students to respond and was sort of self-selective because

8   the people that thought it was a problem were the ones most

9   likely to respond?  That's not -- the survey results are not

10  before me; correct?

11          MS. FAJANA:  No, they are not before you.

12          THE COURT:  And that was done after this law was

13  passed?

14          MS. FAJANA:  The intellectual diversity survey, is

15  that the one Your Honor is referring to?

16          THE COURT:  The survey results came out after this law

17  was passed or before?

18          MS. FAJANA:  The survey itself was taken before the

19  law was passed.  The results came out afterwards.

20          THE COURT:  Well, I guess if you assume the conclusion

21  of the survey, then -- and I guess maybe you can if you only

22  have 2 percent respond -- the people that like your survey,

23  unless they were clairvoyant or assumed the conclusion, that

24  wouldn't be a basis, even if it was in the record; correct?

25          MS. FAJANA:  Correct, Your Honor.  And we didn't see

1    any discussions or soliloquies in the legislative record where

2    they pointed to the intellectual diversity survey as something

3    that was emanating the need behind the Stop WOKE Act.

4              THE COURT:  All right.

5              MR. SYKES:  Your Honor, on your last specific

6    question, before I offer a brief closing statement, under Rule

7    65, we agree that once we have established that First Amendment

8    rights of our clients have been impacted that the burden is then

9    on the defendants to prove that it meets the strict scrutiny

10   test.

11             THE COURT:  Or if I don't apply strict scrutiny, it

12   would be their burden to show it was reasonably related?

13             MR. SYKES:  Yes.

14             And for the record, Your Honor, we believe that -- as

15   much as we encourage you not to apply a K-12 test, we believe we

16   still win even under the legitimate pedagogical interest test.

17             And, finally, I just want to underscore the broad

18   impact that this law is having on the academy.  It's clear who

19   the targets are, as my colleague said, critical race theorists.

20   Our plaintiffs teach critical race theory.  They teach feminist

21   theories, critical race studies, intercultural communications.

22             THE COURT:  But the defendant says those are abhorrent

23   ideas, and we have the right to control and restrict abhorrent

24   ideas.  I think that was the adjective -- did I get the

25   adjective wrong?

1          MR. SYKES:  I'm not sure, Your Honor, but we

2    respectfully disagree with defendants on that point.  I think,

3    as we made clear, I think -- would just highlight the extent to

4    which it goes far beyond these, you know, admittedly not

5    universally held views.

6          Our plaintiff, Russell Almond, is a statistics

7    professor at the College of Education in the School of

8    Educational Psychology.  In the course of teaching his

9    courses -- I believe in the current semester he's teaching a

10   course on basic descriptive and inferential statistical

11   applications, and nothing could seem less politically

12   controversial than something like that.  But what Professor

13   Almond looks at is how data is used to account for differences

14   in educational outcomes, and crucial to his work is explaining

15   to students the role that unconscious bias and structural racism

16   play in data collection design and data analysis and social

17   structures outside of the schools.

18         So for even someone who is teaching something like

19   statistical applications -- another course he teaches is scale

20   and instrument design, how do you design the tools that will

21   measure statistics that will tell us about how education works.

22   Even he is at a loss for how he can honestly teach his course

23   and share his expertise and expose his students to scholarship

24   with his own judgment about which is rigorous scholarship, which

25   is not, so-called, without -- objectively and without

1   endorsement.

2           So we think for all these reasons, this law is having

3   an extraordinarily pernicious effect throughout the state of

4   California and should be --

5           THE COURT:  Florida.

6           MR. SYKES:  Florida.  Sorry.

7           THE COURT:  No worries.

8           You really would be hard-pressed to confuse those two.

9           Mr. Greubel?

10          MR. GREUBEL:  Thank you, Your Honor.

11          Friends of the ACLU have just done an excellent job of

12  going through most of these, but I will do my best to add a

13  little bit extra here.

14          On the vagueness point, Your Honor, the CBA that the

15  defendants have cited to does not apply to my client because

16  those are the CBAs from the Florida State University and

17  Valencia College.  It was not the CBA from the University of

18  South Florida where Dr. Novoa teaches, and because --

19          THE COURT:  If somebody signs a document that uses a

20  word, does that mean it's not vague?

21          MR. GREUBEL:  No, especially not CBA, which all

22  pertain to the just cause provision, and if it were clear what

23  just cause meant, I think labor law would collapse in on itself

24  and no longer be a viable field for lawyers.

25          THE COURT:  And in determining this, does context

1   matter?  So does -- the fact that you had never limited a

2   viewpoint and you've now got the Florida Legislature dictating

3   that viewpoint is going to be limited and you've got to add that

4   into the mix of whether you are or are not being objective, does

5   that in any way inform the vagueness analysis?

6           MR. GREUBEL:  It does inform the vagueness analysis,

7   Your Honor, and part of the reason why is because this is

8   targeting social sciences, which the Supreme Court has taught us

9   are some of the most fraught in terms of academics in which

10  our -- where there are rarely truths that must be mandated.  In

11  that way, the law is clearly not an attempt to raise the

12  standard of teaching at Florida colleges.  It's attempting to

13  suppress a certain viewpoint and to ensure that the teachers

14  feel that they are not capable of teaching those things in their

15  classroom out of fear that if they would teach one of the

16  prohibited concepts, that their university could lose funding to

17  the tune, for the University of South Florida, of about

18  $77 million.

19          Thank you, Your Honor.

20          On the point of prediscipline versus postdiscipline, I

21  agree with the ACLU -- and this is in our papers as well -- that

22  *NTEU* is the proper standard when there is a broad restriction on

23  employee speech that applies across the board that's not done

24  after the fact where typically --

25          THE COURT:  Didn't that case deal, though, with speech

1    outside of work?

2          MR. GREUBEL:  Not entirely, Your Honor.  Well, it did

3    deal with speech outside of work entirely, but there was a

4    distinction -- well, it says with few exceptions that the law

5    applied to the employees' subject matter.  So there were some

6    employees that did talk about the subject matter of their

7    employment with -- per the honorarium, but it wasn't related

8    directly to their job.

9          But that case still stands for the proposition that

10   when it's a broad measure that's taken against an entire class

11   of employees, you have to consider the interests of the audience

12   and consider the interests of the speakers, and that the law

13   is -- there's a heavier burden, which I believe you referred to

14   in the *Austin* case as exacting scrutiny, where the State has to

15   show that its --

16         THE COURT:  But in the *Austin* case, they weren't

17   teaching in a classroom or speaking as a professor.  And didn't

18   I categorically reject the notion that just because you use your

19   educational background and expertise to speak, you are not

20   speaking as a governmental employee, which is why that case law

21   was distinguishable?  Maybe I don't recall my analysis from

22   *Austin,* but I thought that was part of it.

23         MR. GREUBEL:  That's right, Your Honor.

24         But I think the point still stands that if -- here

25   that they are -- the State -- when the State is taking a

1   measure -- and this is very similar to the *NTEU* case where it

2   was an honorary ban, that there was no certain process by which

3   employees were supposed to go and ask for whether or not there

4   -- a certain speaking engagement was permitted or not permitted.

5   It was an all-out ban on the speaking -- or on honoraria

6   acceptance by state employees.

7          THE COURT:  But would that same -- would that analysis

8   have applied and would they have gone through that analytical

9   framework if it wasn't going out and speaking but instead was

10  conversations had as part of internal training in the workplace

11  that was part of speech directly related to and, in fact,

12  located in the workplace?

13         MR. GREUBEL:  I believe so, Your Honor.  And I would

14  give this as an example.  So if an employer -- if a college has

15  a policy that restricts employees from being able to speak to

16  the media on any subject, period, that that would be a case that

17  would be analyzed under *NTEU* because it is an example of a broad

18  restriction on employee speech that they are entitled to such

19  that it should be analyzed with a heavier burden because it's

20  not specifically about the context in which one employee made a

21  decision and the university -- like the *Bishop* case where the

22  university was taking an action in response to actual concrete

23  evidence of a harm that appeared on campus.

24         THE COURT:  I understand your answer.

25         Anything additional?

1            MR. GREUBEL:  On that point, no.

2            THE COURT:  You may proceed.

3            MR. GREUBEL:  On the evidence of pedagogical -- or on

4    what the State has as evidence that this law is aimed at a

5    legitimate pedagogical concern, I am not aware of any.  I

6    believe that the law is clearly -- that these eight concepts

7    were copied and pasted from an executive order President Trump

8    issued.  We know where they came from.  This did not come from a

9    deliberative process by the legislature to identify harms that

10   were occurring on college campuses.

11           THE COURT:  But if it's -- well, that's the "related

12   to" as opposed to the purpose; correct?

13           I mean -- so, for example, if they say discrimination

14   is a problem and we stick it in a statute designed to prohibit

15   discrimination and we -- they say, you know, The real issue here

16   isn't marginalized groups:  The LGBTQ community or people of

17   color.  That's not the real -- the real problem with

18   discrimination is wealthy white men.  Those are the true victims

19   of our society, and we need to protect them.  And then they

20   stick it in an antidiscrimination bill.

21           Why is that not a legitimate concern based on the

22   context of where it's located and on the face of the language?

23   We want to stop this -- that doesn't mean it's reasonably

24   related, though.  It doesn't mean it's reasonable.  That's a

25   different inquiry.  But given the case law and the -- that says

1    what burden there is to establish that, why is that -- based on

2    the face of the language itself and the context that is the

3    statute in which it's put, why is that not enough to establish

4    the concern, which is separate and apart from whether it's

5    reasonably related?

6            MR. GREUBEL:  I don't -- I'm not sure that I

7    understand your question, Your Honor.  Are you saying that if

8    the State says that this is a concern, why is that not -- why is

9    that not sufficient to establish that as a pedagogical concern?

10           THE COURT:  Right.  If they say, We're doing this to

11   prohibit discrimination --

12           MR. GREUBEL:  Sure.

13           THE COURT:  -- it seems to me the case law says

14   there's a low threshold on that part of the inquiry.  The more

15   exacting inquiry deals with whether it is, in fact, reasonably

16   related to a legitimate pedagogical interest, as opposed to what

17   is the interest.

18           The second prong, it seems to me, has two components:

19   Is it legitimate and, two, is it reasonable, which is separate

20   and apart from is there an articulated pedagogical concern.  Why

21   is prohibiting discrimination in the educational setting by

22   definition not a legitimate pedagogical concern?  That doesn't

23   mean it's -- I'm sorry -- wasn't it a pedagogical concern.

24           MR. GREUBEL:  Sure.

25           THE COURT:  That doesn't mean it's legitimate.  It

1    doesn't mean it's reasonably related, and we look at the facts

2    and the whole context to determine that.  But it just seems to

3    me the first question is -- what is the pedagogical concern is a

4    less exacting inquiry than whether it's legitimate or reasonably

5    related.

6            Do I have that wrong?

7            MR. GREUBEL:  No.  That's right, Your Honor.  I'm

8    sorry if I misrepresented this.  But combating racism is a

9    legitimate pedagogical concern.

10           We encourage there's nothing in the record evidence

11   here to show that there is any reasonable fit between the Stop

12   WOKE Act and that legitimate pedagogical concern, and there's

13   already been -- there are laws on the books that prohibit

14   discrimination in education.  And if what they -- they are

15   targeting pure speech, and the line for pure speech and when

16   that crosses from permitted to unpermitted is when it's severe

17   and pervasive, not when the State of Florida decides that it is

18   per se discrimination.

19           THE COURT:  Well, even so, it's deemed as -- it's

20   deemed as conduct, but we go through this legal fiction that if

21   it's so severe and pervasive, we're not restricting speech.  It

22   becomes conduct because it's so overwhelming and so pervades the

23   workplace.  That's why you get to it.

24           But it's -- Title VII is still conduct; correct?

25           MR. GREUBEL:  That is the finding --

```
1              THE COURT:  And it can incidentally include speech,
2    but that's --
3              MR. GREUBEL:  Yes.
4              THE COURT:  It's still viewed as a conduct, not
5    speech-related restriction; correct?
6              MR. GREUBEL:  That's right.
7              And finally, Your Honor, on the point of burden, we
8    have -- we carry the burden here on the preliminary injunction
9    to show that our clients have a claim.  They have conceded that
10   Professor Novoa has standing to challenge these laws, so the
11   burden then shifts back to the State to prove the
12   constitutionality of the law.
13             THE COURT:  Namely, the legitimate pedagogical
14   concerns that this is reasonably related to?
15             MR. GREUBEL:  That's right.
16             THE COURT:  I understand.
17             Anything further?
18             MR. GREUBEL:  Nothing else.
19             THE COURT:  And so we're not going back and forth and
20   back and forth -- I'm going to give Mr. Cooper all the time he
21   needs -- Mr. Sykes or Ms. Moraff -- Moraff; right?
22             MS. FAJANA:  No.
23             THE COURT:  I'm sorry.  I've got y'all switched.  I'm
24   sorry.
25             MS. FAJANA:  Ms. Fajana.
```

```
 1              THE COURT:  Oh, I had you seated in a different place.
 2    I apologize, Ms. Fajana.
 3              If Ms. Fajana or Mr. Sykes wants to add anything --
 4    I'm not suggesting you need to or should, but if there's
 5    something you want to add, I'd rather do that now to
 6    Mr. Greubel's comments than go back and forth.
 7              MS. FAJANA:  Yes, I just wanted to add one thing to
 8    this discussion about the fact that the Stop WOKE Act was
 9    inserted into a preexisting antidiscrimination lawsuit -- or
10    statute.  Excuse me.
11              I think that is one piece of evidence to be considered
12    about whether or not antidiscrimination is the actual
13    pedagogical concern here, in addition to the statements of the
14    bill proponents themselves describing what they believed the Act
15    was doing.
16              THE COURT:  So, Judge, you can stick an act on how
17    pigs can be housed in the same statute, but that doesn't inform
18    the purpose as antidiscrimination simply because you put
19    something unrelated in the act.
20              MS. FAJANA:  Exactly.
21              Thank you.
22              THE COURT:  I understand.
23              MR. SYKES:  Your Honor, just one brief final point
24    about the appropriateness of applying -- we've talked a lot
25    about applying K-12 standards, but I also want to say a word
```

1     about applying government speech tests as well.

2           We are not talking about a university president or a

3     communications director speaking on behalf of the university.

4     We're talking about a professor teaching in class on their

5     subject area within their expertise, and I think that's

6     categorically different.

7           If you look at the reasoning in those employee speech

8     cases, even in *Bishop* -- we're not asking to disturb *Bishop* in

9     any way, but if you look at the balancing that the Court -- that

10    the Eleventh Circuit did in *Bishop*, it was notably a

11    university's interest, not the legislature.  But it was about

12    where the university has its own academic freedom interests.  So

13    that, I think, is the key point about how a Court analyzes

14    public employee speech in the university context.

15          There may be some deference to the university to

16    regulate its own affairs because both individual teachers and

17    the university as an institution have academic freedom

18    interests, and those need to be weighed against each other in

19    some cases.  In this case, they are both on the same side

20    because it's the legislature that's trying to impose this rule

21    upon both universities and individual instructors.

22          And the cases like *Garcetti* and even *NTEU*, as you

23    pointed out, Your Honor, talk about whether you're at work or

24    not at work, or whether it's related to, you know, a matter of

25    public concern or not, or whether it could be interpreted as a

1    message directly for the government.

2          And respectfully, academic speech that we're

3    considering fits none of these.  It doesn't -- it's not really

4    about a public concern.  It's not really out of -- it's not

5    really speaking as a private citizen.  You're clearly a public

6    employee, but you're obviously not speaking on behalf of the

7    government.  Students don't understand it that way; instructors

8    don't understand it that way, and we encourage the Court not to

9    create a new rule that would say so.

10         Thank you, Your Honor.

11         THE COURT:  Mr. Cooper, are you ready to proceed or do

12   you need -- I'm not going to --

13         MR. COOPER:  Ready to go, Your Honor.

14         THE COURT:  I'm sorry?

15         MR. COOPER:  Ready to go.

16         THE COURT:  All right.  Very good.

17         MR. COOPER:  Thank you.

18         So let me address --

19         THE COURT:  And they collectively spent about -- one

20   moment, please.

21         What time did we start back?

22         THE COURTROOM DEPUTY:  10:06.

23         THE COURT:  They collectively spent a half an hour, so

24   you have -- you asked for 15, but you've got a half an hour if

25   you want it.

1              MR. COOPER:  Thank you, Your Honor.  I think this is

2     going to depend more on you than me.

3              THE COURT:  I'll be quiet as a church mouse,

4     Mr. Cooper.

5              MR. COOPER:  Did you take that down, Court Reporter?

6              THE COURT REPORTER:  Sure did.

7              MR. COOPER:  Let me speak first to vagueness,

8     Judge Walker.  And we've been back and forth in the earlier

9     encounter about that subject matter, but I would like to add

10    that our view is that the standard for vagueness is different in

11    the public employee case.

12             And this is something that we didn't articulate in

13    *Falls*, and it's new, so I want to make sure I call this to your

14    attention.  It springs from the Supreme Court case of *Arnett*

15    *against Kennedy.*  The Eleventh Circuit has acknowledged this in

16    dicta really, to be sure, in the *O'Laughlin* case.

17             And that test, Your Honor, is whether ordinary persons

18    using ordinary common sense would be notified that certain

19    conduct will put them at risk of discharge, and that test,

20    again, coming from the cases I've mentioned, were applied in the

21    *Sanfilippo* case by the Third Circuit to uphold the firing of

22    a -- of a university professor for failure to abide by this

23    standard to maintain standards of sound scholarship and

24    competent teaching, a standard, you know, we would submit to

25    you, that is far less concrete than the ones that are before you

1    in the Individual Freedom Act.

2          And in *Waters against Churchill,* Your Honor, the

3    Supreme Court noted that a public employer may, consistent with

4    the First Amendment, prohibit an employee from being rude to

5    customers, a standard almost certainly too vague when applied to

6    the public at large.

7          So there is a difference, and we think it's more --

8          THE COURT:  Well, let me ask you a concrete example.

9    If I'm a professor at FAMU and I invite Cornel West to come and

10   talk about his book which is part of the assigned reading, but

11   I'm not offering my opinion as the professor, in order for it

12   not to be seen as an endorsement, an advancement of whatever

13   Cornel West is saying, do I have to invite a professor from

14   Liberty as a counterpoint to inviting Cornel West, for example?

15         MR. COOPER:  No, Your Honor, just off the top of my

16   head.

17         THE COURT:  Because there is the objective savings

18   clause.  If the presentation -- so I just, for the life of me --

19   because I can't imagine the people that drafted this bill would

20   think that anything that came out of Cornel West's mouth, who I

21   admire, would be objective on any topic, potentially.

22         So if I have him speak in my class, can that -- even

23   though I'm not, as a professor, voicing an opinion, by bringing

24   him into class and giving him that forum, am I not advancing,

25   endorsing, or otherwise supporting the viewpoint of his that

1   I've introduced to the class, and how can I fall under the

2   objective savings clause unless I bring another speaker from

3   another school as a counterpoint?

4           MR. COOPER:  Your Honor --

5           THE COURT:  This is just one -- I'm trying to come up

6   with examples.  If I'm a professor, I'm not sure necessarily

7   what I can or can't do under that savings clause.

8           MR. COOPER:  Your Honor, I think that savings clause

9   focuses on the actual speech and instruction that takes place in

10  the class -- in the class.

11          THE COURT:  Bringing a speaker to my class to speak is

12  not part of the class or speaking?

13          MR. COOPER:  Yes, it would be.

14          THE COURT:  So, again, I reiterate my question.  How

15  am I not advancing Dr. West's ideas if I bring him in and have

16  him speak and give him this forum, and am I in danger of

17  discipline if I don't bring in a countervailing speaker?

18          MR. COOPER:  Your Honor, I think you may well be

19  advancing one of the eight concepts if you bring in Dr. West and

20  Dr. West, in the context of that class within that course,

21  articulates these -- any of these eight concepts.  You may well.

22  I don't think it's a question of -- and in that context, the

23  professor of the class on the payroll would violate one of the

24  eight concepts if the professor endorsed or espoused --

25          THE COURT:  Is calling them endorsing or advancing --

1   same question.  I'm now at the University of Florida, and I'm

2   teaching a course on feminism or women, gender something, gender

3   studies -- we'll -- gender studies, and I invite Gloria Steinem

4   to speak.

5           Haven't I just violated one of these eight principles

6   by having Gloria Steinem speak?

7           MR. COOPER:  Your Honor, if it's within context of the

8   course and the instruction from -- whether it's the professor or

9   Gloria Steinem espouses any of these eight concepts, then, yes,

10  you have.

11          THE COURT:  I understand.

12          I'm sorry.  Go ahead.

13          MR. COOPER:  But, Your Honor, to come back to the

14  question of objective and in an objective manner, we do --

15  whether the collective burden --

16          THE COURT:  I'm sorry.  You didn't answer part two.

17          But if I call somebody with a countervailing view to

18  Cornel West, have I then fixed it for purposes of the savings

19  clause?

20          MR. COOPER:  I think that those events would be

21  analyzed apart from each other, not necessarily in conjunction

22  with each other.  If you invited someone else to come and be the

23  lecturer in your class as part of your course and that

24  individual did not espouse or endorse the eight concepts or --

25          THE COURT:  So you can have a professor from Liberty

1   speak who criticizes those concepts; you just can't have Cornel

2   West in the classroom?

3           MR. COOPER:  Your Honor, the statute is very clear.

4   You can't espouse, promote --

5           THE COURT:  So, like, when I was a UF student and

6   ACCENT spent thousands of dollars bringing William F. Buckley

7   and McGovern to speak, it would have been fine for me to listen

8   to Buckley, just not McGovern, because I was seriously in danger

9   of being indoctrinated when I was 20 years old at UF because,

10  even though I graduated in the top of my class, apparently I was

11  thoughtless and too simple to distinguish between what a

12  professor said and what I believe.  But go ahead.

13          MR. COOPER:  I don't think that particular scenario,

14  if I understand it, would be within the construct of

15  instruction.

16          THE COURT:  Oh, I agree.

17          MR. COOPER:  Of course --

18          THE COURT:  I meant if I brought them in a classroom.

19  What they did at ACCENT is speakers being brought in.  If you

20  had those two speaking in the classroom -- if McGovern, which I

21  suspect if he was alive would, endorsed any of these eight

22  concepts, then he couldn't speak, but William F. Buckley could

23  come in and deride all eight topics.

24          MR. COOPER:  Your Honor, the statute does -- it

25  prohibits espousing these eight concepts --

```
 1              THE COURT:  I understand.

 2              MR. COOPER:  -- in the context of a course in the

 3    classroom in Florida public schools.

 4              THE COURT:  I'm sorry.  Go ahead.

 5              MR. COOPER:  I want to come back to the collective

 6    bargaining agreement.  Whether it applies or not, it uses the

 7    same wording that is used in the statute, and our simple point

 8    is we -- I know the Court, you know, disagrees with us on this,

 9    but I would simply respectfully repeat that we don't think that

10    that formulation is impermissibly vague, and we think that that

11    formulation in an objective matter -- discussion in an objective

12    matter does depend upon context, and you can -- and its meaning

13    becomes clear when you look at its context next to the verbs

14    that the statute itself uses:  Espouse, inculcate, promote,

15    advance.  And it's followed, Your Honor, with -- without

16    endorsement.  When you see --

17              THE COURT:  Let me ask you this because it's -- if I

18    put up a billboard and I've just got a giant picture of Gatorade

19    on it with nothing -- I say nothing on it.  If one of the

20    principles is you couldn't endorse, promote, or advance

21    Gatorade, wouldn't that violate it even without any speech at

22    all?

23              MR. COOPER:  Forgive me, Your Honor.

24              THE COURT:  What I'm asking -- I'm using an example,

25    and I'm using the example for a reason.  It just seems to me
```

```
 1   this idea that you can draw a clear line between advance,

 2   promote, and endorse, I just -- for the life of me, I don't

 3   understand why those are obvious concepts.  I mean, the fact

 4   that you're here speaking and Mr. Sykes is speaking -- I asked

 5   you both questions.  I don't see how anybody can perceive the

 6   fact that I've had y'all here speaking is me endorsing a thing

 7   that's come out of either one of your mouths, but I advanced it.

 8         So I guess the -- my question is I just -- I'm still

 9   having trouble with how -- if it just said you can't express --

10   you can't teach anything about gender studies at all, that's

11   controlling the curriculum.  You can do that.

12         If I said, in terms of vagueness, the -- a professor

13   cannot offer any personal opinions about the subject matter,

14   okay, I get it.  I can't offer any personal opinions.

15         But for the life of me, I don't understand -- when you

16   start with this string of terms -- advance or promote -- how

17   does that give somebody fair notice about what they can and

18   can't do and wouldn't result in selective enforcement by

19   whatever entity is going to review the professor in what they

20   did or did not do?

21         MR. COOPER:  Your Honor, I think there is a

22   difference -- a readily understandable difference to people of

23   ordinary intelligence using ordinary common sense between

24   espousing or inculcating a particular view.

25         THE COURT:  But it's not just espousing or
```

1    inculcating.  It's advancing or promoting; right?

2            MR. COOPER:  Yes, yes, advance or promote.  And

3    promote is -- you know, all --

4            THE COURT:  If I assign Cornel West's book as part of

5    my curriculum, how am I not promoting Cornel West and the --

6    Dr. West and the ideas in his book?

7            MR. COOPER:  Your Honor, if you assign it and you do

8    advance the notion that what Cornel West has to say -- and I'm

9    not sure what that is, but if it violates these concepts --

10            THE COURT:  If Cornel West speaks on one of these

11    topics in a book he writes and I assign the book, you're saying

12    it's self-evident that if I don't say a word about it, we don't

13    discuss it in class -- if I just assign it as part of the

14    curriculum, Judge, easy peasy, self-evident.  You just got fired

15    from UF because you assigned his book that covered one of these

16    eight topics whether you ever talk about it or not.

17            That's self-evident that that would run afoul of this

18    provision?

19            MR. COOPER:  No, I'm not at all sure that's the case,

20    Your Honor.  I mean --

21            THE COURT:  Then how would a professor know?  If

22    you're not sure, how would a professor know?

23            MR. COOPER:  Your Honor, the statute makes clear that

24    the professor is permitted and the statute cannot be construed

25    to prohibit the professor discussing these concepts in an

1    objective manner without endorsing them.  So the fact that --

2           THE COURT:  And what I'm asking is a different

3    question.  Can you do an end run around that by saying, Aha.

4    I'm not going to talk about it in class.  I'm not going to tell

5    my class what I think, but I'm going to assign Dr. -- Cornel

6    West's book on this topic that violates one of the eight topics

7    because I want my students to at least be exposed to his ideas?

8           I don't, for the life of me, understand -- if I assign

9    a book -- and maybe your experience in school was different, but

10   most of my classes, whether it was on English legal history or

11   Latin American history, you might -- I didn't have texts in

12   4000- or 5000- or 3000-level classes, but you'd have a

13   handful -- you'd have materials, and then you'd have a handful

14   of books, and then you'd have recommended reading.

15          But if you're telling me to read something, even if

16   I'm not discussing it in class, wouldn't that be advancing

17   whatever that is and promoting whatever that is?

18          MR. COOPER:  No, Your Honor, it would not be advancing

19   and promoting it in the sense in which those terms are clearly

20   used in the statute.

21          Those terms are clearly used as colloquially

22   synonymous terms with espousing, with inculcating, with

23   endorsing.  The legislature used closely synonymous terms for

24   the avoidance of doubt -- not to sow doubt, for the avoidance of

25   doubt that it is the endorsement, the espousing, the embracing

1    by a university-paid state employee of these eight concepts that

2    is forbidden.

3            And it makes equally clear, Your Honor, that what is

4    not forbidden and what this statute may not be construed to

5    prohibit is discussion of the concepts, and you can't discuss

6    the concepts unless you advance them in the -- in the sense of

7    bringing them forward for discussion.  But that's not the sense

8    in which this statute clearly uses advance --

9            THE COURT:  So let me ask you --

10           MR. COOPER:  -- because that would utterly obliterate

11   the whole notion of this savings clause, as you call it.

12           THE COURT:  All right.  Then let me ask you this.  Is

13   there any doubt, based on what you just described, then, Judge,

14   you're free to assign writing.  You're -- reading.  You're free

15   to have class discussions, so long as the professor doesn't

16   offer an opinion.  So all we're excluding is the opinion.

17           Can we agree that this is, by definition, limiting a

18   viewpoint, that that's all it's doing?  Since you can talk about

19   the content all day long and include the content all day long,

20   isn't it, by definition -- based on your argument, this is

21   absolutely directed to viewpoint, and that's it?

22           MR. COOPER:  We believe that these eight concepts are

23   viewpoints.

24           THE COURT:  Okay.  So there is no -- if I issue an

25   order, there is no quibbling that both sides' position is this

1    is viewpoint limitations?

2              MR. COOPER:  Yes, Your Honor.

3              THE COURT:  Okay.

4              MR. COOPER:  The State is entitled to have a

5    viewpoint.  It has expressed that viewpoint in this statute.

6              Your Honor, I don't really have any more to say about

7    the question of vagueness and the meaning of in an objective

8    manner.

9              Let me move, then, to the question the Court has asked

10   about pre- and post-speech standards.

11             Your Honor, the *NTEU* case, as the Court earlier

12   mentioned, dealt with speech and whether or not, under the

13   Ethics in Government Act, government employees could be paid

14   honoraria for speech -- and these were GS-16 and below, not

15   senior executives -- could be paid for speeches that had no

16   relationship to their job responsibilities.

17             There was no question at all, reading this decision,

18   that if -- that the Ethics in Government Act -- to the extent it

19   prohibited honoraria for speech by these government employees on

20   subjects that were within their job responsibilities, that that

21   would have been upheld.

22             THE COURT:  I understand.  Because even *Bishop*

23   recognizes that; right?

24             MR. COOPER:  Yes.

25             THE COURT:  *Bishop* recognizes the farther you get away

1  from the classroom, the farther you get away from the contours

2  of your actual job description and you're doing something on

3  your own -- we're not going to be having this same discussion is

4  what -- to use that language.  But that's, in essence, even what

5  *Bishop* recognized; right?

6           MR. COOPER:  I think that's right, Your Honor.

7           Now, I will concede that if the *Pickering* balancing

8  test applies to the Individual Freedom Act, then under *NTEU,*

9  because it is a prophylactic prohibition and it embraces,

10  perhaps, many, but certainly more than one professor, and

11  because it is dealing with, perhaps, many audiences, not just

12  isolated classes, that the burden on the State in that *Pickering*

13  process is heavier.

14           THE COURT:  But, Judge, we don't believe *Pickering*

15  applies for the reasons we've stated.

16           MR. COOPER:  That's right.

17           THE COURT:  I understand.

18           MR. COOPER:  That's right.

19           Your Honor, coming now to the question of the

20  pedagogical concerns that are addressed by the -- by the

21  Individual Freedom Act and the -- and their relationship -- or

22  the Act's relationship to those pedagogical concerns,

23  Your Honor, we would submit to you that the pedagogical concern

24  of reducing racism or prohibiting racial discrimination is a

25  legitimate pedagogical concern.  In fact, it's a compelling

1   governmental interest.

2           And that on the face of the statute is the concern --

3   is the governmental issue -- interest that the legislature was

4   addressing in its view, Your Honor, and it says it quite

5   straight up.  The instruction that espouses or promotes, and the

6   rest of the verbs, any of these eight concepts are themselves

7   that -- that speech, if you will, is racially discriminatory or

8   sexually discriminatory or -- but on whatever immutable

9   characteristic is at issue, Your Honor, that is a compelling

10  governmental interest.

11          Now, the -- the relationship between that interest and

12  prohibiting this speech, which the legislature has defined as

13  being racially discriminatory, is as tight as it can possibly

14  be.  The legislature, on the face of the statute, defines

15  espousing these concepts as racial discrimination, and it

16  prohibits that racial discrimination.  It prohibits espousing

17  any of these eight concepts.

18          In this respect, Your Honor, it is an extension on

19  existing federal law, Title IX, the federal funding statutes

20  that prohibit sexually discriminatory or racially discriminatory

21  educational environments, which counsel for the plaintiffs

22  say -- acknowledge are there and acknowledge to be entirely

23  consistent with the First Amendment and saying made unnecessary

24  this statute, at least insofar as they argue that at some level

25  of severity and pervasiveness and objective offensiveness the

1    legislatures can restrict speech -- speech.

2            Your Honor, this is the same principle at work, and

3    there's nothing in the jurisprudence that we're aware of that

4    sets those federal restrictions on hostile environment from

5    speech.

6            THE COURT:  Don't all the cases that construe that,

7    every one, say we're restricting conduct, not speech, and it's

8    only the speech that's incidental, and it's only when the speech

9    rises to the level of severe and pervasive?

10           I mean, I just -- Mr. Cooper, I've got to tell you

11   I've tried, as both a lawyer and as a judge, more employment

12   cases than I want to think about, and I've ruled on more summary

13   judgments on Title VII cases and Title IX cases than I want to

14   think about, and I'm not aware of any case from anywhere that

15   has said language by itself in limited language is actionable

16   under Title VII and Title IX.  In fact, the cases take great

17   pains to explain why that's not so.

18           Is that -- what part am I missing of that?

19           MR. COOPER:  Your Honor, we would simply submit that

20   to the extent that speech, if it is severe and pervasive enough,

21   can somehow become conduct, then the legislature of Florida has

22   determined that that -- this speech that it is proscribing in

23   its classrooms is per se severe and pervasive.

24           THE COURT:  All right.  I want to make sure I

25   understand that.

```
 1            Is concept six -- that's basically affirmative action
 2  by any other name; right?
 3            MR. COOPER:  Your Honor, yes.
 4            THE COURT:  All right.  So a professor at the
 5  University of Florida can use the N-word in class, and that's
 6  not actionable if they use it once.  But if they mention
 7  affirmative action once under this new law, it's actionable;
 8  right?
 9            MR. COOPER:  No, Your Honor.
10            THE COURT:  Why not?
11            MR. COOPER:  A university professor cannot use the
12  N-word.
13            THE COURT:  You can -- you would have a Title VII,
14  Title IX, or Chapter 760 claim if the N-word -- because I want
15  you -- Mr. Cooper, you need to write a brief to Marie Mattox.
16  She's the local lawyer that does employment cases.  Please send
17  her a memo.
18            You're telling me that under federal law the use of
19  the N-word one time in a classroom by a teacher would be
20  actionable?
21            MR. COOPER:  Your Honor, I'm not going to represent
22  what the federal statutes would say about that.
23            THE COURT:  Doesn't Chapter 760, Florida's parallel to
24  Title VII, say, We adopt the case law of Title VII in construing
25  the contours of 760?  I don't know about other states, don't
```

1   really care about other states.  But in Florida, last time I
2   checked, 760 parallels Title VII.
3          Do I have that wrong?
4          MR. COOPER:  I defer to your statement on that score,
5   Your Honor.
6          THE COURT:  So I repeat my question.  I'm having a
7   hard time grappling with the idea that if a professor at the
8   University of Florida says, The way we're going to fix problems
9   in higher education is to maintain affirmative action -- he
10  makes that one statement.  Under this provision, he could be
11  sued by the student, and he could be disciplined by the school.
12         But if that same teacher got angry and upset and used
13  the N-word, it would not be actionable under -- one time and he
14  didn't, like, lock his student -- I know there's case law that
15  if you lock your -- somebody in the classroom and you make
16  racially charged statements and you do it in reaction -- because
17  there's a case that I cited in one of the other cases about, you
18  know, on Juneteenth you do it.  All the facts taken together --
19  but there's a lot of cases that say the use of a racial, you
20  know, term one time out of -- born of frustration, but with no
21  other coercive effects, is not actionable.
22         I mean, that's a -- it just strikes me as interesting
23  that the state of the law in Florida is going to be a professor
24  can't get sued for using the N-word, but they can -- oh, my
25  gosh, that abhorrent concept of affirmative action.  If you

1    mention it, it's actionable.

2          Why is that not so under your application of these

3    provisions?

4          MR. COOPER:  Your Honor --

5          THE COURT:  And maybe that's a good thing.  Maybe

6    affirmative action is more abhorrent in our new age than using

7    the N-word.  I'm not going to make a judgment of that.  It's

8    shocking if that's our -- the new values that we embrace, but

9    I -- just for the life of me, I don't understand that's not a

10   consequence of your reading of the statute.

11         MR. COOPER:  That is not a consequence of my reading

12   of the statute, Your Honor, and in particular whether or not

13   there would be a cause of action under some federal statute or

14   even state law.  I just have no doubt that the university could

15   take disciplinary action.

16         THE COURT:  Oh, they could take disciplinary action.

17   That's true.

18         You couldn't sue, though, somebody in court; right?

19         MR. COOPER:  Well, that is the point of this statute.

20         THE COURT:  The statute goes beyond that, doesn't it?

21   Am I confused?  I thought it went beyond discipline.  It

22   doesn't?

23         MR. COOPER:  Forgive me.

24         THE COURT:  The statute doesn't go beyond discipline?

25   I thought it created a cause of action.  Am I wrong?

1          MR. COOPER:  It creates a cause of action, yes,

2    Your Honor.

3          THE COURT:  Which is why it's stuck in the chapter

4    it's stuck in; right?

5          MR. COOPER:  Excuse me?

6          THE COURT:  That's why it's where it's at?

7          MR. COOPER:  Yes, Your Honor.  And it defines racial

8    discrimination in the context of these eight concepts that can't

9    be espoused.

10          THE COURT:  Yeah.  I didn't ever say somebody could

11    say whatever they wanted and call somebody whatever name they

12    want in a classroom, and there would be no discipline.  We were

13    talking about whether you could sue or not, and I was talking

14    about Chapter 760 and Title VII and Title IX.  And I just didn't

15    bring that up out of nowhere.  You were talking about Title IX

16    and Title VII.

17          Fair enough.  Go ahead.

18          MR. COOPER:  I think the other issue that the Court

19    raised relates to burden of proof, and to the extent that the

20    *Hazelwood* standard applies -- and, again, of course, we submit

21    that it does not here.  But to the extent that it does, it is

22    closely analogous to the rational relationship test, and under

23    the rational relationship test, throughout constitutional

24    jurisprudence it is the plaintiffs that bear the burden of proof

25    from beginning, Your Honor, to end.

1          But to the extent that the burden is on the

2   government, we submit, once again, that the interests -- the

3   governmental interests, the pedagogical concerns that are served

4   by the Individual Freedom Act, are plain on the face of the Act,

5   and that the prohibition on espousing the eight concepts is

6   clearly reasonably related to ending that racial discrimination.

7          THE COURT:  I understand.

8          MR. COOPER:  I don't have more to say on the questions

9   the Court has put forward.

10          THE COURT:  Thank you, Mr. Cooper.

11          MR. COOPER:  Yes.

12          THE COURT:  I didn't -- I said we weren't going to go

13   back and forth, but, Mr. Cooper, I'm going to let you confer

14   with your colleagues.

15          And Mr. Sykes and Mr. Greubel, I'm not inviting a

16   reply.

17          But if either side says, Judge, there's this one point

18   that we didn't -- that we talked about in our papers that we

19   haven't really addressed; we just want to make sure that you

20   consider X when you're reviewing this case, I want to give you a

21   chance because I know that I interrupt y'all and redirect some

22   of the conversation.  I want to make sure I'm not trying to

23   artificially cabin the discussion to just the points we've

24   discussed.

25          So why don't y'all -- each side take a minute to

```
1    confer with each other, and if there's something we haven't
2    discussed -- I'm not asking plaintiffs to reply to Mr. Cooper.
3    I said we are not going to go back and forth.  But if there is
4    something we haven't discussed, then you can bring that topic to
5    my attention.
6        (Pause in proceedings.)
7            THE COURT:  We are back on the record.
8            Mr. Sykes, anything that we haven't covered that,
9    Judge, we just want to make sure we didn't lose sight of X?
10            MR. SYKES:  Nothing additional substantive, Your
11   Honor.
12            We did want to ask a question about logistics and the
13   scheduling of the motion to dismiss argument, but that's a
14   separate thing we wanted to address before the end of the day.
15            THE COURT:  I didn't have any particular questions,
16   and I planned on -- other than what I've already asked.  I
17   didn't plan on -- I planned on ruling on both -- well, I say
18   both.  We have two cases.  But ruling on motions to dismiss and
19   preliminary injunctions and working on them -- typically I do
20   that in tandem.
21            Were you asking for additional argument on the motion
22   to dismiss?
23            MR. SYKES:  No, Your Honor.  In the scheduling
24   conference we had, I remembered that there was some mention of
25   potentially doing one telephonically a week or ten days later,
```

1   but we are fine with proceeding based on the briefing.

2          MR. GREUBEL:  Nothing else from us either, Your Honor.

3          THE COURT:  Do you feel the need to have additional

4   arguments on the motion to dismiss?

5          MR. GREUBEL:  No, we do not.

6          THE COURT:  Mr. Cooper, any other topics or things

7   that, Judge, we didn't want to lose sight of X, and we want to

8   make sure you draw your attention to that?

9          MR. COOPER:  Thank you, Your Honor, but I think not.

10          THE COURT:  All right.  And do you require any

11   additional argument on any issues raised in the motions to

12   dismiss?

13          MR. COOPER:  No, Your Honor.

14          THE COURT:  Okay.  All right.

15          Thank you.  I know it's been three hours.  I know it's

16   no fun to come in and have me pepper y'all with questions.

17   Imagine how my children feel.  But it is helpful, and it's

18   helpful for me to go through this process, and it's useful when

19   I start preparing an order and I go back -- circle back.  Both

20   sides have given me a lot to think about, and I appreciate your

21   thoughtful arguments.

22          I hope you have safe trips home.

23          I will tell you that I will endeavor to work on this

24   and not sit on it.  So I'm not going to wait months and months,

25   but I do have other obligations, including a five- to six-week

1    criminal trial that's starting pretty soon and a flurry of

2    motions.  So I'm going to do my best not to sit on it, but this

3    is not going to be a case where I can issue an order in 72

4    hours.  I mean, it's going to take me time to do it, and I've

5    got to balance that against my other commitments.

6           So I'm not going to tell you you are going to get it

7    in two weeks or some artificial timeline.  I'll just let you

8    know I'll try to do it as quickly as I can, but I also want to

9    take the time I need.  So I promise you, you wouldn't be waiting

10   for an order in January.  On the other hand, I can't promise

11   you'll get it in a week.  So I'll do my best to get it out

12   sooner rather than later.

13          So thank you for your patience and your hard work and

14   your thoughtful papers that you filed.

15          I hope, again, everyone has a safe trip home, a

16   pleasant evening.

17          Court is in recess.

18      (Proceedings concluded at 12:06 PM on Thursday, October 13,

19   2022.)

20                       * * * * * * * *
                I certify that the foregoing is a correct transcript
21   from the record of proceedings in the above-entitled matter.
     Any redaction of personal data identifiers pursuant to the
22   Judicial Conference Policy on Privacy is noted within the
     transcript.

23   /s/ Megan A. Hague                     10/14/2022
     Megan A. Hague, RPR, FCRR, CSR         Date
24   Official U.S. Court Reporter

25