IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

LEROY PERNELL, et al.,

        *Plaintiffs*,

v.                          **Case No.: 4:22cv304-MW/MAF**

FLORIDA BOARD OF GOVERNORS
OF THE STATE UNIVERSITY
SYSTEM, et al.,

        *Defendants*.
and

ADRIANA NOVOA, et al.,

        *Plaintiffs*,

v.                          **Case No.: 4:22cv324-MW/MAF**

MANNY DIAZ, JR., et al.,

        *Defendants*.
_____/

**ORDER GRANTING IN PART AND DENYING IN PART
MOTIONS FOR PRELIMINARY INJUNCTION**

    "It was a bright cold day in April, and the clocks were striking thirteen,"[1] and

the powers in charge of Florida's public university system have declared the State

---

[1] GEORGE ORWELL, 1984 at 1 (1961). In this case, Defendants' "argument is like the thirteenth chime of a clock: you not only know it's wrong, but it causes you to wonder about everything you heard before." *United States v. Marchena-Silvestre*, 802 F.3d 196, 203 (1st Cir. 2015). Coincidentally, Governor DeSantis signed the law at issue on April 22, 2022.

has unfettered authority to muzzle its professors in the name of "freedom." To confront certain viewpoints that offend the powers that be, the State of Florida passed the so-called "Stop W.O.K.E." Act[2] in 2022—redubbed (in line with the State's doublespeak) the "Individual Freedom Act." The law officially bans professors from expressing disfavored viewpoints in university classrooms while permitting unfettered expression of the opposite viewpoints. Defendants argue that, under this Act, professors enjoy "academic freedom" so long as they express only those viewpoints of which the State approves.[3] This is positively dystopian.[4] It

---

[2] Governor DeSantis originally announced his legislative proposal, the so-called "Stop Wrongs to Our Kids and Employees (W.O.K.E.) Act," in December 2021. ECF No. 19-11, *in* Case No.: 4:22cv324-MW/MAF. The Governor championed his proposal as a way to "fight back against woke indoctrination." *Id.* at 2. The bill that ultimately passed, HB 7, was named the "Individual Freedom Act," but it incorporated several of the same tools that the Governor proposed in his "Stop W.O.K.E. Act." *Cf.* ECF No. 19-12, *in* Case No.: 4:22cv324-MW/MAF.

[3] This Court pauses to note that one of the Defendants' members recently praised a construction of academic freedom that is directly at odds with the position Defendants take as a whole. *See* University of Florida Board of Trustees Chair Mori Hosseini, *Message from Board Chair Hosseini Regarding President-Elect Sasse*, November 2, 2022, *available at* https://statements.ufl.edu/statements/2022/november/message-from-board-chair-hosseini-regarding-president-elect-sasse.html ("*Message Regarding President-Elect Sasse*"). Specifically, Chairman Hosseini praised President-Elect Sasse's comments for making clear "that he appreciates the vital importance of academic freedom, civil and full discussion of differing viewpoints, and the key role of the liberal arts in the educational experience." *Id.* So framed, President-Elect Sasse's view of academic freedom comports with this Court's construction—namely, that academic freedom includes the freedom to engage in civil and full discussion of differing viewpoints. But the jury is out as to whether President-Elect Sasse's words can be put into practice given the legal challenge at issue in these cases and the University of Florida's prior actions in another case. *See Austin v. Univ. of Fla. Bd. of Trustees*, 580 F. Supp. 3d 1137 (N.D. Fla. 2022).

[4] Indeed, this also contradicts Defendants' superficial praise for the "marketplace of ideas" in a parallel case before this Court challenging another state law that regulates public universities. *See William Link, et al. v. Richard Corcoran, et al.*, Case No.: 4:21cv271-MW/MAF. At oral argument for the *Link* plaintiffs' motion for preliminary injunction, counsel for Defendants explained that "House Bill 233 is not about trying to rebalance the ideology of the universities or

should go without saying that "[i]f liberty means anything at all it means the right to tell people what they do not want to hear."[5]

I

In 2022, the Florida Legislature passed the "Individual Freedom Act" (IFA). The IFA amended the Florida Educational Equity Act (FEEA) to prohibit "training or instruction that espouses, promotes, advances, inculcates, or compels . . . student[s] or employee[s] to believe [eight specified concepts]." § 1000.05(4)(a), Florida Statutes (2022). These eight concepts are as follows:

> 1. Members of one race, color, national origin, or sex are morally superior to members of another race, color, national origin, or sex.

---

to penalize woke universities or woke professors or anything like that. What this is about strictly is . . . the idea that our universities, our state colleges, our institutions of higher learning *are marketplaces of ideas,* and what we want are *all of those ideas to be welcomed, even the wrong ones* . . . ." ECF No. 91 at 67, *in* Case No.: 4:21cv271-MW/MAF (emphasis added). But when this Court asked whether this liberal welcome to all ideas, even the "wrong ones," extended to "critical race theory," counsel for Defendants glibly responded, "That's not this case, Your Honor." *Id.* This only serves to highlight the State's doublespeak that "academic freedom" means the "freedom" to express only those viewpoints of which the State approves.

[5] George Orwell*, The Freedom of the Press* (First published: *The Times Literary Supplement*, Sep. 15, 1972), The Orwell Foundation, https://www.orwellfoundation.com/the-orwell-foundation/orwell/essays-and-other-works/the-freedom-of-the-press/ (last visited Oct. 27, 2022). It is not lost on this Court that Mr. Orwell, in the original preface to his iconic political satire of the rise of Joseph Stalin, *Animal Farm,* was responding to the liberal elites of his time. According to Mr. Orwell, the censoring of *Animal Farm* was merely a symptom of the fashionable orthodoxy of that era—namely, an "uncritical admiration of Soviet Russia." *Id.* So too, here, the State has responded to fears of "woke indoctrination" in university classrooms. But rather than combat "woke" ideas with countervailing views in the "marketplace of ideas," the State has chosen to eliminate one side of the debate. This only highlights the problem with viewpoint discrimination—in the name of combatting "indoctrination" of one perceived orthodoxy, the State allows for "indoctrination" in its preferred orthodoxy.

2. A person, by virtue of his or her race, color, national origin, or sex is inherently racist, sexist, or oppressive, whether consciously or unconsciously.

3. A person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex.

4. Members of one race, color, national origin, or sex cannot and should not attempt to treat others without respect to race, color, national origin, or sex.

5. A person, by virtue of his or her race, color, national origin, or sex bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, national origin, or sex.

6. A person, by virtue of his or her race, color, national origin, or sex should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion.

7. A person, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin, or sex.

8. Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, national origin, or sex to oppress members of another race, color, national origin, or sex.

§ 1000.05(4)(a)1.–8., Fla. Stat. (2022).

The IFA also included a so-called "savings clause,"[6] which states that the foregoing "may not be construed to prohibit discussion of the concepts listed therein as part of a larger course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts." § 1000.05(4)(b), Fla. Stat. (2022). Thus, professors may "discuss" the eight concepts listed above in class, but they must do so "in an objective manner" and "without endorsement of the concepts." *Id*.

The FEEA applies to public colleges and universities in Florida. *See* § 1000.05(2)(a), Fla. Stat. (2022). Any "person aggrieved by a violation" of the FEEA "has a right of action for such equitable relief as the court may determine." § 1000.05(9), Fla. Stat. (2022).

The FEEA is patterned after Title IX, the chief federal antidiscrimination law in the education setting. *Hawkins v. Sarasota Cnty. Sch. Bd.*, 322 F.3d 1279, 1286 (11th Cir. 2003). Title IX suits are available only against institutions. *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1169–70 (11th Cir. 2003). Though no Florida court has confronted the issue, the FEEA, together with the IFA's definition of "discrimination," appears to authorize suits against public educational institutions—

---

[6] Section 1000.05(4)(b) is not a true "savings clause" in the sense that it requires the law's prohibitions to be construed so as not to infringe upon university employees' First Amendment rights. Instead, it serves to permit "discussion" of the specified concepts, so long as that discussion does not stray from the State's viewpoint or those viewpoints the State allows.

including public universities—if institutions allow professors to "espouse[], promote[], advance[], inculcate[], or compel[] . . . [a] student or employee to believe any of the [specified] concepts."

The FEEA also commands the Board of Governors to "adopt regulations to implement this section as it relates to state universities." § 1000.05(6)(b), Fla. Stat. (2022). To that end, the Board of Governors, on August 26, 2022, issued an implementing regulation that finalized the Board of Governors's enforcement mechanism with respect to section 1000.05(4)(a). *See* ECF No. 1-2, *in* Case No.: 4:22cv324-MW/MAF (Regulation 10.005, Prohibition of Discrimination in University Training or Instruction). The regulation identifies the eight concepts specified in section 1000.05(4)(a), Florida Statutes, and requires "[e]ach university" to "have a university regulation that prohibits discrimination on the basis of race, color, national origin, or sex by subjecting any student or employee to training or instruction that espouses, promotes, advances, inculcates, or compels such student or employee to believe any" of those specified concepts. *Id*. at 2–3.

The regulation also requires each university to follow certain investigatory protocols, including "inform[ing] the Board of Governors through the Office of Inspector General" if the university's "investigation finds that an instruction or training is inconsistent with the university regulation." *Id*. at 3. The Board of Governors commands state universities to "take prompt action to correct the

6

violation by mandating that the employee(s) responsible for the instruction or training modify it to be consistent with the university regulation, issuing disciplinary measures where appropriate and remove, by termination if appropriate, the employee(s)" if they fail or refuse to comply with the universities' mandate. *Id*. at 3–4.

The Board of Governors also defines its own power to investigate unlawful instruction or training "[u]pon receipt of a credible allegation that a university willfully and knowingly failed to correct a violation of the university regulation[.]" *Id*. at 4. In that situation, "the Board of Governors' [sic] Office of Inspector General shall conduct an investigation to determine if evidence exists to support the allegation and ineligibility for performance funding." *Id*. In the event "it is determined an external qualified investigative firm is necessary to assist with or conduct the investigation," the university subject to investigation "will be responsible for any costs incurred," apparently regardless of the investigation's outcome. *Id*.

Ultimately, the Board of Governors makes the "final decision regarding whether the alleged willful and knowing failure to correct a violation of the university regulation is substantiated." *Id*. And "[i]f the Board of Governors determines that a university willfully and knowingly engaged in conduct at the institutional level that constituted a substantiated violation of section 1000.05(4)(a),

Florida Statutes," and did not take "appropriate corrective action, the university will be ineligible for performance funding for the next fiscal year following the year in which the Board of Governors made the determination." *Id*. at 4–5.

## II

Plaintiffs include university professors and college students who challenge the IFA's amendments to the FEEA and the Board of Governors's implementing regulation as they relate to prohibiting expression of certain viewpoints regarding the eight specified concepts during class instruction. Plaintiffs assert these provisions are unconstitutional under the First and Fourteenth Amendments. They ask this Court to enjoin enforcement of the challenged provisions, citing the Supreme Court's long history of shielding academic freedom from government encroachment and the First Amendment's intolerance toward government attempts to "cast a pall of orthodoxy over the classroom." *See Keyishian v. Bd. of Regs. of Univ. of State of N.Y.*, 385 U.S. 589, 683 (1967).

Defendants respond that the First Amendment offers no protection here. They argue that because university professors are public employees, they are simply the State's mouthpieces in university classrooms. As a result, Defendants claim, the State has unfettered authority to limit what professors may say in class, even at the university level. Alternatively, Defendants suggest that even if this Court is required to balance the State's interests against the professors' First Amendment rights, the

State's interests *always* trump the professors' rights. According to Defendants, so long as professors work for the State, they must all read from the same music.[7]

A

This Court pauses to offer an example of what this challenged law means if you accept Defendants' position. At oral argument, Defendants conceded that concept six—as mentioned above, that "[a] person, by virtue of his or her race, color, national origin, or sex should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion"—is another way to describe affirmative action. When asked directly whether concept six is "affirmative action by any other name," defense counsel answered, unequivocally, "Your Honor, yes." Tr. at 91. Thus, Defendants assert the idea of affirmative action is so "repugnant" that instructors can no longer express approval of affirmative action as an idea worthy of merit during class instruction. *See id.* at 42.

Defendants further assert that this prohibition extends to guest speakers if they are invited to participate within a course. *Id.* at 80. As a result, according to Defendants, university professors cannot even organize an in-class debate between guest speakers about the merits of affirmative action if one of those speakers were

---

[7] At the hearing, defense counsel asserted that the *only* limitation the First Amendment imposes upon the State when it comes to professors' in-class speech is prohibiting compelled expression of beliefs that professors do not hold. *See* Transcript (Tr.) at 40–41. According to Defendants, the State is prohibited from *compelling* speech in the classroom, but it has absolute authority to *limit* expression.

9

to espouse, promote, advance, inculcate, or compel students to believe, or otherwise endorse, the idea of affirmative action. *Id*. It's worth keeping in mind that the State has chosen affirmative action as one of its eight concepts because the State has deemed it to be repugnant and "noxious to the people of Florida." ECF No. 52 at 11, *in* Case No.: 4:22cv304. Stated otherwise, you can discuss affirmative action as a historical fact, and you can certainly condemn it as a failed policy, but because the idea of affirmative action is so odious, so repugnant, so vile, and so dangerous that it offends the basic principles of common decency, you cannot have a guest speaker submit their views in favor of affirmative action, even to a class of law students.

What does this mean in practical terms? Assuming the University of Florida Levin College of Law decided to invite Supreme Court Justice Sonia Sotomayor to speak to a class of law students,[8] she would be unable to offer this poignant reflection about her own lived experience, because it endorses affirmative action:

> I had no need to apologize that the look-wider, search-more affirmative action that Princeton and Yale practiced had opened doors for me. That was its purpose: to create the conditions whereby students from disadvantaged backgrounds could be brought to the starting line of a race many were unaware was even being run. I had been admitted to the Ivy League through a special door, and I had more ground than most to make up before I was competing with my classmates on an equal footing. But I worked relentlessly to reach that point, and distinctions such as the Pyne Prize, Phi Beta Kappa, summa cum laude, and a spot

---

[8] Of course, it is questionable whether the University of Florida Levin College of Law would ever choose to invite Justice Sotomayor, in light of its recent demonstration of anticipatory obedience to the powers that be. *See Austin*, 580 F. Supp. 3d at 1145. Nonetheless, this Court poses the hypothetical to illustrate the consequences of Defendants' arguments.

10

> on *The Yale Law Journal* were not given out like so many pats on the
> back to encourage mediocre students. These were achievements as real
> as those of anyone around me.

SONIA SOTOMAYOR, MY BELOVED WORLD 191 (Alfred A. Knopf ed., 2013). Indeed,

in praising the affirmative action policy that opened a "special door" for her, Justice

Sotomayor has expressed a viewpoint that the State of Florida deems repugnant and

has prohibited. Under the IFA, her words would be *per se* discrimination if she were

to utter them as a guest speaker in a law school classroom.[9]

B

Given the disorienting nature of Defendants' arguments, it is necessary to

address the bedrock First Amendment principles that govern this case before

addressing the merits of Plaintiffs' motions, including whether Plaintiffs have

demonstrated standing for purposes of entitlement to a preliminary injunction.[10] This

case squarely presents the tension in Florida between university professors' and

students' First Amendment rights and the State of Florida's claim that it has an

unfettered right to prohibit professors from expressing viewpoints with which it

---

[9] This Court recognizes that the constitutionality of affirmative action is presently before the Supreme Court of the United States. *See, e.g.*, *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 980 F.3d 157 (1st Cir. 2020), *cert. granted*, 142 S. Ct. 895 (2022). This Court does not speak to that issue. However, this Court does note that promoting the legal merits of affirmative action is a far cry from equating affirmative action with hate speech.

[10] This Court recognizes that Plaintiffs also allege that the challenged provisions violate the Due Process Clause of the Fourteenth Amendment as unconstitutionally vague. This Court addresses the merits of their vagueness claims in more detail *infra*.

disagrees. Plaintiffs assert that the challenged restrictions amount to vague, viewpoint-based restrictions on protected speech that are presumptively unconstitutional and subject to strict scrutiny. Defendants, on the other hand, assert that because public university professors work for the State, their in-class speech is government speech beyond the First Amendment's reach. And even if the First Amendment *does* apply, Defendants argue, the State's actions must be judged by something akin to rational basis review.

In presenting their respective positions, both sides go too far in conflating legal concepts, quoting language devoid of context from their source material, and ignoring controlling authority. But this Court does not get to cherry-pick convenient language to build an analytical framework that is unsupported by binding precedent.[11] Instead, this Court must apply binding Supreme Court and Eleventh Circuit authority.

"Start with the basics." *Meriwether v. Hartop*, 992 F.3d 492, 503 (6th Cir. 2021). "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972). This

---

[11] Although we may have recently celebrated Halloween, that is no excuse to stitch together a new legal test resembling Frankenstein's monster. *See generally* MARY WOLLSTONECRAFT SHELLEY, FRANKENSTEIN: OR, THE MODERN PROMETHEUS (Oxford Univ. Press, 1999) (1818).

specific prohibition applies to the States, as "[f]reedom of speech and of the press are fundamental rights which are safeguarded by the due process clause of the Fourteenth Amendment of the Federal Constitution." *De Jonge v. Oregon*, 299 U.S. 353, 364 (1937).

Over time, the Supreme Court has recognized two modes of restricting speech that are almost always subject to heightened scrutiny—namely, content-based restrictions and viewpoint-based restrictions. This Court notes the distinction at the outset as it has direct implications for the State's ability, within constitutional bounds, to restrict educators' speech in public university classrooms—but more on that later.

Start with content. "[T]he First Amendment, subject only to narrow and well-understood exceptions, does not countenance governmental control over the *content* of messages expressed by private individuals." *Turner Broadcasting Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994) (emphasis added). Thus, the Supreme Court has traditionally applied "the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content." *Id*. at 642. A government regulation of speech is content-based if, on its face, the law "draws distinctions based on the message a speaker conveys." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). In addition, laws that are "facially content neutral . . . will be considered content-based regulations of speech . . . [if they] cannot be

'justified without reference to the content of the regulated speech,' or [if they] were adopted by the government 'because of disagreement with the message the speech conveys.' " *Id*. at 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

Next, viewpoint. The Supreme Court has recognized viewpoint-based restrictions as a distinct subset of content discrimination. "Government discrimination among *viewpoints*—or the regulation of speech based on 'the specific motivating ideology or the opinion or perspective of the speaker'—is a 'more blatant' and 'egregious form of content discrimination.' " *Reed*, 576 U.S. at 168 (emphasis added) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 391 (1992) ("In its practical operation, moreover, the ordinance goes *even beyond mere content discrimination*, to actual viewpoint discrimination . . . . St. Paul has no such authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules.") (emphasis added). With respect to viewpoint-based restrictions on protected speech, "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829.

While the concepts overlap—viewpoint discrimination is a recognized form of content-based restriction on speech—they are not always one and the same.

"Thus, a speech regulation targeted at specific subject matter is *content* based even if it does not discriminate among viewpoints within that subject matter." *Reed*, 576 U.S. at 169 (emphasis added). With these principles in mind, this Court turns to the unique role public universities play under the First Amendment and whether the State may permissibly enforce viewpoint-based restrictions on educators' classroom speech.

"[S]tate colleges and universities are not enclaves immune from the sweep of the First Amendment." *Healy v. James*, 408 U.S. 169, 180 (1972). As recently as 2003, the Supreme Court reaffirmed "that given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition." *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003) (listing cases); *see also Healy*, 408 U.S. at 180–81 ("The college classroom with its surrounding environs is peculiarly the 'marketplace of ideas,' and we break no new constitutional ground in reaffirming this Nation's dedication to safeguarding academic freedom.").

To be clear, though, the Supreme Court has never definitively proclaimed that "academic freedom" is a stand-alone right protected by the First Amendment. Moreover, the Eleventh Circuit has explicitly rejected the argument that "academic freedom" is an independent constitutional right. *See Bishop v. Aronov*, 926 F.2d 1066, 1075 (11th Cir. 1991) ("Though we are mindful of the invaluable role

academic freedom plays in our public schools, particularly at the post-secondary level, we do not find support to conclude that academic freedom is an independent First Amendment right.").[12] But the Eleventh Circuit still recognized that academic freedom remains an important interest to consider when analyzing university professors' First Amendment claims. *See id.* ("Last and somewhat countervailing, we consider the strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment."). This is consistent with binding precedent, as the Supreme Court has long recognized that "First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). Accordingly, "the state may not act as though professors or students 'shed their constitutional rights to freedom of speech or expression at the [university] gate.' " *Meriwether*, 992 F.3d at 503 (alteration added) (quoting *Tinker*, 393 U.S. at 506). Nor does the First Amendment "tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian*, 385 U.S. at 683.

This Court also recognizes that while "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools," *Shelton v. Tucker*, 364 U.S. 479, 487 (1960), these freedoms are not

---

[12] As discussed *infra*, this Court concludes that the Eleventh Circuit's balancing test in *Bishop* provides the operative analytical framework for evaluating Plaintiffs' First Amendment claims.

unlimited. Indeed, the Supreme Court has "repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Tinker*, 393 U.S. at 507 (citations omitted).

With respect to regulating in-class speech consistent with constitutional safeguards, this Court again pauses to distinguish between the State's valid exercise in prescribing a university's curriculum and the State's asserted interest in prohibiting educators from expressing certain viewpoints about the content of that curriculum. The Supreme Court has long recognized that "[a] university's mission is education," and it "has never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities." *Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981). "By and large, public education in our Nation is committed to the control of state and local authorities." *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968). To that end, universities may generally make content-based decisions "as to how best to allocate scarce resources or 'to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study.' " *Widmar*, 454 U.S. at 278 (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring in result)).

17

At the hearing on Plaintiffs' motions, both sides recognized this authority of the State to prescribe the content of its universities' curriculum. [13] Indeed, this makes intuitive sense. Of course the State has a say in which courses are taught at its public universities. *Cf. Epperson*, 393 U.S. at 116 (Stewart, J., concurring in result) ("A State is entirely free, for example, to decide that the only foreign language to be taught in its public school system shall be Spanish. But would a State be constitutionally free to punish a teacher for letting his students know what other languages are also spoken in the world? I think not."); *id*. at 111 (Black, J., concurring in result) ("It is plain that a state law prohibiting all teaching of human development or biology is constitutionally quite different from a law that compels a teacher to teach as true only one theory of a given doctrine. It would be difficult to make a First Amendment case out of a state law eliminating the subject of higher mathematics, or astronomy, or biology from its curriculum.").

But Defendants take it a step further, arguing that the State—though constitutionally barred from compelling professors to express the State's chosen belief—has an unfettered right to prohibit professors from expressing viewpoints

---

[13] As noted above, the State is afforded much greater flexibility to control public school curriculum. But this Court is mindful that the Supreme Court has suggested some limitation may apply. *See, e.g.*, *Meyer v. Nebraska*, 262 U.S. 390, 402 (1923) (holding that state law criminalizing the teaching of foreign languages to students who had not yet passed the eighth grade in public and parochial schools—as applied to parochial school teacher who was convicted of teaching the German language to a 10-year-old—violated the Fourteenth Amendment, because the statute was "arbitrary and without reasonable relation to any end within the competency of the state").

with which it disagrees. Thus, according to Defendants, the content of university curriculum may include the State's preferred viewpoint on the subject matter of prescribed courses and certainly excludes (at the State's discretion) any viewpoint the State chooses to prohibit. Defendants ground this argument in the notion that anything professors utter in a state university classroom during "in-class instruction" is government speech, and thus, the government can both determine the content of that speech and prohibit the expression of certain viewpoints. *See, e.g.*, ECF No. 52 at 19, *in* Case No.: 4:22cv324-MW/MAF ("The in-class instruction offered by state-employed educators is also pure government speech, not the speech of the educators themselves.").

Defendants reach this conclusion by cherry-picking language, devoid of context, from two cases in particular—namely, *Rosenberger* and *Garcetti*. In *Rosenberger*, the Supreme Court held that the University of Virginia's denial of funding for a student group amounted to impermissible viewpoint discrimination because the denial was based not on the general religious subject matter of the student group's publication, but on the "prohibited perspective" concerning the "general subject matter." *Rosenberger*, 515 U.S. at 832. In so holding, the Supreme Court rejected the University's reliance on the Court's "assurance" in *Widmar* that universities have the right "to make academic judgments as to how best to allocate scarce resources." *Id*. at 833. Highlighting the fact that *Rosenberger* involved

student, not university, speech, the Supreme Court reaffirmed that the State may "speak[]" when it determines "the content of the education it provides." *Id*. The Court added that its "holding that the University may not discriminate based on the viewpoint of private persons whose speech it facilitates does not restrict the University's own speech, which is controlled by different principles." *Id*. at 834. Here, again, Defendants point to this language to conflate viewpoint with content. They stretch the Court's discussion concerning the "University's own speech" to suggest that the Court *really* meant that the State has complete authority to prohibit university employees from expressing any viewpoint with which it disagrees. But that is not the law.

Contrary to Defendants' argument, *Rosenberger* did not hold or even suggest that everything a professor utters in a university classroom is the university's speech. Instead, *Rosenberger* identifies that (1) content and viewpoint discrimination are discrete concerns under the First Amendment; (2) universities cannot discriminate against student speech based on viewpoint; and (3) university speech is a different animal, "controlled by different principles." *Id*. *Rosenberger* cites *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), in support of the statement that prohibiting viewpoint restrictions on student speech does not restrict the University's speech ("which is controlled by different principles"). 515 U.S. at 834. *Hazelwood* addressed whether the First Amendment limits educators from exercising editorial

20

control over student speech in school-sponsored expressive activities. But given that *Hazelwood* serves as the "polestar" that guides the Eleventh Circuit's test in *Bishop* (discussed at length *infra*) this Court takes a brief detour to examine *Hazelwood*'s contours.

*Hazelwood* involved a school principal's decision to censor high school students' articles in a school-sponsored newspaper. The Supreme Court held that the newspaper, along with "other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school," may be "fairly characterized as part of the school curriculum . . . so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences." *Hazelwood*, 484 U.S. at 271. As such, the Supreme Court further held that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Id*. at 273. But in so holding, the Court declined to determine whether this same standard applies to school-sponsored expressive activities at the university level. *Id*. n.7. Regardless, the Eleventh Circuit reads *Hazelwood* to offer "no indication that the [Supreme] Court intended to drastically rewrite First Amendment law to allow a school official to discriminate based on a speaker's views." *Searcey v. Harris*, 888 F.2d 1314, 1319

21

n.7 (11th Cir. 1989). Instead, "*Hazelwood* acknowledges a school's ability to discriminate based on *content*[,] not *viewpoint*." *Id*. (emphasis in original).[14]

Turning back to Defendants' main argument—that the First Amendment does not protect professors' in-class speech—they connect the professors' speech to the university's speech via *Garcetti v. Ceballos*, 547 U.S. 410 (2006). In that case, the Supreme Court held "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. Thus, "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Id*. at 421–22. "It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id*. at 422 (citing *Rosenberger*, 515 U.S. at 833 ("When the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes.")).

---

[14] The Eleventh Circuit has also recognized that other circuits read *Hazelwood* differently. *See, e.g.*, *Bannon v. Sch. Dist. of Palm Beach Cnty.*, 387 F. 3d 1208, 1218–20 (11th Cir. 2004) (Black, J., concurring in result) (noting that "the majority of our sister circuits to consider the question have held *Hazelwood* permits viewpoint-based discrimination"). But *Searcey* remains binding on this Court, and it informs the proper reading of *Hazelwood* in the context of this case. *See, e.g.*, *ACLU of Fla. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1234 (11th Cir. 2009) (Wilson, J., dissenting) (citing *Searcey* and noting that *Hazelwood*'s standard "does not, however, permit a school board to engage in viewpoint discrimination" when it removes books from the school system).

But the Supreme Court expressly declined to "decide whether [its government speech] analysis . . . would apply in the same manner to a case involving speech related to scholarship or teaching." *Garcetti*, 547 U.S. at 425. In so doing, the Court recognized that "expression related to academic scholarship or classroom instruction [arguably] implicates additional constitutional interests that are not fully accounted for by [the] Court's customary employee-speech jurisprudence." *Id.*; *see also id.* at 438 (Souter, J., dissenting) ("I have to hope that today's majority does not mean to imperil First Amendment protection of academic freedom in public colleges and universities, whose teachers necessarily speak and write 'pursuant to . . . official duties.'" (quoting *Grutter*, 538 U.S. at 329)).

Refusing to take "no" for an answer, Defendants assert this Court must apply *Garcetti*'s reasoning to the professor speech at issue here, notwithstanding the Supreme Court's explicit refusal to do so. ECF No. 52 at 20, *in* Case No: 4:22cv304-MW/MAF. Defendants cast the Supreme Court's clear constitutional concerns aside and suggest that "if *Garcetti* did not apply to curricular speech, it would invite 'judicial intervention' that is 'inconsistent with sound principles of federalism.'" *Id.* (quoting 547 U.S. at 423).[15] In support, Defendants cite two cases from the Sixth

---

[15] Oddly, in the name of preventing improper "judicial intervention," Defendants ask this Court to actively ignore what the Supreme Court did in *Garcetti* and the reasons that led to the Court's refusal to extend its analysis "to expression related to scholarship or classroom instruction."

and Seventh Circuits, noting that these courts have applied *Garcetti* to in-class instruction in the elementary and high school settings. ECF No. 52 at 20–21, *in* Case No: 4:22cv304-MW/MAF (citing *Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 479 (7th Cir. 2007) and *Evans-Marshall v. Bd. of Educ. of Tipp. City Exempted Vill. Sch. Dist.*, 624 F.3d 332 (6th Cir. 2010)). But, like the Supreme Court in *Garcetti*, the Sixth Circuit in *Mayer* declined to determine "[h]ow much room is left for constitutional protection of scholarly viewpoints in post-secondary education . . . ." *Mayer*, 474 F.3d at 480. Indeed, the Sixth Circuit's holding was limited to the principle that "the first amendment does not entitle primary and secondary teachers, when conducting the education of captive audiences, to cover topics, or advocate viewpoints, that depart from the curriculum adopted by the school system." *Id*.

Likewise, in *Evans-Marshall*, the Seventh Circuit distinguished the appellant's constitutional claim from *Garcetti*, noting that "[s]he is not a teacher at a 'public college' or 'university' and thus falls outside of the group the dissent wished to protect." 624 F.3d at 343 (cleaned up). In concluding that *Garcetti* applied to appellant's speech as a public high school teacher, the Seventh Circuit emphasized that different "constitutional rules applicable in higher education do not necessarily apply in primary and secondary schools, where students generally do not choose whether or where they will attend school." *Id*. at 344.

24

All this is to say that Defendants have identified no case, nor has this Court identified any authority—binding or persuasive—holding that *Garcetti* applies to university professors' in-class speech such that it amounts to government speech outside the First Amendment's protection. To the extent Defendants urge this Court to determine that university professors' in-class speech is always pure government speech, the weight of binding authority requires this Court to decline the invitation.[16]

In a similar call to activism, Defendants urge this Court to consider the Third Circuit's conclusion that "a public university professor does not have a First Amendment right to decide what will be taught in the classroom" as persuasive authority for deciding that a university professors' in-class speech is never constitutionally protected. ECF No. 52 at 21, *in* Case No: 4:22cv304-MW/MAF (quoting *Edwards v. Calif. Univ. of Penn.*, 156 F.3d 488, 491 (3d Cir. 1998) (Alito, J.)). In finding that the university's actions in *Edwards* "concerned the content of the

---

[16] Defendants essentially ask this Court to engage in "judicial activism," since accepting Defendants' argument would require this Court to substitute binding precedent with Defendants' policy preference. *See* Adam J. White, *Beware the ABA's Own Version of 'Judicial Activism,'* Washington Examiner (Oct. 31, 2017, 4:14 PM), https://www.washingtonexaminer.com/weekly-standard/beware-the-abas-own-version-of-judicial-activism ("Unaccountable judges sometimes mistake their own policy preferences for the proper rule of decision."); Ilya Shapiro, *The Impact of Judicial Activism on the Moral Character of Citizens*, The Federalist Society (Oct. 28, 2010), https://fedsoc-cms-public.s3.amazonaws.com/update/pdf/e4EClIG7j3akwgbb2OauuGjHpd6wYP r0YUoKErVa.pdf ("Activism is doing something that is not supposed to be the judicial role or not being faithful to the Constitution . . . ."); James C. Dunlop & Tara A. Fumerton, *The Illinois Supreme Court: Judicial Activism, with Limits*, The Federalist Society (Oct. 15, 2004, 3:18 PM), https://fedsoc-cms-public.s3.amazonaws.com/update/pdf/XSjtdj50gN9djeM731gBPu0qzuoMed ExzQUZRrPh.pdf ("[T]he judicial role does not properly contain within it a 'legislative' or 'policy-making' function."). But unlike Defendants, this Court prefers judicial modesty to activism.

education it provides," the Third Circuit held "that the First Amendment does not place restrictions on a public university's ability to control its curriculum." *Edwards*, 156 F.3d at 491. This holding relied in large part on *Bradley v. Pittsburgh Board of Education*, 910 F.2d 1172 (3d Cir. 1990). There, the Third Circuit held that a public high school teacher had no right "to choos[e her] own curriculum or classroom management techniques in contravention of school policy or dictates," because "her in-class conduct is not [protected by the First Amendment]." *Id*. at 1176.

Other courts have also held that university professors do not have a First Amendment right to control curriculum content. *See, e.g.*, *Clark v. Holmes*, 474 F.2d 928, 930 (7th Cir. 1972) (affirming district court's conclusion that professor's conduct was not protected by First Amendment where professor stated, among other things, that he had agreed with his students to teach more on "sex education and mental health . . . and only 'touch on' the other topics covered by the assigned text and the course syllabus," which was at odds with the university's "established curricular contents"). But as explained above, this is hardly a groundbreaking proposition. Indeed, *Bradley* relies on *Clark* in holding that a public high school teacher's "in-class conduct is not [protected under the First Amendment]." *Bradley*, 910 F.2d at 1176 (citing *Clark*, 474 F.2d 928).

In short, these cases support the general proposition that the State is, of course, permitted to determine the content of its public school curriculum. A professor

26

cannot decide to teach something entirely different or do an end-run around the prescribed curriculum by paying lip service to the subject they are supposed to teach and then spend the rest of class time instructing on something else. Defendants, however, ask this Court to read these cases to conflate the State's right to make *content-based* choices in setting the public school curriculum with unfettered discretion in limiting a professor's ability to express certain *viewpoints* about the content of the curriculum once it has been set.

But that is not what these cases hold, nor does their reasoning extend so far. Although then-Judge Alito stated "that a public university professor does not have a First Amendment right to decide what will be taught in the classroom," he did so in the context of determining whether the First Amendment protects a professor's "choice of curriculum materials and the content and subjects of his classes." *Edwards*, 156 F.3d at 491. Given his broad pronouncement, this Court understands why Defendants would cherry-pick it from *Edwards*. But then-Judge Alito's concern was with a professor who sought to change the content of his course from one that "initially focused on how teachers can effectively use various classroom tools, such as projection equipment, chalkboards, photographs, and films," to the professor's chosen syllabi that "included a new emphasis on issues of bias, censorship, religion, and humanism . . . ." *Id*. at 489.

27

*Edwards* is fairly read to affirm the State's ability to control the curriculum in public schools. At most, then-Judge Alito's reasoning implicitly extends to suppression of certain viewpoints from a professor who teaches the approved curriculum. But this Court need not determine the correct way to read *Edwards*, as it is bound not by the Third Circuit's holdings—express or implicit—but by the Eleventh Circuit's holdings. And as discussed on the record at the hearing in this case, then-Judge Alito distinguished his holding from the Eleventh Circuit's opinion in *Bishop*, describing the Eleventh Circuit as "finding that a public university's restrictions on a professor's in-class speech 'implicated First Amendment freedoms.' " *Edwards*, 156 F.3d at 491 ("*But see Bishop v. Aronov*, 926 F.2d 1066, 1075 (11th Cir. 1991)"); *see also* THE BLUEBOOK: A UNIFORM SYSTEM OF CITATION R.1.2(c), at 63 (Columbia L. Rev. Ass'n et al. eds., 21st ed. 2020) (defining *but see* as a signal that indicates contradiction when the "[c]ited authority clearly supports a proposition contrary to the main proposition"). Accordingly, then-Judge Alito recognized that the Eleventh Circuit had reached a different conclusion—that if *Bishop* stands for anything, it is that the First Amendment places some limit on the State's ability to prohibit what a professor may say in a university classroom.

The question remains—how is this Court to evaluate Plaintiffs' First Amendment claims? In addition to the Supreme Court's binding pronouncement that the First Amendment does not tolerate laws that cast a pall of orthodoxy over the

28

classroom, *Keyishian*, 385 U.S. at 683, the Eleventh Circuit and its predecessor have recognized that the First Amendment protects classroom discussions at the secondary and university levels. As early as 1980, the Fifth Circuit held that a high school teacher's "classroom discussion is protected activity" under the First Amendment. *Kingsville Indep. Sch. Dist. v. Cooper*, 611 F.2d 1109, 1114 (5th Cir. 1980).[17] The Eleventh Circuit cited *Kingsville* with approval as recently as 2017, while also noting that *Garcetti* has since altered the analysis with respect to regulating public-employee speech more generally. *See Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1311 n.6 (11th Cir. 2017) (en banc) (Jordan, J.). And as recently as 2019, the Fifth Circuit affirmed that *Kingsville* remains good law and that "academic freedom is 'a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom.' " *See Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019) (quoting *Keyishian*, 385 U.S. at 603).

Further, the Eleventh Circuit acknowledged in *Bishop* that the First Amendment protects university professors' in-class speech and sought to fashion a test that would appropriately balance the speaker's First Amendment rights with the university's special interests in enforcing some limitations on that speech. 926 F.2d 1066. Recognizing the university could not restrict a professor's in-class speech

---

[17] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

without a "suffic[ient] . . . interest," the Eleventh Circuit struck a "somewhat amorphous" balancing test, drawing from the Supreme Court's analysis in *Hazelwood*. *Id*. at 1074. Ultimately, the balance involves "a case-by-case inquiry into whether the legitimate interests of the authorities are demonstrably sufficient to circumscribe a teacher's speech." *Id*. (quoting *Mailloux v. Kiley*, 448 F.2d 1242, 1243 (1st Cir. 1971)). And this Court must follow *Bishop*'s balancing test because the Eleventh Circuit has not yet reversed itself, en banc, and the Supreme Court explicitly declined to extend its employee-speech analysis in *Garcetti* to "speech related to scholarship or teaching." In short, two things are clear: (1) the First Amendment protects university professors' in-class speech and (2) *Bishop* remains the binding authority guiding this Court's analysis of Plaintiffs' speech claims.

Next, this Court must determine whether a different analytical framework applies to the students' claims as compared to the professors' claims. As discussed on the record at the hearing and explained in more detail below, the Professor Plaintiffs' First Amendment claims and the Student Plaintiffs' First Amendment claims—though called by different names—are coextensive based on the context of this case. Thus, this Court applies the same analytical framework to both.

The Student Plaintiffs claim that the IFA infringes on their First Amendment right to receive information and ideas, arguing that the IFA's viewpoint-based restrictions on professors' in-class speech unconstitutionally limit the information

30

they can receive from professors during class instruction. Both sides agreed at the hearing on Plaintiffs' motions that the Student Plaintiffs' right-to-receive-information claims are coextensive with the Professor Plaintiffs' free speech claims, given that the information the students claim the right to receive is the same information that their professors wish to share with them. *See* Tr. at 25–28. Thus, in the context of this case, a university student would not have an independent First Amendment right to receive information that a university professor does not have a First Amendment right to share. This Court agrees with the parties and concludes that the Student Plaintiffs' right-to-receive-information claims are coextensive with the Professor Plaintiffs' free speech claims and, thus, that the Student Plaintiffs' claims are properly analyzed under *Bishop* as discussed *infra*.[18]

To start, the right to receive information "is an inherent corollary of the rights of free speech and press that are explicitly guaranteed by the Constitution, *in two senses.*" *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S.

---

[18] To be clear, this Court is not stating that one individual's First Amendment right to receive information is always coextensive with another's right to speak. Rather, this Court's conclusion is more limited—namely, within the context of this case, the students' right to receive information is coextensive with the university professors' asserted right to free speech with respect to their in-class speech.

This Court's analysis would likely differ if the IFA restricted university students' access to information and ideas beyond its limitations on professors' in-class speech. For example, if the State imposed campus-wide bans on academic literature that advocated viewpoints with which the State disagreed, or if it limited on-campus access to internet sources that advocated prohibited viewpoints, then the students' First Amendment claims would not be coextensive with university professors' free speech claims. This is because the students' injuries in those two examples would flow from more than just the restriction imposed on their professors' speech.

853, 867 (1982) (plurality opinion) (emphasis added).[19] In the first sense, the First Amendment right to receive information "flows ineluctably from the *sender's* right to send them . . . . 'The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive or consider them.' " *Id.* (quoting *Lamont v. Postmaster Gen.*, 381 U.S. 301, 308 (1965)). In the second sense, the First Amendment right to receive information "is a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press, and political freedom." *Id.* In short, the right to receive information comes from both the *sender's* right to provide it and the *receiver's* own rights under the First Amendment.

As noted above, the Student Plaintiffs claim a First Amendment right to receive the information and ideas that, but for the viewpoint-based prohibitions of the IFA, university professors would provide during class instruction. Under the IFA's plain language, those who provide "training or instruction," such as university professors (or the "senders," as described in *Pico*), are restricted from sharing viewpoints contrary to the IFA. *See* § 1000.05(4)(a), Fla. Stat. (2022) ("It shall constitute discrimination . . . to subject any student or employee to training or instruction that espouses, promotes, advances, inculcates, or compels such student or employee to believe any of the following concepts . . . ."). Aside from the

_____

[19] This Court is aware that *Pico* is a plurality opinion and, thus, is not binding precedent. However, this Court finds persuasive its characterization of the First Amendment right to receive information and ideas.

limitations placed on professor speech, the IFA does not otherwise limit the ability of students (or the "recipients," as described in *Pico*) to access the viewpoints that professors are prohibited from expressing during instruction. *Id*. In other words, the IFA does not directly impede the "second sense" of the right to information as described in *Pico*: the "recipient's" own exercise of their individual rights under the First Amendment. It logically follows that a university student's First Amendment right to receive a professor's viewpoints should flow from that professor's First Amendment right to express those viewpoints, for the former cannot be said to exist without the latter. If both claims were viewed and analyzed independently under facts such as this, that analysis could potentially lead to an illogical result—namely, that university students have an independent right to viewpoints that their professors do not have a right to share.

One final point of clarification. This Court notes that of the two Student Plaintiffs—Johanna Dauphin and Samuel Rechek—Ms. Dauphin's First Amendment claim differs from that of Mr. Rechek. Specifically, Ms. Dauphin has not shown that at least one of her professors will have their speech chilled or will be forced to self-censor because of the IFA. Thus, her claim for access to information and ideas is not coextensive with any Professor Plaintiff. Mr. Rechek, on the other hand, has demonstrated that he intends to enroll in Professor Novoa's course in the spring and that Professor Novoa will self-censor because of the IFA. Accordingly, as

discussed in this Court's standing analysis below, Ms. Dauphin has not demonstrated standing for purposes of a preliminary injunction.

Next this Court addresses the merits of Plaintiffs' motions for preliminary injunction.

## III

A district court may grant a preliminary injunction if the movant shows: (1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable injury unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). Although a "preliminary injunction is an extraordinary and drastic remedy," it should be granted if "the movant 'clearly carries the burden of persuasion' as to the four prerequisites." *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (quoting *Canal Auth. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974)). No one factor, however, is controlling; this Court must consider the factors jointly, and a strong showing on one factor may compensate for a weaker showing on another. *See Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Educ., & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979). Finally, "[a]lthough the initial burden of persuasion is on the moving party, the ultimate burden is on the party who would have the burden at trial." *FF Cosmetics FL, Inc.*

*v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017) (citing *Edenfield v. Fane*, 507 U.S. 761, 770 (1993)). Applying this standard, this Court first considers whether Plaintiffs have established a likelihood of success on the merits.

IV

This Court begins with whether Plaintiffs have shown a substantial likelihood of success on the merits. This Court addresses this factor first because, typically, if a plaintiff cannot "establish a likelihood of success on the merits," this Court "need not consider the remaining conditions prerequisite to injunctive relief." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002). And, because standing is always "an indispensable part of the plaintiff's case," this Court begins its merits analysis with standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

The "affirmative burden of showing a likelihood of success on the merits . . . necessarily includes a likelihood of the court's reaching the merits, which in turn depends on a likelihood that [a] plaintiff has standing." *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 328 (D.C. Cir. 1987) (Williams, J., concurring and dissenting). Any evaluation of Plaintiffs' claims thus necessitates an inquiry into Plaintiffs' ability to bring them. Over time, the Supreme Court has developed a three-part test for determining when standing exists. Under that test, a plaintiff must show (1) that they have suffered an injury-in-fact that is (2) traceable to the

35

defendant and that (3) can likely be redressed by a favorable ruling. *See Lujan*, 504 U.S. at 560–61. And "where a plaintiff moves for a preliminary injunction, the district court . . . should normally evaluate standing 'under the heightened standard for evaluating a motion for summary judgment.' " *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255 (6th Cir. 2018) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912 (D.C. Cir. 2015)); *see also Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011). Thus, "a plaintiff cannot 'rest on such mere allegations [as would be appropriate at the pleading stage], but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true.' " *Cacchillo*, 638 F.3d at 404 (some alteration in original) (quoting *Lujan*, 504 U.S. at 561).

A

Before applying the test for standing to Plaintiffs' claims, this Court starts with a brief description of the facts and evidence before it.

Starting with *Pernell*, Plaintiff LeRoy Pernell is a Professor of Law at Florida A&M University College of Law. ECF No. 13-1 ¶¶ 3–4, *in* Case No.: 4:22cv304-MW/MAF (Pernell Declaration). Professor Pernell has over forty years of experience in higher education and teaches primarily in the areas of criminal procedure, torts, juvenile law, and race and the law. *Id.* ¶ 4. He expects to teach a class in the 2023 spring semester that focuses on the role of race in criminal

procedure, using a casebook he authored that explains how racism is embedded in the criminal justice system. *Id.* ¶ 16, 22. Professor Pernell asserts that the IFA prohibits him from teaching from his casebook and that teaching his criminal procedure course risks violating the IFA. *Id.* ¶ 22, 28.

Plaintiff Dana Thompson Dorsey is an Associate Professor of Educational Leadership and Policy Studies at the University of South Florida. ECF No. 13-2 ¶ 3, *in* Case No.: 4:22cv304-MW/MAF (Dorsey Declaration). Professor Dorsey has worked in higher education for over fifteen years and focuses on education law and policy—specifically, she examines local, state, and federal laws and their impact on "minoritized students"[20] and communities at all educational levels. *Id.* ¶ 4. She teaches several classes related to her expertise in education law, including School Law and Critical Race Studies: Research, Policy, and Praxis. *Id.* ¶ 25. Professor Dorsey will teach a critical race studies course in the 2023 spring semester. When teaching her critical race studies course, she typically assigns her own articles that discuss white privilege and critique the concept of colorblindness. *Id.* Professor Dorsey fears that she could face discipline from USF related to teaching her course on critical race studies. *Id* ¶ 57.

Plaintiff Sharon Austin has worked as a professor at the University of Florida since 2001. She currently serves as a Professor of Political Science. ECF No. 13-3 ¶

---

[20] This is Professor Dorsey's word choice.

3, *in* Case No.: 4:22cv304-MW/MAF (Austin Declaration). Professor Austin teaches several courses rooted in her extensive background in American politics, including Politics of Race, Urban Politics, Black Horror and Social Justice, and African American Politics and Policy. *Id.* ¶¶ 27–32. As part of these courses, Professor Austin endorses critical race theory and assigns reading materials that advocate for affirmative action. *Id.* ¶¶ 40–43. To avoid discipline under the IFA, Professor Austin plans to self-censor. *Id*. ¶ 44.

Plaintiff Shelley Park is a tenured Professor of Philosophy and Cultural Studies at the University of Central Florida. ECF No. 13-4 ¶ 3, *in* Case No.: 4:22cv304-MW/MAF (Park Declaration). Professor Park has taught in higher education for over thirty-five years. *Id.* Currently, she teaches four undergraduate courses: (1) Feminist Theories; (2) Theories of Sex and Gender in the Humanities; (3) Race and Technology; and (4) Introduction to Philosophy. *Id.* In some of her courses, Professor Park teaches that merit, objectivity, and colorblindness function to solidify systems of oppression as foundational truths rather than academic theories. *Id*. ¶ 3. Fearing disciplinary action for violating the IFA, Professor Park feels the need to self-censor. *Id*. ¶ 34.

Plaintiff Jennifer Sandoval is an Associate Professor at the Nicholson School of Communication and Media at the University of Central Florida. ECF No. 13-5 ¶ 3, *in* Case No.: 4:22cv304-MW/MAF (Sandoval Declaration). Professor Sandoval

has taught interpersonal, intercultural, and gender communication at UCF since 2011. Currently, Professor Sandoval teaches a graduate level seminar titled Intercultural Communication, which "explores ways in which identity and culture affect communication in various contexts." *Id.* ¶ 4. Professor Sandoval's seminar includes sections on "whiteness" and race discrimination in academia. *Id.* ¶ 13. Professor Sandoval believes she may be disciplined for expressing viewpoints that are prohibited under the IFA. *Id.*

Plaintiff Russell Almond has worked as an associate professor of Measurement and Statistics in the Department of Educational Psychology and Learning Systems at Florida State University since 2010. ECF No. 13-6 ¶ 3, *in* Case No.: 4:22cv304-MW/MAF (Russell Declaration). Catering to students pursuing doctorates and master's degrees, Professor Almond currently teaches Basic Descriptive and Inferential Statistics Applications, Missing Data Analysis, Bayesian Data Analysis, and Educational Psychology Colloquium. *Id.* ¶ 9. Professor Almond encourages students to consider systemic discrimination when evaluating the effects of race in statistical models, in addition to discussing his own white privilege in a class handout. *Id.* ¶ 20. Professor Almond asserts that his speech will be chilled as a result of the IFA. *Id.* ¶ 32.

Plaintiff Dr. Marvin Dunn is a Professor Emeritus of Psychology at Florida International University. ECF No. 13-7 ¶ 3, *in* Case No.: 4:22cv304-MW/MAF

(Dunn Declaration). Dr. Dunn taught psychology for thirty-four years with a focus on "racial/ethnic minority communities and the societal and economic inequities facing those communities." *Id.* In his retirement from FIU, Dr. Dunn continues to interact with FIU students and staff on a Black history bus tour of Miami. *Id.* ¶ 10. Dr. Dunn asserts that the IFA impacts his ability to instruct on institutionalized racism and that he will be forced to self-censor as a result. *Id.* ¶ 13–14.

Plaintiff Johana Dauphin is a student at Florida State University. ECF No. 13-8 ¶ 3, *in* Case No.: 4:22cv304-MW/MAF (Dauphin Declaration). Ms. Dauphin is currently enrolled in a class titled Race and Minority Relations which focuses on "how racial and ethnic groups interact with and are affected by social institutions like the mass media, the political economy, the education system, the environment, and the criminal and civil justice system." *Id.* ¶ 18. She is also taking Religion, Race and Ethnicity, which "examines the intersection of race and religion, and religious beliefs in a cross-cultural context." *Id.* ¶ 20. Ms. Dauphin asserts that she will not be able to get the full benefit of these courses because the IFA will force her professors to refrain from advancing certain concepts. *Id.* ¶ 19, 21, 23.

Next, as to the *Novoa* Plaintiffs, Plaintiff Adriana Novoa is an Assistant Professor in the Department of History at the University of South Florida, where she has taught for the past 21 years. ECF No. 1 at 92, *in* Case No.: 4:22cv324-MW/MAF

(Verification of Adriana Novoa); *id*. ¶ 10.[21] She teaches multiple courses, including Science in Cultural Context, History of Sports from National to Global Contexts, and Modern Latin America. *Id*. ¶ 11. But for the IFA, Professor Novoa's class instruction would include several materials that promote some of the concepts at issue. *See, e.g.*, *id*. ¶¶ 176, 182–83, 190–91, 196, 202–14. Professor Novoa asserts she will continue to refrain from using these materials in her courses out of fear of violating the IFA. *See, e.g.*, *id*. ¶¶ 149–51, 154–56.

Plaintiff Samuel Rechek is an undergraduate student enrolled at the University of South Florida. *Id*. ¶ 14. He is the president of the First Amendment Forum at the University of South Florida (First Amendment Forum), and he plans to take Professor Novoa's Science in Cultural Context course in the spring 2023 semester. *Id*. at 93 (Verification of Samuel Rechek); *see also id*. ¶¶ 14, 16. Plaintiff Rechek asserts the challenged statute and regulation violate his right to receive information under the First Amendment. He plans to enroll in Professor Novoa's Science in Cultural Context course when registration for the Spring 2023 semester opens on October 31, 2022. *Id*. ¶ 226. He is a willing listener to the viewpoints that Professor Novoa, but for the IFA, would advance in her course. *Id*. ¶¶ 229–30.

---

[21] Although the *Pernell* Plaintiffs filed declarations setting out their sworn evidence, the *Novoa* Plaintiffs set out their evidence in the form of verified factual allegations in the verified complaint.

Plaintiff First Amendment Forum has been a registered student organization at the University of South Florida since 2020. *Id*. ¶ 16. The organization's mission is to ensure students have the right to speak their minds. *Id*. To that end, the organization has discussions on "hot-button issues, advocate[s] for student rights policy reform, host[s] events and workshops to involve the student body with their rights, and help[s] cultivate a community that embraces the merit of the First Amendment." *Id*. Each of the organization's five executive committee members is an undergraduate student enrolled at the University of South Florida. *Id*. The First Amendment Forum asserts that the IFA limits its members' ability to hear from faculty whose views may be contrary to the Act. *Id*. ¶ 17.

The *Pernell* Plaintiffs sue the Board of Governors and its members in their official capacities; Manny Diaz, Jr., in his official capacity as the Commissioner of the Florida Board of Education; the University of Florida Board of Trustees; the Florida International University Board of Trustees; the Florida A&M Board of Trustees; the Florida State University Board of Trustees; the University of Central Florida Board of Trustees; and the University of South Florida Board of Trustees. *See* ECF No. 1 at ¶¶ 18–30, *in* Case No.: 4:22cv324-MW/MAF. The *Novoa* Plaintiffs sue the members of the Board of Governors in their official capacities; Manny Diaz, Jr., in his official capacity as the Commissioner of the Florida Board of Education; Julie Leftheris, in her official capacity as the Inspector General of the Board of

Governors; and the University of South Florida Board of Trustees and its members in their official capacities. ECF No. 1 at ¶¶ 34–47, *in* Case No.: 4:22cv304-MW/MAF. They assert the Defendants all play a role in enforcing the State of Florida's prohibition on certain viewpoints in college classrooms, which, they allege, violates their constitutional rights.

B

Even if the parties treat standing as an afterthought, this Court has an independent obligation to ensure that standing, as "perhaps the most important" jurisdictional doctrine, is established. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)).[22] Standing "is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996). " '[A] plaintiff must demonstrate standing for each claim he seeks to press' and 'for each form of relief' " that is sought. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). Here, this means that this Court must address Plaintiffs' standing to pursue an injunction for both their First Amendment and Fourteenth Amendment claims.

---

[22] This Court takes that obligation seriously. For example, in another challenge to the IFA, this Court found that plaintiffs, including teachers and a student at the K-12th grade level, failed to establish standing for purposes of a preliminary injunction. *Falls v. DeSantis*, Case No. 4:22CV166-MW/MJF, 2022 WL 2303949, at *10 (N.D. Fla. June 27, 2022).

In addition to ensuring that they have standing to pursue each claim, Plaintiffs must also demonstrate standing for each provision of the statute they challenge. *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1271–72 (11th Cir. 2006). Put another way, Plaintiffs must demonstrate how their speech arguably implicates each way the IFA's prohibition could be violated. This provision-by-provision analysis applies to both facial and as-applied challenges. In other words, even if plaintiffs bring a facial challenge to a statute, they must still show a personal injury in fact under each provision of the challenged statute. *Id.*

Both the *Novoa* and *Pernell* Plaintiffs seek a preliminary injunction barring enforcement of section 1000.05(4), Florida Statutes (2022), and Regulation 10.005, claiming these laws impermissibly discriminate based on viewpoint in violation of the First Amendment and are void for vagueness under the Fourteenth Amendment.[23] This Court will address Plaintiffs' standing to pursue an injunction for both claims.

1

Before going through Plaintiffs' individual submissions, this Court will clarify what they must show to demonstrate an injury. When First Amendment rights are involved, courts apply the injury-in-fact requirement most loosely, "lest free speech be chilled even before the law or regulation is enforced." *Harrell v. Fla. Bar*, 608

---

[23] The *Novoa* Plaintiffs also seek to enjoin section 1000.05(4), Florida Statutes on overbreadth grounds. ECF No. 19 at 33, *in* Case No: 4:22cv324-MW/MAF. This Court need not address standing for their overbreadth challenge because it does not reach the merits of this claim.

F.3d 1241, 1254 (11th Cir. 2010). "When a plaintiff has stated that he intends to engage in a specific course of conduct 'arguably affected with a constitutional interest,' . . . he does not have to expose himself to enforcement to be able to challenge the law. 'If the injury is certainly impending, that is enough.' " *Taylor v. Polhill*, 964 F.3d 975, 980 (11th Cir. 2020) (quoting *ACLU v. Fla. Bar*, 999 F.2d 1486, 1492 (11th Cir. 1993)). A person "c[an] bring a pre-enforcement suit when he 'has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution[.]' " *Wollschlaeger*, 848 F.3d at 1304 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)).

The constitutional interest implicated in this case—Plaintiffs' protected speech—is burdened in two ways: (1) some Plaintiffs risk being disciplined by their universities, yet will speak anyways, and (2) some Plaintiffs plan to self-censor to avoid discipline. Both Plaintiffs' intended speech and self-censorship show an intent to engage in an act "arguably affected with a constitutional interest" under *Driehaus* and *Wollschlaeger*. To be sure, a pre-enforcement First Amendment injury is typically realized by evidence of self-censorship, and for these injuries, "[t]he fundamental question . . . is whether the challenged policy 'objectively chills' protected expression." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022). But intending to defy the government's speech restriction despite risk of

enforcement is no less cognizable a pre-enforcement injury than self-censorship. To find otherwise would further encourage would-be plaintiffs to self-censor lest they strip themselves of standing. This would undermine the point of permitting pre-enforcement challenges under the First Amendment.

Both Plaintiffs and Defendants misconstrue the requirements for standing here. The *Pernell* Plaintiffs insist that, because they bring a facial challenge to the IFA, they have standing to challenge the entire act. ECF No. 55 at 16–17, *in* Case No: 4:22cv304-MW/MAF.[24] It is well established, however, that even for facial challenges, plaintiffs must show an injury under each provision of the challenged statute. *See Harrell*, 608 F.3d at 1254.[25] Even accepting that they must show a specific injury, the *Pernell* Plaintiffs misunderstand the standard for a self-censorship injury. Their arguments and declarations repeat the notion that some professors are afraid even to discuss the eight concepts in class lest they violate the IFA. *See, e.g.*, ECF No. 55 at 17, *in* Case No: 4:22cv304-MW/MAF; ECF No. 13-3

---

[24] The parties in both *Pernell* and *Novoa* incorporate the arguments on standing from the briefing on the respective motions to dismiss. Accordingly, this Court cites to those briefs in addressing the parties' arguments on standing for purposes of the motions for preliminary injunction. But this Court reiterates that Plaintiffs bear a heightened burden to demonstrate standing at the preliminary-injunction stage, and this Court must hold them to this burden in resolving their motions for preliminary injunction. This Court will address Defendants' standing arguments separately under the motion-to-dismiss standard when it resolves the pending motions to dismiss.

[25] *Harrell*'s holding on standing, as well as the Supreme Court's decision in *Davis* and the Eleventh Circuit's decision in *CAMP*, are discussed in more detail *infra*.

at ¶ 40, *in* Case No: 4:22cv304-MW/MAF. [26] As this Court explains later, the IFA is vague and imprecise, but at least one thing is clear: mere discussion of the eight concepts, without promotion or compulsion,[27] does not violate the IFA. *See* § 1000.05(4)(a), Fla. Stat. (2022). The *Pernell* Plaintiffs' injuries are limited to the concepts that they arguably promote or compel belief in.[28]

The *Novoa* Plaintiffs recognize that there could be a narrower approach to standing. *See* ECF No. 38 at 14–17, *in* Case No: 4:22cv324-MW/MAF. They cite the Eleventh Circuit's decision in *CAMP* to criticize Defendants' "cramped and narrow view of standing . . . ." *Id.* at 18. And they imply that because the "overbreadth doctrine allows [them] to demonstrate the chilling effect of the law

---

[26] The *Pernell* Plaintiffs' declarations are also rife with descriptions of their feelings and impressions of the IFA. These musings do nothing to help this Court determine if it has jurisdiction over this case.

[27] The IFA prohibits instructors from subjecting a student or employee to a training or instruction that "espouses, promotes, advances, inculcates, or compels such student or employee to believe" any of the eight concepts. § 1000.05(4)(a), Fla. Stat. (2022). This Court uses the terms "promotion" and "compulsion" as shorthand for the IFA's full list of prohibited actions. But by using these terms, this Court does not mean to suggest that the terms are synonymous (or even similar). This Court simply uses these terms for ease of reference.

[28] The *Pernell* Plaintiffs' failure to show an intent to promote or compel belief in all eight concepts for each professor contrasts with the showing made in a related case before this Court. In *Honeyfund.com, Inc. v. DeSantis*, --- F. Supp. 3d ---, 2022 WL 3486962 (N.D. Fla. 2022), Plaintiff Collective Concepts, LLC submitted a declaration detailing how its proposed speech arguably ran afoul of each of the IFA's eight concepts. And because a single plaintiff with standing satisfies Article III's case or controversy requirement, *see Rumsfeld v. FAIR*, 547 U.S. 47, 53 n.2 (2006), the *Honeyfund* Plaintiffs demonstrated standing to challenge the IFA's viewpoint restrictions for private employers as to all eight concepts. The *Pernell* Plaintiffs' declarations lack this clarity. And no *Pernell* Plaintiff has established standing to challenge all eight concepts under the IFA.

47

without pleading every possible application," they need not show a personal injury under each of the IFA's eight concepts. *See id.* at 18–19.

However, the Eleventh Circuit squarely rejected this argument when it comes to showing an injury for purposes of Article III standing. "The overbreadth doctrine does not relieve a plaintiff of the burden to prove constitutional standing, which requires that 'the plaintiff himself has suffered some threatened or actual injury resulting from the putatively illegal action.' " *CAMP*, 451 F.3d at 1270 (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). Like the *Pernell* Plaintiffs, the *Novoa* Plaintiffs cannot circumvent binding precedent that requires this Court to examine the injury shown by each plaintiff for each challenged statutory provision.

Not to be excluded, Defendants exaggerate the required showing for an actual injury. Defendants insist that a Professor Plaintiff's intended promotion or compulsion to believe one or more of the eight concepts must be a near-perfect match for the IFA's eight concepts. *See* ECF No. 51-1 at 18–19, *in* Case No: 4:22cv304-MW/MAF; ECF No. 33-1 at 9, *in* Case No: 4:22cv324-MW/MAF. For example, in *Pernell*, Defendants contend that none of the Plaintiffs promote or compel belief in the third concept because they do not "clearly state an intention to teach that '[a] person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex.' " ECF No.

51-1 at 19, *in* Case No: 4:22cv304-MW/MAF (quoting § 1000.05(4)(a)3., Fla. Stat. (2022)).

But this argument overstates the showing required for an injury in a pre-enforcement First Amendment challenge, even at the preliminary injunction stage.[29] Despite Defendants' insistence that the Professor Plaintiffs' proposed viewpoints must serve as a mirror image for each prohibited viewpoint, the proposed speech needs only to arguably run afoul of the prohibition. *See Wollschlaeger*, 848 F.3d at 1304.

In *Pernell*, for example, Professor Dorsey's proposed speech does just that. In her class, she assigns several of her own articles that acknowledge the existence of white privilege, ECF No. 13-2 ¶ 43, *in* Case No: 4:22cv304-MW/MAF (Dorsey Declaration), arguably promoting the third concept that a person's privilege is determined by their race. While a professor assigning their own article endorsing a prohibited viewpoint is not as clear of a "promotion" or "compulsion" as, say, a professor reading prohibited viewpoints verbatim in class as their own opinion, the former would still arguably run afoul of the IFA. Demonstrating a pre-enforcement First Amendment injury does not require an intent to engage in an act that is unquestionably proscribed.

---

[29] As this Court noted *supra*, Plaintiffs bear a heightened burden to prove standing for purposes of a preliminary injunction.

So what is the standard? The Supreme Court's standing analysis in *Davis* is instructive. There, the Court held that a party challenging political campaign regulations—namely, disclosure requirements and self-financing contribution limits—must show an injury under each provision to demonstrate standing. *See Davis*, 554 U.S. at 734. The Supreme Court in *Davis* did not explain, however, what qualifies as a separate statutory provision requiring a separate injury.[30]

The Eleventh Circuit's decisions in *CAMP* and *Harrell* fill in this gap. These decisions explain that standing for each challenged statutory provision must be analyzed at a granular level. Accordingly, this Court turns to these cases to guide its analysis, starting with *CAMP*.

---

[30] The *Pernell* Plaintiffs' argument about the interrelatedness of the prohibited viewpoints, ECF No. 55 at 16, *in* Case No: 4:22cv304-MW/MAF, is well-taken if ultimately mistaken. Here, the IFA's eight concepts are closely related. While each concept purportedly targets a form of discrimination, they all deal generally with the view that race consciousness (or consideration of color, national origin, or sex) is prohibited. *Compare, e.g.*, § 1000.05(4)(a)2., Fla. Stat. (2022) (prohibiting promotion of the view that a person may be unconsciously racist due to their own race) *with, e.g.*, § 1000.05(4)(a)8., Fla. Stat. (2022) (prohibiting promotion of the view that colorblindness is racist). The similarity of these eight concepts creates an arguable basis for the Professor Plaintiffs to refrain from expressing a favorable viewpoint on race or sex consciousness as part of their intended instruction. Further, it could be argued that the injury suffered by the Professor Plaintiffs flows from the IFA's *enforcement mechanism*, not the *definition* of the eight concepts. None of the harms the Professor Plaintiffs face flows from the definitions of the eight concepts. Instead, the requirement that universities implement a grievance system and discipline or terminate employees that promote or compel belief in any of the eight concepts serves as the source of the Professor Plaintiffs' injury.

If the Supreme Court's opinion in *Davis* were the only authority analyzing standing on a provision-by-provision basis, this argument might be tenable. But, as this Court sets out *infra*, the Eleventh Circuit's decisions in *CAMP* and *Harrell* mandate a more granular provision-by-provision analysis to determine whether Plaintiffs demonstrate an injury for each way that a challenged statute may be violated.

In *CAMP*, a group seeking to hold outdoor festivals in Atlanta challenged the City's permitting ordinance on First Amendment grounds. *CAMP*, 451 F.3d at 1264. In determining whether the plaintiffs had standing, the Eleventh Circuit ruled that the group " 'must show that [it] has sustained or is immediately in danger of sustaining a direct injury as the result of' each provision" in the challenged permitting ordinance. *Id.* at 1274 (quoting *Laird v. Tatum*, 408 U.S. 1, 13 (1972)). For example, the Eleventh Circuit held that the group had standing to challenge the ordinance's provision that they apply for a permit ninety days before the proposed event because the group demonstrated its activities were arguably affected by this provision. Specifically, the group submitted evidence that it had "difficulty recruiting performers based on its inability to predict whether it would receive a festival permit 90 days in advance." *Id.* at 1276.

The group did not have standing, however, to challenge the ordinance's provision that permit applicants must not have failed to pay fees or execute a cleanup plan for prior events because the group "presented no evidence . . . that these provisions apply to the permits it seeks." *Id.* In sum, even though the challenged statute's provisions fell under an umbrella of permit requirements, the group still had to demonstrate an injury for each way the statute could be violated. In other words, they could challenge only those provisions that their activities arguably implicated. Thus, *CAMP* teaches that, to satisfy the required provision-by-provision standing

51

analysis, plaintiffs must demonstrate an injury for each challenged provision by showing how their activities arguably implicate each way the challenged statute could be violated.

This Court's reading of *CAMP* is confirmed by the Eleventh Circuit's decision in *Harrell*. In that case, the Eleventh Circuit applied *CAMP*'s meticulous provision-by-provision analysis to an attorney's[31] challenge to nine Florida Bar provisions regulating attorney advertising on vagueness and First Amendment grounds. *Harrell*, 608 F.3d at 1253. For his First Amendment claims, the Eleventh Circuit found that the attorney had standing to challenge all nine of the challenged advertising provisions. While the exact showing for each provision was not specified, the Eleventh Circuit found that the attorney had shown "how the challenged rules seem to prohibit the ads he wishes to run . . . ." *Id.* at 1260 n.7. Again, despite the similarity of the statutory provisions under the umbrella of regulating attorney advertising, the attorney still had to show an injury for each way the challenged provisions could be violated.

In sum, the provision-by-provision analysis set out in *CAMP* and *Harrell* requires plaintiffs to demonstrate an injury by showing how their activities arguably implicate each way a challenged statute could be violated. In *CAMP*, this meant that

---

[31] In addition to the individual attorney, both the attorney's firm and a nonprofit organization challenged the Florida Bar's advertising restrictions.

the group challenging Atlanta's permitting process must show an arguable effect on its operations for every challenged permit requirement. In *Harrell*, this meant that the attorney seeking to run various ads must show an arguable effect on a proposed advertisement for every challenged advertising provision. In this case, this means that the Professor Plaintiffs must show their intent to arguably promote or compel belief in each of the challenged concepts to establish standing.

With this provision-by-provision standard in mind, this Court now addresses standing as to Plaintiffs' First Amendment challenge. Plaintiffs can be divided into two categories: (1) professors and (2) students. This Court will address each in turn.

## 2

First, the Professor Plaintiffs. All but one of the Professor Plaintiffs suffer from (1) a cognizable injury—either self-censorship or planning to speak despite risk of discipline—that is (2) fairly traceable to the members of the Board of Governors (and, for Professor Novoa, to the members of the University of South Florida Board of Trustees) and (3) would be redressed with an injunction prohibiting enforcement of section 1000.05(4), Florida Statutes (2022) and Regulation 10.005. These elements are discussed in detail below.

### i

Now for the first element of standing: a cognizable injury. This Court begins with the sole professor who has failed to demonstrate standing for purposes of the

requested preliminary injunction—namely, Dr. Dunn. Dr. Dunn's showing, while a close call, falls short of meeting his heightened burden to establish an injury at the preliminary injunction stage because he has not demonstrated how his bus tour falls within prohibited instruction or training.

To review, Dr. Dunn is an emeritus professor at FIU who offers his views as part of a Black history bus tour for FIU students and staff. *See* ECF No. 13-7 ¶ 10, *in* Case No: 4:22cv304-MW/MAF (Dunn Declaration). He asserts that FIU currently compensates him for his work running the bus tour, but Dr. Dunn does not explain whether any FIU students or employees participate in the bus tour as part of a course or training put on by the university. These facts are critical to establish whether Dr. Dunn's bus tour is regulated under the IFA as "instruction" or "training."

Regulation 10.005(1)(c) defines "instruction" as "the process of teaching or engaging students with content about a particular subject by a university employee . . . within a course." Regulation 10.005(1)(b) also defines "training" as a "planned or organized activity conducted by the university as a mandatory condition of employment, enrollment, or participation in a university program for the purpose of imparting knowledge, developing skills or competencies, or becoming proficient in a particular job or role." Here, Dr. Dunn's lone statement that he continues "to instruct FIU students and staff on the tour," without more, does not establish that he provides "instruction" or "training" under Regulation 10.005. At the preliminary

injunction stage, Dr. Dunn's failure to demonstrate that the tour is required (or even recommended) as part of a course or training at FIU makes his self-censorship injury unreasonable because the IFA likely does not apply to his speech. Accordingly, Dr. Dunn lacks standing to seek a preliminary injunction.

Aside from Dr. Dunn, the Professor Plaintiffs have shown a substantial likelihood of success in establishing standing for purposes of a preliminary injunction touching at least one—and often several—of the eight concepts.

Starting with Professor Pernell, he asserts that he typically assigns a casebook that he authored as part of his course on the Role of Race in Criminal Procedure at FAMU Law. ECF No. 13-1 ¶ 22, *in* Case No: 4:22cv304-MW/MAF (Pernell Declaration). He will likely teach this class in the 2023 spring semester, *id.* ¶ 16, and most of the readings for it come from his casebook (which includes excerpts of his scholarship), *id.* ¶ 22. Professor Pernell's casebook explains how racism became embedded in the criminal legal system and that it remains embedded there. *Id.*

Professor Pernell realizes the risk to him personally if he were to violate the IFA, *id.* ¶ 28, and that the IFA arguably requires him to stop using his casebook in class, *id.* ¶ 22. This is because the notion that the criminal legal system is not colorblind—and, in turn, that some people are disadvantaged due to their race— arguably promotes or compels belief in the IFA's third and fourth concepts. *See* §§ 1000.05(4)(a)3.–4., Fla. Stat. (2022); Regulation 10.005(1)(a)3.–4.

Professor Pernell does not explicitly state that he plans to either self-censor or promote the third and fourth concepts despite risk of discipline from FAMU Law. However, Professor Pernell's showing permits the reasonable inference that the IFA's speech restrictions leave him with three choices. He can (1) self-censor; (2) promote the third and fourth concepts despite risk of discipline from FAMU Law; or (3) self-censor in part and promote some concepts despite risk of discipline. As this Court previously explained, each alternative evidences an intent to engage in an act "arguably affected with a constitutional interest" under *Driehaus* and *Wollschlaeger*.

Before setting out its ultimate finding on Professor Pernell's injury, this Court pauses to discuss whether Professor Pernell—and the other Professor Plaintiffs— face "a credible threat of prosecution." *See Wollschlaeger*, 848 F.3d at 1304. The interaction between the Professor Plaintiffs' planned speech and Regulation 10.005 makes clear that each state university will likely prosecute any violation of the IFA. Regulation 10.005(2)(a) mandates that "[e]ach university shall have a university regulation that prohibits discrimination . . . by subjecting any student or employee to training or instruction that espouses, promotes, advances, inculcates, or compels such student or employee to believe any of the concepts as defined in paragraph (1)(a)." Regulation 10.005(4)(d) requires each university to establish a process to investigate reported violations of section 10.005(2)(a) and take "prompt action" to

56

force offending employees to modify their behavior or face discipline—up to and including termination. If a university "willfully and knowingly" violates section 1000.05(4)(a), Fla. Stat. (2022) (barring an employee from instruction that promotes any of the eight prohibited concepts), Regulation 10.005(4)(d) commands that "the university will be ineligible for performance funding" in the following fiscal year.

This performance funding is significant. For example, USF received $73,009,247 in performance-based funds in the 2021–2022 budget year, ECF No. 19-24, *in* Case No: 4:22cv324-MW/MAF, which makes up about a fifth of total state appropriations received by the University, *see* ECF No. 1 at 36, *in* Case No: 4:22cv324-MW/MAF. Given that the Board of Governors passed this regulation according to its deliberative process and pursuant to an express grant of authority from the Florida Legislature, this Court is inclined to believe that the Board means what it says. Defendants have also vigorously defended the IFA against legal challenges, which permits this Court to infer "an intent to enforce [the challenged statute] . . . ." *Wollschlaeger*, 848 F.3d at 1305 (quoting *Harrell*, 608 F.3d at 1257).

Universities are required to implement regulations barring promotion of the IFA's prohibited viewpoints, and enforcement is all but ensured with the threat of financial ruin. The Professor Plaintiffs face a credible threat that their universities will discipline them—and potentially terminate their employment—if they promote or compel belief in any of the eight concepts.

57

Here, Professor Pernell has established that (1) he intends to engage in an act "arguably affected with a constitutional interest" under *Driehaus* and *Wollschlaeger*; (2) this speech is arguably proscribed as promoting or compelling belief in the third and fourth concepts under the IFA and Regulation 10.005; and (3) the framework of Regulation 10.005 creates a credible threat of enforcement from FAMU and the members of the Board of Governors. Accordingly, Professor Pernell has demonstrated an injury for purposes of standing as to the third and fourth concepts.

As for Professor Dorsey, she assigns many of her own articles in her Critical Race Studies Course at USF. These articles acknowledge the existence of white privilege and denounce the concept of colorblindness. ECF No. 13-2 ¶ 43, *in* Case No: 4:22cv304-MW/MAF (Dorsey Declaration). Professor Dorsey will teach this class in the 2023 spring semester. *Id.* ¶ 25. Understanding that assigning her own articles acknowledging white privilege and criticizing color blindness arguably qualifies as promotion or compulsion to believe in some of the eight concepts, *id.* ¶ 43, Professor Dorsey fears her career prospects at USF will be limited, *id.* ¶ 57. Professor Dorsey does not explicitly state whether she will self-censor, but like Professor Pernell, her decision to either self-censor, speak with risk of being disciplined, or a combination of the two evidences an intent to engage in an act "arguably affected with a constitutional interest" under *Driehaus* and *Wollschlaeger*.

58

This Court finds that Professor Dorsey's course assignments arguably constitute promoting or compelling belief in the third, fourth, and eighth concepts. *See* §§ 1000.05(4)(a)3.–4. and 8., Fla. Stat (2022).; Regulation 10.005(1)(a)3.–4., and 8. Professor Dorsey's declarations establish that (1) she intends to engage in an act "arguably affected with a constitutional interest" under *Driehaus* and *Wollschlaeger*; (2) this speech is arguably proscribed as promoting or compelling belief in the third, fourth, and eighth concepts under the IFA and Regulation 10.005; and (3) Regulation 10.005's framework creates a credible threat of enforcement from USF and the members of the Board of Governors. Accordingly, Professor Dorsey has demonstrated an injury for purposes of standing as to the third, fourth, and eighth concepts.

At the University of Florida, Professor Austin teaches many courses that promote race consciousness, including Politics of Race and Urban Politics in the fall term of 2022, and African American Politics and Policy, which she teaches almost every year. ECF No. 13-3 ¶¶ 27–32, 35, *in* Case No: 4:22cv304-MW/MAF (Austin Declaration). As part of her courses, Professor Austin promotes Critical Race Theory as an "appropriate lens" and assigns articles from authors who argue, for example, that "racism is the norm in America because it provides advantages to whites and disadvantages to Blacks." *Id.* ¶¶ 40–41. Professor Austin also assigns a text that promotes the concepts of "white privilege, institutional racism at predominantly

white universities, and advocates for affirmative action to ensure campus diversity."
*Id.* ¶ 43. However, to avoid disciplinary action, Professor Austin plans to self-censor.
*Id.* ¶ 44.

This Court finds that by endorsing Critical Race Theory and assigning articles supporting various forms of race consciousness (or the perils of ignoring race), Professor Austin arguably promotes or compels belief in concepts three, four, six, and eight. *See* §§ 1000.05(4)(a)3., 4., 6., and 8., Fla. Stat. (2022); Regulation 10.005(1)(a)3., 4., 6., and 8. Professor Austin's declarations establish that (1) she would teach several classes where Critical Race Theory and various forms of race consciousness are arguably promoted but for the IFA; (2) this proposed speech is arguably proscribed as promotion of or compulsion to believe in the third, fourth, sixth, and eighth concepts under the IFA and Regulation 10.005; and (3) Regulation 10.005's framework creates a credible threat of enforcement from UF and the members of the Board of Governors. Accordingly, Professor Austin has demonstrated that it would be reasonable for her to self-censor, conferring an injury for purposes of standing as to the third, fourth, sixth, and eighth concepts.

Professor Park will teach a course on Race & Technology in the spring semester of 2023 at UCF, which expressly promotes the "basic premise" that technologies "perpetuate inequalities and oppression under the auspices of neutrality" ECF No. 13-4 ¶ 14, *in* Case No: 4:22cv304-MW/MAF (Park

60

Declaration). This course, as well Professor Park's other courses, "do not question whether heterosexism, sexism, or racism exist because there is already consensus" in her discipline. *Id.* ¶ 16. Similarly, Professor Park teaches that "notions of merit, objectivity, colorblindness, and so forth function to solidify systems of oppression— disguising biased standards as ones that are allegedly neutral." *Id.* By teaching "structural oppressions such as sexism, heterosexism and racism as foundational truths" rather than theories contemplated by some academics, Professor Park arguably promotes or compels belief in concepts four and eight under the IFA. *See* §§ 1000.05(4)(a)4. and 8., Fla. Stat. (2022); Regulation 10.005(1)(a)4. and 8.

Professor Park also conducts an exercise in her Feminist Theories class to explore privilege:

> In class, students have the option to answer various questions about their privileges (or lack thereof) related to race, sex, class, and ability. With each answer, they physically move closer or further from the center of the room (where I dispense candy), representing the social "center." We debrief on the activity, which students describe as a memorable lesson about what it feels means [sic] (and feels like) to be "centered" or "marginalized." They also learn how privileges shape the experiences of others.

ECF No. 13-4 ¶ 24, *in* Case No: 4:22cv304-MW/MAF (Park Declaration). This exercise arguably qualifies as promoting or compelling belief in the notion that a student's privileged status is determined by their race, color, national origin, or sex. With reasonable inferences, this exercise also arguably promotes or compels belief

in notions of guilt.[32] Thus, Professor Park's exercise arguably promotes or compels belief in concepts one, two, three, five, and seven. *See* §§ 1000.05(4)(a)1., 2., 3., 5., and 7., Fla. Stat. (2022); Regulation 10.005(1)(a)1., 2., 3., 5., and 7.

Fearing "disciplinary action, including termination" for violating the IFA, Professor Park acknowledges her choice between self-censoring and violating the law. ECF No. 13-4 ¶ 34, *in* Case No: 4:22cv304-MW/MAF (Park Declaration). Professor Park does not explicitly state whether she will self-censor, but like Professor Pernell, her decision to self-censor, speak with the risk of being disciplined, or a combination of the two evidences an intent to engage in an act "arguably affected with a constitutional interest" under *Driehaus* and *Wollschlaeger*.

Thus, Professor Park's declarations establish that (1) she intends to engage in an act "arguably affected with a constitutional interest" under *Driehaus* and *Wollschlaeger*; (2) her proposed speech is arguably proscribed as promotion of or compulsion to believe in the first, second, third, fourth, fifth, seventh, and eighth

---

[32] Professor Park arguably promotes or compels belief in the concept that a member of one race, sex, or national origin is morally superior to another by directing students to participate in an exercise accepting these privileges as true. In other words, students participating in the exercise could plausibly infer that peers with fewer privileges are "morally superior" because they lack the advantages of privileged students and have faced a more difficult life. *See* § 1000.05(4)(a)1., Fla. Stat. (2022). This same promotion of differing privileges could cause students to believe that their moral character is determined by their race, sex, or national origin, *see* § 1000.05(4)(a)3., Fla. Stat. (2022), they bear collective responsibility for the systems that enable their privilege and "must feel anguish," *see* § 1000.05(4)(a)7., Fla. Stat. (2022), that they are "inherently racist, sexist, or oppressive" due to their privilege, *see* § 1000.05(4)(a)2., Fla. Stat. (2022), or that they bear responsibility for "actions committed in the past by other members of the same race, color, national origin, or sex," *see* § 1000.05(4)(a)5., Fla. Stat. (2022).

concepts under the IFA and Regulation 10.005; and (3) the Regulation 10.005's framework creates a credible threat of enforcement from UCF and the members of the Board of Governors. Accordingly, Professor Park has demonstrated an injury for purposes of standing as to the first, third, fourth, fifth, seventh, and eighth concepts.

Also at UCF, Professor Sandoval teaches courses on interpersonal, intercultural, and gender communication. In these classes, she "explicitly" teaches that racial colorblindness "fundamentally denies the lived reality of people in a system that has an embedded racial hierarchy." ECF No. 13-5 ¶ 16, *in* Case No: 4:22cv304-MW/MAF (Sandoval Declaration). Professor Sandoval is currently teaching Intercultural Communication in fall 2022. *Id.* ¶ 13. This course includes a section on "whiteness," which involves instructing students that "people of color are underrepresented in [her] field" due in part to discrimination by white academics. *Id*. By teaching these viewpoints as a foundational premise, *see id.* ¶ 22, instead of theories examined by some scholars, Professor Sandoval arguably promotes or compels belief in concepts three and eight. *See* §§ 1000.05(4)(a)3. and 8., Fla. Stat. (2022); Regulation 10.005(1)(a)3. and 8. Professor Sandoval acknowledges that she might be disciplined, but she still plans to teach these concepts. ECF No. 13-5 ¶ 13, *in* Case No: 4:22cv304-MW/MAF (Sandoval Declaration).

Thus, Professor Sandoval's declarations establish that (1) she will teach several classes where some of the eight concepts are taught as foundational premises

and colorblindness is critiqued despite the risk of discipline from UCF; (2) this speech is arguably proscribed as promotion of or compulsion to believe in the third and eighth concepts under the IFA and Regulation 10.005; and (3) Regulation 10.005's framework creates a credible threat of enforcement from UCF and the members of the Board of Governors. Accordingly, Professor Sandoval has demonstrated an injury for purposes of standing as to the third and eighth concepts.

At FSU, Professor Almond's graduate and doctorate-level courses instruct students on how to account for race as a variable in statistical analysis. ECF No. 13-6 ¶¶ 15–17, *in* Case No: 4:22cv304-MW/MAF (Almond Declaration). In a handout Professor Almond created and assigns in his Basic Descriptive and Inferential Statistics Applications course, students are encouraged to consider the effects of ongoing systemic discrimination when evaluating the effects of race in statistical models. *Id.* ¶ 20. Professor Almond also discusses his own white privilege in the handout. *Id.* By assigning this handout, Professor Almond arguably promotes or compels belief in the third and fourth concepts. *See* §§ 1000.05(4)(a)3.–4., Fla. Stat. (2022); Regulation 10.005(1)(a)3.–4. Professor Almond acknowledges "having to decide whether to continue including this handout in my future courses by weighing the importance of the concepts discussed against the potential penalties for violating" the IFA. ECF No. 13-6 ¶ 32, *in* Case No: 4:22cv304-MW/MAF (Almond Declaration). Professor Almond does not explicitly state whether he will self-censor,

but like Professor Pernell, his decision to either self-censor, speak with risk of being disciplined, or a combination of the two evidences an intent engage in an act "arguably affected with a constitutional interest" under *Driehaus* and *Wollschlaeger*.

Professor Almond's declaration establishes that he (1) intends to engage in an act "arguably affected with a constitutional interest" under *Driehaus* and *Wollschlaeger*; (2) his proposed speech is arguably proscribed as promotion of or compulsion to believe the third and fourth concepts under the IFA and Regulation 10.005; and (3) Regulation 10.005's framework creates a credible threat of enforcement from FSU and the members of the Board of Governors. ECF No. 13-6 ¶¶ 15–17, 20, *in* Case No: 4:22cv304-MW/MAF (Almond Declaration). Accordingly, Professor Almond has demonstrated an injury for purposes of standing as to the third and fourth concepts.

At USF, Professor Novoa will teach Science in Cultural Context in the spring 2023 semester. ECF No. 1 ¶ 152, *in* Case No.: 4:22cv324-MW/MAF (Novoa's Sworn Allegations in Verified Complaint).[33] In this course, Professor Novoa assigns a book she co-authored, *From Man to Ape: Darwinism in Argentina, 1870–1920*, in which they argue that the "strict vertical hierarchy in the flow of scientific knowledge" between Europe and Latin America" relegates "Latin American

---

[33] As this Court explained *supra*, the *Novoa* Plaintiffs set out their evidence in the form of sworn factual allegations in the verified complaint.

scientists to the *status of derivative thinkers*." *Id.* ¶ 161. Professor Novoa also assigns an article arguing that the "new human sciences" used "racial differences between human groups" as the "chief means" of mapping the human world. *Id.* ¶ 170. Assigning her own work treating the existence of racial privilege as a given arguably implicates the IFA's third concept, as does her intention to promote another author's arguments in favor of race consciousness as part of her class discussions. *See* § 1000.05(4)(a)3., Fla. Stat. (2022); Regulation 10.005(1)(a)3.

In the fall 2022 semester, Professor Novoa is teaching History of Sports from National to Global Contexts. In this course, she asserts that she traditionally assigns articles that promote the following viewpoints:

- "Afro-Latino baseball players, despite coming from different backgrounds and cultures, were reduced to their perceived racial identity." ECF No. 1 ¶ 180, *in* Case No.: 4:22cv324-MW/MAF.

- "[D]espite making progress on racial issues, the United States remains segregated by race." *Id.* ¶ 184.

- "[W]hite Americans have historically been privileged to the detriment of non-white" or "subordinate groups . . . ." *Id.* ¶ 193.

Professor Novoa promotes these arguments through her lectures, *see id.* ¶¶ 179, 186, which arguably implicates IFA's concept three. *See* § 1000.05(4)(a)3., Fla. Stat. (2022); Regulation 10.005(1)(a)3.

Finally, in Professor Novoa's Modern Latin America class, she assigns a reading called *Collective Guilt and the Crucifixion* by Geoffrey Turner that teaches about collective guilt. As part of this assignment, Professor Novoa discusses the case of Damiana-Kryygi:

> A group of European explorers killed Damiana-Kryygi's parents, kidnapped her as a small child, and took her to live in Buenos Aires, Argentina, where she was a maid of a famous physician. After she died, Damiana-Kryygi's head was severed and sent to Berlin for phrenological and other pseudoscientific studies because it was believed that her "race" was extinguishing.

ECF No. 1 ¶ 207, *in* Case No.: 4:22cv324-MW/MAF. Professor Novoa asserts that Argentine society—herself included—bears collective responsibility for this act as well as the broader extermination of indigenous peoples. *Id.* ¶¶ 209–11. In expressing her belief that she bears collective responsibility for the wrongs committed by other individuals sharing her national origin during class discussions, Professor Novoa arguably promotes the first, second, third, fifth, and seventh concepts under the IFA. *See* §§ 1000.05(4)(a)1., 2., 3., 5., and 7., Fla. Stat. (2022); Regulation 10.005(1)(a)1., 2., 3., 5., and 7.[34]

---

[34] Similar to the rationale set out with respect to Professor Park, Professor Novoa arguably promotes or compels belief in the concept that a member of one national origin is morally superior to another by sharing her belief that she herself bears responsibility for the actions of her ancestors. In other words, by acknowledging guilt for the extermination of indigenous people that an indigenous person would not bear, a student could plausibly infer that the indigenous person lacking culpability is "morally superior" to the individual with collective culpability based on their national origin. *See* § 1000.05(4)(a)1., Fla. Stat. (2022). This same promotion of collective guilt could cause students to believe that their moral character is determined by their race, sex, or national origin, *see* §1000.05(4)(a)3., Fla. Stat. (2022), they bear their own form of collective

Because of the IFA, Professor Novoa plans to self-censor and refrain from promoting these works. *Id.* ¶¶ 165, 173, 182, 189, 196, 214. Professor Novoa's sworn allegations establish that she (1) would promote or compel belief in the concepts of race consciousness and collective guilt but is self-censoring due to the IFA; (2) her proposed speech is arguably proscribed as promotion of or compulsion to believe in the first, second, third, fifth, and seventh concepts under the IFA and Regulation 10.005; and (3) Regulation 10.005's framework creates a credible threat of enforcement from USF and the members of the Board of Governors. Accordingly, Professor Novoa has demonstrated that it is reasonable for her to self-censor, conferring an injury for purposes of standing as to the first, second, third, fifth, and seventh concepts.

In short, all but one of the Professor Plaintiffs have demonstrated an injury in fact with respect to one or more of the IFA's eight concepts, which they challenge as a viewpoint-based restriction in violation of the First Amendment. The Professor Plaintiffs' declarations and verified allegations show that they plan to alter their course instruction, refrain from speaking on race consciousness altogether, or continue and reasonably risk enforcement against them. Their proposed speech—

---

responsibility and "must feel anguish," *see* § 1000.05(4)(a)7., Fla. Stat. (2022), that they are "inherently racist, sexist, or oppressive," *see* § 1000.05(4)(a)2., Fla. Stat. (2022), or that they bear responsibility for "actions committed in the past by other members of the same race, color, national origin, or sex," *see* § 1000.05(4)(a)5., Fla. Stat. (2022).

promoting or compelling belief in viewpoints in support of race or sex consciousness as part of their course instruction—arguably runs afoul of the IFA's prohibitions. These professors provide "instruction" as defined by section 1000.05(4)'s implementing regulation, *see* ECF No. 1-2 at 2–3, *in* Case No: 4:22cv324-MW/MAF. Regulation 10.005(2)(a)'s mandate that each Florida university implement a bar on promoting or compelling belief in the IFA's concepts—combined with the hefty penalties facing the university to ensure enforcement—imposes a credible threat of enforcement on the Professor Plaintiffs.

For these reasons, this Court concludes that all Professor Plaintiffs, save Dr. Dunn, have demonstrated an injury in fact at the preliminary-injunction stage.

ii

Next, this Court will address whether the Professor Plaintiffs have demonstrated that their injuries are fairly traceable to Defendants. Traceability requires a showing that Plaintiffs' "injuries are connected with" Defendants' conduct. *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125 (11th Cir. 2019) (cleaned up) (quoting *Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018)). In other words, the Professor Plaintiffs must show that their injury is "fairly traceable to the challenged

69

action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560.

Here, the *Pernell* Professor Plaintiffs seek to enjoin (1) the Florida Board of Governors of the State University System, as well as its individual members in their official capacities; (2) the Boards of Trustees for the state university associated with each Professor Plaintiff; and (3) Manny Diaz, Jr., in his official capacity as the Commissioner of the Florida State Board of Education and member of the Board of Governors. The *Novoa* Professor Plaintiff seeks to enjoin (1) the members of the Florida Board of Governors of the State University System in their official capacities; (2) the USF Board of Trustees, as well as its individual members in their official capacities; (3) Manny Diaz, Jr., in his official capacity as the Commissioner of the Florida State Board of Education and member of the Board of Governors; and (4) the Inspector General of the Board of Governors.[35]

This Court finds that the Professor Plaintiffs' injuries are fairly traceable to the members of the Board of Governors and, for the *Novoa* Professor Plaintiff, to the members of the USF Board of Trustees in their official capacities.[36] The IFA requires

---

[35] Defendants fail to include more than a single sentence challenging Plaintiffs' standing as to the Board of Governors and its members, *see* ECF No. 51-1 at 7, *in* Case No: 4:22cv304-MW/MAF, which would qualify as waiver with most other legal arguments. However, this Court's independent obligation to verify jurisdiction is proper again requires this Court to flesh out this argument for them.

[36] The *Pernell* Plaintiffs neglect to bring official-capacity claims against the individual members of each university's Board of Trustees. This Court will not address the traceability of the

70

the Board of Governors to pass implementing regulations, which led to the passage of Regulation 10.005. *See* § 1000.05(6)(a), Fla. Stat. (2022). Each of the universities is controlled by its Board of Trustees. *See* § 1001.71(a), Fla. Stat. Regulation 10.005(2)(a) mandates that each state university pass its own regulation establishing a grievance and discipline procedure for professors who promote or compel belief in the eight concepts under the IFA. If the Board of Governors finds that a university "willfully and knowingly" failed to enforce the university regulation, the university will be ineligible for performance funding for the following fiscal year. Regulation 10.005(4)(d).

As set out in their declarations and verified complaint, the Professor Plaintiffs fear discipline from their universities, given (1) the requirement that their universities pass and enforce regulations barring the promotion of the eight concepts; and (2) the strong incentive their universities have to discipline offending professors. In short, the Board of Governors makes the determination that could lead to withholding performance funding, which in turn leaves the universities little choice but to ban promotion of the eight concepts. Accordingly, the Professor Plaintiffs' injuries are fairly traceable to the members of the Board of Governors in their official

---

*Pernell* Professor Plaintiffs' injuries to the Boards of Trustees because, as explained in more detail *infra*, these entities' sovereign immunity likely prevents an injunction from redressing any injury.

capacities. In addition, Professor Novoa's injuries are fairly traceable to the members of USF's Board of Trustees.[37]

The Professor Plaintiffs' injuries are also fairly traceable to Defendant Manny Diaz, Jr., in his official capacity a member of the Board of Governors. Although Defendant Diaz's role as Commissioner of the Board of Education lacks any clear enforcement authority under the IFA as to universities, his membership on the Board of Governors gives him the same connection to the Professor Plaintiffs' chilled speech as the rest of the Board of Governors under the regulatory framework outlined above. *See* § 1001.70(1), Fla. Stat. (establishing the Board of Governors and naming the Commissioner of Education as a permanent member).

Accordingly, Professor Plaintiffs' injuries are fairly traceable to the members of the Board of Governors in their official capacities and, for Professor Novoa, to the members of USF's Board of Trustees in their official capacities.[38]

iii

Next, this Court will address whether the Professor Plaintiffs have demonstrated that an injunction would sufficiently redress their injuries.

---

[37] This Court need not discuss Professor Novoa's standing to sue the USF Board of Trustees as an entity because, as discussed *infra*, the individual members of the Board of Trustees are likely the proper parties for prospective injunctive relief.

[38] As this Court will explain *infra*, the Professor Plaintiff in *Novoa* fails to show that enjoining the Inspector General would sufficiently redress her injury. For this reason, this Court need not address whether Professor Novoa's injury is fairly traceable to the Inspector General.

Redressability considers "whether the injury that a plaintiff alleges is likely to be redressed through the litigation." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 287 (2008) (emphasis removed). A "substantial likelihood" of redressability will satisfy this prong. *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 79 (1978). And Plaintiffs' redress need not be total. *Moody v. Holman*, 887 F.3d 1281, 1287 (11th Cir. 2018); *see also I.L. v. Alabama*, 739 F.3d 1273, 1282 (11th Cir. 2014). But it must be "the effect of the court's judgment on the defendant—not an absent third party—that redresses the plaintiff's injury." *Lewis v. Gov. of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019) (quoting *Digit. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 958 (8th Cir. 2015)). In sum, "where, as here, a plaintiff has sued to enjoin a government official from enforcing a law, he must show, at the very least, that the official has the authority to enforce the particular provision that he has challenged, such that an injunction prohibiting enforcement would be effectual." *Support Working Animals, Inc. v. Gov. of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021).

As for the *Novoa* Plaintiffs' claims against Defendant Julie Leftheris in her official capacity as the Inspector General of the Florida Board of Governors of the State University System, Professor Novoa falls short of demonstrating that her injury is likely to be redressed by enjoining the Inspector General at the preliminary injunction stage. Regulation 10.005(4)(a) directs the Inspector General to evaluate

73

whether universities have "willfully and knowingly failed to correct" a professor's promotion of any of the eight concepts. The Inspector General reports its findings to the Board of Governors, *see* Regulation 10.005(4)(a), which then decides whether the university ultimately violated Regulation 10.005(2)(a), thus triggering a loss in performance funding.

In short, the Inspector General serves only an investigative function. She makes no decision regarding the availability of the performance funding that encourages universities to bar the promotion of any of the eight concepts. Favorable inferences may sustain Professor Novoa's theory at the more forgiving motion-to-dismiss stage. But here, the Inspector General is only loosely connected to Professor Novoa's injuries. Without further factual support, the connection between Professor Novoa's injury and the Inspector General is too speculative to show a substantial likelihood of redressability at the preliminary injunction stage. *See Lujan*, 504 U.S. at 561 ("[I]t must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." (quoting *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 38, 42 (1976))).[39] Professor Novoa, thus, lacks standing for a

---

[39] The Board of Governors and its individual members lack this degree of separation from Plaintiffs' chilled speech or threat of discipline, making Plaintiffs' injuries fairly traceable to, and likely to be redressed by, enjoining the Board. In other words, Plaintiffs' chilled speech and the threat of discipline are tied to the Board's exclusive power to determine whether a university violated Regulation 10.005—which all but ensures that state universities enforce the IFA's viewpoint prohibitions.

preliminary injunction against Defendant Julie Leftheris in her official capacity as Inspector General of the Board of Governors.

Professor Novoa has demonstrated that her injuries would be substantially redressed by enjoining the remaining Defendants from enforcing the IFA and Regulation 10.005. Enjoining the members of the Board of Governors from enforcing the IFA would remove some chill on Professor Novoa's speech because USF would no longer be required to discipline any employee that promotes any of the eight concepts. So would enjoining the members of USF's Board of Trustees from complying with Regulation 10.005(2)(a)'s requirement that they enact and enforce regulations prohibiting promotion of the eight concepts.

This rationale applies with equal force to the *Pernell* Plaintiffs' claims against the members of the Board of Governors in their official capacities. However, the *Pernell* Plaintiffs inexplicably fail to bring official-capacity claims against the members of each university's Board of Trustees—despite bringing official-capacity claims against the members of the Board of Governors. An injunction against the Boards of Trustees for each *Pernell* Plaintiffs' university would not redress their injuries because suits against these entities are likely barred by sovereign immunity under the Eleventh Amendment. *See, e.g.*, *Univ. of S. Fla. Bd. of Trustees v. CoMentis, Inc.*, 861 F.3d 1234, 1237 (11th Cir. 2017) (finding that USF's Board of Trustees qualified an "arm or alter ego of the State" for diversity jurisdiction because

it satisfied the "same test that applies in determining whether [it] is entitled to Eleventh Amendment immunity").[40] Sovereign immunity bars even prospective injunctive relief when the named defendant is a state entity. *Stevens v. Gay*, 864 F.2d 113, 115 (11th Cir. 1989) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984)). Accordingly, the *Pernell* Plaintiffs have failed to show a likelihood of success in proving that an injunction against the Boards of Trustees would redress their injuries because such an injunction is likely barred by sovereign immunity. The *Pernell* Plaintiffs' lack standing to seek a preliminary injunction against their respective universities' Board of Trustees.

Now, back to redressability for the properly named parties. Because the FEEA still permits individual lawsuits for discrimination, an injunction directed at the properly named Defendants would not provide total redress for Plaintiffs. But redress need not be total to satisfy Article III, *Reeves v. Comm'r*, 23 F.4th 1308, 1318 (11th Cir. 2022), and enjoining these Defendants will provide at least partial redress. The remaining Professor Plaintiffs, thus, have demonstrated that the requested injunction would redress their asserted injuries.

---

[40] Neither party addresses the Boards of Trustees' sovereign immunity in their briefs, but this Court can raise the issue *sua sponte. McClendon v. Ga. Dep't of Cmty. Health*, 261 F.3d 1252, 1259 (11th Cir. 2001). This Court will address whether the Board of Governors and each university's Board of Trustees, as entities, should remain as parties to these suits in separate orders on the pending motions to dismiss.

*     *     *

Accordingly, this Court finds that the Professor Plaintiffs (save Dr. Dunn in *Pernell*) have standing to bring their First Amendment challenge against Defendants (save the Boards of Trustees in *Pernell* and the Inspector General in *Novoa*) as follows:

- Professor Pernell has standing to challenge the IFA's third and fourth concepts against the members of the Board of Governors in their official capacities;

- Professor Dorsey has standing to challenge the IFA's third, fourth, and eighth concepts against the members of the Board of Governors in their official capacities;

- Professor Austin has standing to challenge the IFA's third, fourth, sixth, and eighth concepts against the members of the Board of Governors in their official capacities;

- Professor Park has standing to challenge the IFA's first, second, third, fourth, fifth, seventh, and eighth concepts against the members of the Board of Governors in their official capacities;

- Professor Sandoval has standing to challenge the IFA's third and eighth concepts against the members of the Board of Governors in their official capacities;

- Professor Almond has standing to challenge the IFA's third and fourth concepts against the members of the Board of Governors in their official capacities;

- Professor Novoa has standing to challenge the IFA's first, second, third, fifth, and seventh concepts against the members of the Board of Governors in their official capacities and the members of the University of South Florida's Board of Trustees in their official capacities.

Conversely, Professor Plaintiffs have not demonstrated standing for a preliminary injunction challenging the IFA's prohibitions concerning those concepts that will not affect their classroom instruction.

3

Now to the Student Plaintiffs, who bring a right-to-receive-information claim under the First Amendment. *See* ECF No. 1 at 84–85, *in* Case No.: 4:22cv304-MW/MAF; ECF No. 1 at 76, *in* Case No.: 4:22cv324-MW/MAF.[41] As this Court explains *supra*, in the context of these cases, a student's right-to-receive-information claim is coextensive with a professor's free speech claim. Similarly, the Student Plaintiffs have standing to bring this claim only to the extent they can demonstrate

---

[41] Plaintiffs have not sought preliminary injunctive relief as to the equal protection claim in *Pernell*, ECF No. 1 at 86, *in* Case No: 4:22cv304-MW/MAF, or to the Campus Free Expression Act claim in *Novoa*, ECF No. 1 at 87, *in* Case No: 4:22cv324-MW/MAF. Accordingly, this Court need not address Plaintiffs' standing to bring those claims for purposes of this Order.

that at least one of their instructors is chilled under the IFA. Accordingly, this Court will address whether the Student Plaintiffs have demonstrated standing for purposes of a preliminary injunction, beginning with Plaintiff Johana Dauphin in *Pernell*.

i

Plaintiff Dauphin is a senior at FSU. ECF No. 13-8 ¶ 3, *in* Case No: 4:22cv304-MW/MAF (Dauphin Declaration). In the fall semester of 2022, Ms. Dauphin is enrolled in Race and Minority Relations, a course covering "historical and contemporary race relations in the United States from a sociological perspective." *Id.* ¶ 18. One of the course objectives listed in the course syllabus is to "[i]dentify the ways race/ethnicity is imbedded within the structure of society, and how it materially and symbolically benefits some, while disadvantaging others." *Id.* ¶ 19; *see also id.* ¶ 14. Ms. Dauphin submits no other evidence of her professor's planned promotion of one of the IFA's eight concepts.

While a close call, Ms. Dauphin falls short of demonstrating an injury for purposes of standing at the preliminary injunction stage. The cited course objective provides some evidence that at least one of Ms. Dauphin's professors may touch on some of these concepts. And Ms. Dauphin has presented ample evidence that she seeks a professor's promotion of some of the eight concepts. Even so, she has presented scant evidence that, but for the IFA, her professor would promote any of

79

the eight concepts.[42] Further, Ms. Dauphin does not demonstrate that the professor will self-censor. If the professor plans to promote or compel belief in the course objective while risking discipline, Ms. Dauphin would not suffer an injury. In short, Ms. Dauphin's evidence fails to demonstrate an injury for purposes of standing under the heightened burden imposed at the preliminary injunction stage.

On the other hand, in the *Novoa* case, Samuel Rechek has demonstrated standing. Mr. Rechek is an undergraduate at USF and president of First Amendment Forum at University of South Florida. ECF No. 1 ¶¶ 14, 16, *in* Case No.: 4:22cv324-MW/MAF. He plans to enroll in Professor Novoa's Science in Cultural Context course for spring 2023. *Id.* ¶ 153. As set out above, Professor Novoa plans to assign her own work treating the existence of racial privilege as a given in this course. Likewise, during her class discussion, Professor Novoa intends to promote another author's arguments in favor of race consciousness. Both planned actions arguably promote or compel belief in the third concept under the IFA. *See* § 1000.05(4)(a)3., Fla. Stat. (2022); Regulation 10.005(1)(a)3. Given Mr. Rechek's specific, verified allegations and Professor Novoa's evidence that she would instruct her course in this way but for the IFA, Mr. Rechek has demonstrated that he will imminently suffer an

---

[42] Ms. Dauphin also mentions that she is taking a Race and Minority Relations course in fall 2022, ECF No. 13-8 ¶ 20, *in* Case No: 4:22cv304-MW/MAF, but she fails to establish that any portion of that class would likely involve a professor promoting or compelling one of the IFA's eight concepts. Her speculation about a professor's potential fear of discussing colorblindness and unconscious bias is well taken but insufficient to qualify as an actual injury at the preliminary injunction stage.

injury—namely, a violation of his right to access information promoted by Professor Novoa.

ii

Next, traceability and redressability. As this Court explained above, Professor Novoa's chilled speech is fairly traceable to Defendants' enforcement of the IFA and Regulation 10.005. Likewise, an injunction prohibiting Defendants from enforcing these provisions would redress (if only partly) Professor Novoa's injuries.

The same reasoning applies to Mr. Rechek's injury. The information he seeks to access—Professor Novoa's viewpoint—is chilled by the members of both the Board of Governors's and the USF Board of Trustees's enforcement of the IFA and Regulation 10.005. Enjoining their enforcement would redress much of the chilling effect on Professor Novoa's speech. Accordingly, this Court finds that Samuel Rechek has demonstrated a substantial likelihood of success in showing that his injury is both fairly traceable to the members of the Board of Governors and the USF Board of Trustees, in their official capacities, and redressable by an injunction barring these Defendants from enforcing the IFA and Regulation 10.005.

Thus, having established a substantial likelihood of proving that (1) he will suffer an injury-in-fact that is (2) traceable to the members of both the Board of Governors and USF Board of Trustees in their official capacities and that (3) an injunction can substantially redress his injury, Samuel Rechek has standing to pursue

preliminary injunctive relief for his First Amendment claim against these Defendants.[43] Ms. Dauphin, on the other hand, lacks standing for purposes of her preliminary injunction motion and, thus, is not entitled to such relief.

4

Next, this Court addresses the Professor Plaintiffs' standing to pursue preliminary injunctive relief with respect to their vagueness challenge.[44] The standing analysis here is similar to the analysis for a pre-enforcement free speech claim, because the claimed injury is self-censorship or speaking with the risk of discipline. For a First Amendment claim, a plaintiff must show (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest," (2) that is "proscribed by a statute," and (3) that "there exists a credible threat of prosecution[.]" *Wollschlaeger*, 848 F.3d at 1304 (quoting *Driehaus*, 573 U.S. at 159). For a vagueness claim that allegedly chills speech, a plaintiff must show that (1) he seriously wishes to speak; (2) such speech would arguably be affected by the challenged prohibition, but the rules are at least arguably vague as they apply to him;

_____

[43] Because Mr. Rechek has established standing to seek a preliminary injunction, this Court need not address Plaintiff First Amendment Forum's associational standing. *See Rumsfeld*, 547 U.S. at 53 n.2.

[44] Only the Professor Plaintiffs bring a vagueness claim.

and (3) there is at least a minimal probability that the rules will be enforced if they are violated. *See Harrell*, 608 F.3d at 1254 (cleaned up).

The first and third elements of both tests overlap, and this Court's analysis regarding the Professor Plaintiffs' First Amendment injury applies with equal force to their vagueness injury. The difference comes with an additional requirement for an injury due to a prohibition's alleged vagueness—namely, that the challenged prohibition must also be arguably vague as it applies to the plaintiff. *See id.*

The Professor Plaintiffs satisfy these requirements. First, their proposed speech is arguably covered by one or more of the eight concepts in section 1000.05(4)(a), Florida Statutes (2022). Second, the so-called savings clause in section 1000.05(4)(b), Florida Statutes (20222), which applies to any instruction or training invoking the eight concepts, is arguably vague.[45] Accordingly, the Professor Plaintiffs have demonstrated an injury with respect to their vagueness claim.

The Professor Plaintiffs must also show that their injury resulting from the savings clause's vagueness is fairly traceable to, and redressable by, an order enjoining Defendants from enforcing the IFA. For the same reasons that these Plaintiffs have demonstrated traceability and redressability as to their First Amendment claims, they have also satisfied these requirements as to their vagueness claims. Accordingly, this Court finds that the injuries of Professor Plaintiffs (save

---

[45] This Court will address section 1000.05(4)(b)'s vagueness at length *infra*.

Dr. Dunn in *Pernell*) both are fairly traceable to Defendants (save the Boards of Trustees in *Pernell* and the Inspector General in *Novoa*) and would be substantially redressed by enjoining them from enforcing the challenged statute.

In sum, this Court finds that the Professor Plaintiffs (save Dr. Dunn in *Pernell*) have standing to bring their Fourteenth Amendment vagueness challenge against Defendants (save the Boards of Trustees in *Pernell* and the Inspector General in *Novoa*) as follows:

- Professor Pernell has standing to challenge the IFA's "objective instruction" provision with respect to the third and fourth concepts against the members of the Board of Governors in their official capacities;

- Professor Dorsey has standing to challenge the IFA's "objective instruction" provision with respect to the third, fourth, and eighth concepts against the members of the Board of Governors in their official capacities;

- Professor Austin has standing to challenge the IFA's "objective instruction" provision with respect to the third, fourth, sixth, and eighth concepts against the members of the Board of Governors in their official capacities;

- Professor Park has standing to challenge the IFA's "objective instruction" provision with respect to the first, second, third, fourth, fifth, seventh, and eighth concepts against the members of the Board of Governors in their official capacities;

84

- Professor Sandoval has standing to challenge the IFA's "objective instruction" provision with respect to the third and eighth concepts against the members of the Board of Governors in their official capacities;

- Professor Almond has standing to challenge the IFA's "objective instruction" provision with respect to the third and fourth concepts against the members of the Board of Governors in their official capacities;

- Professor Novoa has standing to challenge the IFA's "objective instruction" provision with respect to the first, second, third, fifth, and seventh concepts against the members of the Board of Governors in their official capacities and the members of the University of South Florida's Board of Trustees in their official capacities.

Conversely, Professor Plaintiffs have not demonstrated standing for a preliminary injunction challenging the IFA's prohibitions concerning those concepts that will not affect their classroom instruction.

## C

Having established that Plaintiffs—save Dr. Dunn and Ms. Dauphin—have standing for purposes of a preliminary injunction, this Court considers the merits of their claims, starting with their First Amendment claims.

1

Before diving in, this Court will first say what it is *not* doing. Contrary to Plaintiffs' request, this Court is *not* conducting any sort of forum analysis or applying strict scrutiny to the challenged provisions. Furthermore, contrary to Defendants' suggestion, this Court is *not* applying *Garcetti* to hold that the professors' speech at issue is outside the scope of First Amendment protection. Instead, as explained at length *supra*, this Court must apply the Eleventh Circuit's test from *Bishop* to both the professors' and Mr. Rechek's First Amendment claims.

For better or worse, *Bishop* guides this Court's analysis. Which begs the question—what is the standard this Court must apply from *Bishop*? First, contrary to Defendants' arguments, *Bishop* does *not* support their contention that the First Amendment does not protect professors' classroom speech.[46] Second, *Bishop* did *not* create a bright-line rule requiring that any conflict between a professor's speech and the State to always yield in the State's favor.[47] That dog just won't hunt. As this

---

[46] As this Court explained *supra*, even in the case Defendants cite for this proposition—*Edwards v. California University of Pennsylvania*—then-Judge Alito recognized this distinction and noted that the Eleventh Circuit in *Bishop* found "that a public university's restrictions on a professor's in-class speech 'implicated First Amendment freedoms.' " *Edwards*, 156 F.3d at 491.

[47] Once again, Defendants have cobbled together a rule from cherry-picked quotations dispersed throughout the opinion. *See* ECF No. 52 at 22, *in* Case No.: 4:22cv304-MW/MAF (arguing that "[t]he government, 'as an employer and educator can direct,' an individual professor 'to refrain from expression' of particular views 'in the classroom,' and federal judges cannot second-guess the government's determination by acting as 'ersatz deans or educators.' ") (quoting *Bishop*, 926 F.2d at 1075, 1077). But this Frankenstein's monster of a rule is wrong. It ignores the test set out in *Bishop* and the Eleventh Circuit's emphasis on a fact-intensive inquiry when judging similar First Amendment claims. It also ignores a body of case law suggesting that the reason

Court noted on the record at the hearing, the undersigned clerked for one of the Eleventh Circuit judges on the *Bishop* panel, and that judge was certainly smart enough to know the difference between a bright-line rule and a balancing test. Tr. at 17. *Bishop* explicitly adopted a balancing test. Full stop.

So, what does *Bishop* require this Court to do? Before discussing the analytical framework in depth and applying it to Plaintiffs' claims, this Court briefly describes the case itself. *Bishop* involved an exercise physiology professor at the University of Alabama who challenged the University's restriction on his class discussions, which included religious matters that the University deemed outside the scope of his required course content. The professor would refer to his religious beliefs during instructional time and, on the eve of exams, offered an "after-class meeting for his students and others . . . wherein he lectured on and discussed 'Evidences of God in Human Physiology.' " *Id.*

After receiving a few complaints from students, the University issued a memo to the professor about "Religious Activities in a Public Institution." *Bishop*, 926 F.2d at 1069. The University's memo advised that the professor's references to his

---

asserted for "the government's determination" may, in fact, be pretextual and the actual motivation for such a determination violates the Constitution. *See, e.g.*, ECF No. 468 (Memorandum of Decision) at 40, in *Gonzalez, et al. v. Douglas*, Case No.: 4:10cv623-AWT (D. Arizona Aug. 22, 2017) (noting several Circuit Courts have "recognized a pretext-based First Amendment claim in the school curriculum context"; concluding "that plaintiffs have proven their First Amendment claim because both enactment and enforcement [of challenged law] were motivated by racial animus"). It ignores, finally, the fact that the Constitution still serves to restrain the government from imposing viewpoint-based restrictions on protected speech.

religious beliefs and his after-class meeting "[were] unwarranted at a public institution such as The University of Alabama and should cease." *Id*. Failing to persuade the President of the University to rescind the memo, the professor sued for declaratory and injunctive relief, alleging that the memo violated his free speech rights, among other constitutional violations. *Id*. at 1070. After the case proceeded to a final order of summary judgment in the professor's favor, the Eleventh Circuit reversed the district court. *Id*.

In reversing the district court, the Eleventh Circuit noted that the "University's restrictions with respect to classroom conduct issued under its authority to control curriculum" did not infringe the professor's free speech rights. *Id*. at 1078. In addition, the Eleventh Circuit held that "the memo's restriction with respect to the optional after-class meeting" did not infringe the professor's free speech rights, given that the " 'extra' or 'optional' class or meeting [was] under the patronage of a university course" and that the meeting was held so close to the course's final examination. *Id*.

To reach these conclusions, the Eleventh Circuit applied a "case-by-case inquiry into whether the legitimate interests of the authorities [were] demonstrably sufficient to circumscribe [the] teacher's speech." *Bishop*, 926 F. 2d at 1074 (internal quotation marks and citation omitted). The Court suggested a balance of interests, taking "as its polestar *Kuhlmeier*'s concern for the 'basic educational mission' of the

school which gives it authority by the use of 'reasonable restrictions' over in-class speech that it could not censor outside the classroom." *Id.* (quoting *Hazelwood*, 484 U.S. at 266–67). But the Eleventh Circuit did not hold that *no* protection attaches to professors' in-class speech. Instead, the Eleventh Circuit recognized the principle, which this Court has already discussed at length, that the State has great flexibility when it comes to setting curriculum and determining course content. And with respect to the facts at issue in *Bishop*, the Eleventh Circuit held that when a professor and a university "disagree about a matter of content in the courses he teaches . . . . [t]he University must have the final say in such a dispute." *Id.* at 1076. In other words, "[t]he University's conclusions about course content must be allowed to hold sway over an individual professor's judgment."[48] *Id.* at 1077.

In *Bishop*, the Eleventh Circuit considered three factors under its "case-by-case" approach—namely, (1) "the context," (2) "the University's position as a public employer which may reasonably restrict the speech rights of employees more readily

---

[48] This is different from the claims now before this Court. Here, the State has expressly permitted professors to engage in classroom discussions regarding the eight concepts. The difference is that having determined the content of course discussions may include these eight concepts, the State has limited the viewpoints professors may share about the eight concepts. They can criticize the concepts or, alternatively, discuss them in an "objective" manner, but they cannot "endorse" the concepts. And while the State may easily point to a valid interest in regulating curriculum or course content, once the State permits discussion of certain content it becomes far more difficult to justify a viewpoint-based restriction on that discussion. Indeed, this Court has found no binding authority that supports the argument for permitting rank viewpoint discrimination, nor have the parties pointed to any persuasive authority for this proposition. But more on that later.

than those of other persons," specifically with respect "to reasonably control[ling] the content of its curriculum, particularly that content imparted during class time," and (3) "the strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment." *Id*. at 1074–75.

The context of *Bishop* involved a professor who independently chose to inject his personal religious beliefs into class discussions on exercise physiology. Citing the ever-present "specter of an establishment violation," the Eleventh Circuit credited the University's concerns of possible coercion as a valid interest in regulating the professor's speech. *Id*. at 1076 n.7. The fact that the professor conducted an "optional class" that served as a soapbox for his own personal agenda on the eve of final exams underscored the University's concern about coercion.

In addition, the Eleventh Circuit recognized that the professor sought to recategorize his religious beliefs as his professional views about the science course he was required to teach. *Id*. Nonetheless, the Eleventh Circuit pointed out "that the two have to be conceptually separated for fair analysis. That is, simply renaming religious views as professional, no matter how well-founded . . . does not deny the authority of his employer to request that he sequester the personal from the professional nor dismiss the specter of an establishment violation." *Id*. In other words, the Eleventh Circuit acknowledged the University had a valid and weighty interest in regulating the course curriculum and avoiding an establishment violation,

90

which outweighed the professor's asserted interest in academic freedom to discuss his religious beliefs in relation to the exercise physiology course he was required to teach.[49] This was particularly true where the Eleventh Circuit was "not convinced . . . that Dr. Bishop ha[d] fully comprehended the separation of his personal views from his professorial duties that the University demands." *Id*. at 1076 n.7.

Ultimately, the Eleventh Circuit found that a professor cannot do an end-run around required curriculum by hijacking a course's content and injecting religious beliefs into the classroom under the guise of offering their "professional opinion" on the subject. Considering the facts and the Establishment Clause concerns at play in *Bishop*, the Eleventh Circuit "concluded that the University as an employer and educator can direct Dr. Bishop to refrain from expression of religious viewpoints in the classroom and like settings." *Id*. at 1077.

This is not to say, however, that the University's restriction was permissible

---

[49] Defendants' suggestion that "the government's 'interests in the classroom conduct of its professors' are *per se* a legitimate pedagogical concern," ECF No. 52 at 23, *in* Case No.: 4:22cv304-MW/MAF, ignores the fact-intensive inquiry the Eleventh Circuit conducted in *Bishop*. Indeed, in suggesting the University's interests were sufficient in *Bishop*, the Eleventh Circuit limited its holding to the facts of that case and the "reasonable restrictions [the University of Alabama] imposed on Dr. Bishop." *Bishop*, 926 F.2d at 1076. The Eleventh Circuit did not hold that in *all* cases, the State is *always* constitutionally permitted to restrict professors' speech based on its "interest in the classroom conduct of its professors." Nor did the Eleventh Circuit hold that courts must *always* credit the State's asserted interest as "*per se* legitimate." Indeed, although this Court does not reach the issue here, other courts have considered whether an asserted pedagogical concern is in fact legitimate versus pretextual when evaluating other restrictions on classroom speech. *See* note 47, *supra*.

simply because of the religious nature of the speech at issue.[50] *Bishop* might have had a different outcome had Dr. Bishop taught a religious studies class and instead offered his views regarding his own faith while instructing on Christianity. Or it might have been a different case had the University permitted the exercise physiology course to include a unit on intelligent design and evolution with respect to human physiology. In *Bishop*, however, the Eleventh Circuit credited the University's determination that Dr. Bishop's religious speech was not part of its curriculum with respect to the exercise physiology course he taught. The same would likely be true if a professor tried to teach an introductory botany class through the lens of critical race theory.

In sum, the Eleventh Circuit—on the facts of the case before it—held that the University's authority to regulate content in the classroom with respect to the established curriculum and its concern regarding a possible establishment violation outweighed the professor's weak interest in academic freedom to change the content of the course. The Eleventh Circuit never said the University of Alabama had unfettered power to control every thought or opinion a professor wished to express

---

[50] Indeed, *Bishop* is not simply an Establishment Clause case. The Eleventh Circuit expressly separated its analysis of Dr. Bishop's free speech claim from any analysis of an actual establishment violation. It noted that "[t]he University can restrict speech that falls short of an establishment violation" and that it did "not reach the establishment questions raised by Dr. Bishop's conduct." *Bishop*, 926 F.2d at 1077. But for purposes of the free speech claim, the Eleventh Circuit credited the University's concerns about an establishment violation as part of its balance of interests in affirming the University's restriction of Dr. Bishop's classroom speech.

during class. Instead, it determined that the University had proved it had a sufficient interest to justify restricting Dr. Bishop's in-class speech about his religious beliefs.

Accordingly, equipped with the First Amendment principles previously discussed, this Court proceeds with its own case-by-case inquiry and applies *Bishop*'s balancing test to Plaintiffs' First Amendment claims.

2

Applying *Bishop*'s balancing test to Plaintiffs' free speech claims, this Court starts with *Bishop*'s first factor—context. Unlike in *Bishop*, the context of this case does not implicate Establishment Clause concerns, nor does it focus on student complaints about a single professor who used class time to discuss personal beliefs that the University had deemed to be outside the scope of his course's curriculum. Instead, the context here includes the State of Florida's passage of a sweeping prohibition on expressing certain viewpoints about eight concepts during training or instruction at state universities. This prophylactic ban on university employees' speech affects potentially thousands[51] of professors and serves as an *ante hoc* deterrent that "chills potential speech before it happens," and "gives rise to far more serious concerns than could any single supervisory decision," such as that in *Bishop*. *U.S. v. Nat'l Treas. Emp's Union*, 513 U.S. 454, 468 (1995) (*NTEU*).

---

[51] For example, the University of Florida, alone, boasts over 6,000 faculty members. *See University of Florida at a Glance*, available at https://news.ufl.edu/media/newsufledu /documents/20220408-311pm-UF-Facts.pdf (last visited November 16, 2022).

In *NTEU*, the Supreme Court reviewed a statute prohibiting over 1.5 million lower-level federal employees from receiving honoraria for writing articles or delivering speeches and held the government to a heavier burden of justification that could not be satisfied through "mere speculation about serious harms." *Id.* As discussed at the hearing, *NTEU*'s facts are distinguishable here because that case addressed a restriction on speech that was "largely unrelated to [the employees'] government employment." *Id.* at 466. Nonetheless, *NTEU* suggests that Defendants face a heavier burden to justify a "statutory restriction on expression," *id.* at 468, than the University of Alabama faced in *Bishop* "with respect to an isolated disciplinary action," *id.*

Likewise, the context here is different from that in *Bishop*, because the Professor Plaintiffs, unlike Dr. Bishop at the University of Alabama, are not seeking to inject unsanctioned concepts into their class content or hijack the established curriculum with their own personal agenda. Instead, the Professor Plaintiffs are challenging a prohibition on expressing approval[52] as to eight specific concepts, when the State of Florida has already sanctioned these eight concepts as part of the curriculum. Indeed, Defendants admit that these concepts are expressly allowed to be discussed in university classrooms. *See* ECF No. 52 at 31, *in* Case No.:

---

[52] Specifically, as noted earlier with respect to the eight concepts, the IFA prohibits "training or instruction that espouses, promotes, advances, inculcates, or compels . . . belie[f]," in them, and "endorsement of the concepts." §§ 1000.05(4)(a)–(b), Fla. Stat. (2022).

4:22cv304-MW/MAF ("As an initial matter, by its own terms, the Act does *not* 'prohibit discussion of the concepts' listed in Section [1000.05(4)(a)]."). The problem here, however, is the State of Florida has determined that although these concepts may be covered in the curriculum, instructors may only discuss them "in an objective manner"—whatever that means—or they may criticize or condemn the concepts. Defendants admit that the State of Florida is engaging in rank viewpoint discrimination, although their admission conflates viewpoint with content. *See* Tr. at 30 ("[W]hen the university is setting its curriculum, it is entitled to have a viewpoint. It is entitled to—and its professors are speaking with its voice, and it's entitled to determine what they say.").

This Court is mindful of the Eleventh Circuit's admonition that it "should not be [an] ersatz dean[] or educator[]" and that it "cannot supplant [its] discretion for that of the [State]." *Bishop*, 926 F.2d at 1066. Accordingly, this Court absolutely defers to the State of Florida's curricular decision to permit instructors to discuss these concepts in its university classrooms. However, this Court has found no authority—nor have the parties pointed to anything binding or persuasive—that requires this Court to defer to the State of Florida's blatant viewpoint-based restrictions on protected speech once the subject at issue is included in the curriculum. In other words, simply because the State of Florida has great flexibility in setting curriculum, it cannot impose its own orthodoxy of viewpoint about the

content it allowed within university classrooms. Thus, unlike in *Bishop*, the context of these cases weighs *against* the State of Florida's interest in prohibiting university employees from expressing certain viewpoints during training or instruction.

Which leads this Court to the second, somewhat-overlapping *Bishop* factor—namely, the State of Florida's "position as a public employer which may reasonably restrict the speech rights of employees more readily than . . . those of other persons." *Bishop*, 926 F.2d at 1074. Without a doubt, the State of Florida is accorded more flexibility to limit public employee speech as opposed to private individuals' speech. *Id*. at 1072 (discussing *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)). Nonetheless, such limitations must be both reasonable and supported by evidence of a sufficiently weighty interest to overcome the employee's right to speak.[53]

For example, in *Bishop*, the Eleventh Circuit credited the University's interest in controlling its curriculum and avoiding an establishment violation, which motivated the University to order Dr. Bishop to cease injecting his religious beliefs into his class discussions on exercise physiology. *Bishop*, 926 F.2d at 1076 ("[T]he University's interests in the classroom conduct of its professors are sufficient, in the balance we have suggested, to warrant the reasonable restrictions it has imposed on Dr. Bishop."). Likewise, the Eleventh Circuit held that the University of Alabama's

---

[53] And, as noted *supra*, a public employer may face a heavier burden to justify a prophylactic ban on expression as compared to an isolated disciplinary action. *See NTEU*, 513 U.S. at 468.

restrictions preventing "Dr. Bishop from making assertions about his religious beliefs vis-à-vis the subject matter of his course" and disassociating his after-class meetings from his courses were reasonable and sufficiently supported by its asserted interests. *Id.*

Here, on the other hand, Defendants assert the challenged provisions address the pedagogical concern of reducing racism or prohibiting racial discrimination as an extension of federal law under Title IX. *See* Tr. at 89. But even if this Court agrees this is a legitimate concern motivating the IFA's enactment, the restriction the State of Florida imposes upon its public university employees—a viewpoint-discriminatory ban targeting protected in-class speech—is certainly *not* reasonable.

Defendants try to dress up the State of Florida's interest as a public employer and educator as prohibiting discrimination in university classrooms, but this does not give Defendants a safe harbor in which to enforce viewpoint-based restrictions targeting protected speech. In short, it is no answer that the challenged provisions are situated within an antidiscrimination law. To the extent Defendants suggest a viewpoint-discriminatory restriction on protected speech is immunized from a First Amendment challenge because it is situated within an antidiscrimination law, they are mistaken.

Following Defendants' suggestion during the hearing that the IFA represents merely an extension of Title IX, this Court engaged in a lengthy discussion with

defense counsel regarding the relationship between the First Amendment and antidiscrimination laws, like Title IX, Title VII, and Florida's Civil Rights Act under Chapter 760. This was familiar territory for defense counsel, given that Mr. Cooper was also lead counsel in a parallel case challenging the IFA's amendments to Chapter 760. *See Honeyfund.com, Inc. v. DeSantis*, --- F. Supp. 3d    ---, 2022 WL 3486962, *9 (N.D. Fla. Aug. 18, 2022).

In *Honeyfund*, Defendants mistakenly asserted that "any holding striking down the IFA's employment provisions would directly threaten the validity of Title VII's protections against hostile work environments." *Id*. (cleaned up). As this Court previously explained, Title VII targets conduct and only incidentally burdens speech, but the IFA does the inverse. *Id*. at *10 (noting that the IFA "targets speech— endorsing any of eight concepts—and only incidentally burdens conduct"). And while "it can be mostly speech that creates" hostile environments under federal antidiscrimination laws, this is only so "when such speech is both objectively and subjectively offensive *and* when it is sufficiently severe or pervasive." *Id*. at *9. As this Court noted in *Honeyfund*, courts have recognized that this "severity or pervasiveness" requirement provides "shelter for core protected speech." *Id*. (quoting *DeJohn v. Temple Univ.*, 537 F.3d 301, 317–18 (3d Cir. 2008)); *see also Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999) (reversing dismissal of complaint alleging student-on-student sexual

harassment that "was not only verbal," but also "included numerous acts of objectively offensive touching . . . [and] multiple victims," and holding that "funding recipients are properly held liable in damages [under Title IX] . . . where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so *severe, pervasive, and objectively offensive* that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school" (emphasis added)). But the IFA, in declaring even the slightest endorsement of any of the eight concepts to be *per se* severe and pervasive, "provides no shelter for core protected speech." *Honeyfund*, 2022 WL 3486962 at *10 (quoting *DeJohn*, 537 F.3d at 318).

Like Title VII, Title IX provides, with certain exceptions, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). This statute, like other antidiscrimination laws, focuses primarily on the act of excluding, denying, or subjecting an individual to discrimination. Thus, given its focus on regulating *conduct* rather than *speech*, Title IX does not, on its face, run afoul of the First or Fourteenth Amendment. *See, e.g.*, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 572 (1995) ("Nor is this statute unusual in any obvious way, since it does not, on its face, target speech or

discriminate on the basis of its content, the focal point of its prohibition being rather on the act of discriminating against individuals in the provision of publicly available goods, privileges, and services on the proscribed grounds."); *R.A.V.*, 505 U.S. at 390 ("Where the government does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy."); *Norwegian Cruise Line Holdings, Ltd. v. State Surgeon Gen., Fla. Dep't of Health*, --- F. 4th ---, 2022 WL 5240425, *7 (11th Cir. 2022) (holding that Florida statute did not implicate First Amendment when it applied "to non-expressive conduct such as failing to grant persons who are unwilling or unable to verify their vaccination status access to, entry upon, or service from the business operations"); *Wollschlaeger*, 848 F.3d at 1317 (noting that "anti-discrimination laws are not categorically immune from First Amendment challenges" but that Florida statute at issue "[did] not, on its face, implicate the spoken or written word"); *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 596–97 (5th Cir. 1995) ("Where pure expression is involved, Title VII steers into the territory of the First Amendment. It is no use to deny or minimize this problem because, when Title VII is applied to sexual harassment claims founded solely on verbal insults, pictorial or literary matter, the statute imposes content-based, viewpoint-discriminatory restrictions on speech.").

Similarly, the FEEA, prior to the IFA's amendments, generally did not "implicate the spoken or written word" on its face. *Wollschlaeger*, 848 F.3d at 1317. Instead, it prohibited "[d]iscrimination on the basis of race, color, national origin, sex, disability, religion, or marital status" against students or employees in the public education system, consistent with Title IX's conduct-based prohibition on sex discrimination in public education. § 1000.05(2)(a), Fla. Stat. (2019).

The statute was amended in 2019 to command public K-20 educational institutions to treat discrimination "motivated by anti-Semitic intent in an identical manner to discrimination motivated by race." *See* § 1000.05(7), Fla. Stat. (2019). These amendments include examples of speech-based anti-Semitism. *See id*. § 1000.05(7)(a)–(b) ("[a]ccusing Jews as a people or the State of Israel of inventing or exaggerating the Holocaust . . . [a]ccusing Jewish citizens of being more loyal to Israel, or the alleged priorities of Jews worldwide, than to the interest of their own nations," etc.). However, the State of Florida also included the caveat that "criticism of Israel that is similar to criticism toward any other country may not be regarded as anti-Semitic." *Id*. § 1000.05(7)(b). Moreover, the State of Florida enacted a "savings clause," stating that "[n]othing in this subsection shall be construed to diminish or infringe upon any right protected under the First Amendment," nor shall it "be

construed to conflict with federal or state discrimination laws." *Id*. § 1000.05(7)(c).[54] In 2022, by contrast, the State of Florida did not include such language in the IFA, notwithstanding the fact that it was enacting a new speech-based restriction that admittedly amounts to rank viewpoint discrimination.

All this is to say that prior to 2019, the FEEA, like Title VII and Title IX, largely targeted conduct as opposed to speech. The 2019 anti-Semitism amendments changed this by specifically targeting speech; however, the State of Florida required these provisions to be applied (1) in the same manner as federal and state discrimination laws and (2) so as to avoid any construction that "diminish[es] or infringe[s] upon any right protected under the First Amendment to the United States Constitution, or the State Constitution." § 1000.05(7)(c), Fla. Stat. (2019). Now, the IFA has added another layer by further targeting speech—namely, expression of a specific viewpoint—without any nod toward the First Amendment or federal law.[55]

---

[54] Although these 2019 amendments present an interesting question about the extent to which the State can restrict anti-Semitic speech in public schools, this provision is not presently subject to challenge. Nonetheless, even pure speech, like true threats of violence, may be restricted if it falls within a category of speech that is proscribable under the First Amendment. *Compare* § 1000.05(7)(a)1., Fla. Stat. (2019) (defining anti-Semitism to include "calling for . . . the killing or harming of Jews . . . .") *with Virginia v. Black*, 538 U.S. 343, 359 (2003) (citing *Watts v. United States*, 394 U.S. 705, 708 (1969)) ("[T]he First Amendment also permits a State to ban a 'true threat.' "). But this Court need not, and does not, reach this issue here.

[55] To be clear, this Court does not mean to suggest that simply including a "savings clause" in a statute targeting speech immunizes that statute from a constitutional challenge. This Court only highlights the "savings clause" that the State of Florida enacted alongside the anti-Semitism amendments to juxtapose the different course it took in 2022. It is remarkable that, at least in 2019, the State of Florida recognized the anti-Semitism amendments arguably implicated the First

As this Court noted above, simply because the State of Florida says it wants to reduce racism or sexism in public universities does not give the State of Florida a safe harbor in which to enact rank viewpoint-based restrictions on protected speech. Further, it should go without saying that enacting a prophylactic ban on protected expression of certain viewpoints—in the interest of suppressing those viewpoints because the State of Florida finds them "repugnant"—is neither sufficiently weighty nor reasonable. If that were the case, the State of Florida could declare *any* idea repugnant and prohibit its professors from expressing approval of that idea while in the classroom.[56]

In short, the State of Florida cannot do an end-run around the First Amendment by declaring which viewpoints are so repugnant to lawmakers that their

_____

Amendment. But in 2022, the State of Florida dropped any pretense of respecting the Constitution's limitations on state law.

[56] Lest there be any doubt, Justice Alito recently emphasized the principle that viewpoint discrimination is anathema to the First Amendment in his concurring opinion in *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302–03 (2019) (Alito, J., concurring). Specifically, in agreeing that a provision of the Lanham Act violated the Free Speech Clause, Justice Alito opined that "[v]iewpoint discrimination is poison to a free society. But in many countries with constitutions or legal traditions that claim to protect freedom of speech, serious viewpoint discrimination is now tolerated, and such discrimination has become increasingly prevalent in this country." *Id*. at 2302. He emphasized that "At a time when free speech is under attack, it is especially important for [the Supreme Court] to remain firm on the principle that the First Amendment does not tolerate viewpoint discrimination." *Id*. at 2302–03. And he underscored that the Supreme Court's decision in *Iancu* "is not based on moral relativism but on the recognition that *a law banning speech deemed by government officials to be 'immoral' or 'scandalous' can easily be exploited for illegitimate ends*." *Id*. at 2303 (emphasis added).

mere utterance, on a single occasion,[57] is *per se* severe or pervasive and prohibiting

their expression under an antidiscrimination law. Here, "[w]here pure expression is

involved," the FEEA's prohibition on "training or instruction that espouses,

promotes, advances, inculcates, or compels" students or employees to believe certain

concepts "steers into the territory of the First Amendment." *DeAngelis*, 51 F.3d at

596–97. For these reasons, unlike in *Bishop*, this second factor adds little weight to

Defendants' side of the scale. The State of Florida's position as a public employer

and its asserted interest in combatting racism or sexism does not justify enforcing a

viewpoint-based restriction targeting protected speech.

Which leads this Court to consider *Bishop*'s third factor; namely, "the strong

predilection for academic freedom as an adjunct of the free speech rights of the First

Amendment." 926 F.2d at 1075. In *Bishop*, the Eleventh Circuit determined that—

under the facts of that case—once the University of Alabama deemed his religious

discussions to be outside the scope of his course's curriculum, Dr. Bishop had a

weak interest in academic freedom to support his contention that he should be free

to discuss his religious beliefs while teaching his exercise physiology course and

holding "after-class" meetings in connection with that course. *Id*. at 1076 ("In short,

---

[57] Indeed, even a single instance of discriminatory *conduct* often is not considered *per se* discrimination under the federal laws to which Defendants hope to link the IFA. *See, e.g., McNorton v. Ga. Dep't of Transp.*, 619 F. Supp. 2d 1360, 1377 (N.D. Ga. 2007) (noting "it is fairly well established that a single instance of touching an employee's buttock, such as the case here, is not serious enough to support a claim for sexual harassment").

Dr. Bishop and the University disagree about a matter of content in the course he teaches. The University must have the final say in such a dispute."). Certainly, "academic freedom" does not justify a professor hijacking their class discussion to focus on matters outside the established curriculum.

But here, in these cases now before this Court, Plaintiffs' free speech claims present an interest in academic freedom of the highest degree. Professor Plaintiffs are not attempting to alter the permitted curriculum. Instead, they seek to prevent the State of Florida from imposing its orthodoxy of viewpoint about that curriculum in university classrooms across the state. According to the State of Florida, so long as professors avoid promotion of one side of a particular idea—or do the State of Florida's bidding and condemn those ideas that the State has deemed unworthy— professors need fear no consequences from the State.[58] But to step out of line during class and utter a single expression of approval of one of the State of Florida's disfavored ideas is to risk discipline or even termination. In other words, the State of Florida says that to avoid indoctrination, the State of Florida can impose its own orthodoxy and can indoctrinate university students to its preferred viewpoint. This extravagant doublespeak flies in the face of "the invaluable role academic freedom plays in our public schools, particularly at the post-secondary level . . . ." *Bishop*,

---

[58] That is not to say that acquiescence to the State of Florida's preferred orthodoxy would not impose any personal, spiritual, or intellectual consequences upon professors who fall in line.

926 F.2d at 1075. As the Supreme Court has previously announced, "[t]eachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Keyishian*, 385 U.S. at 603 (quoting *Sweezy*, 354 U.S. at 250).

The IFA is antithetical to academic freedom and has cast a leaden pall of orthodoxy over Florida's state universities. Neither the State of Florida's authority to regulate public school curriculum, nor its interest in preventing race or sex discrimination can support its weight. Nor does the First Amendment tolerate it. In this case, unlike in *Bishop*, the interest in academic freedom weighs heavily in Plaintiffs' favor.

*       *       *

In sum, *Bishop*'s balancing test—as applied to the facts before this Court—favors Plaintiffs' free speech rights over Defendants' enforcement of a viewpoint-discriminatory ban targeting protected speech. In *Bishop*, the Eleventh Circuit was presented with facts supporting the University's weighty interest in setting curriculum and avoiding an establishment violation, versus a professor's weak interest in academic freedom to discuss matters outside the scope of his course's curriculum. Here, this Court is presented with the reverse—namely, the State of Florida's weak interest in employing viewpoint-based restrictions targeting pure expression to combat racism, versus the weighty interest in academic freedom to

106

instruct university students free from the State's chosen orthodoxy of viewpoint. On balance, given the context of these cases, the IFA unreasonably burdens the Professor Plaintiffs' speech. Defendants cannot, through the IFA, prophylactically muzzle professors from expressing certain viewpoints about topics that the State of Florida has deemed fair game for classroom discussion. Doing so in the name of reducing racism does not insulate the State from the First Amendment's reach.

"The college classroom with its surrounding environs is peculiarly the 'marketplace of ideas,' " *Healy*, 408 U.S. at 180–81, and the State cannot allow its universities to only package its merchandise in the State's favorite color. "The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, rather than through any kind of authoritative selection.' " *Keyishian*, 385 U.S. at 603 (quoting *United States v. Associated Press, D.C.*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943)). Having balanced the context, the State's asserted interest, and the strong predilection for academic freedom in the context of these cases, this Court concludes that the State of Florida, as an employer and educator, cannot restrict university employees from expressing a disfavored viewpoint about a matter within the established curriculum while instructing on that curriculum. Such viewpoint discrimination "is poison to a free society." *Iancu*, 139 S. Ct. at 2302 (Alito, J., concurring). Accordingly, the Professor Plaintiffs have demonstrated a substantial likelihood of

success on the merits as to their free speech claims. And because Mr. Rechek's right-to-receive information claim is coextensive with Professor Novoa's free speech claim (as discussed *supra*), this Court concludes that Mr. Rechek has demonstrated a substantial likelihood of success on the merits as to his right-to-receive-information claim.

Next, this Court considers Plaintiffs' vagueness challenge.

## D

Even if the IFA did not violate the First Amendment for the reasons set out above, Plaintiffs argue, the IFA is impermissibly vague in violation of the Fourteenth Amendment's Due Process Clause. This Court agrees for the reasons set out below.

Vagueness, an outgrowth of the Due Process Clause, reflects the "fundamental principle in our legal system . . . that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012). A law can be impermissibly vague for two distinct reasons. *Hill*, 530 U.S. at 732. "First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Id.* (citing *Chicago v. Morales*, 527 U.S. 41, 56–57 (1999)). And while vagueness descends from the Fifth and Fourteenth Amendments, a vague law

also "raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. ACLU*, 521 U.S. 844, 871–72 (1997).

When statutes are vague, " 'the hazard or loss or substantial impairment of those precious [First Amendment] rights may be critical,' since those covered by the statute are bound to limit their behavior to that which is unquestionably safe." *Keyishian*, 385 U.S. at 609 (quoting *Dombrowski v. Pfister*, 380 U.S. 479, 488 (1965)). Thus, although "[v]ague laws in any area suffer a constitutional infirmity," "[w]hen First Amendment rights are involved," this Court must "look even more closely lest, under the guise of regulating conduct that is reachable by the police power, freedom of speech or of the press suffer." *Ashton v. Kentucky*, 384 U.S. 195, 200 (1966).

This Court begins by construing the challenged provisions at issue, ever mindful of its duty to construe statues as constitutional when possible. *Boos v. Barry*, 485 U.S. 312, 330–31 (1988). The nature of this duty depends on whether a state or federal law is at issue. For federal laws, this Court has a "duty to avoid constitutional difficulties by [adopting a limiting construction] if such a construction is fairly possible." *Id.* at 331. For state laws, however, "federal courts are without power to adopt a narrowing construction . . . unless such a construction is reasonable and readily apparent." *Id.* at 330; *see also Gooding v. Wilson*, 405 U.S. 518, 520 (1972) (noting that "[o]nly [state] courts can supply the requisite construction" to save an

otherwise vague and overbroad statute). Thus, this Court can adopt a narrowing construction of the IFA—a state law—only if such a construction is both reasonable and readily apparent.

With these considerations in mind, this Court turns to the text. To reiterate, the IFA added a definition of discrimination to the FEEA as follows:

> (4)(a) It shall constitute discrimination on the basis of race, color, national origin, or sex under this section to subject any student or employee to training or instruction that espouses, promotes, advances, inculcates, or compels such student or employee to believe any of the following concepts:
>
> 1. Members of one race, color, national origin, or sex are morally superior to members of another race, color, national origin, or sex.
>
> 2. A person, by virtue of his or her race, color, national origin, or sex is inherently racist, sexist, or oppressive, whether consciously or unconsciously.
>
> 3. A person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex.
>
> 4. Members of one race, color, national origin, or sex cannot and should not attempt to treat others without respect to race, color, national origin, or sex.
>
> 5. A person, by virtue of his or her race, color, national origin, or sex bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, national origin, or sex.
>
> 6. A person, by virtue of his or her race, color, national origin, or sex should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion.

110

7. A person, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin, or sex.

8. Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, national origin, or sex to oppress members of another race, color, national origin, or sex.

§ 1000.05(4)(a)1.–8., Fla. Stat. (2022). This provision also contains a savings clause, stating that the foregoing "may not be construed to prohibit discussion of the concepts listed therein as part of a larger course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts." § 1000.05(4)(b), Fla. Stat. (2022).

In addition, the Board of Governors issued an implementing regulation on August 26, 2022, which finalized the Board of Governors's enforcement mechanism with respect to section 1000.05(4)(a), Florida Statutes (2022). *See* ECF No. 1-2, *in* Case No.: 4:22cv324-MW/MAF (Regulation 10.005 Prohibition of Discrimination in University Training or Instruction); *see also* Regulation 10.005, available at https://www.flbog.edu/wp-content/uploads/2022/08/10.005-Prohibition-ofDiscrimi nation-in-University-Training-or-Instruction.pdf (last visited Oct. 25, 2022). The regulation identifies the eight concepts of section 1000.05(4)(a), Florida Statutes (2022), and requires "[e]ach university" to "have a university regulation that prohibits discrimination on the basis of race, color, national origin, or sex by

subjecting any student or employee to training or instruction that espouses, promotes, advances, inculcates, or compels such student or employee to believe any" of those concepts. *Id*. at 2–3. Likewise, the regulation requires universities to note in their own regulations that the prohibition concerning the eight topics "does not prohibit discussion of the concepts as part of a larger course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts." *Id*. at 3.

Plaintiffs first argue that the eight concepts themselves are riddled with undefined terms so vague that they cannot determine what speech is prohibited. Borrowing from this Court's discussion in *Honeyfund* of identical concepts specified under Chapter 760, the *Pernell* Plaintiffs highlight some of the myriad ambiguities present in the challenged provisions. *See, e.g.*, ECF No. 13 at 36–39, *in* Case No.: 4:22cv304-MW/MAF; ECF No. 13-5 ¶ 15 (Sandoval Declaration) ("But my instruction could [be] perceived as violating the Stop W.O.K.E. Act by promoting the concept that my students should not attempt to treat their audience without respect to their racial identities—a concept I'm not even sure how to interpret. Indeed, [this concept] has become the center of conversations and questions I engage in with colleagues, because nobody can figure out what it means."); *id*. ¶ 24 (noting ambiguity about "objectivity").

Defendants respond that the concepts are not vague because they use "plain, everyday language" with an "ordinary or natural meaning" that is "commonly known or can easily be discerned." ECF No. 52 at 33, *in* Case No.: 4:22cv304-MW/MAF (quoting *Tracy v. Fla. Atl. Univ. Bd. of Trs.*, 980 F.3d 799, 807 (11th Cir. 2020)). Defendants further assert the plain language of the challenged provisions must be judged by a more forgiving standard, because they regulate the speech of public employees, not the public at large. *Id.* at 34.

As this Court previously noted in *Honeyfund*, Defendants are correct in the sense that the IFA is not rendered vague merely because it does not define its terms. *See Honeyfund*, 2022 WL3486962, at *12 (citing *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995) ("When terms used in a statute are undefined, we give them their ordinary meaning.")). Nonetheless, as this Court previously made clear—both in *Honeyfund* and at the hearing on Plaintiffs' motions—the fact that the IFA uses real words found in an English dictionary does not magically extinguish vagueness concerns. *See Honeyfund*, 2022 WL3486962, at *12 (citing *Yates v. United States*, 574 U.S. 528, 537 (2015) ("Whether a statutory term is unambiguous . . . does not turn solely on dictionary definitions of its component words.")).

Here, however, Defendants throw out their dictionary definitions from *Honeyfund* in favor of restatements of the statutory text and emphasis on the vagueness standard for public employees—namely whether " 'ordinary persons

113

using ordinary common sense would be notified that certain conduct will put them *at risk*' of violating the Act." ECF No. 52 at 33, *in* Case No.: 4:22cv304-MW/MAF (quoting *O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045, 1055 (11th Cir. 2022)). But Defendants' change of tack and new emphasis on "common sense" only emphasizes the vagueness of the challenged provisions, particularly when it comes to the "objective instruction" savings clause discussed at length below.

Defendants may be right that some of the eight concepts are not vague. But some certainly are, even under this "ordinary person using common sense" test for public employees. For example, concept four is mired in obscurity, bordering on the unintelligible. Under that provision, educators *cannot* endorse the view that "[m]embers of one race, color, sex, or national origin *cannot and should not* attempt to treat others *without* respect to race, color, sex, or national origin." § 760.10(8)(a)(4), Fla. Stat. (emphases added). As this Court recognized in *Honeyfund*, concept four thus features a rarely seen triple negative, resulting in a cacophony of confusion. *See Ne. Pa. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys.*, 938 F.3d 424, 437 n.2 (3d Cir. 2019) (striking down prohibition on political speech with "a tangle of double negatives that [was] vague enough to ensnare nearly any message" and lacked "a sufficiently definite standard . . . to exercise discretion"); *Albanese v. McGinnis*, 823 F. Supp. 521, 563 (N.D. Ill. 1993)

("Triple negatives are not conducive to comprehension."). It is unclear what is prohibited and even less clear what is permitted.

Defendants' effort to clear things up amounts to rewriting the provision: "to say that an individual 'cannot and should not' try to treat people the same no matter their race is to say that the individual is either *unable* or should be *unwilling* to treat people the same regardless of their race." ECF No. 52 at 36–37, *in* Case No.: 4:22cv304-MW/MAF. But canceling out two of the negatives—i.e., educators *cannot* endorse the view that members of one demographic *can and should* attempt to treat others *with* respect to the listed characteristics—does little good. Does this prohibit anything other than colorblindness? Does it ban topics such as affirmative action and diversity? Can educators acknowledge their students' differing cultural backgrounds? In sum, concept four is "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926).

Regardless of whether some of the eight concepts are vague, however, Plaintiffs claim the entire statute is rendered vague by the provision permitting "discussion" of the concepts if "given in an objective manner without endorsement." ECF No. 13 at 39, *in* Case No.: 4:22cv304-MW/MAF; ECF No. 19 at 44–45, *in* Case No.: 4:22cv324-MW/MAF. Rather than resorting again to dictionary definitions, Defendants respond by pointing to some of the *Pernell* Plaintiffs' declarations,

which note their research and teaching challenges the notion of "objectivity." Defendants assert the law is not vague because these professors "obviously must have some understanding of what 'the notion of objectivity' is in the first place." ECF No. 52 at 35, *in* Case No.: 4:22cv304-MW/MAF. But this is another red herring. Simply because some of the *Pernell* Plaintiffs challenge the "ideal" of "objectivity" with respect to their areas of study, ECF No. 13-4 ¶ 29, or situate their approach to research and teaching through a "positionality" lens as opposed to an "objectivity" lens, ECF No. 13-5 ¶ 17, does not make the IFA any less vague when it comes to how section 1000.05(4)(b) and its implementing regulation will be applied to future instruction or training.

Indeed, Defendants' decision to avoid referencing any respected lexicon is unsurprising given that Defendants' preferred construction of "objectivity" ignores any plain meaning of the term and fails to square with any commonsense understanding. Indeed, in *Honeyfund*, counsel for Defendants—who, as mentioned above, are the same lawyers now representing Defendants in the cases at issue here—relied upon the Merriam-Webster Dictionary to define "objective," noting that " 'to discuss a concept in an objective manner' is, obviously, to discuss it by 'expressing or dealing with facts or conditions as perceived without distortion by personal feelings, prejudice or interpretation.' " *Honeyfund*, 2022 WL 3486962, at *14. But now, defense counsel ignores Merriam-Webster and doubles down on the

116

idea that "objective" equals *discussing without approval* and/or *criticizing or condemning* the specified ideas.

For example, Defendants emphasize that "[t]he statute's dichotomy between discussing a concept 'in an objective manner' as distinct from 'endorsing' or 'espousing' the concept provides more than fair notice of what is prohibited." ECF No. 52 at 35–36, *in* Case No.: 4:22cv304-MW/MAF. According to Defendants, the plain meaning of "objective," when read together with "endorsing" or "espousing," allows for discussion of the eight concepts "as concepts that others have articulated" *but not* for "voicing approval the concepts"—for example, "saying the concept is correct or true." *Id.* at 36. Thus, Defendants suggest it is obvious that "objective" means, simply, "without *approval*."

Of course, Defendants' construction redefines the notions of both "objectivity" and "criticism." As the *Novoa* Plaintiffs succinctly put it, "[i]t suggests that speech *condemning* a viewpoint is objective, but *approving* a viewpoint renders the teaching unobjective." ECF No. 19 at 44–45, *in* Case No.: 4:22cv324-MW/MAF.

Defendants dig their heels into this doublespeak while relying upon other notions of "objectivity" that arguably contradict their own point.[59] For example,

---

[59] Even the definition of "objective" provided by the IFA's sponsor, Representative (then-Speaker pro tempore) Bryan Avila, seems contradictory. When asked to define what it means to teach something from an objective standpoint under the IFA, Representative Avila stated, "[S]omething that would compel someone to feel a sense of guilt, or a sense of anguish, or something to that extent . . . would certainly violate that piece of being objective within a

Defendants cite the Florida Board of Education's "useful, albeit obvious, description of the distinction between discussion and endorsement." ECF No. 52 at 36, *in* Case No.: 4:22cv304-MW/MAF. The quoted rule suggests that "teachers serve as facilitators for student discussion and do not share their personal views or attempt to indoctrinate or persuade students *to a particular point of view*." *Id.* (emphasis added) (quoting Fla. Admin. Code Ann. R. 6A-1.0941424(3)(c)).[60] But this quoted language suggests that teachers should avoid persuading students "to a particular point of view," *either* by approving of particular viewpoints *or* by criticizing those

---

classroom." *See* ECF No. 19-12, *in* Case No.: 4:22cv324-MW/MAF (January 26, 2022, House Judiciary Committee Hearing). Thus, Representative Avila's definition of "objective" hinges upon the subjective response of the professor's students. Such a standard can hardly be considered objective in any sense of the word. Indeed, it makes it impossible for a professor to know for certain what speech violates the IFA. To put it plainly, Representative Avila's view of the IFA offers a heckler's veto to the professor's students. His understanding of "objectivity" would force professors to walk on eggshells when discussing certain topics to avoid upsetting the most sensitive or unreasonable student in class. How, under such a standard, would a professor be able to discuss topics like discrimination, racism, or even the civil rights movement and know beforehand which viewpoints are allowed if a student like Richard Spencer, or any other white supremacist, was enrolled in their course? *See, e.g.*, *National Policy Institute's Richard Spencer speaking engagement confirmed for Oct 19 at UF*, University of Florida Media Advisory, https://news.ufl.edu/for-media/media-advisories/archive/2017/10/national-policy-institutes-richa rd-spencer-speech-confirmed-for-oc.html (last visited Nov. 2, 2022) (noting that "UF leadership has denounced Spencer's white supremacist rhetoric").

[60] Defendants do not cite the full rule. Rule 6A-1.0941424(3)(c) provides in full, "Efficient and faithful teaching further means that any discussion is appropriate for the age and maturity level of the students, and teachers serve as facilitators for student discussion and do not share their personal views or attempt to indoctrinate or persuade students to a particular point of view that is inconsistent with the Next Generation Sunshine State Standards and the Benchmarks for Excellent Student Thinking (B.E.S.T.) Standards." It thus defines "efficient and faithful teaching" to include refraining from sharing personal views or persuading students to points of view that are inconsistent with state standards applicable to public K-12 schools. *See* § 1003.42(2), Fla. Stat. (2022).

viewpoints during class discussion. In other words, the quoted rule would have teachers avoid both praise and criticism of a particular idea to steer clear of "indoctrination."

Defendants further displayed their nonsensical reading of "objective" during the hearing on Plaintiffs' motions. When asked whether a professor who wished to instruct on one or some of the eight concepts in an "objective" manner would run afoul of the challenged provisions by inviting knowledgeable guest speakers to discuss both the pros and the cons of one of the concepts, defense counsel argued that the "statute is very clear," and you would have to analyze the two guest speakers "apart from each other, not necessarily in conjunction with each other." Tr. at 80–81. In so doing, defense counsel suggested that a guest speaker who promoted one of the eight concepts as part of a classroom debate where all sides of the issue were represented would still run afoul of the law. *See id*. Thus, according to defense counsel, "objective" instruction allows for only one side of the debate in Florida's public universities—or for no debate at all.

All this is to say that the plain meaning of the "objective" instruction provisions is utterly ambiguous. Assuming, *arguendo*, that this Court construes "objective" to mean "expressing or dealing with facts or conditions as perceived without distortion by personal feelings, prejudice or interpretation," *Honeyfund*, 2022 WL 3486962, at *14 (quoting *Objective*, Merriam-Webster.com,

https://bit.ly/3zcLbB1 (last visited October 24, 2022)), the term loses that meaning when paired with the adverbial phrase "without endorsement of the concepts." Simply put, "objective" instruction allows for the most zealous condemnation of the eight concepts—motivated by an instructor's own personal prejudice or biases—but apparently permits not a single classroom debate between instructors or guest speakers who wish to promote the merits of their position, so long as one of their viewpoints falls on the list of specified concepts. The State of Florida has redefined "objectivity" in a manner that does not comport with common sense. No ordinary person would understand "objective" instruction to allow for this imbalance.[61] *Cf. Arnett v. Kennedy*, 416 U.S. 134, 159–60 (1974) (holding that federal statute authorizing discharge of federal employees for "such cause as will promote the efficiency of the service" was neither void for vagueness nor overbroad in light of "longstanding principles of employer-employee relationships" and "[the availability of legal counsel] to employees who [sought] advice on the interpretation of the Act and its regulations"); *see also San Filippo v. Bongiovanni*, 961 F.2d 1125, 1137 (3d Cir. 1992) (rejecting vagueness challenge to university regulation that permitted

---

[61] Indeed, Representative Avila suggested that the Florida Legislature was more concerned about teachers injecting any personal opinions into the class discussion. *See* ECF No. 19-1 at 8 ("We're not saying that you can't have those discussions. What we're saying is you can't inject your own personal point of view into the discussion."). But the challenged provisions don't just regulate personal opinions—they also prohibit any viewpoint, whether personally held or not, that contradicts the State's opinion on the specified concepts. Indeed, it bears repeating that the IFA considers professors who inject their own point of view *condemning* the specified topics to be teaching in an "objective manner."

dismissal for failure to maintain "standards of sound scholarship and competent teaching," and noting "[a] reasonable ordinary person using his common sense and general knowledge of employer-employee relationships would have fair notice that the conduct the University charged [appellant] with put him at risk of dismissal" and that "[i]t is not unfair or unforeseeable for a tenured professor to be expected to behave decently towards students and coworkers, to comply with a superior's directive, and to be truthful and forthcoming in dealing with payroll, federal research funds or applications for academic positions").

Defendants' remaining arguments are unpersuasive. Defendants assert that because the term "objective" is used in a collective bargaining agreement governing a portion of university faculty, Plaintiffs "cannot credibly claim" they are unable to understand the term as it's used in the challenged provisions. For starters, Professor Novoa is not subject to the cited collective bargaining agreement and cannot be held to understand language which does not bind her. *See* ECF No. 39 at 27, *in* Case No.: 4:22cv324-MW/MAF. At most, only one of the cited collective bargaining agreements, ECF Nos. 19-7 and 19-9, *in* Case No.: 4:22cv324-MW/MAF, appears to bind Plaintiff Almond, as he is the only professor from FSU who is a party to this litigation.

More importantly, the fact that "objective and skillful" instruction is included in a collective bargaining agreement for other university professors does not make

the challenged provisions any less vague. Instead, the exhibits Defendants cite for this proposition undermine their point. For example, the Valencia College guidance for faculty and deans, ECF No. 19-9, *in* Case No.: 4:22cv324-MW/MAF, construes the challenged language "in an objective manner without endorsement" to be consistent with the College's existing policy on academic freedom, which requires professors to "present such matters objectively and skillfully." *Id.* at 5. In offering the College's "best understanding" of each of the concepts, the guidance recommends "including multiple perspectives on them," in order to present those eight concepts "objectively." *Id.* at 7. But as noted above, Defendants construe the challenged provisions such that even presenting multiple perspectives may still run afoul of the "objective" instruction savings clause if the instructor happens to "promote" or "endorse" one of the concepts in the process. These attempts to reconcile the challenged provisions with their own policies on academic freedom demonstrate the disconnect between this new notion of "objectivity" and the institutions' common-sense understanding of the term.

Furthermore, Defendants assert "the scienter requirement in the Act and the Board's Regulation 10.005 eliminates [sic] any genuine vagueness concerns." ECF No. 52 at 39, *in* Case No.: 4:22cv304-MW/MAF. This Court understands that "a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice that the conduct is proscribed." *United States v. Biro*, 143 F.3d

1421, 1430 (11th Cir. 1998) (cleaned up). But Defendants identify no explicit scienter requirement in the statute with respect to instructors' actions. Indeed, they rely on the notion that the terms "espouses, promotes, advances, inculcates, or compels" *imply* a state of mind. And even if these actions imply a state of mind necessary to violate the challenged provisions' broad prohibitions on expressing certain viewpoints, they do nothing to clarify how a professor can continue to incorporate such discussions in their classrooms in an "objective" manner without violating the law.

Defendants' reliance on Regulation 10.005 concerning enforcement of the IFA against individual professors is similarly misplaced. Defendants assert that the Board's enforcement procedure helps eliminate any risk of arbitrary enforcement. ECF No. 52 at 39, *in* Case No.: 4:22cv304-MW/MAF. Not so.

The regulation provides that in the event "an instruction or training is [found to be] inconsistent with the university regulation [prohibiting expression of viewpoints in favor of the eight concepts]," the university "shall . . . take prompt action to correct the violation." *See* Regulation 10.005(3)(c), available at https://www.flbog.edu/wp-content/uploads/2022/08/10.005-Prohibition-of-Discrim ination-in-University-Training-or-Instruction.pdf (last visited Oct. 25, 2022). Such "prompt action" includes "mandating that the employee(s) responsible for the instruction or training modify it to be consistent with the university regulation,

issuing disciplinary measures where appropriate and remove, by termination if appropriate, the employee(s) if there is a failure or refusal to comply with the mandate." *Id*. In support of their argument, Defendants distort this mechanism as one which "reserve[es] punishment to only examples where an employee *refuses to correct* prohibited teaching." ECF No. 52 at 39, *in* Case No.: 4:22cv304-MW/MAF. But as the regulation's plain language states, removal—including termination—may also occur if there is merely a "failure" to comply with the university's mandate. This "failure" requires no affirmative knowing or willful act on the professor's part. Instead, a professor may mistakenly overstep the State's viewpoint ban in a good-faith attempt to teach "objectively"—and can be fired as a result.

As this Court noted in *Honeyfund*, things are not as simple as Defendants portray. *See* 2022 WL 3486962, at *13 ("To start, few terms are as loaded and contested as 'objective.' And many would suggest that it is impossible to discuss a concept—or anything for that matter—'as perceived without distortion by personal feelings, prejudice, or interpretation.' This is especially true when discussing concepts rooted in historical phenomena, like systemic racism, critical race theory, white privilege, and male privilege."). "As Justice Stevens observed, '[i]t is hardly a novel insight that history is not an objective science . . . . The historian must choose which pieces to credit and which to discount, and then must try to assemble them into a coherent whole.' " *Id*. (quoting *McDonald v. City of Chi.*, 561 U.S. 742, 907

124

(2010) (Stevens, J., dissenting)). "And such objective discussion, if attainable, is even more difficult with respect to controversial matters like the eight prohibited concepts here, where many, including Defendants, question their legitimacy." *Id*.

Lacking explicit standards to circumscribe enforcement of "objectivity," Defendants can weaponize this term to further discredit the eight concepts in the "marketplace of ideas," which now permits endorsement of only one side of the debate. Accordingly, because this "objectivity" savings clause commands the entire statute, the IFA is impermissibly vague on its face in violation of the Due Process Clause of the Fourteenth Amendment.[62]

E

Finally, this Court considers the *Novoa* Plaintiffs' overbreadth claim.[63] While laws that fail to clearly define their prohibitions are void for vagueness, "[a] clear and precise enactment may nevertheless be 'overbroad' if in its reach it prohibits

---

[62] This Court need not confront severability because the unconstitutionally vague "objectivity" savings clause, which governs both the challenged statute and regulation, renders the provisions as a whole unconstitutionally vague. Thus, even if the IFA's amendments to the FEEA did not constitute an unconstitutional viewpoint-based restriction on speech and some of the eight concepts were not vague, the entire provision would still be unconstitutionally vague in violation of the Fourteenth Amendment's Due Process Clause. Accordingly, the *Pernell* Plaintiffs have standing to enjoin the members of the Board of Governors from enforcing the "objectivity" savings clause with respect to all eight concepts. The *Novoa* Plaintiffs are entitled to a more limited injunction against the members of the Board of Governors and the members of the USF Board of Trustees with respect to the concepts they have standing to challenge and which implicate the "objectivity" savings clause.

[63] The *Pernell* Plaintiffs have not raised an overbreadth claim. Thus, this Court's analysis is limited to the briefing in the *Novoa* case.

125

constitutionally protected conduct." *Grayned*, 408 U.S. at 114. Overbroad laws violate the First Amendment because they punish "a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep.' " *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)).

Here, the *Novoa* Plaintiffs argue that the IFA "lacks any legitimate purpose" and, thus, "is always overbroad in relation to its legitimate sweep." ECF No. 19 at 43, *in* Case No.: 4:22cv324-MW/MAF. This Court agrees that the challenged provisions lack any legitimate sweep. As articulated above, the challenged provisions of the IFA unconstitutionally discriminate on the basis of viewpoint in violation of the First Amendment and are impermissibly vague in violation of the Fourteenth. Thus, under either analysis, the challenged provisions of the IFA have no legitimate sweep. And the very concept of overbreadth presupposes that there is *some* legitimate sweep. So, because the challenged provisions have no legitimate sweep, the overbreadth doctrine does not apply. Thus, this Court concludes that Plaintiffs have not demonstrated a likelihood of success on the merits for their overbreadth claim, given the challenged provisions' lack of legitimate sweep against which to judge any alleged overbreadth. This is simply the wrong vehicle by which to challenge the statute.

126

V

A

Recall that the remaining preliminary injunction factors are (1) that Plaintiffs will suffer irreparable injury absent an injunction, (2) that the harm to Plaintiffs of not granting an injunction outweighs the harm an injunction would cause Defendants, and (3) that the injunction would not be adverse to the public interest. *Siegel*, 234 F.3d at 1176. Here, the remaining preliminary injunction factors are thoroughly intertwined with considerations already discussed regarding the merits of Plaintiffs' claims. On balance, these factors weigh in favor of granting Plaintiffs' motion for preliminary injunction.

First, absent an injunction, Plaintiffs will suffer irreparable injury because an ongoing First Amendment violation—which the IFA inflicts—constitutes irreparable injury. *Speech First, Inc.*, 32 F.4th at 1128. Second, weighing Plaintiffs' First Amendment injury against Defendants' interest, the scale tips decisively in Plaintiffs' favor. *See KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). This is because the state "has no legitimate interest in enforcing an unconstitutional ordinance." *Id.* Third, an injunction would not be adverse to the public interest. After all, as noted above, "[t]he public has no interest in enforcing an unconstitutional ordinance." *Id.* at 1272–73. And as the Supreme Court has recognized, "[t]he First Amendment, in particular, serves significant societal

interests." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 776 (1978). Plus, the portions of the FEEA that the IFA did not amend remain in effect to protect Floridians from discrimination in education.

In sum, because Plaintiffs have carried their burden as to all four of the preliminary injunction factors, this Court finds that they are entitled to a preliminary injunction.

B

Having determined the merits of Plaintiffs' motions, this Court must now decide the scope of relief to which they are entitled. Here, Plaintiffs present their case as a facial challenge to the IFA and implementing regulation. Although a party's characterization of their challenge as facial or as-applied is not determinative, *Jacobs v. Fla. Bar*, 50 F.3d 901, 905 n.17 (11th Cir. 1995), this Court agrees that Plaintiffs bring facial challenges in both their First Amendment viewpoint discrimination and Fourteenth Amendment vagueness claims.

"A facial challenge is an attack on a statute itself as opposed to a particular application." *City of L.A. v. Patel*, 576 U.S. 409, 415 (2015). Plaintiffs' First Amendment claims are facial challenges because they attack the validity of the IFA and Regulation 10.005, rather than any particular application of the IFA or Regulation 10.005. *See* ECF No. 1 ¶¶ 211–218, *in* Case No: 4:22cv304-MW/MAF; ECF No. 1 ¶¶ 271–285, *in* Case No: 4:22cv324-MW/MAF. The same is true with

128

respect to their Fourteenth Amendment vagueness challenges. *See* ECF No. 1 ¶¶ 226–232, *in* Case No: 4:22cv304-MW/MAF; ECF No. 1 ¶¶ 334–355, *in* Case No: 4:22cv324-MW/MAF.

Considering the nature of Plaintiffs' claims, this Court must next decide whether Plaintiffs have met their burden to obtain facial relief. "[A] plaintiff must establish that a 'law is unconstitutional in all of its applications' " to get facial relief. *Patel*, 576 U.S. at 418 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)). Here, Plaintiffs make that showing as to both their First Amendment viewpoint discrimination claims and their Fourteenth Amendment vagueness claims.

For their First Amendment viewpoint discrimination claims, Plaintiffs demonstrate that the IFA and Regulation 10.005 impermissibly discriminate based on viewpoint. "The facial viewpoint bias in the law results in viewpoint-discriminatory applications." *Iancu*, 139 S. Ct. at 2299–300. Discriminating based on viewpoint—and running afoul of "a core postulate of free speech law"—removes the need for this Court to "pause to consider whether the [viewpoint restriction] might admit some permissible applications . . . before striking it down." *Id*. at 2300, 2302. And as for Plaintiffs' Fourteenth Amendment claims, the vagueness of the objectivity "savings clause," included in both the IFA and the regulation, implicates

*any* training or instruction on the IFA's eight concepts, leaving the statute and Regulation 10.005 unconstitutionally vague in all of their applications.

Accordingly, Plaintiffs are entitled to facial relief on both their First Amendment viewpoint discrimination claims and their Fourteenth Amendment vagueness claims. The members of the University of South Florida Board of Trustees are prohibited from enforcing the IFA and Regulation 10.005 against their respective employees as to the concepts for which Plaintiff Novoa has standing. The members of the Board of Governors, however, are prohibited from enforcing the IFA and Regulation 10.005 against any state university. Here's why.

Only one Plaintiff needs standing to challenge a Defendant's enforcement of the IFA and Regulation 10.005. *See Rumsfeld*, 547 U.S. at 53 n.2. Each Plaintiff established standing against the members of Board of Governors and, as this Court discussed above, Plaintiffs are entitled to facial relief on both their First Amendment viewpoint discrimination and Fourteenth Amendment vagueness claims. Facial relief extends to any entity subject to the Board of Governor's enforcement of the IFA and Regulation 10.005—in other words, all state universities. Accordingly, the members of the Board of Governors are enjoined from enforcing the challenged provisions with respect to all state universities for each concept that the individual Plaintiffs have standing to challenge. As set out in detail in this Court's discussion on standing, the *Pernell* Plaintiffs have standing to challenge all eight concepts on

130

both First Amendment and Fourteenth Amendment grounds. The *Novoa* Plaintiffs have standing to challenge the first, second, third, fifth, and seventh concepts on the same grounds.

VI

This Court next considers whether Plaintiffs must secure a bond in furtherance of the preliminary injunction. Rule 65(c) provides that a "court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). But "it is well-established that 'the amount of security required by the rule is a matter within the discretion of the trial court . . . [, and] the court may elect to require no security at all.' " *BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs.*, 425 F. 3d 964, 971 (11th Cir. 2005) (alteration in original) (quoting *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. Unit B 1981)). Moreover, "[w]aiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right." *Curling v. Raffensperger*, 491 F. Supp. 3d 1289, 1326 n.25 (N.D. Ga. 2020) (quoting *Complete Angler, LLC v. City of Clearwater*, 607 F. Supp. 2d 1326, 1335 (M.D. Fla. 2009)). Here, considering that the IFA's unlawful impact on Plaintiffs' First Amendment rights weighs against requiring a bond, this Court waives the bond requirement.

VII

Finally, having determined a preliminary injunction is warranted, this Court addresses whether it will stay that injunction pending appeal. Stays pending appeal are governed by a four-part test: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *see also Venues Lines Agency v. CVG Industria Venezolana de Aluminio, C.A.*, 210 F.3d 1309, 1313 (11th Cir. 2000) (applying the same test). Considering that this test is so similar to that applied when considering a preliminary injunction, courts rarely stay a preliminary injunction pending appeal. That rings true here. Because no exceptional circumstances justify staying this Order pending appeal, *see Brenner*, 999 F. Supp. 2d at 1292 (issuing a rare stay of a preliminary injunction given the public interest in stable marriage laws across the country), this Court refuses to do so. Defendants have every right to appeal, and this Court sees no reason to delay Defendants in seeking an appeal by requiring them to move to stay under Rule 62.

VIII

The people of Florida have weathered many storms in recent years. But the tensions giving rise to the Individual Freedom Act are not unlike those tensions from

132

another tumultuous era, one "that roiled the country during and after the First World War."[64] A prescient example of this fraught time comes to mind—namely, the resignation of Columbia University Professor Charles Beard.

Given the pressing issues of the day, "we stand on the threshold of an era which will call for all the emancipated thinking that America can command."[65] Such was the conviction of Professor Beard, in October 1917, when he wrote those words in his resignation letter to the President of Columbia University. At the time, Professor Beard resigned in protest of the firing of two anti-war professors. Notwithstanding his own view that the United States should declare war with Germany, Professor Beard recognized that "thousands of [his] countrymen do not share this view" and that "[t]heir opinions cannot be changed by curses or bludgeons." Instead, he asserted that "[a]rguments addressed to their reason and understanding are our best hope."

In decrying the Board of Trustees's decision to fire his anti-war colleagues, Professor Beard urged that "[s]uch arguments . . . must come from men whose

---

[64] *See, e.g.*, ADAM HOCHSCHILD, AMERICAN MIDNIGHT: THE GREAT WAR, A VIOLENT PEACE, AND DEMOCRACY'S FORGOTTEN CRISIS (2022) (noting that the "tensions that roiled the country during and after the First World War still linger today," and arguing that "a vigilant respect for civil rights and constitutional safeguards" is necessary "to save ourselves from ever slipping back into the darkness again").

[65] *Quits Columbia; Assails Trustees*, N.Y. Times, Oct. 9, 1917, at 1 (quoting resignation letter of Professor Charles A. Beard to President of Columbia University), *available at* https://timesmachine.nytimes.com/timesmachine/1917/10/09/96274988.html?pageNumber=1.

disinterestedness is above all suspicion, whose independence is beyond all doubt, and whose devotion to the whole country, as distinguished from any single class or group is above all question."[66] He asserted "the question of academic freedom" is also "the question of intellectual and spiritual leadership in American democracy."[67] Echoing this belief 35 years later, Justice Frankfurter opined that "[i]t is the special task" of our professors—the "priests of our democracy"—"to foster those habits of open-mindedness and critical inquiry which alone make for responsible citizens." *Wieman*, 344 at 196 (Frankfurter, J., concurring).

In this case, the State of Florida lays the cornerstone of its own Ministry of Truth under the guise of the Individual Freedom Act, declaring which viewpoints shall be orthodox and which shall be verboten in its university classrooms. Borrowing from Professor Beard's comments—which are equally applicable here— under the State of Florida's control, those "who love the smooth and easy will turn to teaching," so long as "[p]erfunctory performance of statutory duties . . . bring[s] the paycheck."[68] But educators "of will, initiative, and inventiveness, not afraid of

---

[66] This Court recognizes the terminations that so disturbed Professor Beard resulted from statements the anti-war professors made outside of the classroom. Nonetheless, this example reinforces the principle that academic freedom suffers when those who control the university seek to impose their own orthodoxy upon those who teach.

[67] Charles A. Beard, *The University and Democracy*, THE DIAL, April 11, 1918, at 335.

[68] *Id*. at 336.

falling into error in search for truth, will shun such a life of futile lubricity, as the free woman avoids the harem."[69]

Striking at the heart of "open-mindedness and critical inquiry," the State of Florida has taken over the "marketplace of ideas" to suppress disfavored viewpoints and limit where professors may shine their light on eight specific ideas. And Defendants' argument permits *zero* restraint on the State of Florida's power to expand its limitation on viewpoints to any idea it chooses.

One thing is crystal clear—both robust intellectual inquiry and democracy require light to thrive. Our professors are critical to a healthy democracy,[70] and the State of Florida's decision to choose which viewpoints are worthy of illumination and which must remain in the shadows has implications for us all. If our "priests of democracy" are not allowed to shed light on challenging ideas, then democracy will die in darkness.[71] But the First Amendment does not permit the State of Florida to muzzle its university professors, impose its own orthodoxy of viewpoints, and cast us all into the dark.

Accordingly,

---

[69] *Id.*

[70] *See Austin*, 580 F. Supp. 3d at 1175.

[71] *See* Paul Farhi, *The Washington Post's New Slogan Turns Out to Be an Old Saying*, The Washington Post, Feb. 24, 2017, https://www.washingtonpost.com/lifestyle/style/the-washington-posts-new-slogan-turns-out-to-be-an-old-saying/2017/02/23/cb199cda-fa02-11e6-be05-1a3817ac21a5_story.html.

**IT IS ORDERED:**

1. The *Pernell* Plaintiffs' motion for a preliminary injunction, ECF No. 12, *in* Case No.: 4:22cv304-MW/MAF, is **GRANTED** in part.

2. Defendants Manny Diaz, Jr.; Brian Lamb; Eric Silagy; Timothy M. Cerio; Richard Corcoran; Aubrey Edge; Patricia Frost; Nimna Gabadage; Edward Haddock; Ken Jones; Darlene Luccio Jordan; Alan Levine; Charles H. Lydecker; Craig Mateer; Steven M. Scott; Deanna Michael;[72] and Kent Stermon—all in their official capacities as members of the Florida Board of Governors of the State University System—must take no steps to enforce the following until otherwise ordered:

   a. Sections 1000.05(4)(a)–(b), Florida Statutes; and

   b. the Board of Governors's Regulation 10.005(2)–(3) and (4)(d).

3. The preliminary injunction binds the above-listed Defendants and their officers, agents, servants, employees, and attorneys—and others in active concert or participation with any of them—who receive actual notice of this injunction by personal service or otherwise.

4. The motion, ECF No. 12, *in* Case No.: 4:22cv304-MW/MAF is otherwise **DENIED** in part as to Defendants the University of Florida Board of Trustees;

---

[72] Defendant William Self's term as a member of the Board of Governors appears to have expired. Pursuant to Federal Rule of Civil Procedure 25(d), Deeana Michael, in her official capacity as a member of the Board of Governors, is substituted for Defendant William Self.

the University of South Florida Board of Trustees; the Florida International University Board of Trustees; the Florida A&M University Board of Trustees; the Florida State University Board of Trustees; and the University of Central Florida Board of Trustees.

5. The *Novoa* Plaintiffs' motion for a preliminary injunction, ECF No. 19, *in* Case No.: 4:22cv324-MW/MAF, is **GRANTED** in part.

6. Defendants Manny Diaz, Jr.; Brian Lamb; Eric Silagy; Timothy M. Cerio; Richard Corcoran; Aubrey Edge; Patricia Frost; Nimna Gabadage; Edward Haddock; Ken Jones; Darlene Luccio Jordan; Alan Levine; Charles H. Lydecker; Craig Mateer; Deanna Michael; Steven M. Scott; and Kent Stermon—all in their official capacities as members of the Florida Board of Governors of the State University System—must take no steps to enforce the following until otherwise ordered:

   a. Sections 1000.05(4)(a)1.–3., 5., and 7., Florida Statutes, and Section 1000.05(4)(b), Florida Statutes as to those concepts;

   b. the Board of Governors's Regulation 10.005(2)–(3) and (4)(d) as to the first, second, third, fifth, and seventh concepts listed in Regulation 10.005(1)(a)1.–3., 5., and 7.

7. Defendants Timothy L. Boaz; Sandra Callahan; Michael Carrere; N. Rogan Donelly; Michael E. Griffin; Oscar Horton; Lauran Monbarren; Nithin

Palyam; Shilen Patel; Fredrick Piccolo; Melissa Seixas; Jenifer Jasinski Schneider; and William Weatherford—all in their official capacities as members of the University of South Florida Board of Trustees—must take no steps to comply with the following until otherwise ordered:

    a. Sections 1000.05(4)(a)1.–3., 5., and 7., Florida Statutes, and Section 1000.05(4)(b), Florida Statutes as to those concepts;

    b. the Board of Governors's Regulation 10.005(2)–(3) as to the first, second, third, fifth, and seventh concepts listed in Regulation 10.005(1)(a)1.–3., 5., and 7.

8. The preliminary injunction binds the above-listed Defendants and their officers, agents, servants, employees, and attorneys—and others in active concert or participation with any of them—who receive actual notice of this injunction by personal service or otherwise.

9. The motion, ECF No. 19, *in* Case No.: 4:22cv324-MW/MAF, is otherwise **DENIED** in part as to:

    a. Defendants the Florida Board of Governors of the State University System; the University of South Florida Board of Trustees; and Julie Leftheris in her official capacity as the Inspector General of the Board of Governors; and

    b. The remaining Defendants' enforcement of or compliance with:

    i.   Sections 1000.05(4)(a)4., 6., and 8., Florida Statutes;

  ii.   the Board of Governors's Regulation 10.005 as to the fourth, sixth, and eighth concepts listed in Regulation 10.005(1)(a)4., 6., and 8.

**SO ORDERED on November 17, 2022.**

                           **s/ Mark E. Walker**
                           **Chief United States District Judge**