# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

LEROY PERNELL, DANA THOMPSON
DORSEY, SHARON AUSTIN, SHELLEY
PARK, JENNIFER SANDOVAL,
RUSSELL ALMOND, MARVIN DUNN,
and JOHANA DAUPHIN,

    *Plaintiffs*,

v.

TIMOTHY M. CERIO, RICHARD
CORCORAN, AUBREY EDGE, PATRICIA
FROST, NIMNA GABADAGE, EDWARD
HADDOCK, KEN JONES, DARLENE
LUCCIO JORDAN, BRIAN LAMB,
ALAN LEVINE, CHARLES H.
LYDECKER, CRAIG MATEER, DEANNA
MICHAEL, STEVEN M. SCOTT, ERIC
SILAGY, and KENT STERMON, in their
official capacities as members of the Florida
Board of Governors of the State University
System; MANNY DIAZ JR., in his official
capacity as the Commissioner of the Florida
State Board of Education; MORTEZA
HOSSEINI, THOMAS G. KUNTZ, DAVID
L. BRANDON, RICHARD P. COLE,
CHRISTOPHER T. CORR, JAMES W.
HEAVENER, LAUREN D. LEMASTERS,
DANIEL T. O'KEEFE, RAHUL PATEL,
AMANDA J. PHALIN, MARSHA D.
POWERS, FRED S. RIDLEY, and ANITA
G. ZUCKER, in their official capacities as
members of the University of Florida Board
of Trustees; WILLIAM WEATHERFORD,
MICHAEL E. GRIFFIN, SANDRA
CALLAHAN, MICHAEL CARRERE, N.

Case No.: 4:22-cv-304-MW-1 MAF

ROGAN DONELLY, OSCAR HORTON,
JENIFER JASINSKI SCHNEIDER,
LAURAN MONBARREN, NITHIN
PALYAM, SHILEN PATEL, FREDRICK
PICCOLO, and MELISSA SEIXAS, in their
official capacities as members of the
University of South Florida Board of
Trustees; DEAN C. COLSON, ROGELIO
TOVAR, CESAR L. ALVAREZ, JOSE J.
ARMAS, DEANNE BUTCHEY, CARLOS
A. DUART, NATASHA LOWELL,
CRISTHOFER LUGO, T. GENE
PRESCOTT, CHANEL T. ROWE, MARC
D. SARNOFF, and CARLOS TRUJILLO,
in their official capacities as members of the
Florida International University Board of
Trustees; KEVIN LAWSON, KIMBERLY
MOORE, ANN MARIE CAVAZOS, OTIS
CLIATT, II, THOMAS W. DORTCH, JR.,
MICHAEL DUBOSE, KRISTIN HARPER,
BELVIN PERRY, JR., CRAIG REED,
KENWARD STONE, NICOLE
WASHINGTON, and ZACHARY
CHANDLER BELL, in their official
capacities as members of the Florida A&M
University Board of Trustees; PETER
COLLINS, MAXIMO ALVAREZ,
KATHRYN BALLARD, ERIC CHICKEN,
VIVIAN DE LAS CUEVAS-DIAZ,
NIMNA GABADAGE, JORGE
GONZALEZ, JUSTIN ROTH, BOB
SASSER, JOHN THIEL, DREW
WEATHERFORD, JIM W. HENDERSON,
and DEBORAH SARGEANT, in their
official capacities as members of the Florida
State University Board of Trustees; ALEX
MARTINS, HAROLD MILLS, TIFFANY
ALTIZER, BILL CHRISTY, JEFF
CONDELLO, JOSEPH CONTE, DANNY
GAEKWAD, STEPHEN KING,

DANIELLA LOPEZ, CARYL MCALPIN,
JOHN MIKLOS, MICHAEL OKATY, and
BEVERLY J. SEAY, in their official
capacities as members of the University of
Central Florida Board of Trustees,

    *Defendants*.

## AMENDED COMPLAINT

Plaintiffs LeRoy Pernell, Dana Thompson Dorsey, Sharon Austin, Marvin

Dunn, Shelley Park, Jennifer Sandoval, Russell Almond, and Johana Dauphin,

(collectively, "Plaintiffs"), by their undersigned counsel, bring this action against

the Florida Board of Governors of the State University System; Brian Lamb, Eric

Silagy, Timothy M. Cerio, Richard Corcoran, Aubrey Edge, Patricia Frost, Nimna

Gabadage, Edward Haddock, Ken Jones, Darlene Luccio Jordan, Alan Levine,

Charles H. Lydecker, Craig Mateer, Deanna Michael, Steven M. Scott, and Kent

Stermon, in their official capacities as members of the Florida Board of Governors

of the State University System; Manny Diaz Jr., in his official capacity as the

Commissioner of the Florida State Board of Education; Morteza Hosseini, Thomas

G. Kuntz, David L. Brandon, Richard P. Cole, Christopher T. Corr, James W.

Heavener, Lauren D. Lemasters, Daniel T. O'Keefe, Rahul Patel, Amanda J.

Phalin, Marsha D. Powers, Fred S. Ridley, and Anita G. Zucker, in their official

capacities as members of the University of Florida Board of Trustees; William

Weatherford, Michael E. Griffin, Sandra Callahan, Michael Carrere, N. Rogan

Donelly, Oscar Horton, Jenifer Jasinski Schneider, Lauran Monbarren, Nithin Palyam, Shilen Patel, Fredrick Piccolo, and Melissa Seixas, in their official capacities as members of the University of South Florida Board of Trustees; Dean C. Colson, Rogelio Tovar, Cesar L. Alvarez, Jose J. Armas, Deanne Butchey, Carlos A. Duart, Natasha Lowell, Cristhofer Lugo, T. Gene Prescott, Chanel T. Rowe, Marc D. Sarnoff, and Carlos Trujillo, in their official capacities as members of the Florida International University Board of Trustees; Kevin Lawson, Kimberly Moore, Ann Marie Cavazos, Otis Cliatt, II, Thomas W. Dortch, Jr., Michael Dubose, Kristin Harper, Belvin Perry, Jr., Craig Reed, Kenward Stone, Nicole Washington, and Zachary Chandler Bell, in their official capacities as members of the Florida A&M University Board of Trustees; Peter Collins, Maximo Alvarez, Kathryn Ballard, Eric Chicken, Vivian de las Cuevas-Diaz, Nimna Gabadage, Jorge Gonzalez, Justin Roth, Bob Sasser, John Thiel, Drew Weatherford, Jim W. Henderson, and Deborah Sargeant, in their official capacities as members of the Florida State University Board of Trustees; Alex Martins, Harold Mills, Tiffany Altizer, Bill Christy, Jeff Condello, Joseph Conte, Danny Gaekwad, Stephen King, Daniella Lopez, Caryl McAlpin, John Miklos, Michael Okaty, and Beverly J. Seay, in their official capacities as members of the University of Central Florida Board of Trustees (collectively, "Defendants"). For their Complaint against Defendants, Plaintiffs allege as follows:

4

## I.    INTRODUCTION

1.    Instructors and students at Florida colleges and universities bring this challenge to House Bill 7 ("H.B. 7"), known as the Stop Wrongs Against Our Kids and Employees Act (hereinafter the "Stop W.O.K.E. Act" or "the Act"), which prohibits instructors and students from expressing viewpoints disfavored by the Florida legislature on a range of topics, including systemic racism and sexism.

2.    The Stop W.O.K.E. Act is racially motivated censorship that the Florida legislature enacted, in significant part, to stifle widespread demands to discuss, study, and address systemic inequalities, following the nationwide protests that provoked discussions about race and racism in the aftermath of the murder of George Floyd.

3.    As the United States Supreme Court has recognized, "No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). This is especially "true in the social sciences"—the area of scholarship most directly impacted by the Act—"where few, if any, principles are accepted as absolutes." *Id.* Thus, it is imperative that students and instructors alike "always remain free to inquire, to study, and to

evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Id*.

4.     Rather than allow these important issues to be debated and explored in public discourse, the Florida legislature—spurred on by Governor Ronald DeSantis—has endeavored to impose its own viewpoints in public higher education. By enacting the Stop W.O.K.E. Act, the legislature sought to cut these discussions off by inaccurately defining certain viewpoints that it disfavors as discriminatory under the Florida Education Equity Act ("FEEA"), Fla. Stat. § 1000.05. The Stop W.O.K.E Act allows for specific viewpoints to be denounced—as they have been by leading state officials—while prohibiting those very same viewpoints from being supported. Not only does the law prohibit instructors from teaching the legislature's disfavored viewpoints in the manner dictated by their disciplines; its vague terms also generate uncertainty about when and how the Act will apply, thus creating an even greater chilling effect on academic expression.

5.     The Stop W.O.K.E. Act's title makes no attempt to hide its unconstitutional purpose. "Woke" speech is defined as "alert to racial or social discrimination or injustice,"[1] and has been characterized by the legislature as speech concerned with civil rights, "privilege" and "oppression," and even more

---

[1]     *Woke*, Oxford English Dictionary (3d ed. 2017).

broadly, "systemic racism."[2] Governor DeSantis claimed that the Act was

necessary to create a "woke-free state of Florida."[3] The Act's proponents also

singled out certain topics to be excluded from the classroom, including Critical

Race Theory,[4] a recognized academic theory and body of legal scholarship

originated by legal scholars in the 1970s to identify and challenge the perpetuation

of racial inequalities in social institutions and the law;[5] the 1619 Project,[6] a

critically acclaimed, award-winning journalistic work about the legacy of slavery

in America; the pervasiveness of white privilege; and the goals of anti-racism.[7]

---

[2]    *See, e.g.*, *2/1/22 House State Affairs Committee* at 01:02:00–01:02:29.070, (Feb. 1, 2022), https://thefloridachannel.org/videos/2-1-22-house-state-affairs-committee.

[3]    Press Release, Gov. Ron DeSantis, *Gov. DeSantis Announces Legislative Proposal to Stop W.O.K.E. Activism and Critical Race Theory in Schools and Corporations* (Dec. 15, 2021), https://www.flgov.com/2021/12/15/governor-desantis-announces-legislative-proposal-to-stop-w-o-k-e-activism-and-critical-race-theory-in-schools-and-corporations.

[4]    *See, e.g.*, Press Release, Gov. Ron DeSantis, *Gov. Ron DeSantis Signs Legislation to Protect Floridians from Discrimination and Woke Indoctrination* (Apr. 22, 2022), https://www.flgov.com/2022/04/22/governor-ron-desantis-signs-legislation-to-protect-floridians-from-discrimination-and-woke-indoctrination/.

[5]    *Race, Reform & Retrenchment Revisited: Can States Ban Learning About Our Full History?* AFRICAN AM. POL'Y FORUM (Feb. 2, 2022), https://www.americanbar.org/content/dam/aba/administrative/crsj/webinar/february-2022/aapf-crt-resources-feb2022.pdf.

[6]    Dec. 15, 2021 Press Release, Gov. Ron DeSantis, *supra* note 3; *The 1619 Project*, N.Y. TIMES MAGAZINE, https://www.nytimes.com/interactive/2019/08/14/magazine/1619-america-slavery.html (last visited Dec. 1, 2022).

[7]    *2/1/22 House State Affairs Committee* at 00:53:59, *supra* note 2.

6.     To further signal their disapproval of "woke" speech, the Stop W.O.K.E. Act imposes harsh penalties, up to and including withholding of funding for state colleges and universities, allowing for enforcement by both state officials and private individuals against instructors who teach the viewpoints disfavored by the legislature.

7.     The Stop W.O.K.E. Act casts a pall over higher education in Florida. In place of free and open academic inquiry and debate, instructors fear teaching topics of oppression, privilege, and race and gender inequalities with which the legislature disagrees, and feel compelled to curtail their course offerings and classroom discussions to avoid punishment. The Stop W.O.K.E. Act explicitly threatens race- and gender-based speech, impacting a wide array of courses, in the humanities and beyond. As a result, students are either denied access to knowledge altogether or receive incomplete or inaccurate information from instructors that is steered toward the legislature's own views. These restrictions are particularly invidious because they target instructors and students from marginalized communities, especially Black instructors and students.

8.     Not surprisingly, in the wake of the Act's passage, universities across the State of Florida took down public-facing statements that espoused anti-racist principles and canceled anti-racist trainings, creating a climate of increased racial hostility and harassment on campus by stigmatizing racial justice and its

proponents and generating fear among Plaintiffs and other Black instructors and students who teach or take coursework in which the viewpoints disfavored by the legislature are likely to be discussed. Moreover, the law's vague terms and private enforcement mechanism chill speech and expression, including by narrowing campus discourse and gutting academic freedom; encourage a culture of surveillance to watch, scrutinize, and submit complaints for every act of instruction that references viewpoints disfavored by the legislature; and invite arbitrary and discriminatory enforcement against these same instructors.

9.      The Stop W.O.K.E. Act therefore violates a number of core provisions of the United States Constitution. It unconstitutionally abridges First Amendment freedoms by imposing viewpoint-based restrictions on the speech of instructors and the receipt of information by students in college classrooms. It violates the Due Process Clause's prohibition against vagueness because it is difficult, if not impossible, for instructors to determine what is, and is not, prohibited by its terms. And the Act violates the Equal Protection Clause because it was enacted with the intent to discriminate against Black instructors and students and those who align with them. For each of these reasons, the Stop W.O.K.E. Act should be declared unconstitutional and enjoined.

## II.   PARTIES

### A.   Plaintiffs

10.   Plaintiff LeRoy Pernell is a Black man and Professor of Law at Florida A&M University College of Law ("FAMU Law"), a law school at a historically Black university. He teaches primarily in the areas of criminal procedure, torts, juvenile law, and race and the law. Prof. Pernell previously served as Dean of FAMU law.

11.   This fall, Prof. Pernell is teaching Constitutional Law II and Torts at FAMU Law. In the spring semester of 2023, he will likely teach Criminal Procedure: Pre-Trial Procedure, as well as Advanced Topics in Criminal Procedure: The Role of Race in Criminal Procedure. In each course, Prof. Pernell instructs on topics related to race and racial disparities.

12.   Prof. Pernell believes that his teaching cannot comport with the Stop W.O.K.E Act. For example, the law prohibits him from "espous[ing], promot[ing], instructing, inculcat[ing], or "compel[ling]" a student to believe the concept that "neutrality, objectivity, and racial colorblindness" are "racist" or may have racist origins. Fla. Stat. § 1000.05(4)(a). To comply with the Act, however, would directly conflict with a core tenet of his pedagogy: the idea that the legal system is not, and has never been, race-neutral. Prof. Pernell teaches an entire course entitled The Role of Race in Criminal Procedure, which systematically addresses the role

that race plays at each major stage of the criminal process, including the application of equal protection and due process principles. Across his courses, Prof. Pernell asks his students to consider ways that the legal system is color-conscious and promotes privilege based on race. He thus fears that the Act will restrict his ability to effectively teach his courses and foster discussion on important topics—like systemic racism in the legal system—and prepare his students to be successful lawyers and advocates.

13.     Plaintiff Dana Thompson Dorsey is a Black woman and an Associate Professor of Educational Leadership and Policy Studies, with tenure, at the University of South Florida ("USF"). From 2020 to 2022, she served as the Endowed Chair and Director of the David C. Anchin Center for the Advancement of Teaching at USF.

14.     Dr. Thompson Dorsey will teach two graduate-level courses in the 2022–23 school year, School Law and Critical Race Studies: Research, Policy, and Praxis ("Critical Race Studies"). School Law is a required graduate-level course in USF's College of Education for students pursuing a Master of Education degree specializing in Educational Leadership. In this course, students review court decisions affecting American education with an emphasis on U.S. and state constitutional provisions and Florida state statutes. Critical Race Studies is an elective course for USF doctoral students that focuses on the development of

Critical Race Theory and other race-conscious research frameworks; their treatment of race, racism, and racial justice and injustice; and their contributions to education policy, practice, and leadership praxis.

15.    Dr. Thompson Dorsey believes that she will not be able to teach her courses in the same manner under the Stop W.O.K.E. Act. Her courses center on topics and viewpoints that are prohibited by the Act, including the systemic nature of racism, the origins of Critical Race Theory, and how Critical Race Theory addresses issues such as race, racism, and power in our country. In her courses, students learn that racism is deeply embedded in American society, and Critical Race Theory is an important lens through which to analyze case law, policy, and the world around them. Dr. Dorsey encourages her students to talk about their lived experience with race and privilege, as well as strategies to ensure that our society avoids repeating the discriminatory mistakes of the past. She specifically includes perspectives from Black people and other people of color which have historically been excluded from traditional educational sources. Dr. Thompson Dorsey fears that these discussions may now be prohibited.

16.    Plaintiff Sharon Austin is a Black woman and a tenured Professor of Political Science at the University of Florida ("UF"). She teaches courses in African American politics, minority politics, American government, public law, and public policy.

17.     Dr. Austin will teach four courses in the 2022–23 school year: Politics of Race at UF, Urban Politics, Black Horrors and Social Justice, and African American Politics and Policy. Dr. Austin created the Politics of Race course following a request from UF's Provost Office and after she received a social justice grant from UF in the wake of the murder of George Floyd and the nationwide political unrest that ensued.

18.     Dr. Austin believes that the Stop W.O.K.E. Act will impact her ability to teach all of her courses in this academic year because they involve instruction and engagement with viewpoints disfavored by the legislature. Dr. Austin regularly uses Critical Race Theory as a framework when teaching. Many of the authors and articles she assigns to her students argue that African Americans have been treated in an inferior manner since slavery and continue to be subjected to racism. Furthermore, the class materials maintain that racism is the norm because it provides advantages to whites and disadvantages to Blacks. Dr. Austin advocates in her instruction ideas that could be prohibited by the law, including that people of different races carry different unconscious biases; that white people carry certain privileges that Black and Latinx people do not; and that racial "colorblindness" can be a tool to oppress people of color. Dr. Austin believes that the Stop W.O.K.E. Act will prevent students from hearing the truth about racism.

19.     In her Politics of Race course, Dr. Austin impresses on students the ways Black, Hispanic/Latinx, Asian, international and other students of color have been excluded from the University of Florida and the hostile and unwelcoming environment these students experienced after the University desegregated. She also teaches diverse perspectives on topics such as affirmative action and the intersection of on-campus Greek life and racism to generate debate among students on these issues. One student believed Dr. Austin spent too much time talking about African Americans in her course and felt the course was biased.

20.     In all of her courses, Dr. Austin believes it is necessary for students to recognize the existence and manifestations of racial and gender superiority, intersectionality, unconscious bias, privilege and oppression, affirmative action, and institutional and systemic racism in the United States. Dr. Austin teaches students to engage with these concepts.

21.     Plaintiff Shelley Park is a white woman and a tenured Professor of Philosophy and Cultural Studies at the University of Central Florida ("UCF"). She is also Affiliated Faculty in the Women and Gender Studies Program.

22.     Dr. Park will teach four courses in the 2022–23 school year: Feminist Theories, Theories of Sex and Gender in the Humanities ("Theories of Sex and Gender"), Race and Technology, and Introduction to Philosophy.

23.    Dr. Park's courses study structural oppression, how it operates, and how to imagine and create alternative social structures that take identity into account to remedy this oppression. These courses do not question whether heterosexism, sexism, or racism exist because there is already consensus in her discipline(s). Likewise, there is longstanding consensus in her field that notions of merit, objectivity, and colorblindness, among other concepts, function to solidify systems of oppression—disguising as neutral standards that are in fact biased. Thus, Dr. Park's students learn to critically interrogate such concepts at the macro-level.

24.    Dr. Park does not know how she can meet the instructional standards of her discipline without violating the law. She cannot teach her courses comprehensively without discussing systemic inequalities, a baseline presumption of the scholarship she produces, reads, and teaches. She was specifically trained to identify how the notion of objectivity frequently reflects dominant white, straight, male values. To ignore the origins and functions of these concepts in her teaching would require Dr. Park to teach the history of ideas inaccurately. To ignore how these concepts function today to privilege some forms of thought over others would also be unethical.

25.    Plaintiff Jennifer Sandoval is a Latina woman and a tenured Associate Professor at the Nicholson School of Communication and Media at

15

UCF. She is also the Assistant Director of Inclusive Culture at UCF. She teaches

courses in interpersonal, intercultural, and gender communication. This

semester, she is teaching a graduate seminar called Intercultural Communication.

26.    Dr. Sandoval believes that significant portions of her course curricula

may be prohibited under the Stop W.O.K.E. Act. When teaching her students about

why people of color are underrepresented in the field of communications—in part

because of historical discrimination by white academics—students who feel

uncomfortable might interpret her instruction as espousing the view that they bear

responsibility for, and should feel guilty because of, historical discrimination by

white people. As a result, students or others who hear about her class may raise

complaints that she is promoting such views with her students. Dr. Sandoval also

teaches that "racial colorblindness" fundamentally denies the lived reality of

people in a system that has an embedded racial hierarchy, which she fears

promotes the view that "colorblindness [is] racist," Fla. Stat. § 1000.05(4)(a)(8).

27.    Plaintiff Russell Almond is a white man and an Associate Professor

of Measurement & Statistics in the Department of Educational Psychology and

Learning Systems at Florida State University ("FSU") in Tallahassee, Florida,

where he has been on the faculty since 2010. In the 2022–23 school year at FSU,

Dr. Almond will teach Basic Descriptive and Inferential Statistics Applications,

Missing Data Analysis, Bayesian Data Analysis, and Educational Psychology

Colloquium. In addition, Dr. Almond currently serves as a director on the board of the Florida Educational Research Association.

28.     Dr. Almond typically uses a number of studies that explore race as a variable in social science studies and instructs his students to be aware of the research surrounding race and its effect on educational and other economic outcomes. He believes that students pursuing careers in educational research must be aware of such studies and theories including Critical Race Theory. He believes students need to understand all political perspectives on race, including those disfavored by the Stop W.O.K.E. Act.

29.     The Stop W.O.K.E. Act impairs Dr. Almond's ability to use social science studies that discuss how race impacts educational outcomes. For example, prior to the Act's passage, Dr. Almond would regularly introduce studies that criticize "colorblind" educational policies, or argue that concepts like merit, excellence and hard work are not helpful assessment tools for evaluating groups and have racist origins. Group differences in achievement are better explained by differences in resources due to past patterns of discrimination. He feels constrained from teaching this idea under the Act's requirement that he not endorse the view that concepts like merit, excellence and hard work may have racist origins or outcomes. Further, because Dr. Almond

created his own handout on race in statistics, he does not know how he will be able to use this document going forward without "endorsement" of its content.

30.     Plaintiff Marvin Dunn is a Black man and a Professor Emeritus at Florida International University ("FIU") in Miami, Florida. During his tenure at FIU, Dr. Dunn started a Black history bus tour of Miami, funded by FIU, which he continues to lead despite his retirement. Prior to his retirement, Dr. Dunn taught psychology, with a focus on racial and ethnic minority communities, at FIU for thirty-four years.

31.     On Dr. Dunn's Miami tour, he brings FIU students and staff to areas of importance for Black Miami residents and teaches about the county's history of racial violence and discrimination, as well as institutional racism that continues to this day. Dr. Dunn—who grew up in Florida during the Jim Crow era and has personally experienced the effects of segregation and anti-Black violence—features his own story and firsthand perspective throughout the tour.

32.     The Stop W.O.K.E. Act impacts Dr. Dunn's ability to instruct on institutionalized racism and historical events because he fears that the discussions about his past experiences of discrimination with white colleagues could fall under the Act's prohibition against endorsing the viewpoint that anyone should be made to feel guilty because of their race. Further, and among other concerns, Dr. Dunn feels that he must now self-censor due to the law's requirement that instructors be

"objective" when discussing certain topics related to race, as it is unclear what it means to be "objective" when discussing one's own lived experience with racism and racial inequality. Dr. Dunn's original purpose in instituting these bus tours was to educate FIU students and staff about the experiences of Black Miamians, including experiences of racial inequality and discrimination, by visiting significant sites of Black history and culture in that city. The tours enrich students' learning and inform future instruction by FIU staff. Dr. Dunn's tours include members of the FIU community and Dr. Dunn believes he is acting as an employee of FIU when he instructs students and staff in and outside the classroom about his bus tour.

33.     Plaintiff Johana Dauphin is a Black woman and a senior at FSU, where she majors in International Affairs with a concentration in Urban and Regional Planning.

34.     This fall, Ms. Dauphin is enrolled in two courses at FSU—Race and Minority Relations and Religion, Race, and Ethnicity—that she fears will be negatively affected by the Stop W.O.K.E. Act. Ms. Dauphin signed up for the courses because she endeavors to learn more about racial justice and take classes that include the perspectives of people of color. She believes that the Stop W.O.K.E. Act will result in the denial of her ability to receive information and instruction, particularly regarding race, racial disparities, and structural inequities,

that will stymie her educational enrichment and post-graduate future, and minimize and/or ignore her lived experience as a Black woman. She further believes that she will be deprived of the opportunity to fully explore certain views and modes of analysis within these courses because her professors are now prohibited from endorsing or promoting concepts that had previously been central to coursework—such as white privilege, systemic racism, and unconscious bias—because these concepts suggest that a person's status as privileged is determined by their race. Ms. Dauphin therefore believes that she will be denied information and instruction essential for her educational enrichment, which could make her a less competitive candidate for law school and a less employable lawyer.

35.     Ms. Dauphin also fears that the Stop W.O.K.E. Act will cause professors to avoid discussing race and racial disparities altogether, resulting in her perspective and lived experiences as a Black female student being minimized or ignored.

**B.     Defendants**

36.     Defendant Brian Lamb is the Chair of the Florida Board of Governors of the State University System ("Board of Governors"). The Board of Governors has the authority to "operate, regulate, control, and be responsible for the management of the whole State University System." Fla. Stat. § 20.155(4)(a). As Chair, Defendant Lamb is the official spokesperson of the Board and is authorized to

"exercise such other powers and duties that inure to the office of Chair of a body corporate." Operating Procedures, art. IV, § D(4).[8] Defendant Lamb is sued in his official capacity as Chair.

37.    Defendant Eric Silagy is the Vice Chair of the Board of Governors. As Vice Chair, Defendant Silagy performs the duties of the Chair and has the same power and authority as the Chair in the absence or disability of the Chair. Operating Procedures, art. IV, § E. Defendant Silagy is sued in his official capacity as Vice Chair.

38.    Defendants Timothy M. Cerio, Richard Corcoran, Aubrey Edge, Patricia Frost, Nimna Gabadage, Edward Haddock, Ken Jones, Darlene Luccio Jordan, Alan Levine, Charles H. Lydecker, Craig Mateer, Steven M. Scott, William Self, and Kent Stermon are sued in their official capacities as members of the Board of Governors.

39.    The members of the Board of Governors have authority to determine when institutions of higher learning have "a substantiated violation of s. 1000.05(4)(a)," the provision of the Stop W.O.K.E. Act challenged here. Fla. Stat. § 1001.92(5). Such a finding means that institution "shall be ineligible to receive

---

[8]    Operating Procedures of the Board of Governors of the State University System of Florida art. IV, § D(4), https://www.flbog.edu/wp-content/uploads/Draft-Board-of-Governors-Operating-Procedures-2020_01_30-Updated.pdf.

performance funding during the next fiscal year following the year in which the violation is substantiated." *Id.*

40.    The Board of Governors also has rulemaking authority to "implement this section [Fla. Stat. § 1000.05] as it relates to state universities." Fla. Stat. § 1000.05(6)(b).

41.    The day the Stop W.O.K.E. Act became effective, July 1, 2022, the Board of Governors began exercising that rulemaking authority by issuing a Notice of Board of Governors Proposed New Regulation 10.005, entitled "Prohibition of Discrimination in University Training or Instruction" to "implement recent amendments to section 1000.05(4)" enacted in the Stop W.O.K.E. Act. The regulation was adopted on August 26, 2022. Under the New Regulation, if the Board determines that there was a knowing and willful violation of the law, "the university will be ineligible for performance funding for the next fiscal year."[9] Board of Governors New Regulation 10.005(4)(d). On November 24, 2022, the Board of Governors issued Notice of Proposed Regulation 10.003, entitled "Post-Tenure Faculty Review," which conditions employment of tenured faculty on, *inter alia*, adherence to the Stop W.O.K.E. Act prohibitions. Faculty members who

---

[9]    *Board of Governors Regulation 10.005* at § 4(d), https://www.flbog.edu/wp-content/uploads/2022/08/10.005-Prohibition-of-Discrimination-in-University-Training-or-Instruction.pdf.

fail to meet expectations across the seven measures in the post-tenure review may be terminated despite their tenured status. The Proposed Regulation remains pending during the months-long process for adopting rules under Florida law.

42. Defendant Manny Diaz, Jr. is the Florida Commissioner of Education and a member of the Board of Governors. He is responsible for submitting "recommendations for a coordinated Early Learning–20 education budget that estimates the expenditures for the Board of Governors," and all boards "under the general supervision of the Board of Governors or the State Board of Education for the ensuing fiscal year." Fla. Stat. § 1001.10(6)(g). He is also "responsible for giving full assistance to the State Board of Education in enforcing compliance with the mission and goals of the Early Learning–20 education system, except for the State University System." Fla. Stat. § 1001.10(1). Defendant Diaz is sued in his official capacity as Commissioner of Education.

43. Defendants Morteza Hosseini, Thomas G. Kuntz, David L. Brandon, Richard P. Cole, Christopher T. Corr, James W. Heavener, Lauren D. Lemasters, Daniel T. O'Keefe, Rahul Patel, Amanda J. Phalin, Marsha D. Powers, Fred S. Ridley, and Anita G. Zucker are members of the University of Florida Board of Trustees. The UF Board of Trustees is a corporate body established by Florida law that serves as the governing body of UF, which is part of the State University System of Florida. The members of the UF Board of Trustees set policy for the

university and are responsible for implementing and maintaining high-quality education consistent with UF's mission. Defendant members of the UF Board of Trustees are sued in their official capacities.

44.     Defendants William Weatherford, Michael E. Griffin, Sandra Callahan, Michael Carrere, N. Rogan Donelly, Oscar Horton, Jenifer Jasinski Schneider, Lauran Monbarren, Nithin Palyam, Shilen Patel, Fredrick Piccolo, and Melissa Seixas are members of the University of South Florida Board of Trustees. The USF Board of Trustees is a corporate body established by Florida law that serves as the governing body of USF, which is part of the State University System of Florida. The members of USF Board of Trustees set policy for the university and are responsible for implementing and maintaining high-quality education consistent with USF's mission. Defendant members of the USF Board of Trustees are sued in their official capacities.

45.     Defendants Dean C. Colson, Rogelio Tovar, Cesar L. Alvarez, Jose J. Armas, Deanne Butchey, Carlos A. Duart, Natasha Lowell, Cristhofer Lugo, T. Gene Prescott, Chanel T. Rowe, Marc D. Sarnoff, and Carlos Trujillo are members of the Florida International University Board of Trustees. The FIU Board of Trustees is a corporate body established by Florida law that serves as the governing body of FIU, which is part of the State University System of Florida. The members of the FIU Board of Trustees set policy for the university and are responsible for

implementing and maintaining high-quality education consistent with FIU's mission. Defendant members of the FIU Board of Trustees are sued in their official capacities.

46.     Defendants Kevin Lawson, Kimberly Moore, Ann Marie Cavazos, Otis Cliatt, II, Thomas W. Dortch, Jr., Michael Dubose, Kristin Harper, Belvin Perry, Jr., Craig Reed, Kenward Stone, Nicole Washington, and Zachary Chandler Bell are members of the Florida A&M University Board of Trustees. The FAMU Board of Trustees is a corporate body established by Florida law that serves as the governing body of FAMU, which is part of the State University System of Florida. The members of the FAMU Board of Trustees set policy for the university and are responsible for implementing and maintaining high-quality education consistent with FAMU's mission. Defendant members of the FAMU Board of Trustees are sued in their official capacities.

47.     Defendants Peter Collins, Maximo Alvarez, Kathryn Ballard, Eric Chicken, Vivian de las Cuevas-Diaz, Nimna Gabadage, Jorge Gonzalez, Justin Roth, Bob Sasser, John Thiel, Drew Weatherford, Jim W. Henderson, and Deborah Sargeant are members of the Florida State University Board of Trustees. The FSU Board of Trustees is a corporate body established by Florida law that serves as the governing body of FSU, which is part of the State University System of Florida. The members of the FSU Board of Trustees set policy for the university and are

responsible for implementing and maintaining high-quality education consistent with FSU's mission. Defendant members of the FSU Board of Trustees are sued in their official capacities.

48.     Defendants Alex Martins, Harold Mills, Tiffany Altizer, Bill Christy, Jeff Condello, Joseph Conte, Danny Gaekwad, Stephen King, Daniella Lopez, Caryl McAlpin, John Miklos, Michael Okaty, and Beverly J. Seay are members of the University of Central Florida Board of Trustees. The UCF Board of Trustees is a corporate body established by Florida law that serves as the governing body of UCF, which is part of the State University System of Florida. The members of the UCF Board of Trustees set policy for the university and are responsible for implementing and maintaining high-quality education consistent with UCF's mission. Defendant members of the UCF Board of Trustees are sued in their official capacities.

## III.   JURISDICTION AND VENUE

49.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the First and Fourteenth Amendments to the United States Constitution, and under 42 U.S.C. § 1983.

50.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) and (e).

# FACTUAL ALLEGATIONS

## I.   THE STOP W.O.K.E. ACT & ENFORCEMENT REGULATIONS

51.   Contradicting the State University System's stated commitment to free expression, the legislature enacted the Stop W.O.K.E. Act, which unconstitutionally chills instruction in college classrooms regarding viewpoints disfavored by the legislature, including the existence of systemic racism and sexism.

52.   Section 2(4)(a) of the Stop W.O.K.E. Act amends the Florida Educational Equity Act, § 1000.05, and provides:

> (4)(a): It shall constitute discrimination on the basis of race, color, national origin, or sex under this section to subject any student or employee to training or instruction that espouses, promotes, advances, inculcates, or compels such student or employee to believe any of the following concepts:
>
> 1. Members of one race, color, national origin, or sex are morally superior to members of another race, color, national origin, or sex.
>
> 2. A person, by virtue of his or her race, color, national origin, or sex is inherently racist, sexist, or oppressive, whether consciously or unconsciously.
>
> 3. A person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex.
>
> 4. Members of one race, color, national origin, or sex cannot and should not attempt to treat others without respect to race, color, national origin, or sex.

27

5. A person, by virtue of his or her race, color, national origin, or sex bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, national origin, or sex.

6. A person, by virtue of his or her race, color, national origin, or sex should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion.

7. A person, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin, or sex.

8. Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, national origin, or sex to oppress members of another race, color, national origin, or sex.

(4)(b): Paragraph (a) may not be construed to prohibit discussion of the concepts listed therein as part of a larger course of training or instruction, provided such training or instruction is given in an objective manner without endorsement of the concepts.

53.   The Stop W.O.K.E. Act provides that the list of banned concepts may be presented "in an objective manner without endorsement," but the law provides no explanation of what it would mean to give instruction in "an objective manner" or "without endorsement." For example, it is unclear whether characterizing a

study as "methodologically sound" constitutes "endorsement." Similarly, when describing various approaches as valid, an instructor does not know whether "endorsement" requires prioritization. And there is no guidance as to whether an "endorsement" occurs when instructors distinguish between fact and misinformation, as generally recognized within their discipline.

54.     Instructors in higher education regularly provide—indeed are often expected to provide—"endorsement" or other normative positions on the subjects of their expertise which they were hired by the State University System to teach to their students. To uphold the standard of their disciplines, instructors must identify and teach foundational, widely accepted principles, even when those viewpoints are disfavored by the legislature. Instructors endorse conclusions through their own scholarship as well. Asking higher education instructors to avoid "endorsement" of ideas within their fields of instruction puts them in an impossible situation, forcing them to choose between guessing what might violate the law and providing students with the perspective on academic consensus and debate necessary for their studies and to be fully prepared for their chosen profession.

55.     For example, Professor Pernell is the author of textual materials he assigns to law students as part of his Criminal Procedure classes. His students might interpret discussions of his scholarship on the lack of race neutrality in the

legal system as an endorsement of the view that the concept of colorblindness is racist.

56.    As a feminist philosopher and cultural studies theorist, Dr. Park must teach students to build upon widely accepted foundational principles. The existence of sexism, heterosexism, racism, and other forms of oppression and privilege has been well-documented by several decades of empirical research and is the starting place for her courses. Queer studies and feminist scholars understand and have been trained to view the normative construction of masculinity (e.g., as dominant, as heterosexual, as white) as inherently harmful. Dr. Park's identification of these concepts as foundational for disciplinary study may be perceived as an endorsement of a view prohibited by the Stop W.O.K.E. Act.

57.    The FEEA already prohibits "[d]iscrimination on the basis of race, color, national origin, sex, disability, religion, or marital status against a student or an employee in the state system of public K-20 education." Fla. Stat. § 1000.05(2)(a). Subsection (2) includes further protection against exclusion from participation, restricting access in criteria for admissions, and unavailability of classes to all students. Subsection (3) prohibits discrimination "on the basis of sex" in athletic programs.

58.    The FEEA also authorizes enforcement of anti-discrimination provisions in schools. Section 1000.05 contains a broad enforcement provision for

private lawsuits, directs the State Board of Education to compel compliance, and authorizes the Board of Governors to implement anti-discrimination measures in state universities.

59.    The Stop W.O.K.E. Act adds to this enforcement regime by creating a new category of discrimination codified in Section 1000.05(4). As described above, this new category of "discrimination" does not actually regulate discriminatory conduct; it is a state-mandated prohibition on the expression of certain viewpoints disfavored by the Florida legislature.

60.    Put simply, as a result of the Stop W.O.K.E. Act, which the Board of Governors can enforce by removing performance funding for the following academic year, instructors could be fired or otherwise disciplined for expressing prohibited viewpoints. Not only do these provisions chill the speech of instructors due to fear of loss of employment or state funding, but individual state universities now are effectively forced to fire or otherwise discipline faculty who might violate the vague and undefined strictures of the Stop W.O.K.E. Act.

**A.    The Stop W.O.K.E. Act and the Legacy of Racial Discrimination in Florida**

61.    The Stop W.O.K.E. Act follows a long history of anti-Black violence, harassment, discrimination and neglect, and the suppression of Black activism and speech about those racial injustices in Florida.

62.     For example, during the 1950s and 1960s, white civilians and police officers suppressed student protests of racial segregation in Florida. In May 1956, police officers in Tallahassee arrested two Black students who were protesting racial segregation on city buses. In 1960, during an attack known as Ax Handle Saturday, 200 white men used wooden ax handles to beat Black people in response to lunch-counter demonstrations in Jacksonville.[10]

63.     Three years later, in 1963, hundreds of Black students from FAMU protested racial segregation of a local movie theater. The students were attacked by white police officers who beat them with nightsticks and dragged them into police wagons. Hundreds of students continued the protests at the county jail and were later convicted of trespass under Florida law.

64.     In response to FAMU Law students' demonstrations protesting racial segregation, then Governor W. Haydon Burns collaborated with the Florida Legislature to strip FAMU Law of its funding in 1965. The funds were used to establish a law school at formerly all-white Florida State University in 1966. After graduating its last students in 1968, FAMU Law remained closed for over thirty years until it reopened in 2002.

---

[10]     *"Ax Handle Saturday," a Story*, AFRICAN AM. REGISTRY, https://aaregistry.org/story/ax-handle-saturday-a-brief-story/ (last visited Dec. 1, 2022).

65.     In 1973, in a case brought by Black principals, teachers, aides, and coaches of previously all-Black schools who were passed over for jobs in the integrated school system, U.S. District Judge Charles Scott ruled that, in the early 1970s, the Lake County school system's personnel decisions were "tainted by a racially discriminatory intent to, at least temporarily, shut out [B]lack school principals and assistant principals."[11] Indeed, Lake County had a documented history of racially charged harassment directed at Black residents, and was also the home of a Ku Klux Klan grand wizard in the 1980s.

66.     In 1982, the U.S. Civil Rights Commission issued a report concerning unrest in Miami's Liberty City neighborhood in May 1980. The report documented decades of "neglect of the [B]lack community in housing, jobs, business, politics, education and the criminal justice system."[12]

---

[11] Ramsey Campbell, *Blacks Taking Long, Painful Road to True Equality, Justice*, Orlando Sentinel (July 1, 1993), https://www.orlandosentinel.com/news/os-xpm-1993-07-01-9306240432-story.html.

[12]     David Hoffman, *Racial Isolation Caused Miami Riots, Panel Says*, WASH. POST (June 8, 1982), https://www.washingtonpost.com/archive/politics/1982/06/08/racial-isolation-caused-miami-riots-panel-says/a99115c4-00e6-4ebc-a490-42dea34dd223/; *see also* U.S. Comm'n on Civil Rights, *Confronting Racial Isolation in Miami* (1982), https://archive.org/details/ERIC_ED217116/page/n1/mode/2up.

67.    Not until 1992, after 130 years, did public officials change the racially charged names of a marsh and a bygone Civil War–era shanty town on official maps of Highlands County, located in south-central Florida.

68.    In 1996, a white police officer fatally shot an unarmed Black teenager in St. Petersburg, after pulling him over for speeding. The killing eerily echoes other well documented killings in recent years, as witnesses disputed the officer's account of the events that led to the officer firing several shots.

69.    That same year, there were a number of burnings of Black churches in Florida, which were widely blamed on white extremist groups.

70.    In 1999, two pipe bombs were detonated on FAMU's campus. After each bombing, local television stations received violent, racist calls. A federal jury determined that "the bombings were motivated by racial prejudice."[13]

71.    In recent years, activists in Florida have continued to press the state to not only acknowledge this history of anti-Black violence and repression, but also to promote a more racially just society.

---

[13]    Press Release, U.S. Department of Justice, U.S. Attorney's Office for the Northern District of Florida, *Convicted Pipe Bomber Sentenced to 33 More Years in Federal Prison* (Nov. 19, 2020), https://www.justice.gov/usao-ndfl/pr/convicted-pipe-bomber-sentenced-33-more-years-federal-prison.

**B.     Demands for Racial Justice from Black Activists and Black-Led Organizations in Florida Over the Past Decade**

72.     Since 2012, beginning with the killing of Trayvon Martin in Florida, Black-led organizations, schools, and students have engaged in protests and other actions to encourage discussions about race, racial justice, systemic racism, and white privilege.

73.     Both the National Association for the Advancement of Colored People ("NAACP") and local Florida NAACP branches organized marches across the State of Florida, joined by thousands, to protest Martin's death and condemn anti-Black violence. Rallies were also organized by student groups like the Black Law Students Association of FAMU Law.

74.     Following the killings of George Floyd, Breonna Taylor, and Ahmaud Arbery in 2020, Floridians and Americans—of all races—across the country increased their calls for advancing racial justice throughout all sectors of society. A multiracial coalition of millions of people engaged in racial justice demonstrations, often organized under the banner of Black Lives Matter, making the 2020 protests one of the most significant mass movements in the country's history. Across Florida, thousands of peaceful protestors marched for racial justice in Tallahassee, Miami, Fort Lauderdale, Tampa, Orlando, Gainesville, Jacksonville, and many other cities.

75.     In the summer of 2020, the UF chapter of the NAACP, the UF Black Effort, the UF Black Student Union ("BSU"), and the UF Black Graduate Student Organization worked with other community groups to organize racial justice protests and calls to action in Gainesville.[14]

76.     That fall, the UF NAACP, BSU, and African Student Union helped organize a public protest calling for the university to rename "J. Wayne Reitz Student Union,"[15] due to Reitz's history as an ardent segregationist who denied Black students' entry to UF.[16]

77.     These calls for racial justice reflected a larger shift across the country. According to a 2020 study conducted by Monmouth University, a newfound majority of Americans agreed that: "racism and discrimination is a 'big problem,'" and "there's a lot of discrimination against [B]lack Americans in society."[17]

---

[14]     *2020 Black Lives Matter Protests*, Univ. of Fla. Univ. Archives, https://universityarchives.uflib.ufl.edu/explore-our-projects/2020-black-lives-matter-protests/ (last visited Dec. 1, 2022).

[15]     Lianna Hubbard, *Students, Employees Protest Reitz Union Name*, The Alligator (Oct. 7, 2020), https://www.alligator.org/article/2020/10/students-employees-protest-reitz-union-name.

[16]     Rajel Wolcoff, *UF Students Hold Protest Demanding Name Change For The Reitz Union*, WUFT (Oct. 7, 2020), https://www.wuft.org/news/2020/10/07/uf-students-hold-protest-demanding-name-change-for-the-reitz-union/; Monique Miquel, *Opinion: Renaming the Reitz Union*, Fla. Political Rev. (Oct. 18, 2020), http://www.floridapoliticalreview.com/renaming-the-reitz-union/.

[17]     Nate Cohn & Kevin Quealy, *How Public Opinion Has Moved on Black Lives Matter*, N.Y. Times (June 10, 2020), https://www.nytimes.com/interactive/2020/06/10/upshot/black-lives-matter-attitudes.html.

78.     These social and legal shifts popularized discussions about how to dismantle racism and sexism and how to increase inclusivity, mainstreaming concepts such as "structural," "systemic," or "institutional" racism, and "racial privilege" or "white privilege."

79.     Instead of heeding calls for racial justice, the Florida legislature passed the Stop W.O.K.E. Act to exclude these discussions and sentiments from classrooms.

### C.     Activism of Black Instructors and Students During and After the Summer 2020 Racial Reckoning and Responsive Actions of Florida's Colleges and Universities

80.     In the summer of 2020, Black instructors and students publicly called upon Florida's higher educational institutions to engage in more meaningful anti-racist work and make campus climates more inclusive. These instructors and students were joined by allies of all races seeking to push their institutions to act.

81.     In June 2020, 33 Black faculty members at FSU released a public letter in which they voiced support for FSU's Black students, denounced recent anti-Black violence, and recognized "the toll institutional and structural racism" takes on students of color.[18] In this letter, Black faculty also declared their commitment to address systemic racism in academia and "to deconstruct the present system and to begin to rebuild an academic space that is rooted in anti-

---

[18]     Letter from Dr. Cameron Beatty et al. to Black Students at FSU (June 4, 2020), https://myweb.fsu.edu/jelsner/Letter_to_Black_Students_From_Black_Faculty.pdf.

racist ideology."[19] These Black faculty members also committed to holding the FSU administration accountable for addressing the campus's racial climate, calling on university leadership to enact ten reforms to address historical injustices, promote anti-racism on campus, and better support Black students, faculty, and staff.

82.    In June 2020, UF's BSU created a petition asking UF to better protect the safety and well-being of Black students at UF.[20] The petition called for UF to implement mandatory diversity trainings for faculty and staff, increase the number of Black instructors and administrators, and re-open an investigation into racial harassment in November 2019, when a group of Black students were called the N-word by a white student.[21]

83.    In June 2020, a group of Black students, alumni, and allies sent a separate call-to-action letter to the Dean and leadership at UF's College of Education in June 2020 regarding their concerns about "the state of Black Life in society and more locally, within our college."[22] Leadership at the College of

---

[19] *Id.*

[20]    UF Black Student Union, *Improve Race Relations Here at the Univ. of Fla.*, CHANGE.ORG, https://www.change.org/p/president-w-kent-fuchs-improve-race-relations-here-at-the-university-of-florida (last visited Dec. 1, 2022).

[21]    *Id.*; Ana Escalante, *Black students called racial slurs in SNAP van*, THE ALLIGATOR (Nov. 17, 2019), https://www.alligator.org/article/2019/11/black-students-called-racial-slurs-in-snap-van.

[22]    Collective for Black Student Advancement, UF COLL. OF EDUC., https://education.ufl.edu/cbsa/ (last visited Dec. 1, 2022).

Education responded by creating the Collective for Black Student Advancement. The Collective has among its goals to "create an inclusive academic- and working-environment, in which best practices for addressing social justice, diversity, and anti-racism on behalf of students, staff, and faculty are emphasized;" and "[d]evelop curricular and extra-curricular experiences that delve into the intersections of race, racial history, and the field of education."[23] As part of these efforts, the Collective proposed a new doctoral concentration called Critical Study of Race, Ethnicity and Culture in Education.[24] This concentration was approved by the College in the summer of 2021.[25]

84.    In the fall of 2021, two instructors at UF published "A Way Forward: UF Scholars on Support, Obstacles and the Need for Institutional Engagement."[26] Based on interviews with thirty-nine faculty members across UF, the report

---

[23]    *See id.*

[24]    *See* Emma Pettit, *He Accused the University of Florida of Violating His Academic Freedom. The Provost Disagrees*, THE CHRON. OF HIGHER EDUC. (May 2, 2022), https://www.chronicle.com/article/he-accused-the-university-of-florida-of-violating-his-academic-freedom-the-provost-disagrees.

[25]    *Id.*

[26]    Dr. Katheryn Russell-Brown & Dr. Ryan Morini, Univ. of Fla., Race & Crime Ctr. for Just., *A Way Forward: UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement* (2021), https://www.law.ufl.edu/law/wp-content/uploads/UFRaceScholarshipReport-2021.pdf.

identified and called upon UF to "more effectively support faculty whose work focuses on race or anti-racism."[27]

85.     Many Florida colleges and universities responded to these demands by expanding discussions about systemic racism, equity, and inclusion in their curricula.

86.     For example, the president of UF committed to placing a "focus on the Black experience, racism and inequity" for the 2020–21 academic year, with each of the university's colleges "featur[ing] speakers, seminars and courses" on the subject.[28]

87.     At the University of North Florida, psychology faculty announced plans to "critically evaluate our curriculum and be intentional about including activities within courses that will target dismantling racism . . . includ[ing] discussing the history of structural and systemic anti-Black racism in psychological science as well as the ways in which racism continues in our field today."[29]

---

[27]     *Id.* at 2.

[28] Letter from W. Kent Fuchs to the UF Community, *UF Anti-Racism Initiative* (June 18, 2020),   https://cdo.ufl.edu/strategy/uf-anti-racism-initiative/#:~:text=The%202020%2D21%20academic%20year,our%20curriculum%2C%20including%20UF%20Quest.

[29]     UNF Department of Psychology Addressing Racism & Promoting Diversity and Inclusion Committee, *Statement on Anti-Black Racism*, Univ. of N. Fla., https://www.unf.edu/coas/psychology/Anti-Black_Racism_Statement.aspx (last visited Dec. 1, 2022).

88.     Universities also made strides to address legacies of racism on their campuses. On August 24, 2020, UF removed the memorial of William Loring, a Confederate general, as part of its anti-racism initiative to "remove monuments or naming that UF controls that celebrate the Confederacy or its leaders."[30]

89.     On July 6, 2020, in response to recommendations from Black faculty, the president of FSU, John Thrasher, announced the creation of a Task Force on Anti-Racism, Equity & Inclusion in order to "identify racial and ethnic disparities on campus" and "implement a range of initiatives, such as developing mandatory diversity and inclusivity training for all campus employees and students and fostering the recruitment and retention of students, faculty and staff from underserved groups."[31] This task force was led by Black faculty and administrators. In January 2021, Thrasher accepted the task force's recommendations to permanently remove a statue of slave owner Frances W. Eppes from display on campus and to remove Eppes' name from a university building.[32]

---

[30]     *Central Initiatives: History, Symbolism and Demonstrating Behaviors Consistent with Our Values*, ANTI-RACISM UNIVERSITY OF FLORIDA, https://antiracism.ufl.edu/central-initiatives/history/ (last visited Dec. 1, 2022).
[31]     *President's Task Force on Anti-Racism, Equity & Inclusion*, FLA. STATE UNIV., https://president.fsu.edu/taskforce/ (last visited Dec. 1, 2022).
[32]     *FSU President Agrees to Remove Francis Eppes Name from College of Criminology*, WTXL (Jan. 26, 2021), https://www.wtxl.com/news/local-news/fsu-president-agrees-to-remove-francis-eppes-name-from-college-of-criminology.

90.     University leaders across Florida also released public statements in which they committed to prioritizing anti-racism, equity, and inclusion on their campuses moving forward.

91.     For example, in June of 2020 the president of UCF, Alexander N. Cartwright, declared the university's commitment "to not merely celebrate our diversity, but to be actively anti-racist."[33] UCF leaders also spoke of the "need to be comfortable with the discomfort born from honest, difficult dialogues about race and culture."[34]

92.     Leaders at dozens of other Florida higher education institutions echoed these anti-racist sentiments, in recognition of the widespread desire among students and staff for increased action to combat racism and racial injustice.

93.     This anti-racist work at Florida's colleges and universities also followed persistent complaints from Black students and other students of color about racial isolation, microaggressions, and racial harassment.[35]

---

[33]     Alexander N. Cartwright, *Our Future Is Inclusion*, UCF TODAY (June 2, 2020), https://www.ucf.edu/news/our-future-is-inclusion/.

[34]     S. Kent Butler, *Now Is Our Time to be Actively Anti-Racist*, UCF TODAY (May 29, 2020), https://www.ucf.edu/news/now-is-our-time-to-be-actively-anti-racist/.

[35]     JJ Burton & Rochelle Alleyne, *Local Leaders, Students Want St. Pete Catholic School Dean Removed Over Alleged Racist Comments*, ABC ACTION NEWS (Feb. 1, 2022), https://www.abcactionnews.com/news/region-pinellas/local-leaders-students-want-st-pete-catholic-school-dean-removed-over-alleged-racist-comments; David Williams, *A Florida School District Promises a Swift* Con't)

**D.     The Florida Legislature's Response to Anti-Racist Activism**

94.     The sequence of events surrounding the Stop W.O.K.E. Act's introduction and subsequent enactment reveals that it was enacted to suppress speech about systemic racism, white privilege, and Critical Race Theory, a term that the Act's proponents misused and misconstrued as a catch-all term for all manner of race-conscious concepts with which the legislature and Governor DeSantis disagree. The Act's proponents repeatedly criticized these concepts and the multiracial coalition that called for increased commitments to addressing racism across Florida. Although members of the legislature were put on notice of the Stop W.O.K.E. Act's likely effect on anti-racist speech, including the disparate impact on Black instructors and students, the legislature went on to enact the Stop W.O.K.E. Act specifically because of these harmful effects.

95.     On March 17, 2021, Governor DeSantis distorted and dismissed anti-racist teachings designed to encourage students to grapple with concepts like racial privilege, saying, "[t]here is no room in our classrooms for things like Critical

---

*Investigation After Six Middle School Students Are Seen Spelling Out a Racial Slur in a Photo*, CNN (May 18, 2022), https://www.cnn.com/2022/05/18/us/florida-middle-school-racial-slur-photo/index.html; Marlene Sokol, *Student Petition: Combat Racism in Pinellas Schools*, TAMPA BAY TIMES (June 19, 2020) https://www.tampabay.com/news/gradebook/2020/06/19/student-petition-combat-racism-in-pinellas-schools/.

Race Theory. Teaching kids to hate their country and to hate each other is not worth one red cent of taxpayer money."[36]

96.     In April 2021, in direct response to protests for racial justice, and at the urging of Governor DeSantis, the legislature enacted House Bill 1, which created criminal penalties for protesters, increased criminal penalties for various protest activities, and essentially allowed Governor DeSantis to override a municipality's decision to reduce the operating budget of its police department. *See Dream Defs. v. DeSantis*, 553 F. Supp. 3d 1052 (N.D. Fla. 2021). That same month, the legislature enacted Senate Bill 90, a restrictive voting law that was challenged by several non-profit groups, including the Florida NAACP, who alleged the law sought to curtail the very voting methods used most by Black Floridians. *See League of Women Voters of Fla., Inc. v. Lee*, No. 4:21CV186-MW/MAF, 2022 WL 969538, at *53 (N.D. Fla. Mar. 31, 2022).

97.     On May 28, 2021, Governor DeSantis referred to Critical Race Theory as "race essentialism" that "teaches people to view [race] as the most important characteristic. And obviously if you're certain races, Caucasian and what not, they view that in a negative fashion. That's not something appropriate for

---

[36]     Brooke Singman, *DeSantis Condemns Critical Race Theory, Says it Won't Be Taught in Florida Classrooms*, Fox News (Mar. 18, 2021), https://www.foxnews.com/politics/desantis-critical-race-theory-florida-classrooms.

schools."[37] When stating "they," Governor DeSantis appears to refer to scholars, such as Plaintiffs, who use critical race studies in their coursework.

98.    A few days later, on June 6, 2021, Governor DeSantis vowed to turn his "political apparatus" against Republican school board candidates that support Critical Race Theory.[38]

99.    On June 10, 2021, Governor DeSantis appeared via video at a meeting of the Florida Board of Education, minutes before the Board was due to vote on a rule that would ban Critical Race Theory and the 1619 Project in K-12 schools. He explained that "C[ritical] R[ace] T[heory]" would "cause a lot of divisions . . . [and] cause people to think of themselves more as a member of a particular race based on skin color, rather than based on the content of their character and based on their hard work and what they're trying to accomplish in life."[39] The Board of Education voted to adopt the rule, over strong objection of the Florida Education

---

[37] John Kennedy, *Gov. DeSantis Takes on How Racial History Is Taught in Florida Schools*, HERALD-TRIB. (May 28, 2021), https://www.heraldtribune.com/story/news/politics/state/2021/05/28/desantis-pushes-new-rule-limiting-how-race-taught-florida-schools/7439371002/.

[38] A.G. Gancarski, *Ron DeSantis Vows to Get 'Political Apparatus Involved' in Florida School Board Races*, FLA. POLITICS. (June 6, 2021), https://floridapolitics.com/archives/434128-political-apparatus/.

[39] Robbie Gaffney, *State Board of Education Bans Critical Race Theory From Florida Classrooms*, WFSU (June 10, 2021), https://news.wfsu.org/state-news/2021-06-10/state-board-of-education-bans-critical-race-theory-from-florida-classrooms.

Association, a union which includes over 150,000 public K-12 instructors in Florida.

100.   On June 22, 2021, Governor DeSantis signed House Bill 233 ("H.B. 233") into law. H.B. 233 requires public universities and colleges to distribute an "intellectual diversity" survey to students and faculty, threatening budget cuts for institutions found to be "indoctrinating" students. *See Link v. Corcoran*, No. 4:21-cv-00271-MW-MAF (N.D. Fla. July 1, 2021). At H.B. 233's bill signing conference, Governor DeSantis lamented the current state of higher education, saying: "Unfortunately, now the norm is, [university campuses] are more intellectually repressive environments. You have orthodoxies that are promoted, and other viewpoints are shunned or even suppressed. [Florida's universities] are basically hotbeds for stale ideology. That's not worth tax dollars and that's not something we're going to be supporting going forward."[40]

101.   Governor DeSantis's use of the terms "orthodoxies" and "stale ideology" refer to race-conscious speech and related viewpoints, as he later described H.B. 233 as building on his prior initiatives to ban teaching of Critical Race Theory and the 1619 Project.[41] Moreover, later in the bill signing conference,

---

[40]   First Coast News, *Gov. Ron DeSantis Signs 3 Education Bills Focused on Civic Literacy at Fort Myers Middle School* at 05:57–07:01, YOUTUBE (June 22, 2021), https://www.youtube.com/watch?v=sDIEJztGNXI.
[41]   *Id.* at 00:07:40–00:07:50.

a sponsor of H.B. 233 stated that the law was necessary due to the fact that

universities were "placing a premium" on promoting racial and gender diversity.[42]

102.  The Governor's crusade against race-conscious speech and related

viewpoints culminated on December 15, 2021, with the rollout of the Stop

W.O.K.E. Act—the legislative proposal that ultimately became H.B. 7.

103.  This proposal, which promised to be "the strongest legislation of its

kind," lays out five objectives:

> Codifies the Florida Department of Education's
> prohibition on teaching critical race theory in K-12
> schools;
>
> Prohibits school districts, colleges and universities from
> hiring "woke C[ritical] R[ace] T[heory]" consultants;
>
> Protects employees against a hostile work environment
> due to critical race theory training;
>
> Provides employees, parents and students a private right
> of action; and
>
> Strengthens enforcement authority of the Florida
> Department of Education.[43]

104.  During a press conference announcing the Stop W.O.K.E. Act that

same day, Governor DeSantis warned of "pernicious ideologies," like Critical Race

Theory, explaining that the state's educational institutions did not need terms like

---

[42]   *Id.* at 00:20:57–00:21:19.

[43]   *Stop W.O.K.E. Act Handout*, https://www.flgov.com/wp-content/uploads/2021/12/Stop-Woke-Handout.pdf.

"equity."[44] His office also described the proposal as the state's latest effort to thwart race-conscious initiatives in schools, and again criticized Critical Race Theory and the 1619 Project.[45]

105.   The day after the press conference, in a nationally televised appearance, anti-Critical Race Theory activist Christopher Rufo described himself as "aiding" Governor DeSantis in preparing the Stop W.O.K.E. proposal.[46] He went on to call race-conscious teachings "toxic," "disgusting," and "absurd."[47]

106.   On its face, the Stop W.O.K.E. proposal is designed to thwart "wokeness"—a term originated by Black Americans, dating back to at least the early twentieth century.[48]

107.   Early usage of the term signaled the concept of being "well-informed" or "up-to-date,"[49] as described by Harlem novelist William Melvin Kelley in a

---

[44]   First Coast News, *Gov. DeSantis Introduces "Stop WOKE Act" to Combat Critical Race Theory in FL Schools* at 00:07:40, YOUTUBE (Dec. 15, 2021), https://www.youtube.com/watch?v=kWUgjZrBkNY&t=352s.

[45]   Dec. 15, 2021 Press Release, Gov. Ron DeSantis, *supra* note 3.

[46]   Yael Halon, *DeSantis's 'Stop W.O.K.E.' Legislation Would Make Teaching CRT in Florida Classrooms 'Illegal': Rufo*, FOX NEWS (Dec. 16, 2021), https://www.foxnews.com/media/desantis-stop-woke-legislation-crt-florida-illegal-rufo.

[47]   *See id.*

[48]   *See Woke Adjective Earlier than 2008*, Oxford English Dictionary (June 25, 3017), https://public.oed.com/appeals/woke/; *Woke up*, Oxford English Dictionary (3d ed. 2017).

[49]   *Woke*, Oxford English Dictionary (3d ed. 2017).

1962 *New York Times* Op-Ed about slang in urban Black American communities.[50] The term has evolved to describe someone who is "alert to racial or social discrimination and injustice."[51]

108.   Use of the term "woke" was popularized through its association with the Civil Rights Movement and, more recently, has been associated with the Black Lives Matter movement and calls for racial justice.[52]

109.   In adherence to the Governor's priorities and his repeated criticism of "wokeness,"—i.e., calls for racial and social justice—the Florida legislature took up the Stop W.O.K.E. Act in the 2022 legislative session.

110.   Within a month of Governor DeSantis's December 15, 2021 press conference, Representative Bryan Avila, the Republican Speaker pro tempore, introduced H.B. 7 in the House on January 11, 2022.

111.   The same day, then-Senator Diaz filed Senate Bill 148 ("S.B. 148"), a companion bill to H.B. 7, in the Senate. At the close of the legislative session, Governor DeSantis appointed Senator Diaz as the Commissioner of the Florida Department of Education.

---

[50]     *Id.* (citing William Melvin Kelley, *If You're Woke You Dig It; No Mickey Mouse Can Be Expected to Follow Today's Negro Idiom Without a Hip Assist*, N.Y. Times, May 20, 1962, at SM45).

[51]     *Id.*

[52]     *See id.*

112.    H.B. 7's definitions of prohibited concepts mirror those included in

Executive Order 13950 on "Combatting Race and Sex Stereotyping," issued by

former President Trump on September 22, 2020. The Order specifically banned

what it called "divisive concepts."[53] In December 2020, a federal court issued a

nationwide injunction enjoining enforcement of the "divisive concepts" ban,

finding, among other things, that the Order constituted an unconstitutional

restriction on speech that was "so vague that it is impossible . . . to determine what

conduct is prohibited."[54]

---

[53]    The "divisive concepts" were as follows: "the concept that (1) one race or sex is inherently superior to another race or sex; (2) the United States is fundamentally racist or sexist; (3) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (4) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex; (5) members of one race or sex cannot and should not attempt to treat others without respect to race or sex; (6) an individual's moral character is necessarily determined by his or her race or sex; (7) an individual, by virtue of his race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; (8) any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or (9) meritocracy or traits such as hard work ethic are racist or sexist, or were created by a particular race to oppress another race." *Combating Race and Sex Stereotyping*, Exec. Order No. 13950, 85 Fed. Reg. 60683 (Sept. 22, 2020).
[54]    *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 543 (N.D. Cal. 2020).

113.   Nonetheless, eight of the nine "divisive concepts" in the Executive Order, which was enjoined by federal court order, are included, nearly verbatim, in the Stop W.O.K.E. Act.[55]

114.   During the course of the legislative session, Representative Avila and Senator Diaz made clear to the legislature that H.B. 7 and S.B. 148 were designed to suppress speech about systemic racism, diversity, equity, and inclusion—the very speech championed by higher educational institutions, students, and faculty during and after the 2020 racial reckoning.

---

[55]   *Compare supra* note 53 *with* the text of the Stop W.O.K.E. Act: "identifying the following divisive concepts as: (1) [m]embers of one race, color, national origin, or sex are morally superior to members of another race, color, national origin, or sex; (2) [a] person, by virtue of his or her race, color, national origin, or sex is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (3) [a] person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex; (4) [m]embers of one race, color, national origin, or sex cannot and should not attempt to treat others without respect to race, color, national origin, or sex; (5) [a] person, by virtue of his or her race, color, national origin, or sex bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, national origin, or sex; (6) [a] person, by virtue of his or her race, color, national origin, or sex should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion; (7) [a] person, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin, or sex; and (8) [s]uch virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, national origin, or sex to suppress members of another race, color, national origin, or sex." Fla. Stat. § 1000.05(4)(a).

115.   Representative Avila singled out concepts such as "white privilege," "systemic racism," and "affinity groups," arguing that there was no place for discussion of such concepts in schools or workplaces in Florida.[56]

116.   During debate before the House State Affairs Committee on February 1, 2022, Representative Avila explained that an acquaintance studying to become a math teacher was "learning how to identify 'white privilege'" and "[t]hat to me, is not whatsoever something that should be allowed. . . . Certainly that is not relevant, I would say, to the teaching of math to elementary students."[57]

117.   Representative Avila identified "blatant" examples of the kinds of materials that would not align with H.B. 7 during the February 8, 2022 House Education and Employment Committee session, including Layla Saad's *Me and White Supremacy*, Peggy McIntosh's *White Privilege: Unpacking the Invisible Knapsack*, Robin DiAngelo's *White Fragility: Why It's So Hard for White People to Talk About Racism*, and a video about systemic racism, anti-racism, and white privilege.[58] Representative Avila later referred to these race-conscious materials as "absolutely un-American."[59]

---

[56]    *2/1/22 House State Affairs Committee* at 01:01:41–01:02:47, *supra* note 2.
[57]    *Id.* at 00:53:59–00:55:00.
[58]    *2/8/22 House Education and Employment Committee* at 00:33:48—00:35:14, THE FLORIDA CHANNEL (Feb. 8, 2022), https://thefloridachannel.org/videos/2-8-22-house-education-employment-committee/.
[59]    *Id.* at 00:50:45.

118.   Representative Avila spoke to the sweeping reach of H.B. 7 during its second reading on the House floor on February 22, 2022, stating: "All material has to be in line with the principles that are set forth in this bill. If that material in any way, shape, or form, does not align with the principles in this bill, then that material would certainly not be permissible within a classroom."[60]

119.   In the same discussion, Representative Avila characterized H.B. 7 as an effort to expand civil rights protections from being distorted by "movements," continuing that "some movements threaten to take us backward, asking us to consider people not as individuals but as groups, assigning certain groups and experiences to people based on the group they fit into and not their individual experience" and "[t]hese movements confuse and muddle important history and civics lessons that should be taught."[61]

120.   In debate on the House floor on February 24, 2022, Republican Representative Ralph E. Massullo spoke in support of H.B. 7, specifically promoting the ideology of colorblindness in saying that young children "don't seem to see race or sex or ethnicity," which is what is needed "to make our country a better place."[62]

---

[60]    *2/22/22 House Session* at 01:38:49–01:39:05, THE FLORIDA CHANNEL (Feb. 22, 2022), https://thefloridachannel.org/videos/2-22-22-house-session/.
[61]    *Id.* at 00:37:41–00:38:05.
[62]    *2/24/22 House Session Part 1* at 00:35:15–00:35:38, THE FLORIDA CHANNEL (Feb. 24, 2022), https://thefloridachannel.org/videos/2-24-22-house-session-part-1/.

121.   Later that day, Republican Representative Robert Alexander Andrade also spoke in support of H.B. 7, stating that it was not "an oppressive bill or even really a bill about civil rights necessarily," rather it was a "free market bill."[63] Representative Andrade characterized concern around H.B. 7 as "fear that the market cornered on victimhood is suddenly being jeopardized."[64]

122.   H.B. 7 passed the Florida House by a vote of 74-41, along party lines, on February 24, 2022. Of the twenty Black House members who voted on the bill, only one voted for its passage.

123.   When the Senate took up H.B. 7 the following week, Senator Diaz repeated Representative Avila's criticisms of the concept of white privilege. After Senator Diaz was asked whether discussions of "white privilege" would be off-limits, he responded: "I would say that there are some very specific topics listed including not imposing privilege or oppression on any particular individual based on race."[65]

124.   When asked why H.B. 7 singles out discussions of race, color, sex, and national origin, Senator Diaz responded that these statuses are "historically

---

[63]   *Id.* at 01:24:43–01:24:57
[64]   *Id.* at 01:25:01–1:25:14
[65]   *3/9/22 Senate Session* at 04:15:52–04:16:04, THE FLORIDA CHANNEL (Mar. 9, 2022), https://thefloridachannel.org/videos/3-9-22-senate-session/.

accorded the highest protection," as compared to religion and disability status, and that this justified their inclusion.[66]

125.   Although Senator Diaz initially said that H.B. 7 was developed after "parents' concerns [were] brought forward," when asked directly whether he had spoken to any Black parents as part of this process, he replied without qualification: "I have not."[67]

126.   In the Senate Committee on Rules Hearing on March 1, 2022, when asked how racial colorblindness fits into H.B. 7, Senator Diaz explained: "I think the aspirational goal is the ideology that posits the best way to end discrimination is by treating individuals equally without regard to race, culture, ethnicity, sex. . . ."[68]

127.   On March 10, 2022, H.B. 7 passed the Senate by a strict party-line vote of 24-15. Of the forty state Senators, not a single Black Senator voted for H.B. 7's passage.

128.   At the same time, Florida GOP lawmakers involved in crafting the state budget added last-minute language making certain types of funding to public colleges and universities contingent upon compliance with H.B. 7.

129.   Governor DeSantis signed H.B. 7 into law at a press conference on

---

[66]   *Id.* at 03:59:20–03:59:24.
[67]   *Id.* at 03:49:46–03:50:34.
[68]   *3/1/22 Senate Committee on Rules* at 4:35:08–4:35:18, The Florida Channel (Mar. 1, 2022), https://thefloridachannel.org/videos/3-1-22-senate-committee-on-rules/.

April 22, 2022, while standing shoulder to shoulder with Rufo.[69] In a press release issued the same day, he championed H.B. 7 as a tool for preventing the "the far-left woke agenda" from "tak[ing] over our schools and workplaces," and thanked Rufo and former Senator Diaz for their roles in helping to codify the Stop W.O.K.E. Act.[70]

130.   Since signing H.B. 7 into law, Governor DeSantis has continued to champion the Stop W.O.K.E. Act. In his recent victory speech for winning a second term as governor, Governor DeSantis stated that he and his administration "reject woke ideology. We fight the woke in the legislature. We fight the woke in the schools. We fight the woke in the corporations. We will never, ever surrender to the woke mob. Florida is where woke goes to die."[71]

### E.   The Florida Legislature's Deviation from Normal Substantive Procedures

131.   The legislature lifted the language of the "divisive concepts" from former President Trump's Executive Order 13950, even though these definitions

---

[69]   *4/22/22 Signing of HB 7- Individual Freedom* at 00:28, THE FLORIDA CHANNEL (Apr. 22, 2022), https://thefloridachannel.org/videos/4-22-22-signing-of-hb-7-individual-freedom/.

[70]   Apr. 22, 2022 Press Release, Gov. Ron DeSantis, *supra* n.4.

[71]   *'Florida Is Where Woke Goes to Die:' Republican Ron DeSantis Re-Elected as Governor — Video*, THE GUARDIAN at 00:49–01:11 (Nov. 9, 2022), https://www.theguardian.com/us-news/video/2022/nov/09/florida-is-where-woke-goes-to-die-republican-ron-desantis-re-elected-as-governor-video.

were ruled unconstitutional over a year before H.B. 7 was introduced. When asked, Senator Diaz could not explain why the use of these same definitions was warranted.[72]

132.  Though "anti-indoctrination" was touted as one of the key justifications, H.B. 7's proponents could not provide any evidence of indoctrination in classroom discussions or university lectures in Florida. As Senator Diaz explained, "There are a number of materials that were brought to me across the nation that go into that, go forward into that perspective and that's why we put that [prohibited concept] in there. . . ."[73] Moreover, H.B. 7 does not achieve this end, given that it promotes indoctrination of the legislature's preferred viewpoints.

133.  Instructors—the most obvious subject matter experts for H.B. 7— repeatedly testified that the bill would make their jobs harder, not easier; that the legislature failed to identify a pedagogically sound rationale for the restrictions; that H.B. 7 fundamentally misunderstands how students learn; and that the bill was not needed. Importantly, the Florida legislature declined to formally consult with any instructors throughout the bill drafting process.

---

[72]  *3/9/22 Senate Session* at 04:58:27.840-05:00:32.820, *supra* note 65.

[73]  *Id.* at 04:00:10——04:00:21.

134.    Instead, the legislature and Governor DeSantis's office consulted with Rufo, a Senior Fellow of the Manhattan Institute, a conservative think tank focused on domestic policy and urban affairs. Rufo describes himself as having "led the fight against critical race theory in American institutions,"[74] and has published several articles on the alleged dangers of teaching Critical Race Theory, which he has described as an existential threat to the United States due to its purported attack on core American values.

135.    Rufo has advised multiple state legislatures on crafting legislative proposals that restrict speech on systemic racism and inequality.[75] His stated goal is to give the term "Critical Race Theory" a "toxic" connotation and associate it with "the entire range of cultural constructions that are unpopular with Americans."[76]

136.    Rufo is not an educator or education specialist.[77] Nor does he have any specific expertise on Florida's education system.

---

[74]    *See A Little About Me*, Christopher_Rufo, https://christopherrufo.com/about/ (last Dec. 1, 2022).

[75]    Benjamin Wallace-Wells, *How a Conservative Activist Invented the Conflict Over Critical Race Theory*, THE NEW YORKER (June 18, 2021), https://www.newyorker.com/news/annals-of-inquiry/how-a-conservative-activist-invented-the-conflict-over-critical-race-theory.

[76]    *See id.*

[77]    *See supra* note 74.

137.   In a rushed process during the last few weeks of the session, the legislature added language to a budget appropriation bill, declaring that universities would be ineligible for performance funding in the subsequent fiscal year if there is "a substantiated violation" of the restrictions in H.B. 7.[78] This punitive addition substantially changed the impact of H.B. 7, making the economic survival of public educational institutions contingent upon the suppression of speech on race and racism. Furthermore, this addition, as it relates to H.B. 7, allows the legislature itself to determine whether any entity has violated the bill, giving outsized power to the legislature with respect to higher education.

## II.    THE STOP W.O.K.E. ACT'S VIEWPOINT DISCRIMINATION

138.   Section 1000.05(4)(a) prohibits instructors from providing instruction to students that promotes or advances certain concepts, while allowing them to provide instruction that denounces those same concepts.

139.   The Act not only targets certain viewpoints in a manner that is discriminatory and disparately impacts people of color, but it also prohibits teaching subjects that are pedagogically appropriate because they are grounded in reputable and widely accepted scholarship, such as case law, academic research, or well-recognized analytical frameworks.

140.   For example, Section 1000.05(4)(a)(8) prohibits instruction that

---

[78]    2022 Fla. Sess. Law Serv. ch. 2022-154, § 9.

promotes or advances that "racial colorblindness [is] racist," but does not prohibit a professor or student from espousing the viewpoint that racial colorblindness is not racist. This provision would ban large portions of Professor Pernell's case book, *Cases and Materials on Combatting Racism in Criminal Procedure*, which promotes the view that the legal system has race-conscious and racist origins even if it presently purports to be colorblind. The provision also limits Dr. Park's instruction that colorblindness perpetuates systems of oppression, despite longstanding consensus among feminist philosophers and critical race theorists.

141.   At the same time, the Stop W.O.K.E. Act allows an instructor to teach that the legal system is not race-conscious and that colorblind approaches work to remedy past and present racism, despite ample evidence to the contrary.[79]

142.   Similarly, Section 1000.05(4)(a)(8) prohibits instruction that promotes or advances that notion of neutrality or objectivity are racist or sexist, but would not prohibit a professor or student from espousing the opposite viewpoint. Dr. Park instructs her students on the ways that concepts of neutrality and objectivity reinforce racism and sexism. There is widespread agreement within her field that

---

[79]   *See, e.g.*, *The Myth of Racial Color Blindness: Manifestations, Dynamics, and Impact* (H.A. Neville, M.E. Gallardo, & D.W. Sue, eds., Am. Psych. Ass'n 2016), https://doi.org/10.1037/14754-000 (collecting and explaining the major flaws in the doctrine of racial colorblindness and its harmful impact on the lives of people of color); Cheryl I. Harris, *Whiteness as Property*, 106 HARV. L. REV. 1709 (1993) (demonstrating how colorblindness is a form of race subordination in that it denies the historical context of white domination and Black subordination).

objectivity is a value extending from Eurocentric, colonial thinking that only

recognized white, European men of upper classes as capable of reason. It would be

unethical for Dr. Park to teach her students that these concepts are not racist or

sexist, as the Stop W.O.K.E. Act requires.

143.    The Stop W.O.K.E. Act also permits certain viewpoints regarding

what "privilege" means and how it operates, while banning other perspectives. For

example, under Section 1000.05(4)(a)(3), an instructor could not express the view

that white men enjoy a "status as . . . privileged" when walking around unarmed in

public areas because, for example, they are significantly less likely to be murdered

by police than Black men.[80] In Plaintiff Park's Feminist Theory class, students read

bell hooks' classic text, *Feminist Theory from Margin to Center* and have the

option to answer various questions about their privileges (or lack thereof) related to

race, sex, class, and ability. They move around the classroom with each answer,

providing a visual illustration of how privileges shape their own lives and the

---

[80]    *See, e.g.*, Reed T. DeAngelis, *Systemic Racism in Police Killings: New Evidence From the Mapping Police Violence Database, 2013–2021*, RACE & JUST. (Oct. 2021), https://journals.sagepub.com/doi/full/10.1177/21533687211047943 (finding that Black victims of police killings are overrepresented and white victims are underrepresented, relative to the general U.S. population); Josiah Bates, *Police Killings Happen Far More Often Than What's Widely Reported. Here's Why the Numbers Are Off by So Much*, TIME (Oct. 1, 2021), https://time.com/6102324/study-police-killings-significantly-underreported/ ("Black Americans were as much as 3.5 times more likely to die from police violence than white Americans").

experiences of others. Under the Stop W.O.K.E. Act, both lessons would likely be banned as espousing the concept that one's status as privileged or oppressed is determined by race or sex. But one could teach that white privilege does not exist, that Black men and white men are never treated differently on account of their race, or that there is no correlation between race or sex and privilege or oppression. This sort of viewpoint discrimination is prohibited by the First Amendment.

144.   The Act also prohibits instructors from teaching content "that . . . promotes . . . the . . . concept[] [that] . . . [a] person, by virtue of his or her race, color, national origin, or sex bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, national origin, or sex." Fla. Stat. § 1000.05(4)(a)(5). For Plaintiff Dunn, this subsection of the Act will inhibit his ability to teach his students about his own personal experiences of racism, as students may perceive his recounting of personal instances where white individuals discriminated against him to be an endorsement of the view that white people today bear responsibility for these past actions. However, Section 1000.05(4)(a)(5) of the Act would permit instruction that denounces or denies these same historical—and lived—experiences and concepts. This is an example of the state making an authoritative selection as to which ideas are permissible, and which must be censored due to the state's disagreement with the viewpoint they espouse.

145.   The Act also may prohibit teaching about scientific studies that reach conclusions that the Florida legislature finds disagreeable. For example, the Act may implicate research testing the hypothesis that Black applicants for a job are less likely to be hired than white applicants with the same qualifications.[81] To test this hypothesis, researchers developed a methodology, gathered data, analyzed the data, and then published a study explaining whether the data supports a conclusion that the hypothesis is true or false. If an instructor believes that each of those steps was conducted reliably and soundly, then the instructor would logically believe the conclusion and promote its truth to students, just as instructors teach every other scientific principle. However, under the Act, whether the instructor is allowed to teach such scientific principles arguably depends on which viewpoint the research supports. If a study finds that Black applicants are equally likely to be hired as white applicants, then the study can be taught. If, all else being equal, another study finds that Black applicants are less likely to be hired than white applicants on account of their race, then the study likely cannot be taught, because doing so could compel students to believe that "[a] person's . . . status as either privileged or oppressed is necessarily determined by his or her race[.]" Fla. Stat.

---

[81]    Patrick M. Kline, Evan K. Rose, & Christopher R. Walters, *Systemic Discrimination Among Large U.S. Employers* (Univ. of Chi., Working Paper No. 2021-94), https://bfi.uchicago.edu/wp-content/uploads/2021/08/BFI_WP_2021-94.pdf (finding that recognizably Black names are statistically measurably less likely to by contacted by potential employers for job interviews).

§ 1000.05(4)(a)(3). And, if either the original researcher or the instructor recommended some type of affirmative action remedy that would make it more likely that Black applicants would be hired, then the instruction on the study could be seen as espousing the concept that "[a] person, by virtue of his or her race . . . should . . . receive adverse treatment to achieve diversity, equity, or inclusion." Fla. Stat. § 1000.05(4)(a)(6).

## III.  THE STOP W.O.K.E. ACT'S VIEWPOINT-BASED RESTRICTION ON STUDENTS' RIGHT TO RECEIVE INFORMATION

146.   The Act's viewpoint-based restrictions not only have a chilling effect on instructors, but also interfere with university students' "right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969).

147.   Because instructors are prohibited from advancing particular viewpoints in the course of instruction, as discussed above, students are denied the right to learn from those viewpoints; engage in free, open, and robust discussion; or even debate on the Act's disfavored viewpoints. Without comprehensive instruction in their discipline, Florida students will be disadvantaged when applying to graduate school or participating in the workforce.

148.   For example, Ms. Dauphin believes that Stop W.O.K.E. Act may cause her professors to sugar-coat discussions about race and avoid discussing Black perspectives in class. She has taken courses in the past that delve into issues of systemic racism and unconscious bias, and she believes such discussions are

crucial for contextualizing her own experiences and preparing her to be an effective lawyer in the future. For example, she took a Race and Biology class that included research showing that Black and Latina women are stereotyped as having histrionic personalities, therefore causing doctors to be less likely to take their pain seriously. If instructors feel they cannot advance the concept that individuals have unconscious biases, then they cannot fully educate students on all the nuances of, and biases within, professional systems.

149.   Dr. Park shares Ms. Dauphin's concerns. Withholding instruction about structures of oppression disadvantages students. Without such instruction, students from dominant racial, gender, and sexuality groups will not understand the impact of those structures. Students from vulnerable populations will lack the analytic skills necessary to process their experiences. The value of student degrees in affected disciplines will decrease, making students in those fields less marketable to future schools or jobs.

150.   Another example of students being deprived of their constitutional right to receive information comes from Dr. Dunn's experience. During his tenure at FIU, Dr. Dunn started a half-day Black history bus tour, where he takes his students to areas of importance to Black Miami residents. He discusses historical incidents of anti-Black violence and a significant part of his instruction, through the presentation of these historical events, covers institutional racism. Dr. Dunn

explains the anguish that Black people felt following the acquittals of the officers

after the 1980 McDuffie riots, as well as the racist origins of the police department,

and how racial motivations continue to affect the Black community today. Dr.

Dunn even provides firsthand anecdotes as examples, as he grew up in Florida

during the era of segregation. For example, when he was an officer in the United

States Navy, he was not welcome in designated "white" areas.

151.   Dr. Dunn believes that, due to the Act, he cannot teach about his own

lived experiences of segregation or racial discrimination because he recognizes that

it could make white students feel sad or ashamed of the conduct of other white

people in the past. Dr. Dunn's ability to share his own experiences is censored by

the Stop W.O.K.E. Act because he fears that a student will file a complaint against

him or FIU will withhold his funding. Because of his fears, Dr. Dunn's students

will inevitably be deprived of critical parts of his instruction and the free flow of

information and ideas.

152.   Given the Supreme Court's historic and recent recognition that

learning how to tolerate speech of all kinds is part of learning to live in a pluralistic

society, an essential character trait to a tolerant citizenry, *see Kennedy v.*

*Bremerton Sch. Dist.*, 26142 S. Ct. 2407, 2415 (2022); *Keyishian v. Bd. of Regents*

*of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967), state officials should be deeply

concerned about denying students access to information in a viewpoint-

discriminatory manner.

## IV.   PROVISIONS OF THE STOP W.O.K.E. ACT ARE UNCONSTITUTIONALLY VAGUE

153.   There are two independent reasons a statute may be void for

vagueness: (1) if it fails to provide people of ordinary intelligence a reasonable

opportunity to understand what conduct it prohibits; and (2) if it authorizes or even

encourages arbitrary and discriminatory enforcement. Section 1000.05(4) fails on

both fronts.

154.   First, the law includes ambiguous language that instructors could

interpret in multiple ways. For example, Section 1000.05(4)(a)(4) includes the

following prohibited concept: "Members of one race, color, national origin, or sex

cannot and should not attempt to treat others without respect to race, color, national

origin, or sex." The meaning of this language is indecipherable.

155.   Section 2(4)(b) is also impermissibly vague. It states that the list of

banned concepts "may not be construed to prohibit discussion of the concepts

listed therein as part of a larger course of training or instruction, provided such

training or instruction is given in an objective manner without endorsement of the

concepts." The law provides no further explanation or definition of the terms

"objective manner" or "endorsement." As such, instructors, including Plaintiffs,

are confused about what it means to teach the concepts "in an objective manner

without endorsement," and must curtail their instruction lest it be interpreted as non-objective or as an endorsement. Fla. Stat. § 1000.05(4)(b).

156.   Although the University of Florida published guidance for instructors that includes recommendations for how to comply with the Act, the guidance does not define what it means to teach a concept "without endorsement," and assumes that it will be interpreted differently by different instructors, who should "review their curriculum and presentations to determine if the way the material is currently written or presented could be interpreted as 'espousing, promoting, advancing, inculcating or compelling belief' in any of the concepts."[82]

157.   Professor Pernell, for example, does not know how he can discuss the viewpoints offered in texts he has authored without students perceiving this as endorsement.

158.   Dr. Park does not know how to identify foundational principles of her discipline as widely accepted when they contradict the concepts in the Stop W.O.K.E. Act. She also does not know how the provisions apply to students engaged in classroom discussion. For example, her students may build classroom glossaries or provide examples to illustrate concepts. Can the class adopt a

---

[82]   *Introduction to H.B.7 FAQs: Does the University Have any Guidance for Instructors who Want to Discuss the Concepts Objectively and Without Endorsement?*, UNIV. OF FLA. OFFICE OF THE CHIEF DIVERSITY OFFICER, https://cdo.ufl.edu/hb-7/ (last visited Aug. 16, 2022).

definition that conflicts with a concept prohibited by the Stop W.O.K.E. Act? What does the law require of Dr. Park if a student provides an example of privilege that is based on race or sex, as opposed to class or ability? Dr. Park does not know if the Stop W.O.K.E. Act limits her instruction to formal lecturing so classroom discussions do not venture into prohibited concepts.

159.   Second, Section 1000.05(4) encourages discriminatory enforcement based on both its plain language and public statements contemporaneous with its passage. The Act's title itself encourages enforcement against instructors who "embrace [] progressive activism."[83] When Governor DeSantis announced the legislative proposal that became the Stop W.O.K.E. Act, he stated that the purpose of the law was to create a "woke-free state of Florida," and listed several examples of views that the Stop W.O.K.E. Act would outlaw, including the distorted views "that the education system is guilty of 'spirit murder' against Black children" and that "'all white people' perpetuate systemic racism."[84]

160.   Lieutenant Governor Jeanette Nuñez also confirmed that the Stop W.O.K.E. Act would "put an end to wokeness that is permeating our schools and workforce."[85] After its passage, she touted the Stop W.O.K.E. Act as the "first in the

---

[83]   Michael Ruiz, *What Does "Woke" Mean?*, FOX NEWS (Dec. 7, 2021), https://www.foxnews.com/us/what-does-woke-mean.

[84]   Dec. 15, 2021 Press Release, Gov. Ron DeSantis, *supra* note 3.

[85]   *Id.*

nation to end corporate wokeness and Critical Race Theory in our schools . . .

prioritizing education not indoctrination," vowing to "always fight to protect our

children and parents from this Marxist-inspired curriculum."[86]

161.    The Stop W.O.K.E. Act was designed to, and in fact does, prohibit

instructors from advancing those views, including views that the legislature distorts

and mischaracterizes, and other viewpoints that address the past and present

examples of systemic racism in the United States. The Act is intended to silence

professors who promote viewpoints deemed too "woke" for the legislature's liking.

## V.    THE FLORIDA LEGISLATURE'S INTENT TO DISCRIMINATE AGAINST RACE-RELATED INSTRUCTION

162.    The legislators who passed the Stop W.O.K.E. Act were motivated by

their desire to erase "woke" instruction, or critiques of white supremacy and

analyses of systemic racism and sexism, from classrooms. The Act comes after

years of robust advocacy for the very speech the Act seeks to suppress.

163.    Throughout the 2022 legislative session, the legislature failed to

justify the need for the Stop W.O.K.E. Act. Indeed, as Senator Lori Berman stated

during a Senate session debating H.B. 7's counterpart S.B. 148: "By my count, we

are at least on round four of bills that address a problem that does not exist."[87]

---

[86]    Apr. 22, 2022 Press Release, Gov. Ron DeSantis, *supra* note 4.

[87]    *3/10/22 Senate Session Part 1* at 00:34:04–00:34:12.129, THE FLORIDA CHANNEL (Mar. 10, 2022), https://thefloridachannel.org/videos/3-10-22-senate-session-part-1/.

Senator Shevrin D. Jones echoed Senator Berman's sentiment when he stated: "No one, nowhere has ever said that any white person in this room is responsible for what happened in the past. Nowhere. No one. It is all a farce that we are sitting in this room. Wasting precious time."[88]

164.   Other well-established provisions in state and federal law exist to protect against compelled speech and race discrimination, including but not limited to the Florida Civil Rights Act of 1992, Fla. Stat. §§ 760. 01 *et seq*. and 509.092, which prohibits discrimination because of, *inter alia*, one's race, color, religion, sex, or national origin.

165.   Moreover, although there were at least ten proposed amendments to H.B. 7 that would have made the Bill less restrictive, legislators chose to enact the most restrictive provisions in H.B. 7. For example, Representative Angela Nixon sponsored Amendment 161453, which would have removed lines 211–331 of the Bill that provided a private cause of action and prohibited language about teaching diversity and inclusion in schools. The other proposed amendments[89] would have

---

[88]     *Id.* at 00:39:49–00:40:16.

[89]     Representative Kristen Arrington sponsored Amendment 982331, which removed lines 49-331 of H.B. 7, which allowed employees to sue businesses if they felt uncomfortable as a result of participating in training that may touch on diversity, equity, and inclusion. In addition, Representative Dotie Joseph sponsored two amendments, Nos. 728883 & 135269, which removed references to objective instruction and feelings of guilt, anguish, or other forms of psychological distress. Relatedly, Representative Kevin Chambliss sponsored Amendment 487075, which Con't)

removed (i) employer liability; (ii) the requirement to teach about race "objective[ly]"; and (iii) language related to indoctrinating school children.

166.   The House rejected the amendments, and legislators chose to enact the most restrictive provisions in H.B. 7 despite hearing testimony from their colleagues and from community members about the impact the Bill would have on people of color, particularly Black people, in the state.

## VI.   HARM FROM THE STOP W.O.K.E. ACT'S RESTRICTIONS ON RACE-RELATED SPEECH DISFAVORED BY THE FLORIDA LEGISLATURE

167.   Florida's universities and colleges have already begun restricting access to the viewpoints and speech the Stop W.O.K.E. Act is designed to suppress. For example, UCF's English Department retracted a statement on its commitment to anti-racism due to concerns that it violated the Stop W.O.K.E. Act.

168.   The statement read, in part,

> There has never been a more important time for us to tackle these issues together, with long-standing inequities and discrimination made more visible by the pandemic and recent horrific violence further illuminating the systemic racism plaguing our society and impacting so many . . . Unconscious bias and white fragility are pervasive throughout society, and we recognize that they also exist among faculty. We have many students of color in our department, but we recognize that we have

---

removed lines from the Bill concerning how instructors could use curricula to address unjust laws.

not systemically made sure they feel welcome. We have work to do.[90]

169.   The UCF English Department issued a disclaimer on June 28, 2022, that: "As of July 1, 2022, the statement is suspended as it violates Florida law."[91] By mid-afternoon on July 7, 2022, the disclaimer had been removed from the UCF English Department website. On July 13, 2022, the UCF English Department's anti-racist statement was removed altogether from the site.

170.   UCF's Anthropology Department, Philosophy Department, and Physics Department, among others, removed similar statements regarding anti-racism at the same time. Each of these department statements were published in 2020 and 2021, as part of UCF's commitment to promoting a more inclusive and racially aware environment for students, faculty, and staff in the wake of the murder of George Floyd.

171.   Upon learning that UCF's English Department rescinded this statement, Governor DeSantis's office responded: "The UCF English Department 'Anti-Racism Statement' is mostly nonsensical Marxist drivel, but troubling in

---

[90]   Brandon Wolf (@bjoewolf), Twitter (July 07, 2022, 1:22 PM), https://twitter.com/bjoewolf/status/1545095875906732032?s=20&t=UkSJ1S9MV Z5myT01PUtS7g.

[91]   Annie Martin, *UCF Department Briefly Scraps Anti-racism Policy Amid Concerns about New State Law*, ORLANDO SENTINEL (July 7, 2022), https://www.orlandosentinel.com/news/education/os-ne-ucf-english-anti-racism-20220707-gtigoknfnbgybgxseezxpuvyae-story.html.

areas that suggest intent to treat students/faculty differently based on skin color."[92]

DeSantis's office then said concepts such as "white fragility" and the term

"Latinx," both included in the English Department's statement, are "evidence-free

ideological constructs," and that the office welcomes any institution that wishes to

remove similar statements or initiatives to identify and address discrimination.[93]

172.    The Stop W.O.K.E. Act has a chilling effect on instructors and

students who are enrolled in race-related coursework. Plaintiffs and other

instructors who use social science research and data when discussing race are faced

with an impossible dilemma—run afoul of the Act or fail to teach ethically by

presenting "both sides" in contradiction of widely accepted, research-supported

conclusions in their field, such as the fact that our legal system perpetuates

historical racial disparities and that colorblind approaches cannot fully remedy

these disparities. Endorsing that colorblind approaches are inadequate and have

racist origins, however, is prohibited by the Stop W.O.K.E. Act.

173.    For example, as Dr. Almond describes, the Stop W.O.K.E. Act forced

him to choose between his professional obligation to fully teach these standards to

his students in order to prepare them for their careers and his obligation as a citizen

to comply with Florida law. Race is a necessary component of Dr. Almond's

---

[92]    *Id.*
[93]    *See id.*

course instruction, and the Stop W.O.K.E. Act limits his ability to train his psychometric students on certain required aspects of the American Psychological Association, American Educational Research Association, and National Council on Measurement in Education joint standards for educational and psychological assessment. This could lead not only to his students misunderstanding concepts that are necessary for their course of study, but further to the students' not being competitive in future courses of study or upon entering the workforce. The Stop W.O.K.E. Act also prohibits Dr. Almond from explaining that the standards call for review of assessments by a diverse body of reviewers because members of one group might identify issues that members of another group would not. Fla. Stat. § 1000.05(4)(a)(6).Dr. Almond discusses his own experiences with white privilege, which may be interpreted to violate the Act's prohibition against endorsement of the concept that an individual's "status as either privileged or oppressed is necessarily determined by his or her race." Fla. Stat. § 1000.05(4)(a)(3).

174.   In his courses, Dr. Almond teaches about potential inequities in school resources available to students from traditionally disadvantaged groups. His instruction includes discussions of the racist origins of concepts such as merit and how they contribute to educational disparities such as test scoring. While concepts of merit, excellence, and hard work they may explain differences in achievement at the individual level, Dr. Almond instructs these constructs do not adequately

explain differences in performance across racial groups, and that colorblind policies are not sufficient to achieve colorblind results. Furthermore, Dr. Almond created a handout that discusses race as a variable in the field of statistics. The handout includes information about the role of race in colonialism and eugenics and the appropriateness of analyzing race in statistics. Dr. Almond feels limited in his ability to fully and openly discuss these issues because of the Stop W.O.K.E. Act's prohibitions. Additionally, he fears that he could face punishment if a student raises concerns about the content of his courses.

175.   Similarly, FAMU Law Professor Pernell feels compelled by the Stop W.O.K.E. Act to change how he teaches certain topics by modifying his course material. He worries that he can no longer assign and discuss the casebook he authored about racism in the criminal legal system.

176.   In each of his courses, which include Constitutional Law II, Torts, and Criminal Procedure, Professor Pernell asks students to look critically at the legal system from the perspective that the system is very color-conscious and promotes race privilege. Instruction on these topics may lead a student to accuse Professor Pernell of endorsing the idea that individuals have certain privileges on account of their race, which the Stop W.O.K.E. Act prohibits. His course work focusing on analyzing and understanding systemic inequalities perpetuated by the legal system could be alleged to violate the Act's prohibition on teaching concepts like

unconscious bias. § 1000.05(4)(a)(2). Additionally, Prof. Pernell discusses topics like systemic racism in order to teach students how to bring about transformative changes, and recognizes that discussion often exposes students to ideas and concepts for the first time, prompting them to think about their career trajectories. Although pedagogically sound, engaging students in this critical thought could be alleged to violate the Act's prohibition on teaching that "[a] person, by virtue of his or her race, color, national origin or sex bears responsibility for . . . actions committed in the past by other members of the same race, color, national origin, or sex," § 1000.05(4)(a)(5), or that a person should "feel guilt, anguish, or other forms of psychological distress" because of historical racism. §1000.05(4)(a)(7). The Act hamstrings Professor Pernell's ability to fully and accurately present these nuanced and complex issues, as he is concerned that the state government will strip FAMU Law of funding if he continues to teach students in the manner that he had prior to the Act's enactment. Prof. Pernell's fear is rooted in the vague and chilling text of the law and in the context of its passage. It is also informed by the state's historical discrimination in revoking FAMU Law's funding in an effort to silence students and faculty who were active in the civil rights movement.

177.   Dr. Thompson Dorsey's School Law and Critical Race Studies courses build upon the understanding that racism is embedded in American society, a position widely accepted and supported by research in her field. In these

courses, she endorses the view that race and color impact everyone's lived experiences, including a person's privileges and biases. She also teaches her students that racism is deeply embedded in American society, including in institutions like education. In School Law, Dr. Thompson Dorsey teaches students how to recognize and counter manifestations of racism in schools. She cannot continue to identify systemic racism and sexism in schools, and train students to do the same, if she censors the concepts listed in the Stop W.O.K.E. Act. Dr. Thompson Dorsey teaches Critical Race Theory and other race-conscious frameworks in her Critical Race Studies course and uses this approach to trace issues of race, racism, and power. She assigns articles she has written regarding affirmative action, white supremacy and colorblindness where she advocates ideas that are prohibited by the Stop W.O.K.E. Act. She cannot continue to assign this coursework because doing so could reasonably be interpreted as endorsing the viewpoints expressed in the articles she authored. Nor can she maintain this pedagogical approach without endorsing Critical Race Theory as an appropriate lens.

178.   Dr. Austin shares similar concerns about the ability to use Critical Race Theory in her courses. In particular, Dr. Austin worries about whether she can continue to use this framework to discuss ideas regarding unconscious biases that people carry based on their race and sex, and critiques of "colorblindness" as a

concept that was created to perpetuate racial inequities, given that the Stop W.O.K.E. Act prohibits endorsing these very ideas. She fears she will no longer be able to use the Critical Race Theory framework in her courses about race and politics, and that her students will be exposed to fewer ideas as a result.

179.   Dr. Park teaches that notions of colorblindness, gender neutrality, and objectivity reinforce racism and sexism in the status quo, principles widely accepted in her disciplines for thirty to forty years. The fields in which she works largely concur that objectivity is an outgrowth of Eurocentric, colonial thinking that accorded this capacity (a function of reason) solely to white, European men of the upper classes. To present colorblindness, gender neutrality, or objectivity to her students as undisputed virtues, as the Stop W.O.K.E. Act suggests, would require Dr. Park to abandon her scholarly and ethical integrity.

180.   Dr. Sandoval's course on Intercultural Communication includes a unit on whiteness, in which she teaches that people of color are underrepresented in her field, in part because of historical discrimination by white academics. Students who feel uncomfortable—perhaps because they believe they benefit from the tendency to hire and promote white academics—might decide to complain that she had advanced the view that they bear responsibility for and should feel guilty because of historical discrimination by white people or that white people are necessarily privileged by their race. Dr. Sandoval's course also teaches her

students about systemic inequality so that they understand why we need to communicate differently to people with different identities and so that her students can produce messages that will be effective for people of all sorts of identities. Dr. Sandoval fears, because of the Stop W.O.K.E. Act, the consequences stemming from student complaints could be dire.

181.   FIU Professor Emeritus of Psychology, Dr. Dunn is concerned that the Stop W.O.K.E. Act curtails his ability to truthfully speak about institutionalized racism and his experiences growing up under Jim Crow laws because one cannot speak about their own experiences objectively, as the Stop W.O.K.E. Act requires.

182.   FSU student Johana Dauphin is enrolled in Race & Minority Relations and Religion, Race and Ethnicity for the Fall semester. Race is a central theme in both classes. Because of the Stop W.O.K.E. Act, Ms. Dauphin is concerned that she will not receive the same instruction as students who took these courses before the law passed. Ms. Dauphin worries that, because the Stop W.O.K.E. Act bans instruction that advances the concept that a person's status as privileged or oppressed is determined by race, she will be deprived of relevant information about how race affects people's perceived or actual status in various contexts.

183.   In addition, Dr. Sandoval has spoken to many UCF professors, a majority of whom are Black or Latinx, who have expressed their concerns about

continuing to teach Critical Race Theory, or courses with a Critical Race Theory component, without being fired or losing job prospects. This fear also extends to tenured professors who are concerned that the enforcement of the Stop W.O.K.E. Act will affect their five-year reviews.

## VII.  THE STOP W.O.K.E. ACT'S DISPARATE HARM TO BLACK INSTRUCTORS AND STUDENTS

184.   First, the Stop W.O.K.E. Act specifically targets speech about "race, color, sex, or national origin"; "an individual's . . . status as either privileged or oppressed"; and "diversity, equity [and] inclusion." Fla. Stat. § 1000.05(4)(a).

185.   Because of this, instructors who teach Critical Race Theory, race studies, ethnic studies, or otherwise discuss systemic racism, and gender and sex discrimination will be restricted in their ability to teach. Their instruction necessitates discussions of the prohibited concepts, causing them to fear that any reference may be construed as a violation of the Act. Instructors do not know where the line is between presenting ideas and endorsing them, given that lectures are dynamic conversations during which multiple sides of an issue are discussed.

186.   Second, Black instructors within Florida's State University System are more likely to teach courses on race studies, Critical Race Theory, ethnic studies, and other courses that involve the viewpoints that the Stop W.O.K.E. Act is designed to suppress. Plaintiffs Professors Dunn, Thompson Dorsey, Pernell, and Austin are all Black professors who teach on these topics.

187.    Departments of African American Studies at FSU, FIU, and UF, where instruction on race, white privilege, systemic inequality, and other viewpoints disfavored by the legislature will predictably occur, are predominantly staffed by Black instructors.

188.    Third, the Stop W.O.K.E. Act will exacerbate existing racial disparities and inequalities for Black instructors by exposing them to retaliation and adverse treatment and putting their professions at risk.

189.    Black instructors are less likely to be tenured than their white counterparts.[94] Black instructors who are suspected of violating the Stop W.O.K.E. Act may lose their jobs at an even higher rate.

190.    Black instructors spend more out of classroom time engaged in diversity, equity, and inclusion work—the very type of work that the Stop W.O.K.E. Act seeks to restrict.[95]

---

[94]    *See, e.g.*, J. Nathan Matias, et al., *Universities Say They Want More Diverse Faculties. So Why Is Academia Still So White?*, FIVETHIRTYEIGHT (Sept. 7, 2021), https://fivethirtyeight.com/features/universities-say-they-want-more-diverse-faculties-so-why-is-academia-still-so-white/ (citing that Black instructors made up only 11% of tenured and tenure-track faculty, and that white instructors made up 74% in 2019); Jalelah Abdul-Raheem, *Faculty Diversity and Tenure in Higher Education*, 23 J. OF CULTURAL DIVERSITY 53 (2016), https://pubmed.ncbi.nlm.nih.gov/27439231/ ("Faculty members of color and women face several barriers that effect tenure and promotion and are important resources for changing society and advocating for equity.").

[95]    Selena A. Carrion, *Pay BIPOC Educators for Their DEI Labor*, LEARNING FOR JUSTICE (July 23, 2021), https://www.learningforjustice.org/magazine/pay-bipoc-educators-for-their-dei-labor.

191.   When teaching the same material, Black instructors are criticized more harshly by students than white instructors.[96] It is therefore more likely that Black instructors' discussions of topics related to the prohibited concepts will be negatively received, and that students, parents and other aggrieved parties will file complaints against Black instructors based on perceived violations of the Stop W.O.K.E. Act.

192.   Black instructors are already under-represented in higher education.[97] Enforcement of the Stop W.O.K.E. Act against Black instructors will only compound this disparity, as instructors are disciplined, fired, and forced out.

193.   Fourth, the Stop W.O.K.E. Act will expose Black students to more discrimination because of the suppression of the viewpoints disfavored by the law, their inability to discuss and hear these viewpoints, and the resulting impact on the school environment.[98]

---

[96]    Kerry Chavez & Kristina M.W. Mitchell, *Exploring Bias in Student Evaluations: Gender, Race, and Ethnicity* (Cambridge Univ. Press 2019), https://www.cambridge.org/core/journals/ps-political-science-and-politics/article/exploring-bias-in-student-evaluations-gender-race-and-ethnicity/91670F6003965C5646680D314CF02FA4.

[97]    *Race/Ethnicity of College Faculty*, NAT'L CTR. FOR EDUC. STATISTICS, https://nces.ed.gov/fastfacts/display.asp?id=61 (last visited Dec. 1, 2022) (only four percent of full-time faculty were Black females, and three percent were Black males).

[98]    Christy Byrd, *Does Culturally Relevant Teaching Work? An Examination from Student Perspectives*, 6 SAGE OPEN 1, 5 (2016), https://journals.sagepub.com/doi/pdf/10.1177/2158244016660744.

194.   Instruction about race, and student awareness of racism, reduce the likelihood that students will engage in racial harassment and that students of color will experience school-based discrimination and related academic and mental health consequences.[99]

195.   The converse is also true—removing this instruction increases the likelihood that students of color will experience increased racial harassment and discrimination.[100]

196.   As such, by restricting student access to discussions and information about race, racism, systemic inequality, white privilege, and other topics

---

[99]   *Id.* at 4–5; *see also* Tabbye M. Chavous et al., *Racial Identity and Academic Attainment Among African American Adolescents*, 74 CHILD DEV. 1076 (2003); Oseela Thomas, et al., *Promoting Academic Achievement: The Role of Racial Identity in Buffering Perceptions of Teacher Discrimination on Academic Achievement among African American and Caribbean Black Adolescents*, 101 J. EDUC. PSYCH. 420 (2009); Thomas S. Dee & Emily K. Penner, *The Causal Effects of Cultural Relevance: Evidence from an Ethnic Studies Curriculum* (Nat'l Bureau of Econ. Rsch. 2016), https://www.nber.org/papers/w21865; Ellen Kisker et al., *The Potential of a Culturally Based Supplemental Mathematics Curriculum to Improve the Mathematics Performance of Alaska Native and Other Students*, 43 J. RSCH. IN MATHEMATICS EDUC. 78, 100 (2012); Nolan L. Cabrera, et al., *Missing the (Student Achievement) Forest for All the (Political) Trees: Empiricism and the Mexican American Studies Controversy in Tucson*, 51 AM. EDUC. RSCH. J. 1084, 1102 (2014); Tyrone Howard & Clarence L. Terry, *Culturally Responsive Pedagogy for African American Students: Promising Programs and Practices for Enhanced Academic Performance*, 22 TEACHING EDUC. 345 (2011).
[100]   Sheretta T. Butler Barnes et al., *Promoting Resilience Among African-American Girls: Racial Identity as a Protective Factor*, 89 CHILD DEV. 552 (2018), https://pubmed.ncbi.nlm.nih.gov/29154406/.

disfavored by the legislature, the Stop W.O.K.E. Act will expose Plaintiff Dauphin and other Black students to more discrimination.

## VIII.  THE FLORIDA LEGISLATURE'S KNOWLEDGE OF THE STOP W.O.K.E. ACT'S RACIALLY DISPARATE HARM

197.   First, the Stop W.O.K.E. Act's bill sponsors made clear they intended to censor conversations about systemic racism, inclusion, and equality, particularly among *groups* of people of color.

198.   As described above, Representative Avila and Senator Diaz were squarely focused on suppressing the use of terms like "white privilege" and "systemic racism," specifically when discussed among "affinity groups."[101]

199.   Representative Avila also criticized "movements" that discuss "experiences [] based on the group they fit into," a thinly veiled reference to the Black Lives Matter movement and similar activists who have emphasized the collective experiences of Black people.[102]

200.   Second, members of the public and the Stop W.O.K.E. Act's opponents put the legislature on notice that it would have a disparate impact on Black students and instructors.

---

[101]   *2/1/22 House State Affairs Committee* at 01:01:52.040, *supra* note 2.

[102]   Scott Powers, *Freedom from Discomfort or a Knowledge Ban? 'Individual Freedom' Bill Covering Schools, Businesses Moves in House*, FLORIDA POLITICS (Jan. 26, 2022), https://floridapolitics.com/archives/489834-freedom-from-discomfort-or-a-knowledge-ban-stop-w-o-k-e-act-moves-in-house/.

201.   During public testimony before the House Education & Employment Committee on February 8, 2022, Plaintiff Dauphin, a student activist at Florida State University, said "Your kids are not as colorblind as you think. You are more concerned about them feeling guilty than Black kids being terrorized by racist kids who don't know any better because they were raised by people like you who do things like this." Plaintiff Dauphin also testified: "When I think of my experience in your public schools, all I think of is discomfort. I sat through a classmate arguing in our debate class that Black people are inherently inferior, blaming us for the effects of institutionalized racism. But you don't seem to care about that. Due to the sheer amount of racism I've experienced and the experiences of most Black people you can ask, you guys are clearly failing to teach the values of racial progress that the bill claims to uphold."[103]

202.   Anna Gavalda, with the Florida Student Power Network, testified: "I also want to name something that is very interesting to me that this bill is being passed today on the first day of Black History Month. What is the message that you're sending to our Black youth? What is the message that you're sending to our LGBTQ youth? What is the message that you're sending to our immigrant youth in

---

[103]   *2/8/22 House Education and Employment Committee* at 01:58:19–01:58:54, *supra* note 58.

this state? And the message is that their lives don't matter that their identities don't matter."[104] Ms. Gavalda also testified:

> We strongly oppose H.B. 7 because we know that this bill would take away the right from all students to learn and understand systemic discrimination, racism, and the real history of this country and state. Black, Brown, and LGBTQ+ youth are impacted by systemic discrimination every day and they experience it through their daily lives. And students who do not face these experiences still have the right to learn and understand how their peers go through and navigate the world. . . . This bill will push for children to be silent and their own experiences and to be shunned in the system that should be teaching about our real history and where children can share and discuss with each other and grow through those learnings and also our teachers are not punished.[105]

203. Mary Elizabeth Estrada, a recent graduate and organizer for the Florida Student Power Network, Florida testified: "This country was built on racism, on oppression, murder and other atrocities. History repeats itself, and if we water down historical facts to make it more comfortable for white children, we will never evolve and we will never remove systemic racism."[106]

204. During debate before the House State Affairs Committee on February 1, 2022, Representative Joseph said: "Some people can't and won't acknowledge that Black people in this country are disproportionately harmed by all sorts of

---

[104]   *2/1/22 House State Affairs Committee* at 01:45:01–01:45:23, *supra* note 2.
[105]   *Id.* at 01:42:53.450–01:43:58.779.
[106]   *Id.* at 01:46:44.630–01:47:06.010.

things. And there was commentary about individualism versus the systems and practices that perpetuate the racist results. The fact is this history, the fact of history is that the U.S. Constitution counted Black people as three-fifths of a person. That is a fact, that is structural. . . . The only way to not repeat the past is to educate ourselves and learn the lessons that we need to learn to fix the systems and practices that perpetuate racially unjust results. Racism exists. History in which people have killed or discriminated against should make people uncomfortable or feel guilty. That should happen. That should be a thing."[107]

205.   The ACLU of Florida submitted written testimony in opposition to H.B. 7, stating that, among other things, H.B. 7 would censor public schools and instructors from teaching their students in K-20 schools (including public colleges and universities) about race, national origin, and the impacts of slavery. The ACLU further testified that the bill would make it unlawful to provide instruction or trainings in K-20 schools on the same topics.[108]

206.   "Banning the right of educators and employers to initiate conversations about race and gender and the long-term impacts of slavery and

---

[107]    *Id*. at 02:16:47–02:18:09.

[108]    Letter from Kara Gross, Legislative Director & Senior Policy Counsel, ACLU of Florida to Erin Grall, Chair, Florida House Judiciary Committee (Jan. 26, 2022), https://www.aclufl.org/sites/default/files/aclu_fl_written_testimony_in_opposition-_hb_7_government_censorship_of_race_gender_discussions_judiciary_1.25.22.pdf.

patriarchy on current social, economic, and political realities, would not only

censor employers and educators, but would negate the lived experiences of

marginalized groups in classrooms and workplaces. H.B. 7/S.B. 148 essentially

seek to erase the factual history of the U.S. from being discussed and

acknowledged in workplaces and schools and prevent employees and students

from receiving informative trainings that could improve the culture and habits of

workplace and classroom environments."[109]

207.   Third, the legislature was on notice of a Tennessee law with very

similar language to the Stop W.O.K.E. Act, that is currently being challenged on

constitutional grounds. The initial complaints filed under that law were based on

discussions of anti-racist ideas. As Senator Lori Berman explained:

> Tennessee was one of the first states to pass similar
> legislation and it didn't take long for a complaint to be
> filed under the law for a school that was teaching about
> Martin Luther King and his March on Washington. They
> said that Martin Luther King and his teachings were
> divisive, anti-American and anti-White. Is that where we
> are today as a society vilifying a monumental figure of
> American history?[110]

208.   The Florida legislature enacted the Stop W.O.K.E. Act despite

powerful testimony from the public about the importance of instruction on

systemic racism and the experiences of Black people, as well as the central role

---

[109]    *Id.*
[110]    *3/10/22 Senate Session Part 1* at 00:35:34-00:36:02, *supra* note 87.

such education has in promoting discussions and awareness that lead to a more just society.

209.   Enacting legislation that stifles those discussions exhibits a hostility to Black people because it suppresses speech and ideas that help Black people achieve equality and full citizenship. Indeed, remedying racial inequalities was the driving force behind the surge in discussions and initiatives designed to confront this country's history of racial injustice following the killings of George Floyd, Breonna Taylor, and others.

210.   As noted earlier, the suppression of Black activism and speech in Florida throughout the 1950s and 1960s was a rejection of calls for racial justice. Often times, past efforts to prevent racial justice through the suppression of Black activism and speech were the result of actions from state officials, including the Florida legislature, as demonstrated by its shuttering of FAMU Law School in the wake of Black student protests in the 1960s.

211.   The enactment of the Stop W.O.K.E. Act therefore follows a regrettable decades-old pattern by the Florida Legislature to suppress racial justice efforts. The Stop W.O.K.E. Act does so by infringing upon the constitutional rights of Florida's instructors and students.

## **CLAIMS FOR RELIEF**

### **COUNT ONE**

**First Amendment to the U. S. Constitution –
Right to speak free from viewpoint-based discrimination**

212.   All prior paragraphs are incorporated here by reference.

213.   The First Amendment binds the State of Florida pursuant to the incorporation doctrine of the Fourteenth Amendment. In all of the following paragraphs, references to the First Amendment include the First Amendment as applied to the states through the Fourteenth Amendment.

214.   Viewpoint-based discrimination is presumptively unconstitutional in any setting. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995). But the dangers of viewpoint-based restrictions are magnified in the university setting, because they interfere with academic freedom principles that have long been recognized by the Supreme Court, the Eleventh Circuit Court of Appeals, and Florida's colleges and universities. *Keyishian*, 385 U.S. at 603; *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1127 n. 6 (11th Cir. 2022).[111]

215.   All instructors on college campuses have the First Amendment right to speak free from viewpoint-based restrictions. Instructors include—but are not

---

[111]   *See also* State Univ. Sys. Free Expression Stmt. (Apr. 15, 2019), https://www.flbog.edu/2019/04/15/state-university-system-free-expression-statement/.

limited to—professors, lecturers, guest speakers, student teaching assistants, and anyone participating in leading and providing classroom instruction.

216.   Instructors understand the Stop W.O.K.E. Act to prohibit them from providing instruction that advances students' belief in certain concepts, while allowing them to provide instruction that denounces those concepts.

217.   The Stop W.O.K.E. Act prohibits instructors from teaching students about scientific studies that reach conclusions that contradict its banned concepts.

218.   The Stop W.O.K.E. Act imposes unconstitutional viewpoint-based restrictions on instructors' speech and is contrary to the principle of academic freedom.

219.   Instructors can no longer say anything in class that might be perceived as "woke," as that term is understood by the legislature, without reasonably fearing official consequences.

## COUNT TWO

**First Amendment to the U.S. Constitution –**
**Right to receive information free from viewpoint-based discrimination**

220.   All prior paragraphs are incorporated here by reference.

221.   The First Amendment protects the right to receive information and ideas as well as the right to disseminate ideas. *Stanley*, 394 U.S. at 564.

222.   By prohibiting instructors from advancing particular viewpoints in the course of instruction, the Stop W.O.K.E. Act denies college and graduate students the right to learn from those viewpoints.

223.   The "chief mission [of universities] is to equip students to examine arguments critically and, perhaps even more importantly, to prepare young citizens to participate in the civic and political life of our democratic republic." *Speech First*, 32 F.4th at 1128.

224.   Students can only be prepared for civic and political participation if they are "trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, (rather) than through any kind of authoritative selection.'" *Keyishian*, 385 U.S. at 603 (quoting *United States v. Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943)).

225.   As a result of the Stop W.O.K.E. Act, students only have access to censored classrooms, and have a significantly impaired ability to learn the full scope of their discipline, including ascertainment of academic consensus and debate on issues disfavored by the legislature.

226.   The Stop W.O.K.E. Act infringes on students' right to receive information in college and graduate classrooms, uninhibited by State-imposed viewpoint-based restrictions.

## COUNT THREE

### Fourteenth Amendment – Vagueness

227.   All prior paragraphs are incorporated here by reference.

228.   A law is "void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A law is impermissibly vague if it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

229.   The Stop W.O.K.E. Act is unconstitutionally vague on its face because it fails to provide fair notice of what college professors, student teaching assistants, and other instructors can and cannot say in their courses, and because it invites arbitrary and discriminatory enforcement.

230.   For example, instructors do not know what it means to teach concepts "in an objective manner without endorsement." Fla. Stat § 1000.05(4)(b).

231.   Instructors also are uncertain what it means to not be allowed to teach that one "cannot or should not attempt to treat others without respect to race, color, national origin, or sex." Fla. Stat § 1000.05(4)(a)(4).

232.   The "Stop W.O.K.E" title, text, and legislative history encourages discriminatory enforcement against instructors who embrace progressive activism.

233.   Instructors of color and those who are vocal about or teach social justice or race or gender issues are more likely to be targeted for enforcement than their colleagues.

## **COUNT FOUR**

### **Fourteenth Amendment – Equal Protection**

234.   All prior paragraphs are incorporated here by reference.

235.   The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

236.   An official action taken for the purpose of discriminating on account of race has no legitimacy under the United States Constitution. *City of Richmond v. United States*, 422 U.S. 358, 378–79 (1975).

237.   The Stop W.O.K.E. Act was enacted for a racially discriminatory purpose.

238.   Demonstrating intentional discrimination "does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Instead, as is the case with the Stop W.O.K.E. Act, the discriminatory

purpose must have been a motivating factor, rather than the primary or sole purpose. *Id.* at 265–66.

239.   "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266.

240.   Recognizing that legislation motivated by a discriminatory purpose historically has often been crafted so that it "appears neutral on its face," the U.S. Supreme Court articulated several non-exhaustive factors to inform an analysis of discriminatory intent, including: (1) evidence that defendants' decision bears more heavily on one race than another; (2) the historical background of the decision; (3) the specific sequence of events leading up to the decision; (4) departures from the normal procedural sequence; (5) substantive departures; and (6) legislative history, including "contemporary statements by members of the decision making body, minutes of its meetings, or report[s]." *Id.* at 266–68.

241.   Applying the *Arlington Heights* factors, the Stop W.O.K.E. Act was enacted, at least in part, with the purpose of discriminating against Black instructors and students by chilling and suppressing their speech about race and inequality. The law explicitly targets concepts related to race and racism. As such, the law's impact will bear particularly heavily on Black instructors, who are more likely to teach on these topics, and on Black students, who are most likely to

benefit from discussions on these topics. By limiting this speech, the law will also expose Black students and other students of color to increased harassment and discrimination.

242.   The history surrounding the adoption of the Stop W.O.K.E. Act, along with the unusual events leading up to its signing, and substantive departures from the normal legislative process that resulted in its enactment, further demonstrate its discriminatory purpose. Moreover, statements made by the bill's sponsors and proponents make clear that the Stop W.O.K.E. Act targets the elimination of curriculum, instruction, and conversations designed to improve the educational, social, and civic experiences of Black people and other historically marginalized groups.

243.   The known and reasonably foreseeable discriminatory impact of the Stop W.O.K.E. Act and the tenuousness of the stated justifications for the new law, among other factors, raise a strong inference of a discriminatory purpose in violation of the Equal Protection Clause of the Fourteenth Amendment.

## **PRAYER FOR RELIEF**

**WHEREFORE**, in light of the foregoing facts and arguments, Plaintiffs respectfully request that this Court:

A.   Issue preliminary and permanent injunctive relief restraining

Defendant and its employees, agents, and successors in office

from enforcing the Act;

B.   Declare the Stop W.O.K.E. Act facially unconstitutional under

the First and Fourteenth Amendments to the United States

Constitution;

C.   Award Plaintiffs' costs of suit and reasonable attorneys' fees

and other expenses under 42 U.S.C. § 1998; and

D.   Grant such additional relief as the interests of justice may

require.

Respectfully Submitted,

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF FLORIDA, INC.**

/s/ Daniel B. Tilley
Daniel B. Tilley
Florida Bar No. 102882
Katherine H. Blankenship
Florida Bar No. 1031234
Caroline McNamara
Florida Bar No. 1038312
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2707
dtilley@aclufl.org
kblankenship@aclufl.org
cmcnamara@aclufl.org

Jerry Edwards
Florida Bar No. 1003437
933 Lee Road, Suite 102
Orlando, FL 32810
(786) 363-1107
jedwards@aclufl.org

Jacqueline Azis
Florida Bar No. 101057
4023 N. Armenia Avenue, Suite 450
Tampa, Florida 33607
(786) 363-2708
jazis@aclufl.org

**NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.**

/s/ Morenike Fajana
Morenike Fajana*
Alexis M. Johnson*
40 Rector Street, 5th Floor

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**

/s/ Leah Watson
Leah Watson*
Emerson Sykes*
Sarah Hinger*
Laura Moraff*
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
lwatson@aclu.org
esykes@aclu.org
shinger@aclu.org
lmoraff@aclu.org

**BALLARD SPAHR LLP**

/s/ Jason Leckerman
Jason Leckerman*
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599

New York, NY 10006
(212) 217-1690
mfajana@naacpldf.org
amjohnson@naacpldf.org

Jin Hee Lee*
Lauren A. Johnson*
Santino Coleman*
700 14th Street, Suite 600
Washington, D.C. 20005†
(202) 682-1300
jlee@naacpldf.org
ljohnson@naacpldf.org
scoleman@naacpldf.org

(215) 864-8266
leckermanj@ballardspahr.com

Charles Tobin
Florida Bar No. 816345
1909 K Street NW, 12th Floor
Washington, D.C. 20006
(202) 661-2200
tobinc@ballardspahr.com

Jacqueline Mabatah*
201 South Main Street, Suite 800
Salt Lake City, UT 84111-2221
(801) 531-3063
mabatahj@ballardspahr.com

Isabella Salomão Nascimento*
2000 IDS Center, 80 South 8th Street
Minneapolis, MN 55402-2119
(612) 371-3281
salomaonascimentoi@ballardspahr.com

† Mailing address *only*

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*