## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

LEROY PERNELL, et al.,

    *Plaintiffs*,

v.

BRIAN LAMB, et al.,

    *Defendants*.

Case No.: 4:22-cv-304-MW-MAF

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE LEGISLATORS' MOTION TO QUASH NON-PARTY SUBPOENAS

The Court should deny the motion to quash non-party subpoenas filed by fourteen members of the Florida House of Representatives (the "Legislators"), including thirteen who co-sponsored the Stop W.O.K.E. Act. The subpoenas seek documents highly probative of issues at the heart of Plaintiffs' intentional discrimination claim. The Legislators, in pushing for passage of the Stop W.O.K.E. Act, "singled out" out so-called "woke" topics focused on the teaching of issues related to race, racial inequalities, and anti-racism. First Am. Compl. ¶ 5, ECF No. 76. The Court already has determined that Plaintiffs have stated a viable claim that the Act violates both the First and Fourteenth Amendments. Although vocal in their support of the Act during debate, the Legislators seemingly wish to hide from scrutiny their roles in enacting that legislation, which is now being challenged.

1

They have refused to produce a single document, relying on specious claims of legislative privilege and the false assertion that the requests do not seek *any* non-privileged, relevant information and that *any* production would impose an undue burden. None of these arguments support the Legislators' refusal to comply with the subpoenas. Plaintiffs are entitled to the documents they seek, and the Legislators' motion to quash should be denied.

## BACKGROUND

Plaintiffs are challenging parts of Florida House Bill 7 (2022) ("H.B. 7" or the "Stop W.O.K.E. Act"), a law that severely curtails the discussion of race, gender, and systemic inequalities in higher education. *See* Fla. Stat. § 1000.05(4). Plaintiffs assert claims under the First Amendment and the Fourteenth Amendment's Due Process and Equal Protection Clauses. *See* First Am. Compl. ¶ 212-43. Plaintiffs seek discovery from members of the Florida Legislature related to their claim that the "Stop W.O.K.E. Act was enacted for a racially discriminatory purpose." *Id.* ¶ 237; *see also, e.g.*, *id.* ¶ 1, 4-7, 162, 165, 166.

To resolve this claim, the Court will need to determine whether racial discrimination "was a motivating factor." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). As the Court has held, "Upon review of the allegations in the complaint, Plaintiffs have alleged at least some facts

addressing every factor under *Arlington Heights*."  Order on Mot. to Dismiss at 7,

ECF No. 64. *Arlington Heights* "demands a sensitive inquiry into such

circumstantial and direct evidence of [legislative] intent." 429 U.S. at 265. This

inquiry requires courts to look into the totality of the circumstances surrounding

the Act, which includes "the contemporary statements and actions of key

legislators," "the specific sequence of events leading up to the challenged

decision," "the foreseeability of the disparate impact," and "knowledge of that

impact." *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992

F.3d 1299, 1322 (11th Cir. 2021). Defendants have denied that the Florida

Legislature enacted the Stop W.O.K.E. Act for a racially discriminatory purpose.

*See, e.g.*, Defs.' Answer ¶ 237, ECF No. 82.

Thus, Plaintiffs sent *subpoenas duces tecum* to fourteen legislators to pursue

these issues that are essential to their equal protection claim. Plaintiffs sent the

subpoenas to thirteen of the Legislators[1] because they co-sponsored H.B. 7 in the

Florida House of Representatives. They subpoenaed Representative Alex Andrade

because of his comments in support of H.B. 7 during the debate over the bill in the

---

[1]     These thirteen legislators are: Representatives Melony Bell, David Borrero,
Juan Fernandez-Barquin, Randy Fine, Randy Maggard, Ralph Massullo, Stan
McClain, Toby Overdorf, Bobby Payne, Rick Roth, Jason Shoaf, Tyler Sirois, and
Keith Truenow.

Florida House of Representatives. *See* First Am. Compl. ¶ 121 (observing that "Representative Andrade characterized concern around H.B. 7 as 'fear that the market cornered on victimhood is suddenly being jeopardized'" (citation omitted)).

The subpoenas target communications between the Legislators and other members of the Florida Legislature, Governor Ron DeSantis, Defendants, or Christopher Rufo. *See* ECF No. 91-1 at 13-17.[2] The subpoenas seek only communications discussing the Stop W.O.K.E. Act, critical race theory, Black Lives Matter, racial justice protests, and any reports, studies, or similar documents evaluating the law that the Legislators reviewed.[3] *Id.* The information Plaintiffs seek is directly relevant to the allegations in their Amended Complaint regarding the sequence of events leading up to the enactment of H.B. 7, the foreseeability of the disparate impact, and the knowledge of that impact. *See* First Am. Compl. ¶ 74-130.

---

[2]    Plaintiffs' citations reference the ECF page number in the top right corner of this exhibit, rather than the page number at the bottom of the exhibit.

[3]    Request #16 originally asked for a number of publicly available documents. *See* ECF No. 91-1 at 17. During the meet-and-confer process, Plaintiffs agreed with the Legislators to limit this request to only transcripts of speeches and public statements, to the extent they are not publicly available and not privileged. Plaintiffs agree to continue to abide by that limitation.

These allegations describe how, following the murder of George Floyd, Floridians and Americans of all races engaged in racial justice protests often organized under the banner of Black Lives Matter, including racial justice activism (from students and instructors alike) on college campuses in Florida. *Id.* ¶ 74-93. Part of Plaintiffs' theory for their equal protection claim is that the backlash to this racial justice movement inspired the Stop W.O.K.E. Act and other pieces of discriminatory legislation from the Florida Legislature in the past two years. *See id.* ¶ 94-130, 162

After Plaintiffs served their subpoenas in November 2022, the Legislators served objections on December 1, 2022. ECF No. 91-2 at 4. The parties then engaged in a lengthy meet-and-confer process to attempt to resolve the issues of legislative privilege and the scope of the subpoena without involving the Court. During this process, Plaintiffs agreed to extend the production date on the subpoenas to January 6, 2023, and then to January 13, 2023, and stipulated to the timeliness of any motion to quash filed by that date. *See* ECF No. 96-1 at 3, 5-6. Ultimately, at the parties' final meeting on January 9, 2023, Plaintiffs rejected the Legislators' final offer to search only seven terms[4] and produce only purely factual documents turned up by those searches. And the parties were too far apart on the

---

[4]     These terms were "critical race theory," "CRT," "H.B. 7," "House Bill 7," "Individual Freedom Act," "Stop W.O.K.E. Act," and "Rufo." ECF No. 96-1 at 6.

scope of legislative privilege and how to narrow the search terms to deem the continuation of the meet-and-confer process beneficial. On January 13, 2023, the Legislators filed their motion to quash. *See generally* ECF No. 91.

## ARGUMENT

The Legislators attack Plaintiffs' subpoenas on three grounds: (1) the subpoenas are barred by legislative privilege, (2) the subpoenas impose an undue burden, and (3) the subpoenas seek irrelevant information. Each of these arguments fails. Some of the information Plaintiffs seek falls outside of legislative privilege, and to the extent documents are covered by legislative privilege, the privilege yields under the circumstances of this case. Additionally, the information Plaintiffs request is highly probative, and their subpoenas are neither unreasonable nor oppressive. This Court should deny the Legislators' motion to quash.

## I.     Legislative Privilege

### A. The legislative evidentiary privilege is qualified, and precedent does not sanction the Legislators' refusal to produce documents.

The Legislators have refused to produce any documents in response to Plaintiffs' subpoenas. Instead, in their motion to quash, they argue that the legislative privilege is absolute and Plaintiffs seek only "evidence of improper legislative motive," relying on the Eleventh Circuit's *In re Hubbard* decision as the

linchpin to their argument. ECF No. 91 at 5-8. The Legislators misunderstand the relevant case law.

The Supreme Court has recognized that the legislative privilege must yield where there is a sufficiently important federal interest at stake.[5] *See United States v. Gillock*, 445 U.S. 360, 373 (1980) (holding that "where important federal interests are at stake," the legislative privilege "yields"); *see also Vill. of Arlington Heights*, 429 U.S. at 268 (recognizing that legislative privilege will not always bar members of a legislature from being called to the stand to testify about "the purpose of the official action"). *Cf. Herbert v. Lando*, 441 U.S. 153, 175 (1979) ("Evidentiary privileges in litigation are not favored, and even those rooted in the Constitution must give way in proper circumstances."). Multiple circuits, including the Eleventh Circuit, have held the same. *See, e.g.*, *Am. Trucking Associations, Inc. v. Alviti*, 14 F.4th 76, 87 (1st Cir. 2021) (noting that important federal interests can overcome assertions of legislative privilege); *Jefferson Cmty. Health Care Centers, Inc. v. Jefferson Par. Gov't*, 849 F.3d 615, 624 (5th Cir. 2017) ("While the common-law legislative immunity for state legislators is absolute, the legislative

---

[5]     Courts have found important federal interests at stake where the plaintiffs brought federal constitutional or statutory claims to vindicate the rights of the public. *See, e.g.*, *S.C. State Conf. of N.A.A.C.P. v. McMaster*, 584 F. Supp. 3d 152, 162 & n.4 (D.S.C. 2022) (collecting cases); *League of Women Voters of Fla., Inc. v. Lee*, 340 F.R.D. 446, 456-57 (N.D. Fla. 2021); *Bethune-Hill v. Virginia State Bd. of Elections*, 114 F. Supp. 3d 323, 336 (E.D. Va. 2015); *United States v. Irvin*, 127 F.R.D. 169, 174 (C.D. Cal. 1989).

7

privilege for state lawmakers is, at best, one which is qualified." (citation omitted)); *In re Hubbard*, 803 F.3d 1298, 1314 (11th Cir. 2015) (recognizing that in a different case a "strong federal interest [may] outweigh[] the interests behind the legislative privilege").

In *Hubbard*, the Eleventh Circuit considered Alabama state legislators' motion to quash subpoenas where the plaintiffs asserted a First Amendment retaliation claim and were seeking inquiry into "the [subjective] motives for legislative votes." *In re Hubbard*, 803 F.3d at 1310. The court ruled that the plaintiffs were not entitled to any documents because there was no proper basis for inquiring into motive for a First Amendment retaliation claim. *See id.* at 1312. Thus, the court had no occasion to reach the questions of the scope of legislative privilege or the circumstances under which it yields. *See id.* at 1312 n.13 ("Our decision should not be read as deciding whether, and to what extent, the legislative privilege would apply to a subpoena in a private civil action based on a different kind of constitutional claim than the one AEA made here. We address only the issues that are before us."). But the Eleventh Circuit did recognize that had there been a "strong federal interest that outweigh[ed] the interests behind the legislative privilege," the outcome may have been "different." *Id.* at 1314.

The problem for the plaintiffs in *Hubbard* was that their "subpoenas d[id] not serve an important federal interest" because "as a matter of law, the First

Amendment d[id] not support the kind of claim" they advanced. *Id.* at 1312. *Hubbard* therefore stands only for the proposition that legislators do not have to turn over documents reflecting their motives for passing legislation when the plaintiffs have no valid basis for inquiring into those motives. This case does not resemble *Hubbard*. The subjective motivations of the Legislators are squarely relevant to Plaintiffs' claim that the Stop W.O.K.E. Act violates the Equal Protection Clause. *See Vill. of Arlington Heights*, 429 U.S. at 265 (requiring "[p]roof of racially discriminatory intent or purpose").

In accordance with precedent, this Court recently concluded—in a case featuring an equal protection claim—that the legislative privilege is qualified and "gives way" in civil cases implicating important federal interests. *League of Women Voters of Fla., Inc. v. Lee*, 340 F.R.D. 446, 456-57 (N.D. Fla. 2021). Indeed, despite their assertion that the legislative privilege is absolute, the Legislators recognize this Court's *League of Women Voters* holding that the legislative privilege must yield to federal interests by arguing that Plaintiffs are only entitled to what the Court granted in that case. *See* ECF No. 91 at 9-10.

Because there is a "strong federal interest that outweighs the interests behind the legislative privilege," *In re Hubbard*, 803 F.3d at 1314—in this case, determining whether there was a discriminatory motive behind the legislation— precedent does not support the Legislators' refusal to produce documents here.

**B. Legislative privilege yields in this case.**

In assessing whether legislative privilege yields, this Court has employed "a five-factor balancing test": (1) "whether the evidence Plaintiffs seek is relevant"; (2) "whether other evidence is available"; (3) "whether the litigation is sufficiently serious"; (4) "whether the government is involved in the litigation"; and (5) "whether upholding the subpoena defeats the legislative privilege's purpose." *League of Women Voters*, 340 F.R.D. at 456 (citation omitted). This balancing test tips in favor of Plaintiffs.

*i.    Relevance of the Evidence*

The evidence Plaintiffs seek is highly probative of the issues at the heart of their equal protection claim. As this Court found in *League of Women Voters*, also a case involving an equal protection challenge, "the subjective motivations of [the law's] leading sponsors are highly relevant to many of the issues before this Court." 340 F.R.D. at 457. So too here. Plaintiffs seek documents that will shed a light on what information sponsors and key proponents of H.B. 7 had before them, the knowledge the Legislators had of the bill's potential impacts, and the

motivations of these Legislators in proposing and enacting this law. *See* ECF No. 91-1 at 4-17.[6]

Plaintiffs seek to discover "the contemporary statements and actions of key legislators," additional evidence about "the specific sequence of events leading up to the [enactment of H.B. 7]," and the information available to the Legislators about the potential impact of the Stop W.O.K.E. Act to assess "the foreseeability of the [law's] disparate impact" and "[the legislators'] knowledge of that impact." *Greater Birmingham Ministries*, 992 F.3d at 1322. *Cf. City of Carrollton Branch of the N.A.A.C.P. v. Stallings*, 829 F.2d 1547, 1552 (11th Cir. 1987) (holding that racist speech made by sponsor of act "was evidence of an [unconstitutional] intent to discriminate against black voters"). These are all evidentiary factors the Eleventh Circuit has laid out as relevant to proving "racially discriminatory intent" under *Arlington Heights*, which is required for Plaintiffs to succeed on their equal protection claim. *Greater Birmingham Ministries*, 992 F.3d at 1321. This part of the balancing test weighs in favor of disclosure.

---

[6]    Plaintiffs agree with the Legislators' statement that each of the subpoenas served on them is identical in substance, so the subpoena attached as an exhibit offers a fair representation of Plaintiffs' requests to each. *See* ECF No. 91 at 3 n.2.

### ii.    *Availability of Other Evidence*

The bulk of the evidence Plaintiffs request is only available from members of the Legislature.[7] Even if Plaintiffs were able to obtain some of the information from other sources, Plaintiffs would still need documents from the Legislators to contextualize "the specific sequence of events leading up to the [enactment of H.B. 7]," assess "the foreseeability of the [law's] disparate impact" and "[the legislators'] knowledge of that impact," and help determine whether there are relevant "contemporary statements and actions of key legislators." *Id.* at 1322. Plaintiffs seek these documents to support their intentional discrimination claim. *See S.C. State Conf. of N.A.A.C.P. v. McMaster*, 584 F. Supp. 3d 152, 165 (D.S.C. 2022) (holding while considering this same factor "that the discovery sought is likely the only way to obtain direct evidence of discrimination"). Yet, the Legislators have refused to produce any documents relevant to Plaintiffs' claims. *See League of Women Voters*, 340 F.R.D. at 457 (ruling that this factor weighed against disclosure because the members of the Florida Legislature had already

---

[7]    Plaintiffs are pursuing alternative means of acquiring evidence from other sources, including through subpoenas served on Christopher Rufo and Governor DeSantis—both of whom have or will likely oppose discovery. Plaintiffs' discussions with Rufo's counsel are ongoing in attempts to receive some discovery from him, and Governor DeSantis—like the Legislators here—will presumably assert some privilege, as he did in *League of Women Voters. See* 340 F.R.D. at 452.

produced documents). For all of these reasons, this factor weighs in favor of disclosure.

### iii.     Seriousness of the Litigation

The Court has held that cases brought by private parties seeking to vindicate public rights are sufficiently serious for this factor to weigh in favor of disclosure. *See League of Women Voters*, 340 F.R.D. at 457. This criterion is met here, where Plaintiffs have alleged serious violations of the U.S. Constitution that broadly impact the rights of educators and students of color throughout Florida. *See, e.g.*, First Am. Compl. ¶ 1-2, 9, 162-96. Specifically, Plaintiffs have alleged that the Stop W.O.K.E. Act would cause widespread harm to Black Floridians and other Floridians of color by significantly restricting their ability to provide or receive race-related instruction in higher education in the state. *See id.* ¶ 162-96.

The Legislators do not meaningfully dispute that the litigation is serious. *See* ECF No. 91 at 9. And this Court has itself recognized the seriousness of this litigation, referring to Defendants' stance as "positively dystopian" and noting that the Stop W.O.K.E. Act "affects potentially thousands of professors." *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, --- F. Supp. 3d ---, 2022 WL 16985720, at *1, 36 (N.D. Fla. 2022).

Because Plaintiffs seek to vindicate both their constitutional rights and the rights of the public, the case involves matters of serious concern. This factor weighs in favor of Plaintiffs.

### iv.     Government Involvement in Litigation

The State of Florida is involved in this litigation, but as the Court recognized, this factor "is inapt in the legislative privilege context." *League of Women Voters*, 340 F.R.D. at 457.

### v.     The Purpose of Legislative Privilege

The purpose of the legislative privilege is to avoid undue burden to the Legislators and protect their deliberations, but the burden on the Legislators is minimal here and measures can be adopted to protect materials implicating the deliberative process short of a wholesale refusal to produce documents.

In *League of Women Voters*, this Court found that this factor weighed against disclosure. *Id.* at 458. But that was a different case. There, the legislators had already turned over documents, so the discovery in dispute was limited to deposition testimony, *see id.* at 452-53, which courts have distinguished as more burdensome, *see S.C. State Conf. of N.A.A.C.P.*, 584 F. Supp. 3d at 165 ("Plaintiffs seek the production of documentary evidence rather than testimony here, and such requests are considered to be less burdensome than requirements to testify."

14

(citation omitted)). Here, the Legislators have not produced a single document, and at this juncture, Plaintiffs are not seeking to depose them. This discovery dispute presents a far more limited request at this time, thus mitigating the Legislators' concerns over a political war of attrition, ECF No. 91 at 9. The Legislators' concerns are further reduced by the Court's power to limit the scope of the subpoenas if they are unduly burdensome under Federal Rule of Civil Procedure 45.

In assessing this factor, courts have also looked to the chill that disclosure might have on legislative deliberations. *See, e.g.*, *S.C. State Conf. of N.A.A.C.P.*, 584 F. Supp. 3d at 165; *League of Women Voters*, 340 F.R.D. at 458. To the extent any chill exists with regard to particular disclosures, the concern can be addressed by the parties agreeing to protective measures to safeguard information the Legislators consider highly confidential. Plaintiffs are willing to agree to reasonable protective measures.

Moreover, the Court also possesses the discretionary power to narrow the scope of the subpoena to avoid unduly chilling legislative deliberations and conduct in-camera review, if it chooses. *See S.C. State Conf. of N.A.A.C.P.*, 584 F. Supp. 3d at 166 (limiting the disclosure of documents to avoid unnecessarily chilling legislative deliberations). Plaintiffs' interests in obtaining the evidence outweigh the Legislators' interests in nondisclosure.

15

**C. The legislative privilege only reaches the deliberative process.**

Since the balancing test tips in Plaintiffs' favor, Plaintiffs are entitled to the documents they have requested. However, even if the legislative privilege were to apply—and, for the reasons stated above, it should not—Plaintiffs are still entitled to factually based information used in the decision-making process and any opinions that fall outside the deliberative process.

This Court has held that the proper scope of the legislative privilege is coterminous with the "deliberative process privilege." *Fla. Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health & Rehab. Servs.*, 164 F.R.D. 257, 267 (N.D. Fla. 1995); *see also In re Grand Jury*, 821 F.2d 946, 958 (3d Cir. 1987) ("Although we reject a qualified speech or debate privilege, our discussion does not preclude the possibility of a more narrowly tailored privilege for confidential deliberative communications."). "The 'deliberative process privilege' applies only to confidential deliberations of law or policymaking, reflecting opinions, recommendations or advice." *Id.* at 959. Thus, this Court "limited" the legislative privilege "to communications between an elected legislative member and his or her personal staff members involving opinions, recommendations or advice about legislative decisions." *Fla. Ass'n of Rehab. Facilities*, 164 F.R.D. at 267; *see also League of Women Voters*, 340 F.R.D. at 454 (expanding the privilege to also cover communications between legislators and third parties).

16

This approach adheres to the Supreme Court's determination in *Trammel v. United States*, 445 U.S. 40 (1980), that "[common-law] privileges contravene the fundamental principle that the public has a right to every man's evidence." *Id.* at 50 (cleaned up). Thus, the Supreme Court commands that such privileges "must be strictly construed and accepted only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." *Id.*

A strict construction of the legislative privilege carries the added benefit of aligning the common-law legislative privilege with the privileges that protect the executive branch and the judiciary. For example, the presidential communications privilege, an evidentiary privileged rooted in the Constitution, protects only "documents or other materials that reflect presidential decisionmaking and deliberations and that the President believes should remain confidential." *In re Sealed Case*, 121 F.3d 729, 744 (D.C. Cir. 1997). The executive branch's deliberative process privilege, "primarily a common law privilege," *id.* at 745, protects "materials that are a direct part of the deliberative process in that they make recommendations or express opinions on legal or policy matters," *Broward Bulldog, Inc. v. U.S. Dep't of Just.*, 939 F.3d 1164, 1195 (11th Cir. 2019). And the judicial privilege "extend[s] only to communications among judges and others

17

relating to official judicial business such as, for example, the framing and researching of opinions, orders, and rulings." *Matter of Certain Complaints Under Investigation by an Investigating Comm. of Jud. Council of Eleventh Cir.*, 783 F.2d 1488, 1520 (11th Cir. 1986) ("*Hastings*"). Each of these privileges protects only the decision-making process. It would be odd to construe the legislative privilege, a privilege rooted in federal common law, in a broader manner. *See Gillock*, 445 U.S. at 372 n.10 (making clear that the Supreme Court's "interpretation of federal common law," not the U.S. Constitution, governs its approach to state legislators' assertions of legislative privilege); *see also Am. Trucking Associations*, 14 F.4th at 87 (noting that federal common law provides less protection than a constitutional provision would).

Reaffirming that the legislative privilege is coterminous with the deliberative process privilege means that purely factual documents and information fall outside the scope of the privilege. *See Fla. Ass'n of Rehab. Facilities*, 164 F.R.D. at 267-68. Plaintiffs and the Legislators have disagreed over the scope of "factually based information." The Legislators assert that it only covers meeting minutes and committee reports. *See* ECF No. 91 at 9-10 & n.9. They are mistaken. Factually based information encompasses studies, reports, demographic data, newspaper articles, and any other factual information, as long it is severable from any recommendations or advice this Court rules is privileged. *See, e.g.*, *In re Grand*

18

*Jury*, 821 F.2d at 959 ("Even if documents contain advisory opinions, factual material which is severable is not protected.").

Opinions stated by the Legislators outside the legislative process also fall outside the scope of the privilege. For example, if a legislator emailed an article about a Black Lives Matter protest along with his opinions of the protesters to another legislator without reference to any proposed or pending legislation, this communication would fall outside of the privilege because it was not part of the deliberative process. Consequently, Plaintiffs have a right to all documents not protected as part of the deliberative process.

## II.   Undue Burden and Relevance

### A. The subpoenas do not impose undue burdens on the Legislators.

Federal Rule of Civil Procedure 45 governs third-party subpoenas. This rule allows a court to "quash or modify a subpoena that . . . subjects a person to undue burden."[8] Fed. R. Civ. P. 45(d)(3)(A)(iv). "[T]o determine whether the subpoena subjects the subpoena recipient to an undue burden, one must identify both that burden as well as the interests served by demanding compliance with the subpoena." *Jordan v. Comm'r, Mississippi Dep't of Corr.*, 947 F.3d 1322, 1342

---

[8]   "Generally, modification of a subpoena is preferable to quashing it outright." *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 (5th Cir. 2004).

(11th Cir. 2020). With regard to the interests served by demanding compliance with the subpoena, "the relevance of the requested information to the underlying litigation . . . is important." *Id.* As the moving party, the Legislators have the burden of proof to demonstrate that the subpoenas are unduly burdensome. *Ubiquiti Networks, Inc. v. Kozumi USA Corp.*, 295 F.R.D. 517, 527 (N.D. Fla. 2013) (noting that the moving party must show that compliance with the subpoena is "unreasonable and oppressive" (citation omitted)). They have failed to meet that burden.[9]

Because the relevance of the information sought is an "important" consideration, *Jordan*, 947 F.3d at 1342, it bears emphasizing that the evidence Plaintiffs seek is highly probative of the issues at the heart of their equal protection claim. Plaintiffs seek to discover "the contemporary statements and actions of key legislators," additional evidence supporting their theory of "the specific sequence of events leading up to the [enactment of H.B. 7]," and the information available about the potential impact of the Stop W.O.K.E. Act to assess "the foreseeability of the [law's] disparate impact" and "[the legislators'] knowledge of that impact." *Greater Birmingham Ministries*, 992 F.3d at 1322. These are all evidentiary factors

---

[9] "That the subpoenas here are directed to nonparties makes little difference in terms of the scope the subpoenas are permitted to sweep." *Caravels LLC v. City of Gainesville, Fla.*, No. 1:20CV45-MW/GRJ, 2020 WL 10758492, at *3 (N.D. Fla. July 13, 2020).

the Eleventh Circuit has laid out as relevant to proving "racially discriminatory intent" under *Arlington Heights*, which is required for Plaintiffs to succeed on their equal protection claim. *Id.* at 1321. As this Court found in *League of Women Voters*, which also involved an equal protection challenge, "the subjective motivations of [the law's] leading sponsors are highly relevant to many of the issues before this Court." 340 F.R.D. at 457. Plaintiffs thus have strong "interests served by demanding compliance with the subpoena." *Jordan*, 947 F.3d at 1342.

In response, the Legislators offer a few arguments as to why the subpoenas are allegedly unduly burdensome: (1) Plaintiffs' definitions of "Critical Race Theory," "Racial Justice Protests," and "Black Lives Matter" are too broad, (2) the nearly three-year timeline is overbroad, and (3) Plaintiffs' insistence on a privilege log is unduly burdensome. ECF No. 91 at 10-13.

First, during the course of the meet-and-confer process, Plaintiffs offered to narrow the definitions by providing search terms, which the Legislators attached to their motion as Exhibit 3 (ECF No. 91-3). The Legislators proposed to search only seven narrow terms. *See* ECF No. 96-1 at 6. In the final meeting with the Legislators, Plaintiffs offered to reduce the number of terms and remove and

replace the broadest terms with more-targeted Boolean searches,[10] but Plaintiffs are not willing to agree to the extremely narrow searches suggested by the Legislators, particularly in light of the relevance of the information sought.

Second, Plaintiffs set a roughly two-and-a-half-year timeframe to encompass the racial justice protests and activism following George Floyd's death in the summer of 2020, President Trump's executive order on "divisive concepts" from September 2020, and Governor DeSantis's first public statements against critical race theory in March 2021, because—as detailed in the Complaint—all of these events motivated the proposal and ultimate passage of the Stop W.O.K.E. Act. *See, e.g.*, First Am. Compl. ¶ 2, 74-130 (referencing each of these events and discussing in detail how they influenced what became H.B. 7). Plaintiffs are willing to use May 25, 2020, the date of George Floyd's murder, as a starting point instead of January 1, 2020, but what happened during and following that summer is directly relevant to their intentional discrimination claim, making the requested timeframe reasonable. *See Vill. of Arlington Heights*, 429 U.S. at 267 (noting that the "historical background" behind the law is a relevant source of evidence).

---

[10]   Plaintiffs were willing to narrow search terms like "civil rights," "protest," and "racial" to alleviate the Legislators' concerns that these terms would result in too many hits.

Third, Plaintiffs seek a privilege log insofar as this Court rules that legislative privilege yields. If the Court rules that the privilege yields in full or part, Plaintiffs have a right to a privilege log. *See Bethune-Hill v. Virginia State Bd. of Elections*, 114 F. Supp. 3d 323, 345 (E.D. Va. 2015) (requiring a privilege log where court ordered selective disclosure of the allegedly privileged documents). The parties will be able to better assess the scope of the privilege log, to the extent one would be required, once the Court rules on legislative privilege.

Because Plaintiffs seek relevant information, have set a reasonable timeframe for their subpoenas, and have offered specificity on what they are seeking throughout the meet-and-confer process, Plaintiffs' subpoenas do not subject the Legislators to an undue burden. *See Caravels LLC v. City of Gainesville, Fla.*, No. 1:20CV45-MW/GRJ, 2020 WL 10758492, at *3 (N.D. Fla. July 13, 2020) (noting that "a subpoena's scope is . . . governed by principles of relevance and proportionality"); *Ubiquiti Networks, Inc.*, 295 F.R.D. at 527 (finding an undue burden—but refusing to quash the subpoenas in full—where the plaintiff's subpoenas had no time parameters and failed to describe the subject matter of the requests with any particularity). The Legislators have failed to carry their burden to prove that the subpoenas are "unreasonable and oppressive." *Id.* (citation omitted).

23

**B. The subpoenas seek relevant information.**

A court can quash a subpoena if it calls for clearly irrelevant information. *Bailey Indus., Inc. v. CLJP, Inc.*, 270 F.R.D. 662, 667 (N.D. Fla. 2010). But "[c]ourts construe relevancy 'broadly to encompass any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case.'" *Id.* (quoting *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351 (1978)). "It is the movant's burden to establish that the subpoena must be quashed," unless "the relevancy of a discovery request is not apparent." *G.H. v. Marstiller*, No. 4:19CV431-MW/CAS, 2020 WL 13228155, at *2 (N.D. Fla. Mar. 24, 2020). As set forth above, the requests are clearly relevant to Plaintiffs' equal protection claim. The Legislators have not met their burden.

Narrowly construing the relevance standard, the Legislators assert that documents regarding Black Lives Matter and racial justice protests are irrelevant. ECF No. 91 at 14-15. But they have ignored Plaintiffs' Complaint, which goes into great detail about the connections between Black Lives Matter, the racial justice protests following George Floyd's death, and the Stop W.O.K.E Act.[11] *See* First

---

[11]     Indeed, this month, the Florida Department of Education rejected an Advanced Placement African American Studies course because it purportedly "violates … the Stop WOKE Act" by teaching about the Black Lives Matter movement, among other topics. Terry Spencer, *Florida's rejection of Black history course stirs debate*, Associated Press (Jan. 23, 2023), *available at*

Am. Compl. ¶ 74-130.[12] Certainly, the documents Plaintiffs seek regarding the Legislators' views of Black Lives Matter and this racial justice activism are "reasonably calculated to lead to the discovery of admissible evidence." *Oppenheimer Fund, Inc.,* 437 U.S. at 352; *see also Vill. of Arlington Heights*, 429 U.S. at 267 (explaining that the historical context behind and the sequence of events leading up to the law are relevant sources of evidence); *League of Women Voters*, 340 F.R.D. at 457 ("[T]he subjective motivations of [the law's] leading sponsors are highly relevant to many of the issues before this Court.").

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny the Legislators' motion to quash.

## CERTIFICATE OF COMPLIANCE

This memorandum complies with the word limit of Local Rule 7.1(F) because it contains 5,752 words.

---

https://apnews.com/article/ron-desantis-florida-education-6603c0aa4de0098423eb7b6c04846d0c.

[12]    Plaintiffs' original Complaint also included this discussion. *See* Compl. ¶ 73-128, ECF No. 1.

25

Respectfully submitted,

Dated: January 27, 2023

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF FLORIDA, INC.**

/s/ Jerry Edwards
Jerry Edwards
Fla. Bar No. 1003437
933 Lee Road, Suite 102
Orlando, FL 32810
(786) 363-1107
jedwards@aclufl.org

Daniel B. Tilley
Fla. Bar No. 102882
Katherine H. Blankenship
Fla. Bar No. 1031234
Caroline McNamara
Florida Bar No. 1038312
4343 West Flagler Street, Suite 400
Miami, Florida 33134
(786) 363-2707
dtilley@aclufl.org
kblankenship@aclufl.org
cmcnamara@aclufl.org

Jacqueline Azis
Florida Bar No. 101057
4023 N. Armenia Avenue, Suite 450
Tampa, Florida 33607
(786) 363-2708
jazis@aclufl.org

**NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.**

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
/s/ Leah Watson
Leah Watson*
Sarah Hinger*
Emerson Sykes*
Laura Moraff*
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
lwatson@aclu.org
shinger@aclu.org
esykes@aclu.org
lmoraff@aclu.org

**BALLARD SPAHR LLP**

/s/ Jason Leckerman
Jason Leckerman*
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
(215) 864-8266
leckermanj@ballardspahr.com

Charles Tobin
Fla. Bar No. 816345
1909 K Street NW, 12th Floor
Washington, D.C. 20006
(202) 661-2200
tobinc@ballardspahr.com

Jacqueline Mabatah*
201 South Main Street, Suite 800
Salt Lake City, UT 84111-2221
(801) 531-3063

26

/s/ Lauren A. Johnson
Lauren A. Johnson*
Jin Hee Lee*
Charles McLaurin*
Santino Coleman*
700 14th Street, Ste. 600
Washington, D.C. 20005†
(202) 682-1300
ljohnson@naacpldf.org
jlee@naacpldf.org
cmclaurin@naacpldf.org
scoleman@naacpldf.org

Alexsis Johnson*
40 Rector Street, 5th Floor
New York, NY 10006
(212) 217-1690
amjohnson@naacpldf.org

*Counsel for Plaintiffs*

mabatahj@ballardspahr.com

Isabella Salomão Nascimento*
2000 IDS Center, 80 South 8th Street
Minneapolis, MN 55402-2119
(612) 371-3281
salomaonascimentoi@ballardspahr.com

†Mailing address *only*
*Admitted *pro hac vice*